IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

RECEIVED

2011 JUN -8  A 11: 39

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

```
------------------------------------------------------ x
                                                        :
THOMAS D. ARTHUR,                                       :
                                                        :
                    Plaintiff,                          :
                                                        :
          v.                                            :
                                                        :
KIM THOMAS, INTERIM                                     :
COMMISSIONER, ALABAMA                                   :
DEPARTMENT OF CORRECTIONS,                              :
in his official capacity,                               :
                                                        :
ANTHONY PATTERSON, WARDEN,                              :
HOLMAN CORRECTIONAL FACILITY,                           :
in his official capacity, and                           :
                                                        :
OTHER UNKNOWN EMPLOYEES AND                             :
AGENTS, ALABAMA DEPARTMENT                              :
OF CORRECTIONS,                                         :
in their official capacities,                           :
                                                        :
                    Defendants.                         :
                                                        :
------------------------------------------------------ x
```

CIVIL ACTION NO. *cv.2:11-Cv-438 WFF*

**COMPLAINT**

## NATURE OF ACTION

1.      Plaintiff Thomas D. Arthur is a death row inmate in Alabama.  No execution date

has been scheduled.  Mr. Arthur brings this action pursuant to 42 U.S.C. § 1983 for violations

and threatened violations of his right to due process and to be free from cruel and unusual

punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

Defendants intend to execute him using a lethal injection protocol developed in secrecy and haste

after the U.S. Drug Enforcement Administration ("DEA") seized Alabama's supply of sodium

thiopental, the first drug in Alabama's previous (now-defunct) three-drug protocol.  Defendants

failed to disclose this seizure until nearly a month after it had occurred, allowing the Alabama

Supreme Court to set execution dates without knowledge that Defendants lacked a key ingredient

for the lethal injection.  Shortly before the scheduled execution of Jason Oric Williams,

Defendants announced that they would replace sodium thiopental, an anesthetic, with

pentobarbital, a sedative.  Because Alabama's lethal injection protocol is not publicly available

or subject to the Alabama Administrative Procedures Act ("AAPA"), Chapter 22 of Title 41 of

the Code of Alabama, nobody—not the public at large, the courts, death row inmates or their

counsel—was informed of this change before it took effect or given any opportunity to review or

comment on the modified protocol.

2.     Alabama employs lethal injection as its default method of execution.  Ala. Code

§ 15-18-82.1(a) (1975).  Many states' protocols are publicly available, but Defendants keep their

lethal injection protocol confidential and have proffered no justification for keeping it from

public view.  Further, under Section 15-18-82.1(g), the policies and procedures of the Alabama

Department of Corrections ("DOC") for execution of persons sentenced to death are exempt

from the AAPA—in sharp contrast to the public comment process required in the context of

animal euthanasia procedures.  *See* Ala. Code §§ 34-29-69; 34-29-131.

3.     Mr. Arthur brings this action promptly following the execution on May 19, 2011

of Mr. Williams under the State's new lethal injection protocol, at which time it became apparent

that Defendants were proceeding with an amended protocol and could utilize this protocol—or

any other adopted protocol without any notice to Mr. Arthur—if an execution date were set for

him.

4.     Mr. Arthur's previous attempts to challenge Alabama's lethal injection protocol

were never reviewed on the merits.  In fact, Alabama routinely seeks and obtains dismissals of

lawsuits challenging the constitutionality of Alabama's lethal injection protocol on procedural

grounds. *See Hallford* v. *Allen*, 576 F.3d 1221, 1222 (11th Cir. 2009) (dismissed for

unreasonable delay); *McNair* v. *Allen*, 515 F.3d 1168, 1170 (11th Cir. 2008) (dismissed on

statute of limitations grounds); *Arthur* v. *Allen*, 248 Fed. App'x 128, 132 (11th Cir. 2007)

(dismissed for unreasonable delay); *Grayson* v. *Allen*, 491 F.3d 1318, 1319 (11th Cir. 2007)

(dismissed for laches). Defendants' lethal injection protocols have never been reviewed on the

merits by any court, *see, e.g.*, *Ex parte Belisle*, 11 So. 3d 323, 338-39 (Ala. 2008) (no trial on the

merits), and inmates and their counsel are routinely denied even *access* to such protocol, *see,*

*e.g.*, *Powell* v. *Thomas*, Order Denying Motion to Compel Discovery of Lethal Injection

Protocol, No 2:11-CV-376-WKW (M.D. Ala. May 19, 2011).

     5.     Unlike the procedures in Kentucky adjudicated in *Baze* v. *Rees*, 553 U.S. 35

(2008) and reviewed by the trial court in Kentucky, Alabama's lethal injection protocol has not

been subjected to a trial on the merits and should not enjoy a presumption of constitutionality.

Defendants cannot be permitted to surreptitiously and hurriedly change the lethal injection

protocol at any time without affording any public comment or sufficient scientific study to

confirm that the procedure they intend to use creates no "substantial risk of serious harm." *Baze*,

553 U.S. at 50.

     6.     Defendants claim that their protocol for carrying out Alabama's statutory method

of execution induces death only after a condemned prisoner has been rendered unconscious and

unable to experience pain. But recent actions by Defendants to modify the protocol with no

notice or opportunity to respond by Mr. Arthur, any other death row inmate, or the citizens of the

State of Alabama, demonstrate that an inmate can never be sure that his or her execution—the

protocol for which may change at any time up to the minute of execution—will comport with the

requirements of *Baze* or evolving standards of decency.

7.     Because Defendants have unfettered discretion to change the lethal injection protocol, nothing prevents Defendants from changing Alabama's protocol up until the moment of an inmate's execution.  Even if a court were to uphold the constitutionality of Alabama's protocol based on a review of the merits, there is simply no way of knowing that this same protocol will be the one actually used to carry out the execution.  Thus, no person under sentence of death in Alabama can ever know with certainty the drugs to be administered or the method of administration that will be used to execute him.

8.     Although Defendants seek to execute Mr. Arthur by lethal injection, Defendants have denied the request by Mr. Arthur's counsel for a copy of the current protocol.  Defendants' denial of access to the protocol and failure to provide notice of material changes to the protocol are arbitrary and capricious and in violation of Mr. Arthur's Eighth Amendment and Fourteenth Amendment rights.

## JURISDICTION AND VENUE

9.     Jurisdiction over this matter arises under 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 2201, and 28 U.S.C. § 2202.

10.     Venue is appropriate in the Middle District of Alabama under 28 U.S.C. § 1391(b).

## PARTIES

11.     Thomas D. Arthur is a United States citizen and resident of the State of Alabama. He is currently a prisoner under the supervision of Defendants.

12.     Defendant Kim Thomas is the Interim Commissioner of the DOC.

13.     Defendant Anthony Patterson is the Warden of the Holman Correctional Facility in Atmore, Alabama, where Mr. Arthur is currently incarcerated and where Alabama conducts its executions by lethal injection.

14.     Unknown Employees and Agents of the DOC are involved in the development and carrying out of executions by lethal injection.  Mr. Arthur does not know the identities of these persons.

15.     All Defendants are being sued in their official capacities.  The named Defendants are citizens and residents of the State of Alabama.

**JUSTICIABLE CASE OR CONTROVERSY**

16.     There is a real and justiciable case or controversy between the parties.

17.     Upon information and belief, Defendants have adopted a written and confidential lethal injection protocol for administering capital punishment by lethal injection.

18.     This protocol differs in a material way from the protocol used in previous executions by lethal injection in Alabama because it substitutes pentobarbital, a sedative, for sodium thiopental, an anesthetic.  Mr. Arthur has made a prima facie showing that this modification or others unknown to Mr. Arthur will increase his suffering.  *See Getsy* v. *Strickland*, 577 F. 3d 309, 313 (6th Cir. 2009).

19.     Mr. Arthur challenges the constitutionality of Alabama's recently revised lethal injection procedures under 42 U.S.C. § 1983.  This lawsuit does not challenge the fact of Mr. Arthur's death sentence or the constitutionality of Alabama's statute requiring execution by lethal injection.

20.     Upon information and belief, there is no administrative grievance process available at Holman Correctional Facility for Mr. Arthur or other death row inmates to  challenge

the procedures to be employed during their execution. Although counsel for Mr. Arthur requested a copy of the entire lethal injection protocol on May 24, 2011 from Defendants through Alabama Assistant Attorney General J. Clayton Crenshaw, a copy has not been provided.

21.     Under Ala. Code § 15-18-82.1(g), the policies and procedures of the DOC for execution of persons sentenced to death are confidential and exempt from the AAPA, and Mr. Arthur can never be sure that the secret procedures used to execute him will comply with constitutional requirements.

22.     Absent judicial intervention, Mr. Arthur will be executed pursuant to Defendants' arbitrary and capricious lethal injection procedures. There is a justiciable case or controversy regarding the unconstitutionality of these lethal injection procedures, the unnecessary risk of pain and suffering inherent in the procedures, and Defendants' secrecy surrounding the procedures.

## BACKGROUND

23.     Mr. Arthur was convicted of capital murder in the Circuit Court of Jefferson County, Alabama, on December 5, 1991, and sentenced to death on January 24, 1992, even though no physical evidence linked Mr. Arthur to the crime.

24.     Through various proceedings in the state and federal courts, Mr. Arthur maintained his innocence and sought access to several pieces of physical evidence for purposes of DNA testing, including a rape kit prepared on the morning of the murder of Troy Wicker. The State opposed Mr. Arthur's requests for DNA testing, and Mr. Arthur litigated his right to test the physical evidence for six years without success. Following denial of post-conviction relief as untimely, the Alabama Supreme Court set an execution date of July 31, 2008 for Mr. Arthur.

25.     On July 28, 2008, an inmate at St. Clair Correctional Facility, Bobby Ray Gilbert, confessed in a sworn affidavit to committing the murder for which Mr. Arthur had been convicted.  Gilbert stated that he had an affair with Judy Wicker who paid him to kill her husband, Troy Wicker.  Gilbert also stated that he had disguised himself as an African-American man by wearing a wig before, during and after the murder, and that he had unprotected sex with Judy Wicker after committing the crime.

26.     Based on Gilbert's confession, on July 29, 2008, Mr. Arthur filed an emergency Rule 32 petition for post-conviction relief, asserting a claim of actual innocence and requesting DNA testing of the wig and the rape kit to help prove that claim.

27.     The State opposed the petition on July 30, 2008, and disclosed for the *very first time*, on the eve of Mr. Arthur's scheduled execution, that the rape kit—which had been the subject of several years of litigation and numerous judicial decisions and letter requests from counsel *since 2002*—could not be located.  Much like the timing of the State's disclosure of the seizure of its sodium thiopental and resulting changes to the lethal injection process, this disclosure was made not when the State first discovered the information but when the State apparently recognized that others—including opposing counsel—would discover it also.

28.     On July 30, 2008, the Alabama Supreme Court issued an order staying Mr. Arthur's execution and remanded the case to the Jefferson County Circuit Court to adjudicate Mr. Arthur's Rule 32 petition.

29.     The Jefferson County Circuit Court held a two-day hearing and ordered limited DNA testing on the available evidence, which did not include the missing rape kit.  The rape kit was never located by the State.  Neither Mr. Arthur's nor Mr. Gilbert's DNA was detected on any of the available evidence that was tested.  A critical piece of evidence—the wig worn by the

perpetrator—was not subjected to DNA testing because the Alabama Department of Forensic

Sciences ("ADFS") lacked the technology to develop a DNA profile on this evidence.  Despite

the existence of more advanced technology for DNA testing of the wig and pro bono counsel's

offer to pay for such testing, the Circuit Court denied Mr. Arthur's Rule 32 petition and request

for additional testing on September 1, 2009.  The Court of Criminal Appeals affirmed the

judgment on April 30, 2010.  An application for rehearing was filed on May 14, 2010 and

overruled on June 11, 2010.

## ALABAMA'S LETHAL INJECTION PROCESS

**A.   Alabama's Attempt to Obtain a Key Ingredient for Its Lethal Injection Protocol Fails.**

30.   On January 11, 2011, the State of Alabama filed a motion to set an execution date

for Jason Williams.

31.   On January 13, 2011, death row inmate Leroy White was executed by the State of

Alabama.  Upon information and belief, sodium thiopental was used as the first drug in a three-

drug sequence to execute Mr. White by lethal injection.

32.   On January 18, 2011, the State of Alabama moved the Alabama Supreme Court to

set an execution date for another death row inmate, Eddie D. Powell.  In that motion, there was

no reference to any possible shortage of sodium thiopental.  (Attached as Exhibit A.)

33.   At that time, several state departments of corrections, including the Alabama

DOC, had apparently been struggling for months to secure sufficient supplies of this ingredient

for lethal injection.  Dominic Casciani, *US Lethal Injection Drug Faces UK Export Restrictions*,

BBC NEWS, Nov. 29, 2010, http://www.bbc.co.uk/news/uk-11865881.  (Attached as Exhibit B.)

34.   On November 29, 2010, U.K. Business Secretary Vince Cable imposed an

immediate ban on the export of sodium thiopental to the United States, under the U.K.'s Export

Control Act, because of the drug's use in human executions. *See Human Rights Victory as Vince Cable Imposes Restrictions on Export of 'Execution' Drug to U.S.*, DAILY MAIL ONLINE (November 29, 2010), http://www.dailymail.co.uk/news/article-1334090/Vince-Cable-bows-human-rights-controls-lethal-execution-drug-export.html. (Attached as Exhibit C.)

35.     On January 21, 2011, Hospira, the only remaining U.S. supplier of sodium thiopental, announced that it would exit the sodium thiopental market entirely. *Hospira Statement Regarding Pentothal (sodium thiopental) Market Exit*, Jan. 21, 2011. (Attached as Exhibit D.) Hospira's official statement noted that the company had "never condoned" the use of its product in capital punishment. *Id.* Although Hospira, a global pharmaceutical company, initially considered continuing to manufacture this drug in Italy, the Italian authorities required assurance that sodium thiopental would not be used in human executions if exported to the United States. *Id.* Despite attempts to obtain this assurance from its wholesalers, Hospira was informed that there was no means of preventing the drug from being "diverted to departments of corrections for use in capital punishment procedures." *Id.* Fearing the company's liability to the Italian authorities and given "issues" with the product, Hospira discontinued all production, expressing regret that "many hospital customers who use the drug for its well-established medical benefits will not be able to obtain the product." *Id.*

36.     On January 24, 2011, the Vice President of the German Medical Association advised all of Germany's pharmaceutical companies to refrain from selling sodium thiopental to the United States, due to the "ethical responsibility" not to provide the product for non-medical use. Melissa Eddy, *German doctors: No sodium thiopental to U.S.*, ASSOCIATED PRESS, Jan. 24, 2011, http://www.msnbc.msn.com/id/41233372/ns/health-health_care/t/german-doctors-no-sodium-thiopental-us/. (Attached as Exhibit E.) Germany's Health Minister Philipp Roessler

also urged German pharmaceutical manufacturers to ignore any possible U.S. requests for delivery of the drug. *Id.*

37.    As a result of the consensus among both foreign and domestic manufacturers of sodium thiopental that the drug should not be used in executions, states authorizing capital punishment by lethal injection were unable to replenish their supplies.

38.    Such consensus is relevant here. The United States Supreme Court has considered international opinion in assessing the constitutionality of actions under the Eighth Amendment. *See Roper* v. *Simmons*, 543 U.S. 551, 575, 578 (2005) (referencing the "stark reality that the United States is the only country in the world that continues to give official sanction to the juvenile death penalty" and explaining that "[i]t does not lessen our fidelity to the Constitution or our pride in its origins to acknowledge that the express affirmation of certain fundamental rights by other nations and peoples simply underscores the centrality of those same rights within our own heritage of freedom"); *Atkins* v. *Virginia*,  536 U.S. 304, 316 n.21 (2002) (recognizing that "within the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved"); *Thompson* v. *Oklahoma*, 487 U.S. 815, 830, 831 n.31 (1988) (recognizing "the relevance of views of the international community in determining whether a punishment is cruel and unusual" and noting that executing a person under 16 at the time of the offense offends civilized standards of decency common to "other nations that share our Anglo-American heritage [and] the leading members of the Western European community");  *Enmund* v. *Florida*, 458 U.S. 782, 796-97 n.22 (1982) (noting that "felony murder has been abolished in England and India, severely restricted in Canada and a number of other Commonwealth countries, and is unknown in continental Europe"); *Coker* v. *Georgia*, 433 U.S. 584, 595 n.10 (1977) ("It is . . . not irrelevant here that out

of 60 major nations in the world surveyed in 1965, only 3 retained the death penalty for rape where death did not ensue.").

39.     Due to its inability to obtain sodium thiopental from manufacturers and faced with dwindling supplies, on January 25, 2011, Alabama, along with 13 other states, sent a letter to Attorney General Eric Holder requesting assistance in obtaining sodium thiopental to carry out executions.  (Attached as Exhibit F.)

40.     On March 15, 2011, Defendants secretly obtained a supply of eight grams of sodium thiopental from the Tennessee Department of Corrections, in apparent violation of the Federal Controlled Substances Act, 21 U.S.C. § 954(2) and 21 U.S.C. § 822(a)-(b).

41.     One week later, on March 22, 2011, the DEA seized Tennessee's stock of sodium thiopental.  The eight grams of sodium thiopental that Alabama covertly obtained from Tennessee appear to have come from the very same stock seized by the DEA.

42.     Unbeknownst to the courts, inmates or their counsel, or the citizens of the State of Alabama, the eight grams of sodium thiopental Alabama obtained from Tennessee were also seized by the DEA, less than one week after Alabama had obtained them.  Bob Johnson, *Alabama Switches Key Drug for Execution Next Month*, ASSOCIATED PRESS, Apr. 26, 2011, http://news.yahoo.com/s/ap/20110427/ap_on_re_us/us_execution_drug_shortage_3.  (Attached as Exhibit G.)

43.     Defendants did not disclose to the public or Mr. Arthur or his counsel that they were no longer in possession of a supply of sodium thiopental, that the stock obtained from Tennessee had been seized by the DEA, or that Alabama intended to alter its lethal injection protocol because the State could no longer obtain a necessary ingredient.  Nor did the State

advise the Alabama Supreme Court of these crucial facts in its motions to set execution dates for Jason Williams and Eddie Powell.

44.     On March 31, 2011, the State of Alabama executed William Boyd.  Upon information and belief, Mr. Boyd was executed using sodium thiopental.  Aside from the batch obtained from Tennessee, upon information and belief, the only remaining sodium thiopental in Defendants' possession expired on April 1, 2011.

45.     On April 15, 2011, unaware that Defendants had recently surrendered their existing batch of sodium thiopental from Tennessee and thus were missing a crucial ingredient in the lethal injection protocol, the Alabama Supreme Court set execution dates of May 19, 2011 for Jason Williams and June 16, 2011 for Eddie Powell.

46.     On April 15, 2011, the Supreme Court of Alabama denied Mr. Arthur's Petition for Certiorari review of his Rule 32 petition for post-conviction relief.  *Ex parte Arthur*, No. 1951985 (Ala. Apr. 15, 2011).  Five days later, the State filed a motion to set an execution date for Mr. Arthur on April 20, 2011.  As in its prior motions, the State failed to advise the Court that Defendants intended to alter Alabama's lethal injection protocol because the State could no longer obtain a necessary ingredient.  The Alabama Supreme Court has not set an execution date, and Mr. Arthur has filed an opposition to the State's motion.

47.     On April 22, 2011, based on public records obtained from Tennessee, and unaware that the DEA had already seized Alabama's sodium thiopental, attorneys from the Equal Justice Initiative wrote a letter to Attorney General Eric Holder asking that the United States Department of Justice investigate Alabama's receipt of sodium thiopental from Tennessee. (Attached as Exhibit H.)

48.     On April 26, 2011, for the very first time, Defendants revealed that nearly a month earlier the State's sodium thiopental had been seized by the DEA—less than a week after it had been obtained from Tennessee. *See* Ex. G. That same day, the State announced—without public comment or review—that it was switching drugs in the lethal injection protocol from sodium thiopental, an anesthetic, to pentobarbital. *Id.* There was no mention, however, that pentobarbital is a sedative used to euthanize animals.

49.     On May 19, 2011, Mr. Williams became the first inmate to be executed in Alabama using pentobarbital in place of sodium thiopental in the State's three-drug lethal injection. Prior to his execution, Mr. Williams was denied discovery of the confidential Alabama lethal injection protocol. *Powell*, Order Denying Motion to Compel Discovery of Lethal Injection Protocol, No 2:11-CV-376-WKW (M.D. Ala. May 19, 2011).

### B.     Alabama Secretly Changes Its Lethal Injection Protocol.

50.     Although Alabama's lethal injection protocol has been provided in discovery in civil rights cases, such disclosures have been made only under seal and subject to strict confidentiality requirements. *See, e.g., Siebert* v. *Allen*, No. 2:07-cv-295, 2007 WL 2903009, at *7 (M.D. Ala. Oct. 3, 2007) (noting that defendants were ordered to provide a copy of Alabama's lethal injection protocol under seal and that the parties signed a confidentiality agreement regarding the protocol). As a result of this secrecy, no person under sentence of death in Alabama can ever know the drugs to be administered, or the method of administration that will be used to execute him, unless such inmate brings a lawsuit. However, because Alabama is able to change its lethal injection protocol without providing any notice, an inmate would not know whether he should bring a lawsuit to challenge such protocol in the first place. Due to this secrecy, no person under sentence of death in Alabama can show that this unknown lethal

injection protocol will create a substantial risk of serious harm, or an objectively intolerable risk of harm. *See Baze*, U.S. at 50 (*citing Farmer* v. *Brennan*, 511 U.S. 825, 842, 846 & n.9 (1994)).

51.     Under Alabama law, Defendants are responsible for carrying out executions, all of which take place at Holman Correctional Facility. Alabama law merely states that death-sentenced inmates are to be executed by "lethal injection." Ala. Code §§ 15-18-82 to 82.1. Alabama law does not prescribe specific drugs, dosages, drug combinations, or sequences or the manner of administering lethal chemicals to carry out executions. Nor does it prescribe any certification, training or licensing required of those who participate in either the anesthesia process or the execution.

52.     The Alabama legislature has exempted the DOC from complying with the AAPA with respect to the State's lethal injection protocol. Ala. Code § 15-18-82.1(g). ("The policies and procedures of the Department of Corrections for execution of persons sentenced to death shall be exempt from the Alabama Administrative Procedure Act, Chapter 22 of Title 41.").

53.     In other respects, however, the DOC is subject to the AAPA. *See* Ala. Code §§ 41-22-2(d), 14-1-11. In promulgating rules, the DOC must give at least 35 days' notice of its intended action to give "all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing." Ala. Code § 41-22-5(a)(1), (2). The promulgated rule must then be kept in an official register with the agency secretary for public access. Ala. Code § 41-22-7(a). Thus, when the DOC decided to define, for example, the professional attire of its employees, it was required to propose that definition for 35 days, allow public comment, and then maintain a public version of the resulting rules for public access. Ala. Code § 41-22-5(a)(1)-(2); Ala. DOC Reg. 217, *available at*

http://www.doc.state.al.us/docs/AdminRegs/AR217.pdf). In sharp contrast, the DOC has not

provided "all interested persons"—or any person for that matter—"reasonable opportunity to submit data, views, or arguments, orally or in writing" on its manner of human execution or maintained any version of the protocol for public or even inmate access.

54.     The exemption from public comment of Alabama's lethal injection protocol also contrasts sharply with the public comment process the State of Alabama requires of the Alabama State Board of Veterinary Medical Examiners ("ASBVME") in the context of animal euthanasia. *See* Ala. Code § 34-29-69 (giving the ASBVME authority to "adopt, amend, or repeal all rules necessary for its governance and all regulations necessary to carry into effect the provisions of this article in accordance with the Administrative Procedure Act," and stating that the regulations enacted by the ABSVME "shall be published and distributed to all licensed Alabama veterinarians and to all applicants for licensing," that "[a]ny proposed changes to the administrative code shall be published in the official newsletter of the Alabama Veterinary Medical Association and mailed to all Alabama licensed veterinarians," and that "[a] period of 10 days shall be allowed to post publication or notification so that any Alabama licensed veterinarian opposing the changes has time to request a hearing as hereafter provided").

55.     Despite the fact that a period of ten days is provided for all Alabama licensed veterinarians to oppose changes to an *animal* euthanasia protocol, and that 35 days of public comment were required to amend the length of the pants DOC officers could wear, no such period is given to licensed physicians, anesthesiologists, or other medical personnel for *human* lethal injection protocols. Such a policy is not consistent with the "fundamental respect for humanity underlying the Eighth Amendment." *Woodson* v. *North Carolina*, 428 U.S. 280, 304 (1976).

56.     Although Alabama's lethal injection protocol is secret, upon information and belief, Defendants have used a series of three drugs, administered sequentially, to attempt to achieve first a loss of consciousness and sensation, then paralysis, and finally death by cardiac arrest. Upon information and belief, from 2002 until April 26, 2011, Defendants conducted lethal injections by successive injections of sodium thiopental, pancuronium bromide, and potassium chloride.

57.     Upon information and belief, the drug that Defendants now intend to use as the first drug in the sequence, pentobarbital, is not an ultra-short-acting barbiturate like sodium thiopental. Pentobarbital is not commonly used in humans at all, even as an anesthetic. Greg Bluestein, *Replacement Execution Drug Ample But Has Issues*, ASSOCIATED PRESS, Mar. 2, 2011, http://abcnews.go.com/US/wireStory?id=13040160. (Attached as Exhibit I.) ("Using pentobarbital for lethal injections also raises medical questions, since it has only been used in a few executions and rarely is used in humans. [Dr. David Varlotta, a Tampa, Fla., anesthesiologist who sits on the board of the American Society of Anesthesiologists] . . . said he has not used pentobarbital since 1986. 'If departments of corrections are moving toward pentobarbital, they're moving away from the expertise of anesthesiologists,' said Varlotta.").

58.     Sodium thiopental and pentobarbital are not reliably interchangeable. Pentobarbital is less lipid-soluble than sodium thiopental, meaning that it penetrates the brain less rapidly and causes the onset of anesthesia after intravenous injection to occur more slowly. Because, in medical contexts, pentobarbital is not used to induce loss of consciousness and loss of sensation, there is no standard clinical dose for that purpose. Expert Report of David V. Waisel, MD ¶ 17 (Oct. 29, 2010) (the "Waisel Report"). (Attached as Exhibit J.) Indeed, the sole U.S. manufacturer of pentobarbital, Lundbeck, Inc., has notified several states' departments

of corrections, including the Alabama DOC, that the company is opposed to the use of pentobarbital for executions because the drug was not intended for such a purpose. *See* Letter from Lundbeck to Ohio Department of Rehabilitation and Correction (Jan. 26, 2011). (Attached as Exhibit K.)

59.     Although pentobarbital is used in animal euthanasia, it is not used as part of a three-drug protocol. Ty Alper, *Anesthetizing the Public Conscience: Lethal Injection and Animal Euthanasia*, 35 FORDHAM URB. L.J. 817, 851 (2008) ("People are never executed using the anesthetic-only procedure that veterinarians and shelter workers use on animals. And animals are never euthanized by the three-drug formula prison officials use on human beings."). It is therefore unwarranted to use pentobarbital on humans in a three-drug protocol without further testing. *See* Ex. J ¶ 15, 22 (finding that the "lack of knowledge about dosing pentobarbital" and "significant unknowns and a lack of clinical history related to using pentobarbital to induce anesthesia [and] inadequate implementation of procedural safeguards . . . puts the inmate at risk for serious undue pain and suffering").

60.     While pentobarbital is used in medical contexts to create a state of sedation, sedation is not the same as a loss of consciousness and loss of sensation. Greg Taposci, *Three Steps to Death: The Use of the Drug Pavulon in the Lethal Injection Protocol Utilized Today Violates the Eighth Amendment's Protections Against Cruel and Unusual Punishment*, 35 OHIO N.U. L. REV. 425, 441-42 (2009) (use of sedatives in tripartite drug protocols should be stayed pending further study). Sedated individuals can be aware and can feel pain. Ex. J ¶ 22.

61.     Upon information and belief, Defendants administer pancuronium bromide as the second drug in the three-drug lethal injection sequence. Pancuronium bromide paralyzes voluntary muscles, including the diaphragm, but does not affect consciousness or the perception

of pain.  If the pentobarbital fails to establish and maintain loss of consciousness and loss of sensation, the pancuronium bromide serves only to mask the inmate's pain and suffering from observers.  It does not prevent the inmate from suffering a painful death by asphyxiation.

62.     Upon information and belief, anesthetic depth cannot be reliably determined during an execution under the State's lethal injection protocol because the pancuronium bromide precludes an accurate assessment by observers, paralyzing all of the muscles which would otherwise move when a prisoner is in excruciating pain.  Because no one can reliably assess anesthetic depth using this process (and make appropriate adjustments), the procedures Defendants use can result in conscious paralysis (and therefore suffocation), which is masked from observers by the use of pancuronium bromide.

63.     Upon information and belief, the third drug in the three-drug protocol, and the substance intended to cause death, is potassium chloride.  Potassium chloride disrupts the normal electrical activity of the heart and stops it from pumping blood, thereby causing cardiac arrest.  As it travels in the bloodstream from the site of injection towards the heart, potassium chloride activates all of the nerve fibers inside the vein, causing a burning sensation as it travels through the body and destroys the internal organs.  Absent complete anesthesia, the injection of potassium chloride causes excruciating pain that is agonizing for a recipient.  *See* Alper, 35 FORDHAM URB. L.J. at 828-29 (citing *Conner* v. *N.C. Council of State*, Nos. 07-GOV-0238, 07-GOV-0264, at 5 (N.C.O.A.H. Aug., 9, 2007) ("If the pentothal [pentobarbital] is not properly administered, an inmate could be conscious and suffer a very painful death from the other two lethal drugs.  If not unconscious but paralyzed, an inmate would not be able to move or scream while painfully suffocating or when the deadly, burning potassium chloride is injected into the veins causing more excruciating pain while stopping the heart.")).

18

64.     The State's expert in *Williams* v. *Alabama*, No 1960223 (Ala. May 4, 2011), Dr. Mark Dershwitz, a board-certified anesthesiologist and Professor of Anesthesiology and Biochemistry and Molecular Pharmacology at the University of Massachusetts, opines that "a dose of 2,500 mg of pentobarbital [the dosage Dershwitz asserts is used in Alabama's lethal injection protocol] will cause virtually all persons to stop breathing."  Expert Report of Mark Dershwitz ¶ 12.  (Attached as Exhibit L.)  According to Dr. Dershwitz, 2,500 mg of pentobarbital "by itself would cause death to almost everyone."  *Id.*  If Dershwitz's statements are in fact true and it is the case that the first drug in the process (if administered properly— which cannot be assumed given Defendants' failure to use medically trained professionals for its executions) kills the inmate, the gratuitous injection of two additional drugs only underscores the haphazard scientific approach the State of Alabama has taken in setting—behind closed doors and without public comment—its current protocol.  The gratuitous injection unnecessarily prolongs the execution, heaps further indignity on the inmate, and unnecessarily and substantially increases the risk of pain and suffering.

65.     Upon information and belief, the State of Alabama's existing lethal injection protocol does not require the personnel who perform the tasks of anesthetizing and executing the prisoner to have any minimum qualifications or expertise.  Training, experience and supervision are essential to ensuring that an execution will be humane and comport with the requirements of the Eighth Amendment.  Upon information and belief, Defendants do not adequately ensure that the individuals responsible for inducing and maintaining unconsciousness are credentialed, licensed and proficient in the knowledge, skills and procedures necessary to establish an appropriate plane of anesthesia throughout the lethal injection process, notwithstanding the fact that it is a complex medical procedure that requires expertise if it is to be performed correctly.

*See* Alper, 35 FORDHAM URB. L.J. at 820 (describing "problems at every step of the process, including the mixing of the drugs; the setting of the IV lines; the administration of the drugs; and the monitoring of their effectiveness").

66.     Because pentobarbital is not even used medically to induce loss of consciousness and loss of sensation, there is no standard clinical dose of pentobarbital used to induce anesthesia.  The potential absence of credentialed, licensed, and proficient medical personnel and lack of procedural safeguards increases the risk that a prisoner will not be properly anesthetized prior to pancuronium bromide-induced paralysis, leaving the prisoner exposed to the extremely painful internal burning caused by the potassium chloride.

67.     Defendants' secrecy denies Mr. Arthur and other death-sentenced inmates the ability to effectively enforce their Eighth Amendment rights through the judicial system. Without notice of the adopted procedures, inmates are left to allege claims based only on the limited information occasionally made public at the State's discretion.  Given the State of Alabama's grant of unfettered and unsupervised discretion to the DOC in implementing a lethal injection protocol, *see* Ala. Code § 15-18-82 to 82.1, Defendants could change the State's procedures for any reason, with no oversight and no notice to the public or to the condemned.

68.     The combination of these factors results in a system where Defendants receive no medical, judicial or public oversight—indeed, no oversight of any sort—of their execution procedures.  Nothing prevents Defendants from changing the lethal injection protocol up until the moment of an inmate's execution.  Accordingly, even if a court were to find that Alabama's lethal injection protocol is constitutional based on a review on the merits (which has not yet happened), there is simply no way of knowing that this same protocol will be the one actually used to carry out the execution.

69.     An inmate sentenced to death has a right to be notified of material changes to the lethal injection protocol. *Oken* v. *Sizer*, 321 F. Supp. 2d 658, 664 (D. Md. 2004) (holding that an inmate had a right to review, with his counsel and before the court, a recent amendment to a protocol designed to "prevent the barbituate from leaking all over the death chamber floor"), *stay vacated*, *Sizer* v. *Oken*, 542 U.S. 916 (2004). According to the court in *Oken*, "Fundamental fairness and due process requires that the lethal injection protocol that will regulate an inmate's death be made available to him in a prompt and timely fashion." *Id.*

70.     Alabama's lack of transparency effectively thwarts the availability of judicial review and violates due process. Theoretically, an hour before an execution is carried out, the DOC could unilaterally decide to lethally inject a condemned inmate with any form of poison sufficient to effectuate death, even if the poison results in excruciating pain, and where painless alternatives are available. Mr. Arthur has a legally cognizable right to be free from such cruel and unusual punishment under the Eighth Amendment. *See Baze*, 553 U.S. at 50.

71.     In order to effectuate and protect that legally cognizable interest, the Fourteenth Amendment guarantees the right to notice of—and an opportunity to be heard regarding—the State of Alabama's lethal injection protocol that will be used to carry out his sentence. *See Mathews* v. *Eldridge*, 424 U.S. 319, 334-35 (1976) (due process generally requires consideration of three distinct factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail). Due process requires an opportunity to receive notice of how one's rights will be affected and the opportunity to respond

and be heard. Such opportunity applies equally when what is at stake is the procedure that will be used in one's own execution. *See Bowling* v. *Kentucky Dep't of Corr.*, 301 S.W.3d 478 (Ky. 2009). An inmate does not have to "take Defendants' word that his rights will not be violated by what they propose to do." *Oken*, 321 F. Supp. 2d at 664-65 (the fact of court review presupposes the production of a lethal injection protocol); *see also Dickens* v. *Brewer*, No. CV07-1770-PHX-NVW, 2009 WL 1904294, at *24 n.9 (D. Ariz. July 1, 2009) (a plaintiff is entitled to notice of any amendment to protocol if the amendment will be in effect for the plaintiff's execution), *aff'd*, 631 F.3d 1139 (9th Cir. 2011).

72.     The State has no rational interest in keeping its lethal injection protocol(s) secret. The secrecy serves only to engender suspicion. Indeed, numerous states, including Arizona, California, Florida, Maryland, Oklahoma, Oregon and Washington make their lethal injection protocols publicly available. *See*, *e.g.*, Arizona Protocol, *available at* http://www.azcorrections.gov/Policies/700/0710.pdf; Colorado Protocol, *available at* http://www.cdcr.ca.gov/Regulations/Adult_Operations/docs/4_LI_7-28-10.pdf; Florida Protocol, *available at* http://edocs.dlis.state.fl.us/fldocs/governor/orders/2006/06-260-lethalinjection.pdf; Maryland Protocol, *available at* http://www.dpscs.state.md.us/tmp/NewProvisionalDeathPenaltyProcedures.pdf; Oklahoma Protocol, *available at* http://www.doc.state.ok.us/offtech/op040301.pdf; Oregon Protocol, *available at* http://arcweb.sos.state.or.us/rules/OARS_200/OAR_291/291_024.html; Washington Protocol, *available at* http://www.doc.wa.gov/policies/showFile.aspx?name=490200.

73.     Arkansas, Delaware, Georgia, Missouri, Ohio and the federal government have made their protocols public through litigation. *See*, *e.g.*, Motion for Preliminary Injunction by Don William Davis, Exhibit 1, *Nooner* v. *Norris*, No. 5:06-cv-00110 (E.D. Ark. June 12, 2006);

Appendix to Defendant's Opening Brief in Support of Their Motion for Summary Judgment, Attachment 1, *Jackson* v. *Danberg*, No. 1:06-cv-00300 (D. Del. Dec. 19, 2008); Defendants' Response to Plaintiffs' Notice of Filing, Attachment 1, *Alderman* v. *Donald*, No. 1:07-cv-00896 (N.D. Ga. June 15, 2007); Response to Order to Prepare a Written Protocol For the Implementation of Lethal Injection, Attachment 1, *Taylor* v. *Crawford*, No. 2:05-cv-04173 (W.D. Mo. July 14, 2006); Notice by Defendants, Attachment 1, *Cooey* v. *Kasich*, No. 2:04-cv-01156 (S.D. Ohio Nov. 30, 2009); Notice of Filing Exhibits in Support of Defendants' Reply to Plaintiffs' and Intervenor Plaintiffs' Opposition to Defendants' Renewed Motion for Judgment on the Pleadings and Renewed Motion to Lift the Stay of the Plaintiffs' Executions, Attachments 1-3, *Roane* v. *Gonzales*, No. 1:05-cv-02337 (D.D.C. July 21, 2008).

74.     Moreover, several states are required to go through the administrative process and promulgate their lethal injection protocols as rules. *See, e.g.*, *Bowling*, 301 S.W.3d at 481; *Evans* v. *Maryland*, 914 A.2d 25, 34 (Md. 2006); *Morales* v. *California Dep't of Corr.*, 168 Cal. App. 4th 729, 739 (Cal. Ct. App. 2008); *Conner*, Nos. 07-GOV-0238, 07-GOV-0264 (N.C.O.A.H. Aug. 9, 2007); *Robinson* v. *Beck*, No. 07 CVS 001109 (W.C. Sup. Ct. Jan. 25, 2007). Many states do not exempt their lethal injection protocol from their AAPA equivalents. *See, e.g.*, Col. Rev. Stat. § 24-4-101; 5 Ill. Comp. Stat. 100/5-5; Ind. Code § 4-22-2-3; La. Rev. Stat. § 49:968(B)(2), (12), (18); Neb. Rev. Stat. § 84-901(1); S.C. Code § 1-23-10; S.D. Codified Laws § 1-26-1(8)(g).

75.     It would be a violation of Mr. Arthur's constitutional rights to execute him before the protocol the State intends to use on him is (i) disclosed to him and his counsel and (ii) reviewed and adjudicated by the courts after an evidentiary hearing.

## FIRST CAUSE OF ACTION

**Violation of Mr. Arthur's Right to Due Process of Law Pursuant to the Fourteenth Amendment to the United States Constitution.**

76.    Mr. Arthur repeats and realleges paragraphs 1 through 75 as though fully set forth herein.

77.    Procedural due process imposes constraints on governmental decisions that deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fourteenth Amendment.

78.    Behind a veil of secrecy, Defendants have adopted and revised processes and procedures for carrying out executions in the State of Alabama.  The DOC is specifically exempted from rulemaking requirements regarding lethal injection.  Inmates may not file grievances respecting this process, and the protocol is kept secret.  Because of the unfettered and unsupervised discretion of Defendants regarding the State's lethal injection protocol and procedures, no inmate can ever be certain of the protocol and procedures that the State will use to carry out his sentence.  Absent notice of the protocols, procedures, and training involved in the execution process, and any modifications thereto, and the opportunity to comment on or challenge these provisions, Defendants are violating Mr. Arthur's right to due process of law under the Fourteenth Amendment to the United States Constitution.

79.    Moreover, Mr. Arthur and inmates like him are prevented from meeting their burden under *Baze* because the State goes to great lengths to maintain the secrecy of its lethal injection protocol, obtaining court orders to prevent even inmate-plaintiffs from viewing the protocol during litigation challenging that protocol.  *See, e.g.*, *Powell*, Order Denying Motion to Compel Discovery of Lethal Injection Protocol, No 2:11-CV-376-WKW (May 19, 2011); *Siebert v. Allen*, No. 2:07-cv-295, 2007 WL 2903009, at *7 (M.D. Ala. Oct. 3, 2007) (requiring lethal

injection protocol to be kept under seal and pursuant to a confidentiality agreement). It is a violation of Mr. Arthur's due process rights to be denied access to the protocol enabling him to satisfy *Baze*. *See Oken*, 321 F. Supp. 2d at 664-665 (a constitutional right to court review of the lethal injection protocol under *Baze* assumes production of the protocol).

80.     Because Alabama can secretly change its lethal injection protocol at any time, Mr. Arthur is denied the opportunity to be notified of changes to his manner of execution. Such secrecy further impedes Mr. Arthur's ability to satisfy *Baze* in violation of Mr. Arthur's Fourteenth Amendment rights.

## SECOND CAUSE OF ACTION

### Violation of Mr. Arthur's Right to Be Free from Cruel and Unusual Punishment Pursuant to the Eighth Amendment to the United States Constitution.

81.     Mr. Arthur repeats and realleges paragraphs 1 through 75 as though fully set forth herein.

82.     The Eighth Amendment guarantees every person the right to be free from cruel and unusual punishment. Cruel and unusual punishment is inflicted where a method of execution creates a "substantial risk of serious harm." *Baze*, 553 U.S. at 55. Upon information and belief, although it is possible to conduct executions in a constitutionally compliant manner, Defendants have chosen not to do so.

83.     Defendants are acting under color of Alabama law in undertaking to execute Mr. Arthur by lethal injection through (i) the use of an insufficient, improperly designed and improperly administered procedure for inducing and maintaining loss of consciousness and loss of sensation prior to execution and (ii) the use of chemicals that cause severe pain in the process of causing death, in conjunction with chemicals used specifically and for no other purpose than

to mask that severe pain, such that there is a substantial risk that Mr. Arthur will suffer serious harm in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

84.     The Eighth Amendment requires that state conduct surrounding capital punishment not be arbitrary and capricious, *Furman* v. *Georgia*, 408 U.S. 238, 255 (1972), and that such conduct comports with "evolving standards of decency that mark the progress of a maturing society," *Atkins*, 536 U.S. at 311.

85.     Defendants are acting under color of Alabama law in undertaking to execute Mr. Arthur by lethal injection under a state-administered protocol that is not public and is not subject to administrative review, denying Mr. Arthur any assurance that the constitutional protections the Eighth Amendment requires will be satisfied by the procedures applied at his execution.  Even if Alabama's *current* protocol does not create a substantial risk of harm, there is no guarantee that an amended protocol—which may be adopted in secrecy and haste, and without notice to Mr. Arthur—will satisfy the constitutional standard.

86.     European and U.S. medical manufacturer's resistance to the use of their drugs in lethal injection give rise to a substantial risk that even pentobarbital may become unavailable for Mr. Arthur's execution and that the actual procedure that will be used in Mr. Arthur's execution will differ materially from the chemical concoction the State now purports to be using—under a protocol to which Mr. Arthur and his counsel are currently denied access.

87.     Defendants' current secret and non-transparent actions will give Mr. Arthur no notice or opportunity to challenge any newly adopted procedures under *Baze*, in violation of Mr. Arthur's Eighth Amendment rights.

## **PRAYER FOR RELIEF**

For these reasons, Mr. Arthur respectfully requests this Court to:

A.  Enjoin Defendants from executing Mr. Arthur with inadequate anesthesia and execution procedures that violate Mr. Arthur's due process right under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments;

B.  Order Defendants to disclose to Mr. Arthur and his counsel the lethal injection protocol that will be used during Mr. Arthur's execution at least 90 days in advance of such execution;

C.  Enter a declaratory judgment that Defendants' inadequate anesthesia and execution procedures violate Mr. Arthur's due process right under the Fourteenth Amendment and Mr. Arthur's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution; and;

D.  Grant any further relief as it deems just and proper.

Dated: June 7, 2011

Suhana S. Han (Pro hac vice admission pending)
   NY Bar Registration # 3016482
Jordan T. Razza (Pro hac vice admission pending)
Meredith A. Calandra (Pro hac vice admission
   pending)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588
COUNSEL FOR THOMAS D. ARTHUR