# EXHIBIT G

PAVATT AND MATTHEWS V. JONES, ET AL.                    MARK DERSHWITZ, M.D., Ph.D.  11/8/10

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
 2                 WESTERN DISTRICT OF OKLAHOMA
 3
 4                      C.A. NO. CIV-10-141-F
 5

 6    _____

 7    (1) JAMES PAVATT,                    )
         Plaintiff,                        )
 8                                         )
      and                                  )
 9                                         )
      JEFFREY D. MATTHEWS,                 )
10       Intervenor Plaintiff,             )
                                           )
11    VS.                                  )
                                           )
12    (1) JUSTIN JONES, in his capacity as )
      Director of the Oklahoma Department  )
13    of Corrections;                      )
      (2) RANDALL WORKMAN, in his capacity )
14    as Warden of the Oklahoma State      )
      Penitentiary;                        )
15    (3) EARNEST D. WARE;                 )
      (4) TED LOGAN;                       )
16    (5) MATTHEW HUNTER McBEE;            )
      (6) ROBERT L. RAINEY;                )
17    (7) LINDA NEAL;                      )
      (8) JERRY SMITH;                     )
18    (9) DAVID C. HENNEKE, in their       )
      capacities as members of the Oklahoma)
19    Board of Corrections; and            )
      (10)-(60) DOES 1-50, UNKNOWN         )
20    EXECUTIONERS, in their capacities as )
      employees and/or agents of the       )
21    Oklahoma Department of Corrections,  )
         Defendants.                       )
22    _____
23    VIDEO DEPOSITION OF MARK DERSHWITZ, M.D., Ph.D.
24              NOVEMBER 8, 2010
```

**Page 2**

```
 1              VIDEOTAPE DEPOSITION of MARK
 2    DERSHWITZ, M.D., Ph.D., taken at the request of
 3    the Defendants State of Oklahoma, Justin Jones
 4    and Randall Workman, pursuant to Rule 30 of the
 5    Federal Rules of Civil Procedure before Carol A.
 6    Jeffrey, a notary public in and for the
 7    Commonwealth of Massachusetts, on November 8,
 8    2010, commencing at 9:20 A.M. at the offices of
 9    McCarthy Reporting Service, 12 Harvard Street,
10    Worcester, Massachusetts.
11
12    A P P E A R A N C E S:
13
      FOR THE INTERVENER PLAINTIFF JEFFREY D. MATTHEWS:
14
      TIMOTHY R. PAYNE, ESQ.
15    Assistant Federal Public Defender
      Capital Habeas Unit
16    Office of the Federal Public Defender
      Western District of Oklahoma
17    215 Dean A. McGee, Suite 109
      Oklahoma City, Oklahoma  73102
18
19    FOR THE DEFENDANTS STATE OF OKLAHOMA,
      JUSTIN JONES AND RANDALL WORKMAN:
20
      STEPHEN KRISE, ESQ.
21    Assistant Attorney General
      State of Oklahoma
22    Office of the Attorney General
      313 NE 21st Street
23    Oklahoma City, Oklahoma  73105
24    VIDEOTAPE SPECIALIST: Sean McDonald
```

**Page 3**

```
 1                   I N D E X
 2    DEPONENT: MARK DERSHWITZ, M.D., Ph.D.
 3
 4
 5                                            PAGE
 6
 7    DIRECT EXAMINATION BY MR. KRISE           5
 8    CROSS-EXAMINATION BY MR. PAYNE           64
 9    REDIRECT EXAMINATION BY MR. KRISE       106
10    RECROSS-EXAMINATION BY MR. PAYNE        114
11    FURTHER REDIRECT EXAMINATION BY MR. KRISE 121
12
13
14                  EXHIBITS
15
16    1.  Procedures for the Execution of Offenders
          Sentenced to Death
17
18    2.  Two Photographs
19    3.  8/29/2010 Letter to Dershwitz from Rockoff
20    4.  Expert Report of Mark Dershwitz, M.D., Ph.D.
21    5.  Nembutal Sodium Solution Package Insert
22    6.  Fordham Urban Law Journal
23
24
```

**Page 4**

```
 1              VIDEOTAPE SPECIALIST:  This is the
 2    videotape deposition of Dr. Mark Dershwitz taken
 3    in the matter of James Pavatt versus Justin
 4    Jones, et al. pending in the United States
 5    District Court for the Western District of
 6    Oklahoma, Case Number CIV-10-141-F, being held
 7    today, November 8, 2010, in the offices of
 8    McCarthy Reporting Service, 12 Harvard Street,
 9    Worcester, Massachusetts, commencing at 9:20 a.m.
10              The court reporter's name is Carol
11    Jeffrey.  She is from the firm of McCarthy
12    Reporting Service.
13              I am the videotape specialist, my name
14    is Sean McDonald, and I represent McCarthy
15    Reporting Service of Worcester, Massachusetts.
16              Counselors, if you would introduce
17    yourselves, please.
18              MR. KRISE:  My name is Stephen,
19    S-t-e-p-h-e-n, Krise, K-r-i-s-e.  I represent the
20    State of Oklahoma and Defendants Workman and
21    Jones.
22              MR. PAYNE:  My name is Timothy Payne.
23    I'm an Assistant Federal Public Defender from the
24    Federal Defenders Office in Oklahoma City.  I
```

5

1   represent Jeffrey Matthews, Plaintiff Intervener,
2   in this case.
3
4        MARK DERSHWITZ, M.D., Ph.D.,
5   whose identity is known by this Notary
6   Public, was duly sworn by the Notary
7   Public and was examined and testified as
8   follows:
9
10       MR. KRISE:  This is the trial
11  deposition of Dr. Dershwitz, who is testifying as
12  an expert for the Defendants Workman and Jones in
13  this case.  The deposition is being conducted per
14  agreement of the parties, and is intended to be
15  used in the entire case of Pavatt V Jones, et al,
16  to include the intervener.
17
18  DIRECT EXAMINATION BY MR. KRISE:
19       Q.   Would you introduce yourself, please,
20  sir.
21       A.   Mark Dershwitz.
22       Q.   And, Dr. Dershwitz, what is -- what
23  degrees do you hold?
24       A.   I have a bachelor's degree in

6

1   chemistry, I have a medical degree, and I have a
2   Ph.D. in pharmacology.
3        Q.   And where are you currently employed?
4        A.   I work for the University of
5   Massachusetts Medical School, and UMass Memorial
6   Healthcare, which is a hospital.
7        Q.   Do you have teaching duties?
8        A.   Yes, I do.  I teach residents who are
9   preparing to be anesthesiologists, and I teach
10  medical students primarily in the area of
11  pharmacology.
12       Q.   How long have you taught in that
13  regard?
14       A.   Going back to the beginning, close to
15  30 years.
16       Q.   And do you have a clinical practice?
17       A.   Yes, I do.  I have a 40 percent
18  clinical commitment, which means that I'm in the
19  operating room administering anesthesia
20  approximately two days a week.
21       Q.   Do you have a background in
22  pharmacology?
23       A.   Yes, I do.  I have a Ph.D. in
24  pharmacology, and I have a particular interest in

7

1   the pharmacology of intravenous anesthetic
2   agents, and that is the primary area where I've
3   done my research over the years.
4        Q.   Have you testified as an expert
5   witness before?
6        A.   Yes.  I think the number of
7   appearances I've made as an expert in court is
8   approximately 15.
9        Q.   So it's safe to say you have quite a
10  bit of experience with intravenous anesthetics;
11  is that true?
12       A.   Yes.
13       Q.   Would you consider yourself an expert
14  in this field?
15       A.   Yes.
16       Q.   And tell us why you consider yourself
17  an expert.
18       A.   Within the field of anesthesiology,
19  there are not that many people who also are
20  trained in pharmacology.  And furthermore,
21  there's even fewer that are particularly
22  interested in the pharmacokinetics and
23  pharmacodynamics of intravenous anesthetics, and
24  I am one of those people.

8

1        Q.   And you've been asked to testify today
2   by the defendants in this case; is that correct?
3        A.   Yes.
4        Q.   And prior to your deposition, I'm
5   going to hand you what's been marked as
6   Defendants' Exhibit 1.  Would you review that.
7        A.   This is the protocol from the State of
8   Oklahoma, it's titled "Procedures for the
9   Execution of Offenders Sentenced to Death," and
10  it's dated October 21st, 2010.
11       Q.   Were you provided a copy of that
12  protocol before today?
13       A.   Yes.
14       Q.   Have you had an opportunity to review
15  it?
16       A.   Yes, I have.  Although I emphasize in
17  my review the portions of the protocol involved
18  with the actual administration of the
19  medications.
20       Q.   And in reviewing that protocol, do you
21  note that it involves the administration of three
22  drugs to result in the execution of an inmate?
23       A.   Yes.
24       Q.   Do you recall what the three drugs

9

1  are?

2      A.    The first drug is a barbiturate that

3  can be either thiopental or pentobarbital.  The

4  second drug is a paralytic drug, a vecuronium.

5  And the third drug is potassium chloride.

6      Q.    What is the purpose of the first drug?

7      A.    The first drug renders the inmate

8  unconscious.

9      Q.    And why is it necessary to render the

10  inmate unconscious?

11      A.    Because the administration of either

12  the second or the third drug to a conscious

13  person would be extremely uncomfortable.

14      Q.    Was there anything in that protocol

15  that you reviewed that would, if it was followed

16  correctly, would result in what you just

17  mentioned?

18      A.    No.

19      Q.    And I believe I probably worded that

20  poorly.  If that protocol that you reviewed is

21  followed properly, would an inmate be properly

22  anesthetized before the administration of the

23  second and third drugs?

24      A.    Yes.

10

1      Q.    And, therefore, would not be able to

2  experience the effects of the second and third

3  drugs?

4      A.    Yes.

5      Q.    I'm going to hand you now what's been

6  marked as Defendants' Exhibit No. 2.  Would you

7  describe what those look like to you.

8      A.    This is a photograph of a vial of

9  pentobarbital solution.  The specific vial

10  contains 50 milliliters of a five percent

11  solution, which is 50 milligrams per milliliter.

12      Q.    And I'm going to -- there's a page

13  two, what does page two appear to be?

14      A.    Page two has the lot and expiration

15  date from a package.  This particular package

16  expires in September 2012.

17      Q.    Okay.  I'm going to represent to you

18  that that photograph is of the pentobarbital that

19  is in the possession of the Department of

20  Corrections of the State of Oklahoma and what we

21  intend to use as the anesthetic agent.

22            In reviewing that, do you see anything

23  that would give you reason to believe that that

24  could not be used to anesthetize that inmate?

11

1      A.    No.

2      Q.    And it appears to be in a form that

3  would be readily usable, doesn't need to be

4  premixed for treated any differently than how it

5  exists in that bottle?

6      A.    No, it would simply need to be

7  withdrawn from the vial into a syringe.

8      Q.    Now, going back to the protocol,

9  you've looked at that protocol in other cases,

10  have you not?

11      A.    Yes.

12      Q.    Do you happen to remember how Oklahoma

13  administers that pentobarbital -- or correction,

14  administers its first drug?

15      A.    The protocol states that two

16  intravenous catheters will be inserted, one in

17  each arm, and the total dose is divided in half,

18  such that half is given through one intravenous

19  line and the other half is given through the

20  other intravenous line.

21      Q.    Is it normal for pentobarbital to be

22  administered intravenously?

23      A.    Yes.

24      Q.    Are there any similarities in the way

12

1  the drugs are administered in our protocol and

2  how they're administered in a clinical or a

3  hospital setting?

4      A.    The only difference is that if one

5  were to give this large a dose to a patient, it

6  would be given much, much more slowly.

7      Q.    Why is that?

8      A.    Because of the substantial cardiac

9  depressant effect of barbiturates when given

10  rapidly, and giving 5,000 milligrams of

11  pentobarbital in the span of a couple of minutes

12  would drop the blood pressure to what is probably

13  such a low value, it's not survivable.

14      Q.    Are you familiar with the drug

15  pentobarbital?

16      A.    Yes.

17      Q.    Describe how you're familiar with it.

18      A.    First of all, from the point of view

19  of teaching pharmacology, pentobarbital is one of

20  the barbiturates that we teach.  It's the

21  prototype in its class.  And also pentobarbital

22  is used today primarily for the production of

23  what's called barbiturate coma.

24      Q.    So you have actual hands-on experience

PAVATT AND MATTHEWS V. JONES, ET AL     MARK DERSHWITZ, M.D., Ph.D. 11/8/10

---

13

1 with using that drug in a clinical setting?

2    A.    Yes.

3    Q.    How long do you believe that you've

4 had experience with that drug?

5    A.    I believe the first time I

6 administered it with my own hands was in 1981.

7    Q.    Have you conducted any research with

8 regard to pentobarbital?

9    A.    Not laboratory research per se, but

10 certainly I have read about it and am quite

11 familiar with its pharmacology.

12    Q.    Are you -- that was my next question.

13 Are you intimately familiar with the pharmacology

14 and pharmacokinetics of pentobarbital?

15    A.    Yes.

16    Q.    Can you briefly just describe the

17 drugs and its intended uses in a clinical

18 setting.

19    A.    Pentobarbital is classified as an

20 intermediate-duration barbiturate that is in

21 comparison to other drugs which are either

22 classified as short or long-lasting.  And

23 historically, it was commonly used in the past as

24 a nighttime sedative for people needing help

---

14

1 falling asleep.  Because it suppresses dream

2 sleep, it is virtually never used or almost never

3 used for that indication today.

4      It also was formerly commonly used as

5 a preoperative sedative, but although it does

6 make people sleepy in low doses, it's not very

7 good at relieving anxiety, and so therefore we've

8 switched to other drugs more recently that make a

9 preoperative patient sleepy, as well as relieving

10 their anxiety.

11      And so the most common use for the

12 drug today is in the management of either severe

13 seizures or in the introduction of barbiturate

14 coma in a patient.

15    Q.    Now, earlier you noted that our

16 protocol allows for the use of pentobarbital and

17 sodium thiopental, do you recall seeing that?

18    A.    Yes.

19    Q.    Are you able to make a comparison

20 between pentobarbital and sodium thiopental?

21    A.    No.  And the reason for that is

22 although I'm intimately familiar with the

23 comparative pharmacology of the two medications,

24 because of a recent ruling from the American

---

15

1 Board of Anesthesiology, which is the entity that

2 provides board certification to the members of my

3 specialty, I am prohibited from comparing

4 medications to each other that may be used in

5 lethal injection.

6    Q.    Did you ask for clarification from the

7 American Board of Anesthesiology in regard to you

8 giving expert testimony?

9    A.    Yes, I did.

10    Q.    And did they respond to you?

11    A.    Yes.

12    Q.    I'm going to hand you Defendants'

13 Exhibit No. 3.  Would you describe what that is?

14    A.    In April of this year, the American

15 Board of Anesthesiology adopted the American

16 Medical Association's policy on the participation

17 of physicians in executions, and it is my

18 interpretation that their ultimate goal is to

19 make sure that anesthesiologists do not serve as

20 executioners.

21      Now, while the AMA guideline

22 explicitly permits the provision of expert

23 testimony, I never wrote to the AMA for

24 clarification on this because I'm not an AMA

---

16

1 member.

2      When the American Board of

3 Anesthesiology adopted this policy, I wrote to

4 them to make sure that although I've always

5 intended to be in compliance with the AMA

6 guideline, I wanted to make sure that they viewed

7 my participation as an expert witness as

8 permissible.

9      And so, therefore, what they wrote to

10 me was, quote, To be clear about the specific

11 facts you presented, the ABA believes that

12 providing expert testimony regarding the effects

13 of specific pharmacologic agents as you describe

14 would be permissible and that you would not be

15 making any recommendations as to the necessary

16 pharmacologic agents needed to bring about death.

17 In contrast, providing expert opinion on the

18 relative effectiveness of different combinations

19 of agents in bringing about death would not be

20 permissible, and that providing such opinions

21 constitutes a recommendation to the court or a

22 jury on a punitive matter, unquote.

23      So it is my belief that the ABA is

24 very clear that they do not want a board

---

17

1 certified anesthesiologist comparing different
2 existing or possible protocols in lethal
3 injection.
4     Q.   Now, Defendants' Exhibit 3, that
5 letter from the ABA to you, that letter states
6 that it is applying only to you; is that correct?
7     A.   Yes. What they wrote is -- at the
8 last sentence is, quote, Also note that this
9 opinion is based upon the specific facts that you
10 presented in your letter, and is not intended to
11 create a precedent for any other individual or
12 situation, unquote.
13     But because they also say, quote, The
14 ABA intends for the public to clearly understand
15 that board certified physicians specializing in
16 anesthesiology are healers, not participants in
17 executions, unquote, and again, it's clear to me
18 that the American Board of Anesthesiology does
19 not want anesthesiologists giving advice on the
20 best way to write a protocol for lethal
21 injection.
22     Q.   So the ABA policy really applies to
23 all board members of that entity; is that
24 correct?

18

1     A.   Well, yes, the policy as they
2 published on their website clearly apply to all
3 board certified anesthesiologists.
4     Q.   Now, earlier you had discussed
5 pentobarbital as being an intermediate-acting
6 barbiturate. Would you discuss the significance
7 of that term in regards to a lethal injection
8 context?
9     A.   The barbiturates can be subdivided
10 into three general classes based upon their
11 kinetics, and I tend to refer to them as short,
12 intermediate, and long duration. Others in the
13 past have referred to them as ultra short, short,
14 and long duration.
15     It really doesn't matter what you call
16 them, as long as one recognizes that there are
17 three kinetic classes. The long-duration
18 barbiturates like phenobarbital are used as
19 anticonvulsants to treat epilepsy. The
20 short-duration barbiturates like thiopental,
21 methohexital and thiamylal are used as
22 intravenous anesthetics. And the
23 intermediate-duration barbiturates like
24 pentobarbital and secobarbital have been used in

19

1 the past as nighttime sedatives, although as I
2 said, that indication is pretty much archaic in
3 the 21st century.
4     And so pentobarbital's primary use
5 today is in the treatment of -- the emergent
6 treatment of severe epileptic seizures or in the
7 production of barbiturate coma.
8     Q.   Is there anything about being
9 classified as an intermediate acting barbiturate
10 that would prevent its effective use as an
11 anesthetic in the lethal injection context?
12     A.   No, and there's nothing that would
13 prevent it from being used as an anesthetic agent
14 in clinical anesthesia, except for the fact that
15 it's too long lasting for our present purposes.
16     Most of the time today at the end of
17 an operation, we want a patient to wake up
18 rapidly and often be discharged from the hospital
19 rapidly. And that's one of the reasons why
20 thiopental has been largely abandoned as an
21 anesthetic today, because even it, although
22 classified as the shortest acting barbiturate, is
23 too long lasting for our uses.
24     Q.   Are all barbiturates central nervous

20

1 system depressants?
2     A.   Yes.
3     Q.   And so it would stand that
4 pentobarbital is a CNS depressant as well?
5     A.   Yes.
6     Q.   What are the effects of a CNS
7 depressant on the body?
8     A.   At low doses, it makes the person
9 sleepy. At higher doses, it can cause
10 unconsciousness. And in addition, along with the
11 suppression of the CNS activity, one will also
12 see EEG effects, that is effects on the brain
13 waves in that initially at low doses there is
14 slowing of the brain waves.
15     As the dose is increased, there is the
16 production of what is called burst suppression,
17 which is intermediate periods of flat line on the
18 brain wave tracing, and at high doses, all
19 barbiturates can cause complete flat line of the
20 EEG.
21     In addition, all barbiturates suppress
22 the circulation in that they cause the blood
23 pressure to fall by two different mechanisms,
24 they cause the vasculature to dilate, and they

**PAVATT AND MATTHEWS V. JONES, ET AL**          **MARK DERSHWITZ, M.D., Ph.D. 11/8/10**

21

1  cause the heart to pump less strongly.  Both of
2  these effects are dose dependent.  So at low
3  doses, the effect is modest, and at high doses,
4  the effect is profound and can easily lead to
5  death.
6      Q.   Let's go back earlier where you talked
7  about it can cause unconsciousness.  Could you
8  give us a definition of unconsciousness?
9      A.   To a pharmacologist, consciousness and
10 unconsciousness are all or none phenomena, and so
11 consciousness is awareness and the ability to
12 respond to one's environment, and unconsciousness
13 is the opposite, unawareness and the lack of
14 response to the environment.
15     Q.   If you are unconscious, are you able
16 to experience or sense pain?
17     A.   One cannot sense pain in a conscious
18 way.  It is still possible for parts of the brain
19 to respond to pain in terms of, for example,
20 increasing the heart rate or blood pressure, but
21 that would not be perceptible to the individual
22 who is unconscious.
23     Q.   Now, let's compare unconsciousness
24 with the term anesthesia.  Are you able to

22

1  distinguish?
2      A.   Well, depth of anesthesia would be
3  grading the anesthetic state in such a way that
4  although the person may be unconscious, there are
5  still -- it is still possible to describe a
6  person as either being deeply anesthetized or
7  lightly anesthetized primarily based upon how
8  they react physiologically to noxious stimuli.
9           They may be unconscious, however, a
10 lightly anesthetized person may increase their
11 heart rate and blood pressure in response to a
12 noxious stimulus where a deeply anesthetized
13 person will not.
14     Q.   Another term you used was burst
15 suppression.  I believe you described that as
16 intermittent brain electrical activity?
17     A.   Yes.  To the average person, if you
18 looked at brain waves, it would look like random
19 squiggles, and burst suppression is when these
20 random looking squiggles have interspersed among
21 them flat line.  And so sometimes the squiggles
22 are there and sometimes the squiggles are gone
23 and the line is flat, and that is burst
24 suppression.

23

1           And as the dose of a drug like a
2  barbiturate is increased, all of the squiggles
3  disappear, and then we have flat line on the EEG.
4      Q.   Why do we even identify burst
5  suppression, what does it mean to the
6  anesthesiologist?
7      A.   Well, first of all, burst suppression
8  is easy to measure, and so the EEG monitors that
9  we use in anesthesia display a number called
10 suppression ratio, which is easy to measure and
11 represents as a percentage what percentage of the
12 time is there flat line and what percentage of
13 the time are the EEG squiggles there.
14          Under clinical anesthesia, the
15 suppression ratio should be zero.  And phrased
16 another way, when we administer clinical
17 anesthesia to a patient, in almost all
18 situations, burst suppression represents a depth
19 of anesthesia that is deeper than we need.  And
20 so that's one of the reasons why that the machine
21 will display that number for us.
22     Q.   Well, let's talk about what if you
23 notice burst suppression in your patient in a
24 surgical setting, what would you do?

24

1      A.   Assuming that we're not speaking about
2  an operation where we deliberately intended to
3  cause barbiturate coma, whenever burst
4  suppression is viewed on the EEG monitor, our
5  response is to lighten the depth of anesthesia.
6      Q.   So are there instances where you
7  intend to achieve burst suppression?
8      A.   Yes.
9      Q.   And could you describe some of those?
10     A.   Typically barbiturate coma is used to
11 protect the brain from stroke in operations where
12 there is going to be the deliberate and
13 intentional interruption of blood flow to the
14 brain, and that may involve operations on the
15 brain where somebody has an aneurysm, for
16 example, that needs to be cured, or it may be
17 operations on the peripheral vasculature where
18 the circulation is going to be stopped to permit
19 the surgeon to perform the operation.
20     Q.   Do you have personal experience with
21 the use of pentobarbital in inducing a coma in a
22 normal healthy patient?
23     A.   Yes.
24     Q.   And are you aware -- or tell us what

**McCARTHY REPORTING SERVICE**

PAVATT AND MATTHEWS V. JONES, ET AL      MARK DERSHWITZ, M.D., Ph.D. 11/8/10

25

1  instances perhaps where a pentobarbital-induced
2  coma would be done intentionally on a person with
3  a normal healthy brain?
4      A.    One example might be if a person has
5  an aneurysm inside the brain, an aneurysm is like
6  a ballooning of an artery that if it ruptures, it
7  could be catastrophic or deadly, and so if such
8  an aneurysm is discovered, one way of treating it
9  would be surgically to put a -- it's called a
10  clip, and the clip cures the aneurysm.
11      And sometimes the surgeon will need to
12  clamp an artery before putting the clip on, and
13  that would result in an interruption of blood
14  flow to part of the brain. And so if the surgeon
15  plans on doing this, we might induce barbiturate
16  coma to decrease the likelihood that the person
17  will suffer a stroke.
18      Another example would be certain types
19  of operations on the aorta where the circulation
20  needs to be completely stopped. During most open
21  heart operations using the heart-lung machine,
22  circulation is maintained by the machine to all
23  critical organs, like the brain and the liver and
24  the kidney. But if, for example, a patient is

26

1  having the upper part of their aorta replaced
2  with a plastic tube, that operation requires
3  complete cessation of the circulation. It also
4  is accompanied by cooling the person to
5  approximately 12 or 15 degree centigrade to also
6  decrease the likelihood of a stroke.
7      And in such operations, it is common
8  to use pentobarbital to induce a coma that will
9  then decrease the likelihood of the person waking
10  up after the surgery with a stroke.
11      Q.    Typically what doses are we talking
12  about of pentobarbital being administered to
13  induce a coma?
14      A.    The typical starting dose is around 10
15  milligrams per kilogram, and so in an average 80
16  kilogram person, that would be about 800
17  milligrams to start. And then an infusion would
18  be administered depending on how long the
19  barbiturate coma needs to be continued.
20      Q.    Well, how would you compare the
21  introduction of five grams of pentobarbital with
22  that -- with the dose used in -- for
23  barbiturate-induced coma?
24      A.    5,000 milligrams of pentobarbital is

27

1  an enormous overdose and is much higher than
2  would ever be needed to be given at once for the
3  introduction of barbiturate coma.
4      Q.    If a person is in a
5  barbiturate-induced coma, do they have burst
6  suppression at that point?
7      A.    Yes.
8      Q.    Would a person who has burst
9  suppression be able to feel the effects of the
10  second and third drugs?
11      A.    No.
12      Q.    Would they likely be able to feel or
13  sense anything?
14      A.    No.
15      Q.    Would five grams of pentobarbital
16  administered IV cause burst suppression?
17      A.    That dose of pentobarbital goes well
18  beyond burst suppression, it will cause complete
19  flat line of the EEG.
20      Q.    What about half, what would -- would
21  2.5 grams cause burst suppression?
22      A.    It will cause flat line of the EEG.
23      Q.    And when you say flat line of the EEG,
24  to be clear, that would mean that person would

28

1  not be able to feel the effects of the second and
2  third drugs?
3      A.    In fact, flat line of the EEG is the
4  deepest effect of a central nervous system
5  depressant that we can measure. And so, for
6  example, if one were to produce flat line with a
7  dose of X and then you gave twice that much, we
8  don't actually have the ability to measure the
9  additional effect, because flat line of the brain
10  waves is the greatest effect that we can measure
11  on the brain.
12      Q.    Are you familiar with the term off
13  label use?
14      A.    Yes.
15      Q.    What does that mean?
16      A.    Off label use means that a drug is
17  approved by the FDA for one use, which means it
18  can be marketed and sold. And off label use
19  means that a physician is using the medication
20  for a use that is not explicitly described in the
21  package insert or approved by FDA.
22      Q.    Now, is it legal to use a drug that is
23  off label or in a manner that's not FDA approved?
24      A.    Yes.

PAVATT AND MATTHEWS V. JONES, ET AL               MARK DERSHWITZ, M.D., Ph.D. 11/8/10

29

1   Q.   Is it common?

2   A.   Yes.

3   Q.   Why is that done?

4   A.   There are many reasons why drugs may

5   be subject to off label use. One of the more

6   common explanations is that if a drug is no

7   longer protected by a patent and is therefore

8   available as a generic drug, the submission to

9   FDA of an adequate amount of data to permit the

10  granting of an indication is so expensive that it

11  would not be cost effective for a generic drug

12  company to invest that money, because typically

13  it is hundreds of millions of dollars worth of

14  research to get an additional indication of a

15  drug that's already approved.

16  Q.   So is it safe to say that the FDA does

17  not regulate the practice of medicine?

18  A.   Absolutely not.

19  Q.   Meaning that is a true statement?

20  A.   The FDA does regulate many of the

21  things that we do in medicine. For example, it

22  is not legal in the United States for a physician

23  to use a drug that is not FDA approved. And so,

24  for example, some of the ineffective cancer

30

1   therapies that are available to patients in other

2   countries are not available here because FDA has

3   determined they're not effective and therefore

4   not approved.

5   Similarly there are drugs that are not

6   sold in this country because FDA considers them

7   to be too dangerous. An example would be either

8   heroin or marijuana, these are drugs that have no

9   legal use in the United States because FDA

10  considers them to be too dangerous.

11  Q.   Is the use of pentobarbital to induce

12  a barbiturate coma an off label use of that drug?

13  A.   To be honest with you, I'm not sure,

14  because intractable seizures is an indication,

15  and to treat intractable seizures, one would need

16  to induce barbiturate coma.

17  On the other hand, using barbiturate

18  coma in a person with a perfectly normal brain

19  prior to stopping blood flow to the brain appears

20  to be an off label use to me.

21  Q.   Have you personally used drugs in an

22  off label manner?

23  A.   Every day of my career.

24  Q.   So do you see anything inappropriate

31

1   or wrong with using pentobarbital as an

2   anesthetic in this lethal injection context?

3   A.   No. Because the primary disadvantage

4   of pentobarbital, which is its duration of

5   action, and that is why it is not used in

6   clinical anesthesia. Duration of action in the

7   long duration that it produces is clearly not a

8   disadvantage in a lethal injection protocol.

9   Q.   In your opinion, would the

10  administration of a five gram dose of

11  pentobarbital be survivable?

12  A.   No. The five gram dose of

13  pentobarbital will cause the person to stop

14  breathing, and cessation of breathing will then

15  lead to decreased oxygen delivery to critical

16  organs.

17  In addition, a five gram dose of

18  pentobarbital will cause the blood pressure to

19  fall so low that that effect will also decrease

20  the delivery of oxygen to critical organs,

21  because the circulation will become so slow that

22  it may not even be measurable.

23  So by two different mechanisms, a five

24  gram or 5,000 milligram dose of pentobarbital

32

1   will be lethal.

2   Q.   What about half of that amount,

3   two-and-a-half grams, would that be considered to

4   be lethal?

5   A.   Yes, for the same reasons.

6   Q.   So it's safe to say that even

7   two-and-a-half grams would certainly be

8   sufficient to cause unconsciousness?

9   A.   Yes.

10  Q.   Now, on a more technical sense, can

11  you describe to us what the blood brain barrier

12  is?

13  A.   The blood brain barrier in a global

14  sense is actually a series of different

15  physiological mechanisms that restrict access to

16  the brain of some medications. And that barrier

17  includes both a physical component as well as a

18  physiologic component.

19  And so the blood vessels in the brain

20  are surrounded by cells that block the diffusion

21  of some medications, and this barrier does not

22  exist outside of the central nervous system.

23  It's not just the brain, it's also the spinal

24  cord.

**McCARTHY REPORTING SERVICE**

PAVATT AND MATTHEWS V. JONES, ET AL      MARK DERSHWITZ, M.D., Ph.D. 11/8/10

33

1      In addition, there is a physiologic
2 mechanism by which some medications that are able
3 to diffuse into the brain are then pumped out of
4 the brain almost as rapidly as they diffuse in,
5 and so they appear not to be able to gain
6 entrance to the brain at all. But that's not
7 because they don't penetrate, it's because they
8 are pumped out almost as rapidly as they get in.
9      Q.      In order to render somebody
10 unconsciousness, must the drug pass through the
11 blood brain barrier?
12      A.      Yes.
13      Q.      And does pentobarbital readily pass
14 through the blood brain barrier?
15      A.      Yes.
16      Q.      Is that true with all barbiturates?
17      A.      Yes.
18      Q.      And does that have anything to do with
19 their lipid solubility?
20      A.      All barbiturates are extremely lipid
21 soluble. There are minor differences in lipid
22 solubility amongst them, with the short acting
23 ones being the most lipid soluble, the long
24 acting ones being the least lipid soluble, and

34

1 the intermediate duration ones having medium
2 lipid solubility.
3      And so they can be compared amongst
4 each other in terms of lipid solubility, but in
5 fact if one compares barbiturates to most other
6 classes of drugs, barbiturates are amongst the
7 most lipid soluble drugs available to physicians.
8      Q.      Now, as a pharmacologist, would you
9 consider pentobarbital to be an anesthetic?
10      A.      Yes. In fact, it's one of the most
11 commonly used intravenous anesthetics in small
12 animal anesthesia.
13      Q.      Do you know if pentobarbital is also
14 used to euthanize animals?
15      A.      Commonly.
16      Q.      Do you have any knowledge as to why
17 that particular drug is chosen?
18      A.      First of all, it works very rapidly.
19 And second of all, it's very inexpensive. And so
20 for a veterinarian to give an overdose of
21 pentobarbital to euthanize a pet is rapid and
22 inexpensive, and that is why it has gained common
23 use amongst the veterinarians.
24      Q.      Even though it's used in that manner

35

1 on animals, do you have any reason to believe the
2 effects in a person would not be the same,
3 accounting for different dosing and that type of
4 thing?
5      A.      No, the effect on a human would be the
6 same. And in fact, the intended dose that
7 Oklahoma is going to use, which 5,000 milligrams
8 in an 80 kilogram person works out to a little
9 over 60 milligrams per kilo, and the recommended
10 dose for animal euthanasia is 40 milligrams per
11 kilogram.
12      So the intended dose that Oklahoma
13 plans to use is about 50 percent higher than that
14 dose of pentobarbital that is used in small
15 animal euthanasia.
16      Q.      Now, some question has been made in
17 regards to what time frame would this -- the
18 effects of this drug occur. You'll notice in our
19 protocol, we require a minimum of five minutes to
20 elapse before we administer the second and third
21 drugs.
22      Do you know if five minutes after
23 adminis -- do you know after being administered
24 five grams of pentobarbital, would a person be

36

1 unconscious after a five-minute period?
2      A.      Yes.
3      Q.      Would they be dead?
4      A.      That depends on the definition of
5 death. And one of the problems we have in
6 medicine, although we have good definitions of
7 what constitutes death, we don't have a good
8 definition of the instant at which death occurs.
9      Typically death occurs when a person
10 who is able to pronounce death does so. And so
11 if one gave a 5,000 milligram dose of
12 pentobarbital, certainly after five minutes, the
13 person will be unconscious. Certainly after five
14 minutes, the person will not be breathing.
15      The question is will they have any
16 perceptible circulation at that point, and the
17 answer is I don't know because I've never done
18 that. And when I give pentobarbital to patients,
19 I actually have to take measures to support their
20 circulation and keep their blood pressure
21 adequate.
22      So if the circulation has not ceased
23 by five minutes, it will certainly do so within a
24 few minutes after that.

McCARTHY REPORTING SERVICE

37

1    Q.    Now, in Oklahoma's protocol, we have a
2    licensed medical doctor who is present and
3    monitors the inmate after the administration of
4    the pentobarbital primarily to assess
5    consciousness. In your opinion, is a licensed
6    medical doctor, does he possess the requisite
7    training, experience, education and knowledge to
8    be able to determine whether or not a person is
9    conscious or unconscious?
10    A.    In general, that's true, but I would
11    add one more criterion, and that is the person
12    should regularly assess the presence or absence
13    of consciousness in their routine practice.
14          And so, for example, there are some
15    physicians who never have the opportunity to do
16    that. But many classes of physicians do. And so
17    that is one more criteria that I think is
18    important.
19    Q.    Are there not instances where lay
20    persons determine consciousness of an individual?
21    A.    Yes. For example, somebody who's
22    taken the basic life support course or CPR, the
23    very first thing that they're taught is to
24    confirm that the victim is unconscious, because

38

1    one does not perform CPR on an unconscious (sic)
2    person. And so, therefore, in basic life support
3    classes, the first thing that people are taught
4    are to run up to the dummy and say, "Annie,
5    Annie, are you okay?" as they shake Annie, and if
6    Annie doesn't respond, then it is appropriate to
7    begin CPR.
8    Q.    Now, you're familiar with the Baze V
9    Rees Supreme Court case involving Kentucky's
10    lethal injection protocol; are you not?
11    A.    Somewhat.
12    Q.    Do you know who determined
13    consciousness of the inmate in Kentucky at the
14    time that opinion was rendered?
15    A.    I actually don't recall.
16    Q.    If I tell you it was the warden, do
17    you have any reason to doubt that?
18    A.    No.
19    Q.    Or does that help you to remember?
20    A.    Again, the case, because I testified
21    in that case I believe in 2004, it's quite fuzzy
22    in my mind.
23    Q.    Well, if it's true that the warden
24    determines whether or not the inmate in that

39

1    particular scenario is conscious, what are some
2    ways a lay person could determine whether or not
3    a person is conscious?
4    A.    A lay person can be taught easily to
5    assess the presence or absence of
6    unconsciousness, and the typical process involves
7    applying graded stimuli to the person, so the
8    first step might be something like speaking their
9    name and asking them to open their eyes. If they
10    do not respond, a reflex can be checked like the
11    lash reflex. Then slight shaking can be applied.
12    And if they don't respond to vigorous shaking,
13    then a painful stimulus can be applied.
14          And if they do not respond to any of
15    these, not only can they be deemed to be
16    unconscious, but they could be deemed to have a
17    level of anesthesia that is consistent with
18    surgical anesthesia.
19    Q.    And you're saying that a lay person
20    who's taught or trained to assess or perform
21    these graded stimuli can make that determination;
22    is that correct?
23    A.    Yes. In other words, if a lay person
24    applies the hardest pinch that they could

40

1    possibly squeeze on somebody's skin, if the
2    person doesn't respond, that's quite strong
3    evidence that they are unconscious and
4    unresponsive to noxious stimuli.
5    Q.    And if that determination is made, is
6    it safe to conclude that they will not experience
7    the effects of the second and third drugs in the
8    protocol?
9    A.    Yes.
10          MR. PAYNE: I'm sorry, could you read
11    that last, I don't know, question or two back for
12    me. I lost track there. Is that okay?
13          MR. KRISE: I don't know, which
14    question?
15          MR. PAYNE: Just the last two
16    questions and answers.
17          THE REPORTER: Question: "And you're
18    saying that a lay person who's taught or trained
19    to assess or perform these graded stimuli can
20    make that determination, correct?"
21          Answer: "Yes. In other words, if a
22    lay person applies the hardest pinch that they
23    could possibly squeeze on somebody's skin, if the
24    person doesn't respond, that's quite strong

**PAVATT AND MATTHEWS V. JONES, ET AL**        **MARK DERSHWITZ, M.D., Ph.D. 11/8/10**

---

41

1 evidence that they are unconscious and
2 unresponsive to noxious stimuli."
3        Question: "And if that determination
4 is made, is it safe to conclude that they would
5 not experience the effects of the second and
6 third drugs in the protocol?
7        Answer: "Yes."
8        MR. PAYNE: Okay, thank you.
9   Q.   Are you aware of pentobarbital being
10 used in physician-assisted suicide?
11  A.   Yes.
12  Q.   Would you just describe the extent of
13 your knowledge of that.
14  A.   In Oregon, I believe the typical
15 regimen is for the person to be supplied with
16 nine grams of pentobarbital as oral tablets.
17  Q.   And do you know if that nine grams is
18 lethal?
19  A.   Well, nine grams is easily lethal, and
20 the reason why Oregon uses such a large overdose
21 is that many people who take nine grams by mouth
22 vomit soon afterward, and so the goal is that
23 there will be enough grams remaining after they
24 vomit to result in their death.

---

42

1   Q.   Would the intravenous administration
2 of pentobarbital have a quicker onset than if it
3 was taken orally?
4   A.   Much.
5   Q.   If you were given pentobarbital
6 intravenously as opposed to orally and you were
7 attempting to cause death, would you need much
8 less than the nine grams taken orally?
9   A.   Yes.
10       MR. PAYNE: Object. Leading question.
11  Q.   For instance, would five grams cause
12 death, if given intravenously?
13  A.   Yes.
14  Q.   Now, you prepared a report outlining
15 your expert opinion in this case; is that
16 correct?
17  A.   Yes.
18  Q.   I'm going to hand you Defendants'
19 Exhibit 4, is that your expert report?
20  A.   Yes.
21  Q.   And in that report, do you give your
22 expert opinion?
23  A.   Yes.
24  Q.   And attached to that report are two

---

43

1 articles. Can you identify what the two articles
2 are and the purpose for attaching them to your
3 report?
4   A.   The purpose of the two articles is to
5 show that there is a long history of using
6 pentobarbital in clinical medicine for the
7 production of barbiturate coma. And so the first
8 article, which was published in 1979, the first
9 author is Rockoff, that was the first significant
10 study in which pentobarbital was described as
11 being used effectively to produce barbiturate
12 coma.
13       The second article, whose first author
14 is Marshall, is actually published in the Journal
15 of Trauma in this country just a couple of months
16 ago, and it shows that using pentobarbital coma
17 remains a common medical procedure in this
18 country.
19  Q.   If you would turn to page five of your
20 report, and you'll look at paragraph 12, you
21 state that, and I'm paraphrasing, but basically a
22 5,000 milligram dose of pentobarbital being
23 administered intravenously, you found to a
24 reasonable degree of medical certainty a

---

44

1 negligible chance that the inmate could
2 experience the effects of the second and third
3 drugs; is that your opinion?
4   A.   Yes.
5   Q.   Tell us how you arrived at that
6 opinion.
7   A.   Well, first of all, a dose of 5,000
8 milligrams of pentobarbital will induce
9 electrical inactivity of the brain. That is the
10 deepest level of anesthesia that we can measure.
11 And at that depth of anesthesia, nothing is
12 perceptible by the person.
13  Q.   And how quickly would that occur?
14  A.   Unconsciousness will occur after the
15 intravenous administration of just a few hundred
16 milligrams, so just a few milliliters of that
17 five percent solution.
18       And so after a few milliliters of that
19 five percent solution have been delivered to the
20 intravenous catheter, it will take between 30 and
21 60 seconds for it to circulate from the arm to
22 the heart, out to the lungs, back to the heart,
23 and up to the brain. And we call that the brain
24 to -- or arm-to-brain circulation time.

---

PAVATT AND MATTHEWS V. JONES, ET AL                    MARK DERSHWITZ, M.D., Ph.D. 11/8/10

45

1  And so the person will lose
2  consciousness in less than a minute.
3      Q.  And at that point, are they able to
4  feel the effects of the second and third drugs?
5      A.  Not after the delivery of 5,000
6  milligrams, although they will lose consciousness
7  well before the 5,000 milligrams have been
8  administered.
9      Q.  Okay, let's talk a little more
10 specifically about pentobarbital.  On the
11 photographs of the solution that I showed you, do
12 you know, is pentobarbital in this form, is this
13 stable?
14     A.  Yes.
15     Q.  And when I say or actually when you
16 say stable or when you agree with me that it is
17 stable, what does that mean?
18     A.  It means that the medication can be
19 used until its expiration date, which is
20 typically several years after manufacture.
21     Q.  Now, this bottle in this picture notes
22 that it's a multiple dose vial, and what does
23 that mean?
24     A.  A multiple dose vial contains a

46

1  preservative, so that after some medication is
2  withdrawn from the vial for one patient, it may
3  be left uncapped, although it's still sealed, to
4  have medication withdrawn at a later time for
5  another patient.
6      Q.  And is that a typical clinical use?
7      A.  It is possible, it's not common,
8  because today for reasons that have nothing to do
9  with pharmacology, they have primarily to do with
10 billing and FDA regulations, once a vial is open,
11 it is used for one patient and then discarded
12 even though the vial is labeled as a multiple
13 dose vial.
14     Q.  So even the manufacturer recognizes
15 that it is safe to use that product more than
16 once from that one vial?
17     A.  Yes.
18     Q.  Now, this bottle that's in that
19 photograph, in order to use it in the manner we
20 intend or the State of Oklahoma intends to use
21 it, you would simply insert a syringe, draw up
22 the necessary amount and inject it into an
23 intravenous line; would that be correct?
24     A.  Yes.

47

1      Q.  And do you see any problem with that?
2      A.  As long as the person who does this
3  knows how to draw medications into syringes and
4  attach the syringes to IV tubing, it should be
5  easy for them to do.
6      Q.  Would you expect a licensed pharmacist
7  to be competent to perform this task?
8      A.  Well, the pharmacist will perform part
9  of the task, which is drawing the medication up
10 into the syringe, and then someone else will
11 perform the task of injecting it into the
12 intravenous line.
13     Q.  Are there any unique storage
14 requirements for this particular bottle of
15 pentobarbital?
16     A.  I don't believe so.  I believe that it
17 is stated in the package insert to be used or
18 stored at room temperature.  I do not believe it
19 needs refrigeration.
20     Q.  I'd like to hand you Defendants'
21 Exhibit 5, which I'm going to represent to you is
22 a copy of the package insert that came with the
23 product that is depicted in those photographs,
24 and this is a one -- six-page document.  And I

48

1  apologize, but perhaps could you find in there
2  where it talks about the storage?
3      A.  On the package insert it says, and I
4  quote, It is recommended that the product be
5  stored at 20 to 25 degree centigrade, which is 68
6  to 77 degrees Fahrenheit.  That is typically
7  taken as room temperature.
8      Q.  And when it states that it is to be
9  stored at room temperature, does that mean unused
10 in the bottle and also once it's drawn out of the
11 bottle and into the syringe?
12     A.  Typically that's true.
13     Q.  Do you have any reason to believe that
14 that's different for this particular
15 pentobarbital?
16     A.  No.
17     Q.  So if the syringes containing the
18 pentobarbital are prepared in one location and
19 transported to another location, do you see any
20 problem or negative effect that having on the
21 drug?
22     A.  No.  In fact, the package insert
23 addresses a potential situation where it says in
24 addition to the storage requirements, it says,

PAVATT AND MATTHEWS V. JONES, ET AL                    MARK DERSHWITZ, M.D., Ph.D. 11/8/10

49

1  quote, Brief excursions are permitted between 15
2  and 30 degree centigrade, which is 59 to 86
3  degrees Fahrenheit, unquote.
4           And in all honesty, even excursions
5  well beyond 86 degrees Fahrenheit will not have a
6  deleterious effect on the drug as we know from
7  its common use in developing countries where they
8  don't have refrigerators or air conditioning.
9      Q.   And would it be likely that if this
10  drug were to be delivered to a hospital, it would
11  simply be transported by common carrier over land
12  or through the air?
13     A.   Well, pentobarbital is a Schedule 2
14  drug, which is the highest level of security that
15  the DEA mandates.  So the shipment needs to be
16  tracked, but it could be shipped by United Parcel
17  Service or Fed Ex or other companies that use a
18  tracking number and that can locate the package
19  along its route.
20     Q.   But you're not aware of any particular
21  storage or temperature handling requirements
22  during that transport?
23     A.   No.  For example, unlike some
24  medications, it does not need to be transported

50

1  on ice or dry ice or something like that.
2      Q.   What about light sensitivity, are you
3  aware of there being any problem with light
4  sensitivity with this drug?
5      A.   As far as I know, one can leave the
6  vial out in light, and that's because the glass
7  is clear.  Medications that are light sensitive
8  that need to be protected from light are
9  typically prepared in amber colored bottles or
10  vials.
11     Q.   I'd like to refer back to your report.
12  I apologize for jumping around a little bit.
13  Page six, paragraph 14, would you read that
14  aloud, please.
15     A.   "Therefore it is my opinion to a
16  reasonable degree of medical certainty that there
17  is a negligible risk that a condemned inmate to
18  whom 5,000 milligrams of pentobarbital is
19  properly administered pursuant to the lethal
20  injection protocol of the State of Oklahoma would
21  experience any pain and suffering associated with
22  the administration of lethal doses of vecuronium
23  bromide and potassium chloride."
24     Q.   And did you notice in reviewing

51

1  Oklahoma's protocol any particular part that
2  would indicate to you that it could not be
3  carried out as intended?
4      A.   No.
5      Q.   Did you notice -- well, other than why
6  we're using the drugs, but did you notice
7  anything in our protocol that differs from how
8  administration of drugs would be done in a
9  clinical setting?
10     A.   Other than the large dose, which is
11  beyond what is used clinically of the
12  pentobarbital, no.
13     Q.   Now, when anesthetics are used in a
14  clinical setting, for example, in a surgical
15  procedure, do you use one intravenous line or do
16  you use a backup and a primary?
17     A.   It depends on a number of factors, and
18  I can detail these.  First of all, sometimes if
19  we plan on giving transfusions in a patient, we
20  will use separate IVs for drugs and separate IVs
21  for the blood products.
22           There are some medications that need
23  to be given into an intravenous line by
24  themselves without any other drug going through,

52

1  so that might be another reason for putting a
2  second IV in.
3           Another reason might be if we don't
4  have adequate access to the arms.  I start many
5  operations with one intravenous catheter, and if
6  I have good access to the arms, if that one
7  fails, I'll just put another one in.  However, if
8  because of the nature of the surgery or surgeon
9  request, often both arms are tucked at the sides,
10  and since I would not have access to them during
11  the case, that's another reason I might have a
12  backup intravenous in place in a patient.
13           So it really is very dependent upon
14  the nature of the intended surgery.
15     Q.   If you were to administer just one
16  anesthetic, would you have any reason to use more
17  than one IV line?
18     A.   Do you mean one anesthetic --
19     Q.   Well, if you weren't going to
20  administer anything other than, say, just your
21  anesthetic, would you have any reason to inject
22  that via two lines or would it be suitable to use
23  one intravenous line?
24     A.   I would certainly inject all of the

McCARTHY REPORTING SERVICE

53

1 anesthetic drug through one intravenous line,
2 however I might have a second one available as a
3 backup if, for example, I don't have access to
4 the arms during the surgery.
5   Q. So the fact that Oklahoma uses two
6 intravenous lines is a good thing?
7   A. Good is not a medical word, so I can't
8 give you an expert opinion on that.
9   Q. How would you classify it?
10   A. It's not that different from how we
11 use intravenous lines clinically.
12   Q. And I think we mentioned this earlier,
13 but just to be sure, as you noted in the
14 protocol, we administer 2.5 grams into one line
15 and 2.5 grams into the other. Let's assume one
16 line failed, you stated earlier that 2.5 grams
17 would be independently lethal; is that true?
18   A. Yes.
19   Q. And would also render a person
20 unconscious to where they wouldn't feel the
21 effects of the second and third drugs?
22   A. Yes.
23   MR. KRISE: I'm probably close to
24 finishing. We could go off the record to give me

54

1 a chance just to review my notes.
2   VIDEOTAPE SPECIALIST: Now going off
3 the record, the time is 10:25 a.m.
4   (Short recess taken.)
5   VIDEOTAPE SPECIALIST: We're now going
6 back on the record, this is tape number two, the
7 time is 10:34 a.m.
8   Q. Doctor, were you provided a copy of
9 the expert report of Dr. David Waisel?
10   A. Yes.
11   Q. Did you have an opportunity to review
12 it?
13   A. Yes.
14   Q. I'm going to read one or two passages
15 from that report for you. The first, Dr. Waisel
16 states in paragraph 17 on page six of his report,
17 "The use of pentobarbital as an agent to induce
18 anesthesia has no clinical history and is
19 non-standard." Do you agree with that statement?
20   A. In humans, pentobarbital is not
21 approved by FDA for general anesthesia use.
22 However, the state of general anesthesia comes
23 along with the use of pentobarbital as either an
24 anticonvulsant in status epilepticus or when it's

55

1 used to produce barbiturate coma, because in both
2 of those instances, the depth of anesthesia that
3 results goes beyond what we use clinically for
4 surgery.
5   Q. In that same paragraph, Dr. Waisel
6 states, "There are therefore no standard clinical
7 doses of pentobarbital to induce anesthesia,
8 making it much harder to determine how much
9 pentobarbital would constitute a sufficient
10 overdose." Is that an accurate statement?
11   A. No, it's extremely inaccurate, because
12 even though the package insert doesn't explicitly
13 list the doses of pentobarbital that would be
14 used to induce barbiturate coma, there are
15 numerous papers over the last decades that
16 describe its successful use as an agent to induce
17 barbiturate coma, and we know very, very well
18 what doses are needed.
19   And furthermore, when barbiturate coma
20 is induced long term, for example, in the
21 intensive care unit, very commonly brain waive
22 monitoring is done at the same time to actually
23 measure the effect of the drug.
24   So we have a very good sense of how

56

1 much medication is needed, not only to induce,
2 but to maintain barbiturate coma.
3   Q. And you have firsthand experience with
4 that; is that correct?
5   A. In the operating room, yes. I have
6 less experience in the intensive care unit, but
7 certainly in the operating room, yes.
8   Q. My point was your opinion is based on
9 practical experience?
10   A. As well as extensive review of the
11 literature, as well as writing about the drug in
12 book chapters and related things like that.
13   Q. On page seven of Dr. Waisel's report
14 in paragraph 18, he states, "Pentobarbital is
15 much less lipid soluble than sodium thiopental."
16 But I think the important statement is the next
17 one, "low lipid solubility decreases rate of
18 penetration into the brain causing the slower
19 onset of anesthesia after intravenous injection."
20 Is that an accurate statement?
21   A. I think that statement is extremely
22 inaccurate and extremely misleading. It is true
23 that thiopental is slightly more lipid soluble
24 than pentobarbital, although I do not have the

PAVATT AND MATTHEWS V. JONES, ET AL          MARK DERSHWITZ, M.D., Ph.D. 11/8/10

57

1  solubility numbers off the top of my head right
2  now.  But all barbiturates are extremely lipid
3  soluble drugs compared to many of the other
4  medications that we use in medicine.
5     Q.    And then down in paragraph 20, he
6  states that pentobarbital is generally used in
7  situations that do not induce an anesthetic
8  state, but it has been used to induce -- and I'm
9  paraphrasing -- a deep anesthetic state commonly
10 known as barbiturate coma.
11       Dr. Waisel makes the statement that
12 "These types of patients are assumed to have a
13 blood brain barrier that is not intact.  And
14 dosing of drugs with low lipid solubility such as
15 pentobarbital, when compared to sodium
16 thiopental, reliably cannot be based on data from
17 patients with a chemically induced barbiturate
18 coma, because data for inducing a barbiturate
19 coma are drawn from individuals whose blood brain
20 barriers are significantly different than the
21 blood brain barriers of healthy individuals."  Is
22 that an accurate statement?
23     A.    No, it's extremely inaccurate.  First
24 of all, as I described, pentobarbital is

58

1  routinely given to people with perfectly normal
2  and intact blood brain barriers prior to the
3  deliberate interruption of blood flow to the
4  brain.
5       Second of all, the difference in lipid
6  solubility between thiopental and pentobarbital
7  is tiny in the overall continuum of lipid
8  solubilities of medications that are used in
9  medicine.
10      And finally, based upon clinical
11 experience, even though someone, for example, who
12 has had a stroke and has brain swelling does
13 indeed have an abnormal blood brain barrier,
14 their response to pentobarbital is similar to
15 somebody who has a perfectly intact blood brain
16 barrier because pentobarbital penetrates into the
17 brain easily.  And, therefore, we apply the same
18 regimen in the operating room for the production
19 of barbiturate coma as intensive care doctors
20 apply in the ICU for a person who's had, for
21 example, a stroke.
22      And when we measure brain waive or
23 when we use brain waive monitoring in the
24 operating room in persons with normal brains, and

59

1  the intensive care physician uses brain waive
2  monitoring in the intensive care unit in a person
3  who's had a stroke, the same doses applied by the
4  same regimen are effective in both groups of
5  patients.
6     Q.    All right.  On page eight of
7  Dr. Waisel's report, in paragraph 22, he notes
8  that "It is hard to say with any certainty the
9  practical effects of the differences between
10 pentobarbital and sodium thiopental," and I know
11 that we're not here to compare and contrast those
12 two drugs, but he does say that "Because of these
13 significant unknowns and a lack of clinical
14 history related to using pentobarbital to induce
15 anesthesia, using pentobarbital as part of a
16 3-drug lethal injection protocol puts the inmate
17 at an undue risk of suffering," do you agree with
18 that statement?
19     A.    Absolutely not.  I -- as I wrote in my
20 report and as I've testified here today, after
21 giving someone 5,000 milligrams of pentobarbital,
22 the risk of them being conscious for the
23 administration of the second and third drugs is
24 negligible.

60

1     Q.    And not to split hairs, but when you
2  say negligible, what do you mean?
3     A.    I use the term negligible to describe
4  a probability as low as we can possibly measure.
5  And to split hairs, I have to be accurate when I
6  say when we talk about probabilities in
7  pharmacology, it is mathematically impossible to
8  reach either a zero percent probability at one
9  end of the curve or a 100 percent probability at
10 the other end of the curve.
11      But I can tell you that if you were to
12 query experienced anesthesiologists about what
13 the effects of 5,000 milligrams of pentobarbital
14 is, I cannot imagine anyone saying that this is
15 survivable.
16     Q.    Okay, I'd like to sort of end with
17 handing you what's marked as Defendants' Exhibit
18 6.  Do you recognize that?
19     A.    Yes.
20     Q.    And what is that?
21     A.    This is an article that Dr. Tom
22 Henthorn and I co-authored as part of our
23 participation in a symposium that was held in
24 2008 at Fordham University Law School, and the

McCARTHY REPORTING SERVICE

PAVATT AND MATTHEWS V. JONES, ET AL                    MARK DERSHWITZ, M.D., Ph.D.  11/8/10

**61**

1  article is published in the Fordham Urban Law
2  Journal, and it represents our expert opinions on
3  the pharmacology of thiopental as used in lethal
4  injection.
5      Q.   Now, this article that you wrote at
6  the time mentions specifically sodium thiopental;
7  is that true --
8      A.   Yes.
9      Q.   -- as the first drug.  And although
10 we're talking about a different drug, if you'll
11 turn to the last page of that report, page 956,
12 halfway down, you talk about, and I know it's
13 talking about thiopental, but we know that
14 pentobarbital is a barbiturate and a central
15 nervous system depressant, you talk about what a
16 large dose would do to the inmate, and it
17 indicates that it would cause him to stop
18 breathing, experience a huge drop in blood
19 pressure, and resulting in a fatal decrease in
20 oxygen delivery to critical tissues, and you
21 mention monitoring this with an EKG and with a
22 physical examination.
23      Could you elaborate on that for us
24 here, because I want to clarify what we're

**62**

1  looking for and how we're finding what we're
2  looking for before we administer our second and
3  third drugs.
4      A.   One of the purposes of that paragraph
5  was to describe that after circulation ceases, as
6  a result of a barbiturate, it is common for
7  electrical activity in the heart to continue as
8  displayed by an electrocardiogram or ECG.  And
9  that represents a medical situation that is
10 typically known as PEA or pulseless electrical
11 activity.
12      And the reason why this is important
13 in the context of a lethal injection is that if
14 death occurs due to the cessation of circulation
15 produced by a barbiturate, one should not rely on
16 the ECG as an indicator of death because we
17 expect that for many minutes after circulation
18 ceases, that electrical activity will still be
19 displayed.
20      And in such a situation, death should
21 be pronounced based upon a physical exam that
22 reveals no spontaneous respiration, no palpable
23 heartbeat and no evidence of peripheral
24 circulation.

**63**

1      Now, in those jurisdictions that use
2  the three-drug protocol for lethal injection, the
3  administration of the potassium chloride will not
4  only stop the heart mechanically, but it will
5  also cause the ECG to become flat, and in those
6  situations, it is possible to pronounce death by
7  viewing the ECG without actually examining the
8  inmate first.
9      Q.   And you've reviewed the protocols of a
10 variety of other states; is that correct?
11      A.   Yes.
12      Q.   And are you aware that there are some
13 states that prohibit the involvement of a
14 physician in the process?
15      A.   Yes.
16      Q.   And in your opinion, can the protocol
17 be carried out humanely even if we don't have a
18 physician participating?
19      A.   Yes.
20      MR. KRISE:  I pass the witness.
21      MR. PAYNE:  Let's take a break.
22      VIDEOTAPE SPECIALIST:  Sure.  Now
23 going off the record, the time is 10:48 a.m.
24      (Short recess taken.)

**64**

1      VIDEOTAPE SPECIALIST:  We're now going
2  back on the record, the time is 1:17 p.m.
3  CROSS-EXAMINATION BY MR. PAYNE:
4      Q.   Isn't it the case, Doctor, that the
5  Oklahoma Department of Corrections with their new
6  protocol added pentobarbital as an alternative
7  first drug, but in doing so, they kept the same
8  dosage requirement and same time requirement for
9  waiting before administering the second and third
10 drugs as the protocol calls for with sodium
11 thiopental?
12      MR. KRISE:  Object to the form.
13      A.   Essentially yes.
14      Q.   Okay.  And isn't it correct that you
15 are not the expert that the Department of
16 Corrections consulted with in making the
17 determination to just keep the same dosage and
18 keep the same time requirement for pentobarbital?
19      MR. KRISE:  Object to the form.  Just
20 so we don't continue down a path of
21 misperception, the new protocol requires a
22 minimum wait of five minutes, the old protocol
23 mandated just a five-minute wait.  So that's a
24 significant distinction.

PAVATT AND MATTHEWS V. JONES, ET AL                    MARK DERSHWITZ, M.D., Ph.D.  11/8/10

65

1    Q.    Okay.  With that distinction, Doctor,
2  could you answer the question?
3    A.    I have no information on the route
4  that they took to change the protocol.
5    Q.    So you were not involved in that
6  route?
7    A.    That is correct.
8    Q.    And so it's not based on your
9  consultation, is it, that the five-minute minimum
10  time requirement for waiting to begin the
11  administration of the second and third drugs,
12  that it starts to run from the beginning of the
13  administration of the first drug; is that fair to
14  say?
15    A.    First of all, I do not serve as a
16  consultant.  I'm an expert witness, and I did not
17  give them any advice about any part of their
18  protocol.
19    Q.    If a protocol's going to have such a
20  time requirement before administering the second
21  and third drugs, wouldn't you agree that it makes
22  more sense to run the time requirement from the
23  finish of administration of the first drug?
24    A.    In the context of also assessing

66

1  consciousness by someone, it doesn't matter.
2    Q.    Well, haven't you recommended before
3  that it makes more sense to have such a minimum
4  time lapse run from the end of the solution flush
5  after administering the first drug until the
6  beginning of the second drug?
7    A.    However, in the context of a separate
8  assessment of consciousness, it doesn't matter
9  whether you start the stopwatch at the beginning
10  of the administration or the end, it makes no
11  difference whatsoever.
12    Q.    But you're not answering the question.
13    A.    Yes, I am.  It doesn't matter, because
14  there is a separate assessment of consciousness,
15  it doesn't matter whether the five-minute time
16  limit starts from the beginning of the
17  administration of the drug or the end of the
18  administration of the drug, because the
19  assessment of consciousness proves that an
20  adequate amount of drug was delivered to cause
21  the intended effect.
22    Q.    Wouldn't you agree that would be safer
23  to --
24    MR. KRISE:  Object to the form.

67

1    Q.    -- to run the time requirement from
2  the time of the end of administration of the
3  first drug rather than from the beginning?
4    MR. KRISE:  Object to the form.
5    A.    First of all, I will not give an
6  opinion on whether something is safer or not,
7  because that is not an appropriate term in this
8  context.  But I will reiterate that no matter
9  what adjective you use, there is no meaningful
10  difference in whether or not the protocol is
11  humane whether one starts the stopwatch at the
12  beginning of the infusion or the end of the
13  infusion simply because of the mandated
14  assessment of consciousness.
15    Q.    Isn't it true, Doctor, that there's a
16  relative difference in the amount of information
17  available to scientists and doctors as to the
18  impact of pentobarbital as opposed to sodium
19  thiopental?
20    A.    In terms of kinetics, yes.  In terms
21  of dynamics, no.
22    Q.    And isn't it true or fair to say that
23  we don't have similar state of the art studies
24  for pentobarbital as we have for sodium

68

1  thiopental?
2    A.    Only in terms of kinetics, not
3  dynamics.  And furthermore, every person who has
4  evaluated the two drugs will agree that in the
5  doses given, there's no meaningful difference in
6  the duration.  The difference in duration is only
7  meaningful when very low doses are given.
8    Q.    And by kinetic or pharmacokinetic, we
9  mean basically how the drug interacts with the
10  human body; is that correct?
11    A.    No.  The time course of the
12  medication, how long it takes to cause its
13  effect, and how long it takes the effect to last.
14    Q.    Okay.  Isn't it true that when we're
15  talking about the initial minute of
16  administration of the first drug, whether it be
17  sodium thiopental or pentobarbital, that how long
18  within that minute or maybe longer than that
19  minute it takes for the drug to render the
20  individual unconscious, doesn't that involve some
21  individual variability?
22    A.    Yes, but in a person who is a typical
23  patient, the arm-to-brain circulation time for
24  both medications is under one minute.  So it

McCARTHY REPORTING SERVICE

69

1 really doesn't matter if one is five or ten
2 seconds longer than the other or there is a
3 difference from patient to patient, it will
4 always occur rapidly.
5    Q.   So you agree that there's very little
6 high quality, high resolution kinetic data for
7 pentobarbital; is that correct?
8    A.   Yes.  And that would be useful only if
9 our goal was to wake up the person at the end of
10 the case.  It has no bearing whatsoever on the
11 scientific facts under discussion in this case.
12    Q.   Okay.  And with respect to
13 pharmacodynamic data, isn't it the case that
14 there's even less of that data than there is of
15 the kinetic data?
16    A.   Absolutely not.  We actually have a
17 large amount of pharmacodynamic data on
18 pentobarbital in terms of both how it acts at its
19 receptor as well as the dosing requirements that
20 are necessary to prove or to produce rather a
21 given end point like burst suppression.
22    Q.   Well, in the case of Dickens versus
23 Napolitano, at a hearing on December 9, 2008, do
24 you recall giving the following testimony, I

70

1 quote, "Pentobarbital given by the IV route is
2 uncommonly used in humans, and we have very, very
3 little high quality, high resolution kinetic data
4 on pentobarbital in humans, and we have even less
5 pharmacodynamic data."  Do you recall giving that
6 testimony?
7    A.   I don't specifically recall, but in
8 that context, I was not talking about the
9 production of burst suppression.  It is true that
10 we do not have high quality, high resolution
11 pharmacokinetic data on pentobarbital in terms of
12 how it will last when given to a patient for
13 anesthesia and predicting how long it will take
14 them to wake up, and that is the context in which
15 I was discussing it there, both in terms of
16 kinetics and dynamics.
17       Because pentobarbital is extremely
18 rarely used as a primary anesthetic agent, after
19 we give a dose or an infusion, it is difficult to
20 predict what the range of wake-up times will be.
21 That is a true statement.
22    Q.   Would you agree then that use of
23 pentobarbital via the IV route is uncommon?
24    A.   In general amongst the entire

71

1 population of people who come to the operating
2 room, you are correct, it is uncommon.  In terms
3 of the percentage of people who have certain
4 pathological states, amongst that subpopulation
5 of people, it is very commonly used, especially
6 today now that thiopental is no longer available
7 in the United States.
8       Let me add to that, phrased another
9 way, in the last year, pentobarbital use in this
10 country has increased dramatically simply because
11 thiopental is no longer available.
12    Q.   Well, in the past, haven't you
13 recommended sodium thiopental over pentobarbital
14 in terms of use for judicial executions?
15    A.   First of all, I would never make a
16 recommendation.  What I did in the past was I
17 compared the advantages and disadvantages, and I
18 have a long paper trail of comparing the
19 advantages and disadvantages of the two drugs.
20 However, that is a matter that is now prohibited
21 by the American Board of Anesthesiology for me to
22 discuss.  So I refer you to my prior paper trail,
23 but I cannot elaborate on it.
24    Q.   So you're saying you've never made

72

1 such a recommendation?
2    A.   I've never made any recommendation in
3 terms of one particular option being better than
4 another.  If somebody believes that that is the
5 case, I am being misquoted.
6    Q.   Okay.  Do you recall given the case of
7 Dickens versus Napolitano, December 9, 2008
8 hearing, being asked the following: "So it's
9 your opinion that if a decision was made to only
10 use one drug that was guaranteed to be painless,
11 you would still recommend staying with thiopental
12 rather than switching to pentobarbital?"  Answer,
13 "Yes."  Do you remember that testimony?
14    A.   I actually do not, but I believe
15 that's being taken out of context, because I have
16 been asked in the past can you compare and
17 contrast the advantages and disadvantages of
18 thiopental and pentobarbital, I have given long
19 and detailed answers to that question.  They are
20 a matter of public record, and I can't discuss it
21 anymore.
22    Q.   Now, you testified earlier about use
23 of pentobarbital to induce coma.  You've also
24 mentioned that pentobarbital's been used more

73

1  frequently of late.  Is that with respect to
2  inducing coma that it's been used more
3  frequently?
4      A.    It is being used more frequently for
5  both the management of severe epilepsy, as well
6  as the induction of coma because of the
7  unavailability of thiopental.
8      Q.    Wouldn't you agree that in terms of
9  using pentobarbital strictly for purposes of
10 inducing coma, that that is still an infrequent
11 use of pentobarbital?
12     A.    It's actually the most frequent use of
13 pentobarbital in this country now.  Phrased
14 another way, pentobarbital is not a commonly used
15 drug.  When it is used, it is used most commonly
16 to produce coma or to treat prolonged epileptic
17 seizures.
18     Q.    Okay.  I guess what I was getting at
19 was whether it's used more often for the
20 epileptic seizure treatment or to induce coma.
21 Just for clarification, can you answer that?
22     A.    I actually do not have data to answer
23 that question.
24     Q.    Well, is it -- wouldn't you agree that

74

1  pentobarbital used to induce coma in cases that
2  don't involve severe head trauma, those
3  circumstances are quite limited; are they not?
4      A.    I think it depends on the specific
5  institution.  For example, if an institution does
6  a significant number of cases in which
7  hypothermic circulatory arrest is produced, then
8  today pentobarbital is essentially the sole
9  medication that is used to achieve the coma.  So
10 in that situation, it's regularly used.
11     Q.    Well, as I understand it, the
12 circumstances in which pentobarbital is used to
13 induce coma involves cases with intracranial
14 pressure that's too high, in cases of AV
15 malformation, AV meaning --
16     A.    Arteriovenous.
17     Q.    -- arteriovenous malformation.  Is
18 that -- is my understanding correct on that?
19     A.    Absolutely not.  You describe either
20 increased intracranial pressure or a ruptured
21 arteriovenous malformation as indications in
22 which pentobarbital is used after the fact to
23 lower intracranial pressure.  And those are the
24 people, for example, that Dr. Waisel describes as

75

1  having an abnormal blood brain barrier.
2          Pentobarbital is also used in
3  virtually every patient with a normal brain who
4  undergoes hypothermic circulatory arrest as part
5  of their surgical procedure.  And, for example,
6  in my institution, that is a regular procedure.
7      Q.    And is the example of an aneurysm,
8  does that fit in the category of cases of
9  hypothermic arrest?
10     A.    No.  If the barbiturate coma is used
11 prospectively, that is before the surgery, then
12 the goal is if the surgeon is going to clamp a
13 major artery in the brain, the pentobarbital
14 decreases the likelihood of the person waking up
15 having had a stroke.  That is a completely
16 separate indication for the use of pentobarbital
17 prospectively in somebody with a perfectly normal
18 brain in addition to its use in hypothermic
19 circulatory arrest.
20          It can also be used in somebody who
21 had an aneurysm that ruptured, but that's
22 typically used to decrease the intracranial
23 hypertension, which is a completely separate
24 indication.

76

1      Q.    Well, wouldn't you agree that even
2  small amounts of hypoxemia, if that's the way you
3  pronounce it, affects the blood brain barrier?
4      A.    It can, but that bears no relevance on
5  what we're talking about.
6      Q.    Well, you would agree that the blood
7  brain barrier does affect pentobarbital's
8  crossing over or its effects on the brain, would
9  you agree with that?
10     A.    No.  Only to a negligible degree.  All
11 barbiturates, without exception, cross rapidly
12 into the brain.
13     Q.    Would you agree not as rapidly as
14 sodium thiopental?
15     A.    Absolutely not.  There is no clinical
16 difference, none, no measurable clinical
17 difference between the onset of anesthesia when
18 given by thiopental as compared to pentobarbital,
19 and recent experience bears that out.
20     Q.    Are you saying there's no difference
21 in terms of the lipid solubility between sodium
22 thiopental and pentobarbital?
23     A.    There is a measurable difference in
24 lipid solubility, and lipid solubility does not

77

1  affect the rate of the person falling asleep
2  after a typical sleep dose of pentobarbital as
3  compared to thiopental.
4          I have stood there, I have given them,
5  I have watched it, and in both cases, the person
6  falls asleep in less than a minute.  Now, whether
7  it's 45 seconds or 38 seconds or 56 seconds, it
8  doesn't matter.
9      Q.    But so you then do agree that it could
10 affect the duration of the drug taking effect?
11     A.    No, duration means how long the drug
12 lasts.
13     Q.    Okay.  Well, it could affect the time
14 it takes for the drug to take effect?
15     A.    No, there is no measurable difference
16 in onset from thiopental to pentobarbital in a
17 typical patient.
18     Q.    Okay.  Is there any published data or
19 are there any studies showing that the doses of
20 pentobarbital to induce coma is more or less the
21 same in severe head injury cases and cases of
22 normal healthy blood brain barrier tacked brains?
23     A.    Yes, the usual regimen for the
24 induction of barbiturate coma, especially when

78

1  one is not in a big hurry, is to give a loading
2  dose of 10 milligrams per kilogram over about a
3  30-minute period, follow that by an infusion at
4  five milligrams per kilogram per hour for a few
5  hours, monitor the EEG, and if the barbiturate
6  coma needs to be continued, then adjusting the
7  infusion rate someplace between one and five
8  milligrams per kilogram per hour to achieve the
9  continuation of burst suppression.
10         And there is no meaningful difference
11 from a brain-injured patient to a person with a
12 normal brain, with the understanding that there
13 is a significant population difference, even
14 amongst people with normal brains or injured
15 brains, which is why the maintenance phase has a
16 wide range, from one to five.
17         What's more important is that the
18 medication infusion is titrated to the end point
19 of achieving burst suppression.  And a 5,000
20 milligram dose or even a 2,500 milligram dose is
21 so far beyond that, that not only will the --
22     Q.    I'm going to have to interrupt.
23     A.    Please, no, you cannot interrupt me.
24     Q.    I cannot interrupt you?

79

1      A.    No, you cannot.
2      Q.    You're not answering the question.
3      A.    Yes, I am.
4      Q.    The question was are there any data or
5  studies --
6      A.    Yes, there are, and let me finish.
7  You are being rude and you're interrupting me,
8  and I will leave if you do it again.
9      Q.    Well, I'm sorry, I'm just --
10     A.    You should be sorry.
11     Q.    I'm just doing my job.
12     A.    No, you're not.  Now let me finish.
13     Q.    You had a long, long time to answer
14 whether there exists any data or published
15 material or any studies, you haven't answered
16 that question.
17     A.    The use of the dose, as I said at the
18 very beginning of the first sentence, the same
19 regimen is used in people with normal brains or
20 with intracranial hypertension, so the answer is
21 yes, the same dose is used.
22     Q.    And that's based on your experience,
23 but not on any studies?
24     A.    No, if you go into the literature

80

1  looking for papers on pentobarbital coma in
2  intracranial hypertension or pentobarbital coma
3  in patients who are undergoing hypothermic
4  circulatory arrest, the regimen will be the same,
5  a loading dose of 10 milligrams per kilo
6  approximately given over 30 minutes, followed by
7  an infusion of five milligrams per kilo per hour
8  for the first few hours.  Both will be
9  successful.
10     Q.    You attached two articles to your
11 report in this matter; is that correct?
12     A.    Yes.
13     Q.    And don't both of those articles
14 pertain to use of the pentobarbital in cases of
15 serious head trauma?
16     A.    Yes.  And the reason why I chose those
17 two was as far as I can tell, that is the oldest
18 and the newest articles on pentobarbital coma.
19 It has nothing to do with what it's being used
20 for, I chose those two because they are at
21 opposite ends of the time spectrum.
22         I could supply other articles that
23 discuss it's use in hypothermic circulatory
24 arrest.  My point in supplying those two articles

81

1  was to show that barbiturate coma with
2  pentobarbital is neither new nor archaic.
3      Q.    Isn't it true that there's a
4  difference between barbiturate-induced coma and
5  surgical plane of anesthesia?
6      A.    If one defines barbiturate coma as the
7  production of at least burst suppression, that is
8  a deeper level of anesthesia than is typically
9  targeted during surgery.
10     Q.    It's much deeper; is it not?
11     A.    It depends on how much burst
12 suppression there is.
13     Q.    Okay.  But these -- this experience
14 with use of pentobarbital to induce coma, that's
15 not specifically telling us what dose and what
16 time it takes for the drug to take effect to
17 reach a plane of -- a surgical plane of
18 anesthesia; isn't that the case?
19     A.    No, but a plane of surgical anesthesia
20 is completely irrelevant to the discussion here,
21 because burst suppression is deeper.  So if one
22 achieves a deeper level of anesthesia, what does
23 it matter in the context of a lethal injection,
24 it doesn't matter at all.

82

1      Q.    Well, that's making certain
2  assumptions.  But let me ask you this, you say
3  that the surgical plane of anesthesia is not
4  relevant, but isn't it the case that the protocol
5  in Oklahoma calls for the physician to monitor
6  that specific plane, maybe not in so many words,
7  but to monitor the surgical plane of anesthesia
8  before signalling the onset of the second and
9  third drugs?
10     A.    Yes.  And if the person has achieved
11 burst suppression, they will be deemed
12 unconscious and unresponsive by the examiner.
13     Q.    And so is it -- your testimony earlier
14 was that it takes within a minute for the
15 individual to reach a state of unconsciousness
16 using the five grams dosage of pentobarbital.
17 Are you saying then that within that minute, that
18 the person has achieved the -- or has reached the
19 state of burst suppression?
20     A.    Within one minute, probably not.
21 Within five minutes, almost certainly.
22     Q.    Would you agree that an individual
23 could be unconscious but not have reached the
24 surgical plane of anesthesia?

83

1      A.    It is possible, but not likely in this
2  context.
3      Q.    Now, just so I understand correctly,
4  is an ECG and an EKG the same thing?
5      A.    Yes.
6      Q.    Okay.  Would you agree that the EKG
7  tells us nothing regarding the plane of
8  anesthesia?
9      A.    It doesn't tell one much.  Under
10 surgery, we rely on the ECG to tell us the heart
11 rate, although we get that information elsewhere
12 also.  So heart rate is one of the determinants
13 of depth of anesthesia.  But in the context of a
14 lethal injection, the ECG is there to assist the
15 practitioner in pronouncing death, not to assist
16 in assessing the presence or absence of
17 unconsciousness.
18     Q.    Okay.  Now, you've testified that in
19 your opinion, the five grams of pentobarbital
20 would induce unconsciousness in the subject
21 within one minute; is that correct?
22     A.    From the time the drug is delivered to
23 the IV, so I'm excluding the time it takes to
24 transit from the syringe through the tubing to

84

1  the inmate.
2      Q.    Okay.  And is it possible that you've
3  ever given a time frame for that longer than one
4  minute?
5      A.    It depends on the injection rate and
6  the length of the tubing.  But depending on the
7  length of the tubing and the dead space inside
8  the tubing, the typical infusion rate of a few
9  milliliters per second will flush the dead space
10 in a few seconds.  And then once a few hundred
11 milligrams of pentobarbital has been delivered to
12 the vein, then the person will typically lose
13 consciousness in under a minute.
14     Q.    Well, isn't it true that the Oklahoma
15 protocol does not provide any injection rate for
16 administering pentobarbital?
17     A.    It does not, and as long as the inmate
18 is deemed unconscious, it really doesn't matter.
19     Q.    Well, let's assume that the state
20 wanted to use a protocol that was in effect a
21 one-drug protocol, how long would it take five
22 grams of pentobarbital in your opinion to achieve
23 death?
24     A.    Well, as I said earlier today, it is

85

1  difficult in medicine to define the exact instant
2  at which a person dies, and typically, the time
3  of death is written down at whatever time the
4  person charged with the pronouncement determines
5  death.
6         So after the administration of 5,000
7  milligrams of pentobarbital, after the person
8  loses consciousness, very shortly thereafter,
9  they will stop breathing. And if one measured
10  their blood pressure, it would be extremely low,
11  possibly unmeasurable. So death will occur in a
12  matter of a few minutes, where few is single
13  digits.
14         Going from the experience of states
15  that use a one-drug protocol, the time to
16  pronouncement of death I believe has been
17  universally under ten minutes.
18     Q.   Well, isn't it true that you've stated
19  before that if you -- if the state was to use a
20  one-drug protocol using pentobarbital, that the
21  execution would result in lapsed time likely in
22  excess of a half an hour before death is
23  pronounced?
24     A.   That is a true statement, regardless

86

1  of the drug used, if an ECG flat line is used as
2  the end point, and only if the ECG is used as the
3  end point. I testified that if physical
4  examination is used to determine death, it should
5  be able to be done quite a bit earlier than that.
6         Now, it is true in Ohio I predicted
7  that the cessation of circulation would take
8  longer than when they use their three drug
9  protocol, but it turns out after they started
10  their one-drug protocol, they proved me wrong and
11  there was no difference in the time to
12  pronouncement of death in Ohio when you compare
13  their one-drug protocol with their three-drug
14  protocol.
15     Q.   But what you're saying is that using
16  an ECG to determine death is going to take more
17  than 20 minutes over just using a physical
18  examination to determine death?
19     A.   In the absence of potassium chloride
20  administration, that is true, because it is
21  common that after circulation stops, the person
22  still has what's called PEA, which stands for
23  pulseless electrical activity. And in fact, a
24  person pronouncing death is able to and is

87

1  allowed to pronounce death in the presence of
2  pulseless electrical activity if abilities to
3  resuscitate the patient to restore pulse have not
4  been successful.
5         So it is true that the electrical
6  activity persists typically long after the
7  mechanical activity stops, except when the
8  mechanical activity is stopped with potassium
9  chloride.
10     Q.   So then isn't your testimony that if a
11  state was using a three-drug protocol including
12  potassium chloride and was using an ECG to
13  monitor heart activity, and if that state wanted
14  to make sure the inmate was dead before
15  administering the potassium chloride, they would
16  have to wait over half an hour before
17  administering the third drug?
18     A.   I believe what you're saying is
19  theoretically correct. I am unaware of any state
20  that built such a step into their protocol.
21     Q.   Okay. But what I'm asking is isn't
22  that -- isn't that consistent with your opinion
23  given here and in other cases?
24     A.   Okay, let me be very clear here.

88

1  Using ECG to determine death of an inmate given a
2  lethal injection only makes sense when the inmate
3  has been given potassium chloride. When an
4  inmate is executed with a one-drug protocol, a
5  physical examination is necessary to confirm that
6  the inmate has been successfully executed.
7     Q.   Okay. In the situation where an ECG
8  is not being used, was it your testimony just a
9  little -- a few minutes ago that it could take
10  somewhere as long as ten minutes to achieve death
11  through use of pentobarbital using a five gram
12  dosage?
13     A.   In those situations, the time of
14  pronouncement of death has also been dictated by
15  the protocol that mandates how long -- there is a
16  waiting period from the administration of the
17  drug until someone examines the inmate. Now,
18  some states have a five-minute wait, some states
19  have a ten-minute wait, but the time of death is
20  arbitrary, because as I explained, we don't have
21  a definition for when death occurs, death occurs
22  when somebody who is empowered to pronounce death
23  pronounces death.
24     Q.   You would agree, wouldn't you, that

PAVATT AND MATTHEWS V. JONES, ET AL        MARK DERSHWITZ, M.D., Ph.D.  11/8/10

89

1 individual monitoring of the IV site during an
2 execution, that the individual monitoring that IV
3 site should have some training and experience in
4 doing so?
5       MR. KRISE:  Object to the form.
6    A.   The person who monitors the IV site,
7 whoever that is, should have knowledge of what is
8 the normal situation and what abnormalities may
9 occur that indicate a problem.
10    Q.   Wouldn't you say that the individual
11 should have experience doing it on a regular
12 basis?
13       MR. KRISE:  Object to the form.
14    A.   Yes, they should have familiarity with
15 -- both with what to look for and what the normal
16 situation is and the abnormal situation.
17       THE WITNESS:  Excuse me one second, I
18 just need to check to see who's paging me.
19       If we could go off the record, I need
20 to take this one.
21       VIDEOTAPE SPECIALIST:  Now going off
22 the record, the time is 1:53 p.m.
23       (Discussion off the record.)
24       VIDEOTAPE SPECIALIST:  Now going back

90

1 on the record, the time is 1:55 p.m.
2    Q.   Doctor, you would agree, would you
3 not, that there's more to monitoring an IV site
4 than simply watching for swelling?
5       MR. KRISE:  Object to the form.
6    A.   There's other things that one can do
7 besides looking.  If one is concerned that there
8 may be infiltration, usually one uses a palpating
9 finger to see if one can feel swelling.
10       But generally with the volume that is
11 anticipated to be injected here, the
12 pentobarbital will be a hundred milliliters.  A
13 hundred milliliters, which is three-and-a-half
14 ounces of liquid, is not subtle if it went
15 subcutaneously.
16    Q.   And wouldn't you agree that one way to
17 detect a problem with the flow of the medication
18 into the vein is for the person who is pushing
19 the drug into the -- into the line to notice
20 resistance within the IV lines?
21       MR. KRISE:  Object to the form.
22    A.   Generally that's not a true statement
23 when the barbiturate is loaded into large
24 syringes, and typically a 50 or a 65 milliliter

91

1 syringe is used to hold the barbiturate so that
2 the number of syringe changes is minimized.
3       Now, in a system that contains a
4 syringe, tubing and an intravenous catheter, by
5 far, most of the resistance is present in the
6 syringe.  And so unless the catheter is
7 completely obstructed, mild increases in
8 resistance in the catheter itself will not be
9 perceptible easily to the person pushing the
10 plunger because there's so much resistance in the
11 syringe itself.
12    Q.   Well, wouldn't you agree that the
13 individual who is plunging the medication through
14 the lines should be trained to detect when
15 there's resistance to pushing the medication
16 through?
17       MR. KRISE:  Object to the form.
18    A.   In general, yes.  I've often said that
19 the people who have various tasks as part of a
20 lethal injection should have experience
21 performing similar tasks in patients.  However,
22 it's relatively uncommon in clinical medicine for
23 anyone to inject a medication intravenously using
24 a 50 or a 60 milliliter syringe.

92

1       And so even somebody whose hands are
2 as experienced as mine would have difficulty
3 detecting changes in resistance at the level of
4 an 18-gauge intravenous catheter when that is at
5 the other end of a system that has a 50 or a 60
6 milliliter syringe on it.
7    Q.   Well, wouldn't you agree that it would
8 be preferred to have the individual have training
9 in this regard?
10       MR. KRISE:  Object to the form.
11    A.   Certainly anyone who injects
12 medications into patients has experience
13 detecting and perceiving what it feels like when
14 there is an obstruction to the intravenous
15 system.  But in reality, that is meaningful only
16 when one is using relatively small syringes.
17       When one is using a very large
18 syringe, and in my practice, the only time I ever
19 use a 50 or a 60 milliliter syringe is when a
20 pump is going to be pumping the piston, not my
21 hands, it is very difficult because of the
22 tremendous amount of resistance in the syringe
23 itself to detect a change in resistance at the
24 tip of the intravenous catheter.

PAVATT AND MATTHEWS V. JONES, ET AL          MARK DERSHWITZ, M.D., Ph.D.  11/8/10

93

1   Q.   Well, as far as cases using a small
2  syringe, isn't it the case that there is training
3  that's available to individuals who use small
4  syringes?
5       MR. KRISE:  Object to the form.
6   A.   I wouldn't phrase it like that.  I
7  would say that everyone who injects medications
8  into patients develops experience knowing what an
9  obstructed intravenous system feels like because
10  they encounter it on occasion, and it's more
11  easily palpated with a small syringe as compared
12  to a big syringe.  So I wouldn't say the person
13  needs training, I would say the person needs
14  experience.
15   Q.   Well, the question wasn't whether he
16  needed training, it was whether training is
17  available.  Is such training available --
18       MR. KRISE:  Object to form.
19   Q.   -- or is the only way you can learn to
20  do it is by experience, is that what you're
21  saying?
22       MR. KRISE:  Object to form.
23   A.   In my practice, the way that my
24  trainees develop this knowledge is by on-the-job

94

1  experience.  I don't provide them with training,
2  for example, using a dummy or with tubing that's
3  emptying into a garbage can, they develop this
4  experience by taking care of patients on a
5  regular basis.
6   Q.   Okay.  And do you know whether the
7  individuals in Oklahoma who are responsible for
8  administering the medications do this on a
9  regular basis?
10   A.   I have no specific knowledge of the
11  people on the execution team.
12   Q.   You would agree, would you not, that
13  all physicians -- that it's not the case that all
14  physicians are trained in assessing the plane of
15  anesthesia?
16   A.   That is true.  I should also point
17  out, by the way, plane of anesthesia is an
18  archaic term that's not used anymore by modern
19  anesthesiologists, because plane of anesthesia
20  only applies to the use of diethyl ether as an
21  anesthetic, and plane of anesthesia is a term
22  that is not applied to any of the modern drugs we
23  use.  A better term would be depth of anesthesia
24  or depth of hypnosis.

95

1   Q.   Okay.  Wouldn't you agree that
2  assessing the plane of anesthesia and knowing
3  when the individual has reached at minimum a
4  surgical plane of anesthesia is of critical
5  importance in the three-drug protocol?
6       MR. KRISE:  Object to the form.
7   A.   And also substituting my use of depth
8  of anesthesia for your use of plane, I agree, the
9  person should confirm that the patient is
10  unconscious before proceeding with the second and
11  third drugs.
12   Q.   Earlier you testified about animal
13  studies and use of pentobarbital in animal
14  euthanasia.  Can you point to any clinical data
15  or studies that demonstrate that pentobarbital
16  administered in small animals translate to
17  administration of pentobarbital with humans?
18   A.   When pentobarbital is used as an
19  anesthetic, not as a euthanizing drug in animals
20  like household pets or primates, the dose is not
21  that different than the dose that would achieve
22  unconsciousness in humans.
23   Q.   Okay, let me ask the question again.
24  Can you point to any clinical data or studies

96

1  that demonstrate that pentobarbital and its use
2  in animals translates to its use in humans?  I'm
3  asking for clinical data or studies.
4       MR. KRISE:  Object to the form.
5   A.   Well, the answer is yes.  Now, I'm not
6  a veterinary anesthesiologist, but I know that
7  there are data in the veterinary literature that
8  describe recommended doses of pentobarbital to
9  achieve anesthesia in small animals.  The doses
10  are not that different from the doses needed in
11  humans.
12       But more importantly, in the context
13  of a lethal injection, the drug is given in such
14  a large overdose that even differences between
15  animals and humans of a factor of severalfold
16  become meaningless.
17   Q.   But you just stated that the amount
18  needed to induce anesthesia in animals, the small
19  animals, is not that different from that which is
20  needed for humans, but we don't have data on
21  pentobarbital in terms of what dosage and how
22  long it takes to affect -- to achieve actually an
23  anesthetic state.
24   A.   That's absolutely incorrect.

97

1 Absolutely positively incorrect. We know that if
2 one delivers ten milligrams per kilogram, one
3 will reliably achieve burst suppression. It's
4 actually an overdose.
5        We also know that pentobarbital acts
6 in less than one arm to -- or actually one
7 arm-to-brain circulation time, which is typically
8 less than a minute in humans. Nobody that I know
9 disputes that fact who's used the drug in humans.
10     Q.     Well, when it's used to induce coma to
11 the level of burst suppression, that is different
12 than using it to induce an anesthetic state; is
13 it not?
14     A.     Yes, it's an overdose. But, for
15 example, when we have a patient who is going to
16 have elective barbiturate coma for part of the
17 surgery, a perfectly reasonable regimen is to
18 induce anesthesia and maintain anesthesia with
19 pentobarbital.
20        Now, we know that a large dose given
21 in a short period of time has a significant
22 effect to decrease the blood pressure. So one
23 way of achieving that ten milligram per kilogram
24 dose would be to give half of it as a bolus in

98

1 which the person will fall asleep in under a
2 minute, and give the remaining half over the next
3 30 minutes. And that is a perfectly reasonable
4 way of starting an anesthetic in which
5 barbiturate coma is desired later in the case.
6 And that is how my colleagues and I typically do
7 it.
8     Q.     But isn't it true that when
9 pentobarbital is used to induce a state of a coma
10 in a healthy brain, it is being used not alone
11 but with other medications, isn't that the case?
12     A.     No.
13     Q.     It's used alone when inducing coma in
14 a healthy brain?
15     A.     It certainly can be and has been in
16 our practice. Now, I should add the person may
17 have other medications, for example, a paralytic
18 drug to facilitate the surgery, but when
19 barbiturate coma is intended as the -- as a part
20 of a surgical procedure, it is perfectly
21 reasonable to induce anesthesia with
22 pentobarbital by itself and give a muscle
23 relaxant to facilitate both endotracheal
24 intubation and the surgery, and to maintain

99

1 anesthesia with whatever drugs that may be
2 necessary.
3        But the only hypnotic drug that needs
4 to be given is pentobarbital. There may be drugs
5 given in other classes, like pain relievers or
6 muscle relaxants, but the only drug for sleep
7 that is necessary is pentobarbital, and that is
8 the way it's commonly used.
9     Q.     But you would agree using it for --
10 I'm sorry, you'd have to define for me what you
11 mean by using it to -- for sleep.
12     A.     The components of a general anesthetic
13 typically involve a medication for sleep, a
14 medication for pain, a medication for muscle
15 relaxation, and the use of pentobarbital as the
16 hypnotic agent, that is the agent that produces
17 unconsciousness, that drug is adequate to be the
18 only drug that the patient receives to produce
19 unconsciousness.
20        They may be given other medications
21 like opioids for pain and muscle relaxants to
22 facilitate intubation and to facilitate the
23 surgery, but it would be wrong to say that
24 additional medications need to be given in

100

1 addition to pentobarbital for the production of
2 the sleep or the coma part of the anesthesia.
3     Q.     You would agree, would you not, that
4 experience has shown us that using sodium
5 thiopental at a dosage of five grams can take
6 longer than five minutes to induce death?
7     A.     Yes, it has taken longer for the
8 pronouncement of death in those states that wait
9 an arbitrary five or ten minutes before a person
10 approaches the inmate's body to perform an exam.
11 We have no idea when death actually occurred.
12        Phrased another way, in Ohio when they
13 used thiopental by itself, whenever the person
14 charged with pronouncing death performed the
15 exam, the person was pronounced dead. But we
16 have no idea how long prior to that examination
17 they might have met the criteria for death
18 because nobody had approached them to examine
19 them for that purpose.
20     Q.     Well, isn't it the case that
21 experience has shown us that sodium thiopental
22 has numerous times taken longer to induce an
23 anesthetic state equivalent to surgical plane of
24 anesthesia than what was expected?

PAVATT AND MATTHEWS V. JONES, ET AL      MARK DERSHWITZ, M.D., Ph.D. 11/8/10

101

1      MR. KRISE:  Object to the form.

2    A.   I don't understand the question.

3    Q.   Hasn't experience shown us that sodium

4 thiopental on occasion has taken longer to induce

5 unconsciousness than expected?

6      MR. KRISE:  Object to the form.

7    A.   Well, since you repeated the question

8 word for word, I still don't understand it.  Are

9 you asking me about the times when inmates

10 haven't fallen asleep or when patients haven't

11 fallen asleep?

12    Q.   Either/or.

13    A.   Well, two cases of executions that I'm

14 aware of where the inmate did not fall asleep in

15 the expected period of time were very likely due

16 to the intravenous catheter not being in a vein,

17 and clearly applying these medications by any

18 other route other than intravenous is going to

19 cause their behavior to be not what's expected.

20    Q.   But now you're using terminology about

21 individuals not falling asleep.  But there's a

22 difference between falling asleep and reaching a

23 level of anesthesia such that you don't feel any

24 pain; isn't that the case?

102

1    A.   That is true.  But in the cases -- and

2 I have to preface this by saying I have no inside

3 information, what I know about these cases I read

4 in the paper, of the inmates not falling asleep

5 because they did indeed not fall asleep.

6      I'm not saying that falling asleep is

7 an adequate end point, I'm saying these two

8 instances, one in Florida, one in Ohio, an inmate

9 was given thiopental and the inmate did not fall

10 asleep, the inmate was continuing to talk.  That

11 is a very, very unexpected outcome, and almost

12 certainly it was due to the IV catheter not being

13 in the right place.

14      MR. PAYNE:  Just give me one more

15 moment here to look over my notes.

16      VIDEOTAPE SPECIALIST:  Now going off

17 the record, the time is 2:13.

18      (Short recess taken.)

19      VIDEOTAPE SPECIALIST:  Now going back

20 on the record, the time is 2:14 p.m.

21    Q.   Earlier you had testified about use of

22 pentobarbital with small animals in cases of

23 euthanasia.  Isn't it true that using

24 pentobarbital for euthanasia purposes with

103

1 animals, pentobarbital is used as a one-drug

2 regimen?

3    A.   Often, yes.  I can't use the word

4 typically because I'm not a veterinarian, but

5 there are multiple preparations available to

6 veterinarians for the production of euthanasia.

7 And so a highly concentrated solution of

8 pentobarbital by itself is available and commonly

9 used by veterinarians.

10      There are also solutions of

11 pentobarbital with other things that are used for

12 euthanasia.  And I don't have enough experience

13 or knowledge to say which of those is more

14 commonly used in the 21st century.

15    Q.   Well, isn't it true that the -- I

16 think it's called the American Veterans --

17 Veterinarians Medical Association, AVMA, that

18 they -- that they mandate that pentobarbital is

19 not to be used with a neuromuscular blocker?

20    A.   Correct.  And I was talking about

21 combinations of drugs.  There is a veterinary

22 preparation containing pentobarbital and

23 phenytoin, the anticonvulsive agent mixed

24 together in the same bottle.  And some

104

1 veterinarians prefer that because the phenytoin

2 more rapidly stops the heart.  But I can't tell

3 you whether this combination is used more

4 commonly than pentobarbital by itself.  But both

5 are readily available to veterinarians.

6    Q.   But you do agree that pentobarbital is

7 not used in euthanizing small animals along with

8 a neuromuscular blocker such as vecuronium

9 bromide?

10    A.   My understanding is veterinarians are

11 not supposed to use a paralytic agent as part of

12 a euthanasia regimen.

13    Q.   Now, isn't it true that in judicial

14 executions of humans, that use of a single

15 barbiturate would avoid all significant risk of

16 pain?

17      MR. KRISE:  Object to the form.

18    A.   The problem is with your use of the

19 word all, because there are still places within

20 the protocol in which some pain could occur.  For

21 example, there will always be the pain associated

22 with the placement of the IV, and if the IV is

23 malpositioned, giving a barbiturate

24 subcutaneously can be uncomfortable.

**McCARTHY REPORTING SERVICE**

PAVATT AND MATTHEWS V. JONES, ET AL                    MARK DERSHWITZ, M.D., Ph.D.  11/8/10

105

1          With those two things acknowledged,
2  using a one-drug protocol would obviate the
3  potential uncomfortable effects of the other
4  drugs.
5      Q.   And that -- would you not agree that
6  that pain, that potential pain we're talking
7  about where the individual has not reached the
8  adequate anesthetic depth prior to administration
9  of the second and third drugs in Oklahoma's
10 protocol, that that pain is highly significant?
11         MR. KRISE:  Object to the form.
12     A.   I've answered that question in the
13 past.  I don't believe I am free to answer that
14 question now because it requires drawing
15 comparisons between two different protocols.
16         But, yes, indeed, I have answered that
17 question in the past, and I stand by my prior
18 testimony.
19     Q.   You have testified before, have you
20 not, that eliminating the second and third drug
21 would certainly avoid all risk of any significant
22 pain?
23         MR. KRISE:  Object to the form.
24     A.   I don't believe I am free to answer

107

1  a clinical setting or during a surgical
2  procedure, an anesthesiologist is attempting to
3  assess the depth of anesthesia; is that correct?
4      A.   Yes.
5      Q.   And that -- he's attempting to obtain
6  a -- or administer just the right amount of the
7  anesthetic agent; is that true?
8      A.   In general that's true, because with
9  few exceptions, our usual goal is to have the
10 patient wide awake at the end of the operation
11 and ready to meet criteria for either discharge
12 from the recovery room or even discharge from the
13 hospital in a short period of time.
14     Q.   And in a lethal injection context
15 where we don't want the inmate to wake up, those
16 -- that level of detail is not necessary; is that
17 true?
18     A.   Well, the way I would phrase it is
19 it's not important to try to carefully assess the
20 depth of anesthesia as long as one is rendered as
21 deep or deeper than is necessary, and there's no
22 downside of rendering the inmate deeper than is
23 necessary, but that would be a down side in
24 clinical anesthesia.

108

1  that question.  However, if it's in the record,
2  you have proof of it.
3          But you are asking me to compare two
4  different versions or two different protocols,
5  and my interpretation of the letter from the ABA
6  expressly prohibits me from doing so.
7      Q.   Okay, but I'm talking about the past.
8  Let me see how far in the past I'm talking about.
9  Over a year ago, and so if I told you that was
10 your testimony in the case of Stenson versus
11 Vail, would you have any reason to disagree with
12 me?
13     A.   I do not believe I am free to answer
14 the question, because implicitly it would be
15 providing the information you request.
16 Understand that I received the letter from the
17 American Board of Anesthesiology August 21, 2010,
18 and so my ability to answer certain questions
19 changed on that date.  And I believe that applies
20 to all board certified anesthesiologists, not
21 just me.
22         MR. PAYNE:  I have nothing further.
23 REDIRECT-EXAMINATION BY MR. KRISE:
24     Q.   I have a few follow-up questions.  In

108

1      Q.   Now, it was mentioned earlier, at
2  least my recollection is that it was stated to
3  you that Oklahoma's protocol requires the
4  physician to determine the depth of anesthesia.
5  You've looked at the protocol, but I'll show it
6  to you again.  It's Exhibit -- what exhibit
7  number?
8      A.   One.
9      Q.   Exhibit No. 1 to your deposition, if
10 you'll turn to -- and the page numbers are up
11 here on the block at the top, if you'll turn to
12 page 15.  At the very bottom, that last paragraph
13 beginning with "Prior to the administration,"
14 would you read that first sentence.
15     A.   "Prior to the administration of
16 vecuronium bromide, the physician present in the
17 execution room will monitor the condemned
18 offender's level of consciousness through
19 whatever means the physician believes are
20 appropriate to ensure that the condemned is
21 sufficiently unconscious prior to the
22 administration of the vecuronium bromide."
23     Q.   And that doesn't mention depth of
24 anesthesia, does it?

McCARTHY REPORTING SERVICE

109

1    A.    No.  It does use the term level of
2  consciousness, which semantically is not the same
3  as the way I use the word consciousness.  But the
4  intent, I believe, is to make sure that the
5  inmate is deep enough so that the inmate is
6  incapable of perceiving any effects from the
7  second and third drugs.
8    Q.    And that doesn't require any
9  specialized training, does it?  Well, let me back
10  up.  That doesn't require any level of training
11  or knowledge expected of an anesthesiologist?
12    A.    No, it's very important to
13  differentiate between determining presence or
14  absence of consciousness and the depth of
15  anesthesia.  And carefully assessing the depth of
16  anesthesia requires a lot of experience and a lot
17  of finesse that I would expect an
18  anesthesiologist to have, and I would expect most
19  other specialists in medicine not to have.  But
20  that's not necessary here as long as the inmate
21  is brought to a depth at or beyond what is
22  needed.
23    Q.    Okay.
24    A.    And clearly 5,000 milligrams of

110

1  pentobarbital will cause electrical inactivity of
2  the brain, which is a depth beyond which no one
3  can measure a depth.
4    Q.    In anesthetic practice, after a drug
5  to induce anesthesia is given, anesthesiologists
6  test for adequate depth of anesthesia sometimes
7  using a hands-on assessment like an eyelash
8  reflex, touching the eyelash to see if the
9  eyelids flutter.  Do you agree with that
10  statement?
11    A.    That's one of the things that we often
12  do.
13    Q.    And in the absence of a hands-on
14  assessment of anesthetic depth, sustained apnea
15  may be a reasonable surrogate for adequate
16  delivery of a large quantity of a barbiturate; do
17  you agree with that?
18    A.    Yes.
19    Q.    And do you agree that sustained apnea
20  guarantees a sufficient depth of anesthesia?
21    A.    For the purposes of not perceiving the
22  second and third drugs, that is a reasonable
23  assessment.
24    Q.    And to be clear, you have actually

111

1  administered pentobarbital to a healthy person,
2  correct?
3    A.    Yes.
4    Q.    And you have seen its effects?
5    A.    Yes.
6    Q.    On more than one occasion?
7    A.    Yes.
8    Q.    When was the last time you
9  administered pentobarbital to a person with a
10  normal healthy brain?
11    A.    Well, my most recent participation, I
12  actually did not administer the drug, but I was
13  consulted by one of my colleagues who's a cardiac
14  anesthesiologist, the patient required
15  replacement of the aortic valve and the aortic
16  root, which is the very beginning of the
17  ascending aorta, and hypothermic circulatory
18  arrest was planned.
19         And my colleague came to me and said
20  "What should I do?  There's no thiopental."  And
21  I gave her the same regimen for inducing
22  barbiturate coma that I previously described
23  several times here.  And in fact, we used
24  pentobarbital as the sole hypnotic agent for the

112

1  entire case.
2         And so the patient was put to sleep
3  with pentobarbital, and pentobarbital coma was
4  induced and assessed with an EEG and maintained
5  for the duration of the surgery where it was
6  necessary.
7         Now because of the nature of the
8  surgery, it was previously decided that this
9  patient would not be awakened and extubated at
10  the end of the case.  The patient was going to be
11  kept deliberately sedated and ventilated in the
12  intensive care unit overnight for safety reasons.
13  And so, therefore, it was not terribly important
14  in this particular patient how rapidly the
15  pentobarbital would wear off.
16         Phrased another way, the fact that it
17  was longer lasting than thiopental in this
18  context was not a disadvantage.
19    Q.    Okay.  If -- or in a situation where
20  death occurs as a result of a barbiturate, would
21  you expect to see an ECG flat line?
22    A.    Eventually, yes.  Because after the
23  heart stops beating and there's no circulation of
24  oxygenated blood, the heart will die and

**PAVATT AND MATTHEWS V. JONES, ET AL**  MARK DERSHWITZ, M.D., Ph.D.  11/8/10

113

1  ultimately there will be no electrical activity
2  whatsoever.  But the period of time that must
3  elapse between the cessation of mechanical
4  activity and the cessation of electrical
5  activity, when the latter is due to oxygen
6  deprivation, is many minutes.
7       And in fact, in my experience of
8  taking care of patients who are organ donors,
9  I've actually measured that period of time as
10  long as half an hour, which is why I used 30
11  minutes in that prior testimony that was quoted
12  to me, because that is based upon my personal
13  experience.
14       Q.  Now, it goes without saying that we've
15  not conducted, when I say we, medical science has
16  not deliberately conducted tests to determine
17  what levels of drugs cause death in persons on
18  people, correct?  That I'm aware of.
19       A.  Well, there are retrospective data,
20  especially based on medical examiner reports, of
21  people who overdosed on drugs, so we have some
22  knowledge of what blood concentrations are
23  associated with death and overdoses, but those
24  are retrospective and they tend to be very wide

114

1  ranges of concentrations.
2       Q.  The point I'm trying to make is we can
3  use models from existing data to determine what
4  effect a certain dose of a barbiturate will have
5  on a person, even though we may not have
6  deliberately ever given that dose, we can
7  determine what the effect would likely be; is
8  that true?
9       A.  That's true, especially when the drug
10  is given in a large overdose.
11       Q.  And is five grams of pentobarbital
12  considered a large overdose?
13       A.  Five grams of any barbiturate is an
14  enormous overdose for all indications.
15       MR. KRISE:  I don't have anything
16  else.  Tim, do you have anything?
17       MR. PAYNE:  Yeah, I'd like to ask a
18  couple more.
19  RECROSS-EXAMINATION BY MR. PAYNE:
20       Q.  Doctor, wouldn't you agree that the
21  knowledge we have regarding use of pentobarbital
22  to induce anesthesia is essentially based on what
23  we know regarding use of pentobarbital to induce
24  a coma?

115

1       A.  Not necessarily, because on the way to
2  achieving coma, as I just described, we gave a
3  dose of pentobarbital that was similar to the
4  dose of thiopental that we might have used back
5  in the days when thiopental was used as an
6  anesthetic.
7       Q.  How long ago was pentobarbital used as
8  an anesthetic?
9       A.  In my practice, as recently as a few
10  weeks ago.
11       Q.  I'm sorry, I misunderstood then your
12  previous answer.
13       MR. PAYNE:  Could I have his previous
14  answer read back to me, please.
15       THE REPORTER:  "Not necessarily,
16  because on the way to achieving coma, as I just
17  described, we give a dose of pentobarbital that
18  was similar to the dose of thiopental that we
19  might have used back in the days when thiopental
20  was used as an anesthetic."
21       Q.  I did misunderstand the answer.  Would
22  you agree, Doctor, that the Oklahoma protocol
23  does not call for assessing whether the
24  individual has reached a state of coma or a state

116

1  of burst suppression before administering the
2  second and third drugs?
3       A.  Well, it certainly doesn't mandate the
4  measurement of burst suppression, because that
5  requires an EEG machine, and that is not measured
6  -- mentioned, excuse me.
7       The protocol gives the physician
8  latitude for assessing consciousness.  It says
9  here, and I quote, through whatever means the
10  physician believes are appropriate, unquote.
11  And, therefore, the responsibility for
12  implementing this is on the specific physician
13  who's there.
14       Q.  But he is required to monitor for
15  consciousness, correct?
16       A.  Yes.
17       Q.  And consciousness or even being
18  unconscious is a different matter than being at
19  an anesthetic level or depth of burst
20  suppression, correct?
21       A.  Yes.
22       Q.  Now, do you know whether the physician
23  in Oklahoma who is attendant at executions has as
24  part of his routine practice assessing depth of

**PAVATT AND MATTHEWS V. JONES, ET AL**          **MARK DERSHWITZ, M.D., Ph.D. 11/8/10**

117

1 anesthesia?

2    A.    Before I answer the question, I don't

3 know if I can do this, but I think I have to ask

4 Mr. Krise a question, because I don't want to

5 disclose something that's protected.  I don't

6 know if the piece of information I'm about to

7 tell you has been protected or not.

8         MR. PAYNE:  Should we go off the

9 record?

10        MR. KRISE:  Yes.  We'll confer really

11 quick.

12        VIDEOTAPE SPECIALIST:  Now going off

13 the record, the time is 2:33 p.m.

14        (Short recess taken.)

15        VIDEOTAPE SPECIALIST:  Now going back

16 on the record, the time is 2:39 p.m.

17        THE WITNESS:  So I can answer now.

18        MR. KRISE:  Yes.

19    A.    Okay.  I have been told that the

20 physician who is present at the executions is an

21 emergency room physician, and although I know

22 nothing else specifically about this person or

23 about his or her practice, I have to assume that

24 the assessment of consciousness is an integral

118

1 part of the examination performed by emergency

2 room physicians on a significant fraction of the

3 patients who are carried into the emergency

4 department.

5    Q.    Okay.  Wouldn't you agree, Doctor,

6 that generally speaking, when anesthesiologists

7 are using pentobarbital to induce a state of

8 coma, that they are not going to be keeping track

9 and logging down in writing when the individual

10 has reached an adequate depth of anesthesia so as

11 not to feel pain?

12        MR. KRISE:  Object to the form.

13    A.    It's absolutely incorrect.  Because,

14 for example, in the case that I described for you

15 a few weeks ago, the patient was given five

16 milligrams per kilogram of pentobarbital, and

17 that was the primary agent that was used to

18 render the person unconscious prior to putting in

19 the breathing tube.  And putting in the breathing

20 tube is one of the most painful and stimulating

21 things that we do to people.  It's actually more

22 uncomfortable than a surgical incision.

23        So therefore, after the administration

24 of the pentobarbital and before the insertion of

119

1 the breathing tube, my colleague convinced

2 herself that the patient was indeed deep enough

3 so as to be able to tolerate the endotracheal

4 tube, and the time required to achieve that state

5 was approximately a minute or a little less.

6    Q.    Because that's based on some recent

7 experience you've had.  But I'm asking generally

8 speaking, across the board when anesthesiologists

9 are using pentobarbital to induce a state of

10 coma, do you believe then that indeed they are

11 typically keeping track and writing down when the

12 individual has reached let's say a surgical depth

13 of anesthesia?

14        MR. KRISE:  Object to the form.

15    A.    I guess it depends if they like in

16 this case I just described are using the

17 induction of coma for the purposes of beginning

18 the surgery and the anesthesia, like putting in

19 the breathing tube and making the incision, and

20 if the answer is yes, then they certainly are

21 convincing themselves that the patient is

22 adequately anesthetized.

23        Phrased another way, it is possible to

24 induce anesthesia with pentobarbital and later as

120

1 part of the continuum of increasing the dose

2 achieve coma.  And it's actually a very efficient

3 way of using one drug to achieve both the

4 induction of anesthesia as well as the production

5 of the necessary coma.

6    Q.    Okay.  Can you point me then to a

7 single article where these time durations,

8 meaning you're using pentobarbital in a healthy

9 brain and it reaches an adequate state of

10 anesthesia so as the patient's not going to feel

11 any pain, can you point me to any studies that

12 show that data and spell out then how long it

13 typically takes?

14    A.    In terms of articles that discuss the

15 use of barbiturate coma that is induced at the

16 very beginning of the anesthesia, I would have to

17 go back and look for that because that's an area

18 of the literature with which I'm not familiar.

19    Q.    So off the top of your head, the

20 answer is you can't point to such a study?

21        MR. KRISE:  Object to form.

22    A.    I may not be able to point to such a

23 study, but it is common knowledge among my

24 colleagues who do this.

**McCARTHY REPORTING SERVICE**

PAVATT AND MATTHEWS V. JONES, ET AL                MARK DERSHWITZ, M.D., Ph.D. 11/8/10

---

121

1          MR. PAYNE:  I have nothing further.

2   FURTHER REDIRECT EXAMINATION BY MR. KRISE:

3      Q.     In light of --

4          MR. KRISE:  Do we have time?

5          VIDEOTAPE SPECIALIST:  Less than a

6   minute.

7      Q.     Okay.  In light of everything we

8   discussed here today, Mr. Payne's

9   cross-examination, does any of this change your

10  opinion, your expert opinion that to a reasonable

11  degree of medical certainty, there is a

12  negligible risk that an inmate to whom 5,000

13  milligrams of pentobarbital is properly

14  administered pursuant to the lethal injection

15  protocol in the State of Oklahoma would

16  experience any pain and suffering associated with

17  the administration of lethal doses of vecuronium

18  bromide and potassium chloride?

19     A.     No.

20     Q.     That opinion stands, correct?

21     A.     Yes.

22          MR. KRISE:  Thank you.

23          MR. PAYNE:  Nothing further.

24          VIDEOTAPE SPECIALIST:  We're now going

---

122

1   off the record, this is the end of tape number

2   two, the time is 2:44 p.m.

3          (Discussion off the record.)

4          MR. KRISE:  Doctor, this concludes

5   your deposition, and you now have to elect

6   whether you would like to read and sign your

7   deposition or if you would like to waive that

8   right.  You have to state that on the record.

9          THE WITNESS:  I would like to read and

10  sign.

11          MR. KRISE:  And we agree that you do

12  not need to have your signature notarized.

13          And, Tim, do you agree to that as

14  well?

15          MR. PAYNE:  Yes, I agree.

16          MR. KRISE:  That's all I have.  Thank

17  you.

18          (The deposition then ended.)

19

20

21

22

23

24

---

123

1   COMMONWEALTH OF MASSACHUSETTS.

2   WORCESTER, SS.

3      I, CAROL A. JEFFREY, a notary public in and

4   for the Commonwealth of Massachusetts, do certify

5   that pursuant to appropriate notice of taking

6   deposition, there came before me the subject

7   deponent, who was by me duly sworn; that said

8   witness was thereupon examined under oath and

9   said examination reduced to writing by me; and

10  that the deposition is a true record of the

11  testimony given by the witness.

12      I further certify that I am not a relative or

13  employee or counsel or attorney for any of the

14  parties, or a relative or employee of such

15  counsel or attorney, nor am I financially or

16  otherwise interested in the outcome of the

17  action.

18  Witness my hand and official seal at Worcester,

19  Massachusetts, this      day of        , 2010.

20  My Commission Expires

    July 12, 2013

21

                        _____

                        Notary Public

22

23      The foregoing certification of this transcript

    does not apply to any reproduction of the same in

24  any respect unless under the direct control of

    the certifying reporter.

---

124

1          I have read the foregoing, and it is a

2   true transcript of the testimony given by me at

3   the taking of the subject deposition.

4

5

6

7

8

9

10

    _____

11  MARK DERSHWITZ, M.D., Ph.D.

12

13

14

15

16

    _____

17          DATE

18

19

20

21

22

23

24  CAJ-11/8/10

---

McCARTHY REPORTING SERVICE

**PAVATT AND MATTHEWS V. JONES, ET AL**          **MARK DERSHWITZ, M.D., Ph.D. 11/8/10**

125

```
 1              ERRATA SHEET
 2         I WISH TO MAKE THE FOLLOWING CHANGES
 3    IN THE FOREGOING TRANSCRIPT OF MY DEPOSITION:
 4
 5    PAGE   LINE   CHANGE        REASON
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22    DATE: _____
23                    MARK DERSHWITZ, M.D., Ph.D.
24    CAJ-11/8/10
```

**McCARTHY REPORTING SERVICE**