# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

THOMAS D. ARTHUR,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　　Case No: 2:11-cv-438-MEF-TFM
　　　　　　　　　　　　　　　　)
KIM THOMAS, Interim Commissioner,　)
Ala. Dept. of Corrections, *et. al.,*　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　　)

===

## DEFENDANTS' MOTION TO DISMISS AND, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

===

Luther Strange
*Attorney General*

J. Clayton Crenshaw
*Assistant Attorney General*
 Counsel of Record *

Stephanie E. Reiland
*Assistant Attorney General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, AL  36130
(334) 242-7423*
(334) 353-3637 Fax
ccrenshaw@ago.state.al.us

August 15, 2011

# TABLE OF CONTENTS

A.   Background of Arthur's Crime, Conviction, and Subsequent Litigation..................................................................................7

B.   Arthur's § 1983 Lethal Injection Action And Relevant Background...............................................................................12

C.   Summary of the State's Evidence Filed With This Motion ..........................14

    1.   Dr. Mark Dershwitz's Affidavit And Testimony in Pavatt v. Matthews ...............................................................15

    2.   Warden Patterson's Affidavit.............................................................18

    3.   Warden Culliver's Affidavit..............................................................20

    4.   Anne Hill's Affidavit .........................................................................20

    5.   Christopher Summers's Affidavit ......................................................22

    6.   Matt Schulz's Testimony In DeYoung ...............................................22

    7.   Dr. Heath's Previous Affidavits and Testimony Opining That Pentobarbital Is Preferable To Ultrashort-Acting Drugs Such As Sodium Thiopental .....................23

    8.   Miami-Dade Circuit Court's Order Denying Manuel Valle's Motion For A Stay Of Execution ...........................................26

D.   Recent Proceedings in the Alabama Supreme Court.....................................30

E.   Relevant Standards Of Review.....................................................................30

ARGUMENT ...................................................................................................32

I.   ALL OF THE CLAIMS RAISED IN ARTHUR'S COMPLAINT ARE BARRED BY THE STATUTE OF LIMITATIONS...................................................................................32

II.   ARTHUR'S COMPLAINT SHOULD BE DISMISSED BECAUSE HE FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED ......................................39

    A.   Arthur's Eighth Amendment Claim Fails To State A Claim For Which Relief Can Be Granted ...........................................40

    B.   Arthur's Fourteenth Amendment Due Process Claim Fails To State A Claim For Which Relief Should Be Granted ...........................................................................45

    C.   Arthur's Equal Protection Claim Fails To State A Claim For Which Relief Can Be Granted ...........................................48

    D.   Arthur's Claim That Alabama's Lethal Injection Statute Violates The Separation Of Powers Clause Of The Alabama Constitution Should Be Dismissed For Lack Of Jurisdiction And For Failure To State A Cognizable Claim Under § 1983 ........................................53

III.   PRELIMINARY EQUITABLE RELIEF IS PRECLUDED BY ARTHUR'S INEQUITABLE CONDUCT..............................60

IV.   ARTHUR'S EIGHTH AMENDMENT CLAIM IS BARRED BY RES JUDICATA..............................................64

V.   THE STATE IS ENTITLED TO SUMMARY JUDGMENT .....................66

    A.   Arthur's Eighth Amendment Claim Should Be Summarily Dismissed ........................................................67

    B.   Arthur's Fourteenth Amendment Due Process Should Be Summarily Dismissed ..............................................75

    C.   Arthur's Equal Protection Claim Should Be Summarily Dismissed ........................................................77

CONCLUSION ................................................................................81

CERTIFICATE OF SERVICE .........................................................82

On June 8, 2011, Thomas Arthur, an Alabama death row inmate, filed this action pursuant to 42 U.S.C. § 1983 in which he seeks declaratory and injunctive relief aimed at stopping the State of Alabama from executing him using its lethal injection protocol.[1]  Doc. 1.  In this initial complaint, Arthur alleged two causes of action concerning the Alabama Department of Corrections's (ADOC) execution protocol: (1) a Fourteenth Amendment due process violation; and (2) an Eighth Amendment cruel and unusual punishment violation.  See id.  Arthur's complaint was virtually identical to the complaints filed recently in this Court by Jason Oric Williams and Eddie Powell.  The Commissioner of the ADOC (hereinafter "the State"), through the Alabama Attorney General's Office, moved to dismiss this action pursuant to Rule 12 of the Federal Rules of Civil Procedure on the grounds that Arthur's complaint: (1) failed to state a claim upon which relief can be granted; (2) was filed with inexcusable delay; and (3) was time-barred by the statute of limitations.  In the alternative, the State moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure because "there is no

---

[1]  Arthur's complaint also purports to bring claims against other unknown employees and agents of the Alabama Department of Corrections involved in the development and execution of lethal injections.  Of course, there is no fictitious party practice in federal courts.  See, e.g., Fed.R.Civ.P. 10(a); New v. Sports & Recreation, Inc., 114 F.3d 1092, 1094 n.1 (11th Cir. 1997); Harris v. Palm Harbor Homes, Inc., 198 F.Supp. 2d 1303, 1304 n.6 (M.D.Ala. 2002); Edwards v. Ala. Dep't of Corr., 81 F.Supp. 2d 1242, 1257 (M.D.Ala. 2000).  Accordingly, there are only two proper party defendants to this lawsuit.

issue as to any material fact and the moving party is entitled to a judgment as a matter of law."

On June 22, 2011, Arthur amended his complaint to add allegations regarding the execution of Eddie Powell on June 16, 2011 in Alabama, and the execution of Roy Blankenship on June 23, 2011 in Georgia.[2]   See Doc. 12. Arthur's amended complaint alleged four causes of action: (1) a Fourteenth Amendment due process violation; (2) an Eighth Amendment cruel and unusual punishment violation; (3) a Fourteenth Amendment equal protection violation; and (4) a violation of Alabama's doctrine of separation of powers pursuant to Article III, Section 43 of the Alabama Constitution.   See Doc. 12.  Arthur also included numerous exhibits, most notably: (1) an expert witness report from Dr. David Lubarsky, Doc. 12, Ex. A; (2) an expert witness report from Dr. Mark Heath, Doc. 12, Ex. B; (3) a Birmingham News article written by Matthew Busch who witnessed Eddie Powell's execution, Doc. 12, Ex. N; (4) an affidavit from Christine Freeman, the Executive Director of the Middle District of Alabama Federal Defender Program and Powell's counsel, who witnessed Powell's execution, Doc. 12, Ex. O; (5) an affidavit from Matt Schulz, an Assistant Federal Defender and Powell's lead counsel, who witnessed Powell's execution, Doc. 12,

---

[2] Powell and Blankenship were executed by a serial administration of three drugs; both executions utilized pentobarbital as the first drug.

Ex. P; and (6) a newspaper article written by Greg Bluestein, an Associated Press reporter, who witnessed Roy Blankenship's execution in Georgia, Doc. 12, Ex. R. The declarations of Dr. Lubarsky and Dr. Heath, in opining on Powell's execution, are primarily based on the affidavits of Powell's counsel, Christine Freeman and Matt Schulz.  See Doc. 12, Ex. A at ¶¶ 14-15, Ex. B at ¶5(j).  In addition, Dr. Heath's declaration indicates he spoke with Greg Bluestein concerning that reporter's eyewitness account of Blankenship's execution.  Id. at ¶ 5(i).

A federal district court in Georgia conducted an evidentiary hearing on July 19, 2011, in DeYoung v. Owens, No. 11-02324, hearing testimony from two witnesses, Dr David Waisel and Matt Schulz, and admitting numerous exhibits regarding Roy Blankenship's execution.   The state defendants offered into evidence 12 affidavits from persons who witnessed Blankenship's execution, including two from reporters, which differed substantially from the account in Bluestein's article.  DeYoung, No. 11-02324, Docs. 11, 22.  The state defendants also offered into evidence an affidavit from the pathologist who conducted Blankenship's autopsy which concluded that Blankenship did not suffer any trauma during his execution as the catheters were inside Blankenship's veins and the veins were not burst or broken.  Id.

Neither Dr. Lubarsky nor Dr. Heath reviewed any of the evidence presented by the state defendants in DeYoung in preparing their declarations in the case at

3

hand.  Dr. Lubarsky and Dr. Heath also failed to review any of the following evidence: Matt Schulz's testimony at the <u>DeYoung</u> evidentiary hearing; the eyewitness account of a Birmingham News reporter who witnessed Powell's execution, included as an exhibit to Arthur's complaint, which differs substantially from the accounts of Powell's counsel, <u>see</u> Doc. 12, Ex. N; or the affidavit of Anne Hill, general counsel for the ADOC, whose eyewitness account of the Powell execution differs substantially from the affidavits submitted by Powell's counsel, Schulz and Freeman.[3]

Arthur's complaint fails to mention that in <u>DeYoung</u>, both the district court and the Eleventh Circuit, after reviewing the evidence presented concerning the executions of Blankenship and Powell, ruled for the State and allowed DeYoung's execution to proceed.  Indeed, the district court denied DeYoung's request for a stay of execution because it found that he "ha[d] absolutely no likelihood of success on the merits."  <u>DeYoung</u>, No. 11-02324, Doc. 27 at 8 (mem. op.).  The district court found, among other things, that: (1) DeYoung's evidence failed to show that the administration of pentobarbital inflicts serious harm; and (2) DeYoung failed to prove that Blankenship suffered pain or serious harm during his execution.  <u>Id.</u> at 13-16.  The Eleventh Circuit affirmed the district court's decision, holding that even if DeYoung's claims were timely, they would "fail as a

---

[3] Anne Hill's affidavit is attached as "Ex. I" to this motion.

matter of law." <u>DeYoung v. Owens</u>, __ F.3d __, 2011 WL 2899704, at *3 (11th Cir. July 20, 2011).  The Eleventh Circuit further held that "DeYoung has wholly failed to show that pentobarbital, once fully administered and allowed to act, is ineffective as an anesthetic." <u>Id.</u> at *6.  The district court and the Eleventh Circuit held that DeYoung's claims were barred by the relevant statute of limitations. <u>DeYoung</u>, No. 1102324, Doc. 27 at 13; <u>DeYoung</u>, 2011 WL 2899704 at *3.  As noted above, Arthur ignores this binding precedent.

Other recent cases decided by this Court and the Eleventh Circuit likewise establish that Arthur's claims are barred by the statute of limitations.  United States District Judge Keith Watkins issued a memorandum opinion and order summarily dismissing Powell's complaint on the ground that it was filed more than six years outside the statute of limitations.  <u>Powell v. Thomas</u>, __ F.Supp.2d __, 2011 WL 2292108 (M.D. Ala. June 9, 2011).  In determining that Powell's claims were time-barred, the district court, applying <u>Powell v. Thomas</u>, 641 F.3d 1255 (11th Cir. 2011) (hereinafter, "<u>Powell (Williams)</u>")[4] and <u>McNair v. Allen</u>, 515 F.3d 1168, 1173 (11th Cir. 2008), held that the modification of Alabama's lethal injection protocol to allow for the use of pentobarbital, instead of sodium thiopental, as the

---

[4] The plaintiff/appellant in <u>Powell v. Thomas</u>, 641 F.3d 1255 (11th Cir. 2011) was Alabama death row inmate Jason Oric Williams.  The case was styled <u>Powell</u> because Williams intervened in Eddie Powell's § 1983 action.  To avoid confusion, the case involving Jason Williams is referred to as <u>Powell (Williams)</u>.

first drug in the three-drug protocol, did not constitute a significant alteration in the protocol, and thus, did not restart the statute of limitations clock. Id. In addition, the district court in Powell noted that because it dismissed the complaint on statute of limitations grounds, it did not address the State's "other arguments for dismissal . . . although some are persuasive." Powell, 2011 WL 2292108, at *4 n.7.

On June 15, 2011, the Eleventh Circuit affirmed the district court's dismissal of Powell's § 1983 complaint on statute of limitations grounds. Powell v. Thomas, 643 F.3d 1300 (11th Cir. 2011). The Eleventh Circuit held that in dismissing Powell's complaint the district court properly applied "binding precedent" which established that "the replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's execution protocol," and therefore, the accrual date for Powell's complaint remained unchanged. Powell, 643 F.3d at 1304 (emphasis omitted). The court noted that it had recently reached this holding in the companion litigation to Powell's case, which "addressed a § 1983 claim identical to Powell's Eighth Amendment claim." Id. at 1302 (citing Powell (Williams), 641 F.3d 1255, cert. denied, Williams v. Thomas, 131 S.Ct. 2487, 179 L.Ed.2d 1243 (2011)). The Eleventh Circuit emphasized that it had rejected Jason Williams's identical Eighth Amendment claim on the merits, "squarely holding that 'the evidence present does not demonstrate that the ADOC's

use of pentobarbital creates a substantial risk of serious harm to Williams.'" Id. at 1303 (quoting Powell (Williams), 641 F.3d at 1257).

## A.     Background of Arthur's Crime, Conviction, and Subsequent Litigation

Arthur has been thrice convicted of capital murder and thrice sentenced to death for his crime.   Before Arthur was convicted of capital murder, he was convicted in 1977 of murder in the second degree in the Circuit Court of Marion County and was sentenced to life imprisonment.   While serving that sentence and assigned to the Decatur, Alabama work release center, Arthur murdered Troy Wicker, the husband of one of his paramours, by shooting Wicker with a .22 caliber pistol through the right eye, while Wicker was asleep.   Arthur was indicted for that murder by a Colbert County grand jury on August 29, 1982.   He was convicted and sentenced to death by electrocution.   The Alabama Court of Criminal Appeals affirmed his conviction and sentence.   Arthur v. State, 472 So. 2d 650 (Ala. Crim. App. 1984).   The Alabama Supreme Court reversed because the trial court had improperly permitted the State to offer evidence regarding the details of the 1977 murder conviction, which provided one of the factors that made Arthur eligible for the death penalty.   Ex parte Arthur, 472 So. 2d 665 (Ala. 1985).

In May of 1987, after a change of venue to the Circuit Court of Jefferson County, Arthur was again convicted of the murder of Troy Wicker and was sentenced to death.   The second conviction was reversed by the Alabama Court of

Criminal Appeals.  <u>Arthur v. State</u>, 575 So. 2d 1165 (Ala. Crim. App. 1990) (holding that the trial court improperly admitted a statement made by the defendant to a police officer in the absence of counsel two weeks after he had asserted his right to remain silent), <u>cert. denied</u>, 575 So. 2d 1191 (Ala. 1991).

On December 5, 1991, a jury found Arthur guilty of capital murder for the third time.  After the penalty phase, the jury recommended that Arthur be sentenced to death.  On January 24, 1992, after conducting a separate hearing and reviewing the aggravating and mitigating circumstances, the state trial judge sentenced Arthur to death.  The Alabama Court of Criminal Appeals and the Alabama Supreme Court affirmed Arthur's conviction and death sentence.  <u>Arthur v. State</u>, 711 So. 2d 1031 (Ala. Crim. App. 1996); <u>Ex parte Arthur</u>, 711 So. 2d 1097 (Ala. 1997).  An application for rehearing was denied on March 20, 1998. Arthur did not file a petition for writ of certiorari in the United States Supreme Court.

Arthur failed to timely file a state petition for post-conviction relief.  Rule 32.2(c) of the Alabama Rules of Criminal Procedure provided that a petition for post-conviction relief must be filed within two years after the issuance of the certificate of judgment by the Court of Criminal Appeals.[5]  In the case at hand, the

---

[5] The Alabama Supreme Court, effective August 1, 2002, changed the Rule 32 limitations period to one year.  Ala. R. Crim. P. 32.2(c)(cmt.).

Court of Criminal Appeals issued a certificate of judgment on April 7, 1998, thus, Arthur's Rule 32.2(c) limitations period began to run on that date.  Arthur's time to file a Rule 32 petition challenging his capital murder conviction and resulting death sentence therefore expired on April 7, 2000.

On September 8, 2000, the State moved for the Alabama Supreme Court to set an execution date.  On March 23, 2001, the Alabama Supreme Court granted the motion and ordered that Arthur be executed on Friday April 27, 2001.

On January 25, 2001, Arthur, through counsel, filed a Rule 32 petition in the Circuit Court of Jefferson County.  The Rule 32 petition was dismissed as untimely on March 5, 2001.  The Alabama Court of Criminal Appeals affirmed the denial and dismissal of Arthur's Rule 32 petition.  Arthur v. State, 820 So. 2d 886, 889 (Ala. Crim. App. 2001).  The Alabama Court of Criminal Appeals denied Arthur's application for rehearing on July 27, 2001, and the Alabama Supreme Court denied certiorari review on November 2, 2001.  Id.  The United States Supreme Court, on May 13, 2002, denied Arthur's petition for writ of certiorari.  Arthur v. Alabama, 535 U.S. 1053 (2002).

On April 20, 2001, seven days before his scheduled execution, Arthur filed a petition for writ of habeas corpus, along with a motion to stay his execution, in the United States District Court for the Northern District of Alabama.  That court

issued a stay of execution on April 25, 2001.  That same day, the federal district court entered an order staying the habeas proceeding pending a resolution of the above-listed state post-conviction proceeding.

Arthur attempted to overcome his failure to comply with the statute of limitation in federal court by asserting a "gateway claim" of actual innocence.  His claim was based principally on the affidavits of Alphonso High and Ray Melson, who claimed to have seen Arthur on February 1, 1982, the morning of the murder. High and Melson subsequently gave affidavits to the State that contradicted their earlier affidavits, stating that they could not be certain of the day or month that they saw Arthur.

The federal district court rejected Arthur's "actual innocence" claim and dismissed Arthur's habeas petition as untimely.  The Eleventh Circuit affirmed the dismissal.  Arthur v. Allen, 452 F.3d 1234 (11th Cir. 2006).  The decision was modified slightly on petition for rehearing, with the court elucidating its denial of a hearing and discovery.  Arthur v. Allen, 459 F.3d 1310 (11th Cir. 2006).  Arthur's petition for certiorari was denied by the United States Supreme Court.  Arthur v. Allen, 549 U.S. 1338 (2007).

After Arthur's conventional appeals ended, his pro bono legal team has initiated numerous (and seemingly endless) legal proceedings, including petitions for state post-conviction relief, petitions for federal habeas corpus relief, a pair of §

10

1983 actions challenging the constitutionality of the State's method of execution, and a § 1983 action asserting a right to DNA testing.  See Arthur v. King, 500 F.3d 1335, 1337-38 (11th Cir. 2007) (listing proceedings); Arthur v. Ala. Dep't of Corr., 285 Fed. Appx. 705, 705 (11th Cir. 2008) (unpublished opinion).

    In his most recently filed litigation in state court, Arthur, on July 29, 2008, filed a successive Rule 32 petition alleging that he is factually innocent.  Arthur presented a signed and notarized confession (drafted by Arthur's counsel) from Bobby Ray Gilbert, an inmate serving a life without parole sentence, alleging that Gilbert, not Arthur, murdered Troy Wicker.  On the basis of these allegations, the Alabama Supreme Court issued an order staying Arthur's execution scheduled for July 31, 2008, to allow the Rule 32 court to decide whether or not Gilbert's affidavit was credible or not.

    After conducting a two-day evidentiary hearing, the Rule 32 court held that Arthur perpetrated a fraud on the court by supplying Bobby Ray Gilbert with information concerning the capital murder for which Arthur was convicted and persuading Gilbert to confess in exchange for the promise of money.  The court based this holding on the following evidence:

> During the hearing, the State presented extensive evidence, particularly through the testimony of its inmate witnesses, which clearly indicated that the affidavit of Gilbert was prepared with Arthur's assistance.  The State offered evidence that Arthur arranged for numerous notes to be transported and delivered to Gilbert while both

> were incarcerated in Holman Prison. Through these notes, Arthur was able to feed Gilbert facts about the murder of Troy Wicker to enable Gilbert to have information to create his affidavit.

Arthur v. State, __ So. 2d __, 2010 WL 1740415, at *4 - *5 (Ala. Crim. App. Apr. 30, 2010). The court held "that the evidence presented demonstrates that both Gilbert and Arthur engaged in an attempt to defraud this Court by means of the affidavit made the subject of this Rule 32, in which Gilbert takes credit for the murder of Troy Wicker." Id. at *5 - *6. Arthur's successive Rule 32 petition was denied by the Rule 32 trial court and that ruling was affirmed by the Court of Criminal Appeals. Arthur, 2010 WL 1740415. The Alabama Supreme Court denied certiorari review. Ex parte Arthur, No. 1091292 (Ala. Apr. 15, 2011).

**B.    Arthur's § 1983 Lethal Injection Action And Relevant Background**

The Alabama Department of Corrections (ADOC) has slightly amended its lethal injection protocol to allow for the use of pentobarbital as the first drug in Alabama's three-drug lethal injection protocol if sodium thiopental is unavailable. See Ex. A.[6] In 2010, stories abounded in the media regarding a shortage of sodium thiopental because the drug's sole manufacturer, Hospira, did not have the necessary raw materials to make it. See, e.g., Exhibit B (press account dated

_____

[6] As discussed below, Alabama has employed lethal injection since 2002. The only modification that has recently been made to Alabama's lethal injection protocol is to allow for the use of pentobarbital if sodium thiopental is unavailable.

September 27, 2010).  Hospira eventually ceased manufacturing sodium thiopental "amid a broad global campaign by opponents of the death penalty."  See Exhibit C, "Drug Halt Hinders Executions in the U.S.", Wall Street Journal, January 22, 2011.[7]

Because of the unavailability of sodium thiopental, numerous states began switching from using sodium thiopental to using pentobarbital in their respective lethal injection protocols.  Indeed, in 2011 alone, nine states (including Alabama) have used pentobarbital in carrying out twenty-three executions.  See http://www.deathpenaltyinfo.org/execution-list-2011 (last visited August 11, 2011).

Arthur's amended complaint alleges four causes of action: (1) a Fourteenth Amendment due process violation; (2) an Eighth Amendment cruel and unusual punishment violation; (3) a Fourteenth Amendment equal protection violation; and (4) a violation of Alabama's doctrine of separation of powers pursuant to Article III, Section 43 of the Alabama Constitution.  See Doc. 12.  In his prayer for relief, Arthur asks this Court to: (1) enjoin the state defendants from executing him with

---

[7] Reprieve, a human rights organization in England, pressured Lundbeck, the only pharmaceutical company that makes pentobarbital, to sign an amicus brief that Reprieve had prepared for filing in the Alabama Supreme Court in the Jason Williams case.  Lundbeck representatives refused to sign the brief.  See www.reprieve.org.uk/2011_05_12Lundbeck_ refuses_amicus (last visited May 19, 2011).

Under pressure from anti-death penalty activist groups, however, Lundbeck recently announced it would take steps to prevent distribution of pentobarbital for use in executions. Doc. 12, Ex K.

inadequate anesthesia and execution procedure that violate his rights to due process and equal protection under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment; (2) require the ADOC to provide him notice of its complete lethal injection protocol at least 90 days before his execution; and (3) enter a declaratory judgment that the ADOC's execution procedures are unconstitutional under the Eighth and Fourteenth Amendments.  See Doc. 12 at p. 42.

**C.     Summary of the State's Evidence Filed With This Motion**

In support of this motion, the State provides several exhibits concerning Alabama's execution protocol and the recent amendment allowing for the use of pentobarbital when sodium thiopental is not available.  In addition, the State submits several affidavits from witnesses to Powell's execution that counter the baseless allegation that Powell suffered during his execution and that he raised his head for a minute during the administration of pentobarbital.  In fact, these affidavits establish that Powell raised his head for a brief moment, at the most a few seconds.  These affidavits also demonstrate that the execution protocol was followed, including the graded stimuli to be performed during the consciousness assessment that take place after the administration of pentobarbital.  The State also presents several affidavits and testimony from Dr. Heath, one of Arthur's expert witnesses, who when evaluating execution protocols using the ultra-short acting

drug sodium thiopental testified that using a longer lasting barbiturate (such as pentobarbital) would be preferable.   The State also attaches as an exhibit a memorandum opinion from the Circuit Court of Miami-Dade County that considered evidence concerning the Blankenship and Powell executions and ruled for the State and denied the requested stay of execution.   See <u>Florida v. Manuel Valle</u>, F78-5281A (Miami-Dade Cir. Ct. Aug. 3, 2011) (Ex. N).

### 1.   Dr. Mark Dershwitz's Affidavit And Testimony in <u>Pavatt v. Matthews</u>

Dr. Mark Dershwitz, a board certified anesthesiologist at the University of Massachusetts and Professor of Anesthesiology and Biochemistry and Molecular Pharmacology at the University of Massachusetts, prepared an affidavit opining that Alabama's lethal injection protocol, "when implemented as written, will render an inmate unconscious quickly and cause the inmate's rapid and painless death."   Ex. D at ¶ 5.   Dr. Dershwitz is uniquely qualified to serve as an expert witness in lethal injection cases because he is an anesthesiologist with a Ph.D. in pharmacology.   Ex. D at ¶ 2.   In <u>Pavatt v. Matthews</u>, 627 F.3d 1336 (10th Cir. 2010), the Tenth Circuit credited Dr. Dershwitz's opinion in upholding Oklahoma's use of pentobarbital in an execution by lethal injection.   Dr. Dershwitz has "done extensive research and written numerous review articles and research papers on the use of anesthetics" and has performed time course studies of the effects of those drugs.   Ex. D at ¶ 3.   In addition, he has reviewed the execution

protocols in the states of Arkansas, Alabama, Arizona, Delaware, California, Florida, Georgia, Kentucky, Maryland, Missouri, Montana, North Carolina, Ohio, Oklahoma, South Carolina, Texas, Virginia, and Washington, as well as the federal government's protocol.  Ex. D at ¶ 5.

As Dr. Dershwitz noted in his affidavit, the first step of a lethal injection in Alabama is the intravenous administration of an anesthetic drug – specifically, 2,500 milligrams of sodium thiopental, or if sodium thiopental is unavailable, 2,500 milligrams of pentobarbital.  Ex. D at ¶ 6b.  After the anesthetic drug is administered, a member of the execution team who is in the execution chamber performs a "consciousness check," during which he assesses the consciousness of the inmate by performing graded stimuli.  Ex. D ¶ 6d.  Dr. Dershwitz stated, "once 2,500 mg of pentobarbital have been administered intravenously to an inmate, there is an exceedingly small risk that the inmate could experience the effects of the subsequently administered pancuronium bromide or potassium chloride" (the second and third drugs serially administered during Alabama's lethal injection procedure).  Ex. D at ¶ 11.  Dr. Dershwitz went on to explain that "a dose of 2,500 mg of pentobarbital will cause virtually all persons to stop breathing."  Ex. D at ¶ 12.  Indeed, 2,500 mg of pentobarbital "by itself would cause death to almost everyone."  Ex. D at § 12.

16

Pentobarbital is a barbiturate just like sodium thiopental.   Ex. D at ¶ 7. Moreover, as Dr. Dershwitz explained, "[p]entobarbital is the most common agent used for physician-assisted suicide in those jurisdictions where the practice is legal." Ex. D at ¶ 13.  Pentobarbital is not commonly used in general anesthesia in surgery because its duration is considered too long for this purpose.  Ex. D at ¶ 13. Thus, because the goal in surgery "is to have the patient awaken quickly and recover promptly following completion of the surgical procedure," pentobarbital is generally not used.   Id.   Pentobarbital is administered in clinical settings "to produce barbiturate coma in the attempt to decrease the degree of brain damage following head trauma, stroke, and other causes of brain damage."   Id. Pentobarbital is "also used to prevent brain damage during surgical procedures in which there will be the planned and deliberate interruption of blood flow to the brain." Id.  Dr. Dershwitz stated that the amount of pentobarbital administered during an execution pursuant to Alabama's lethal injection protocol is "far in excess of that used to induce and maintain barbiturate coma, and since this is a depth of anesthesia far greater than that needed for any surgical procedure, once 2,500 mg of pentobarbital have been administered intravenously to an inmate, there is an exceedingly small risk that the inmate could experience the effects of the subsequently administered pancuronium bromide or potassium chloride." Ex. D at ¶ 11.

Dr. Dershwitz testified recently in a case in Oklahoma that pentobarbital is considered to be an anesthetic drug and would be used in surgery "except for the fact that it's too long lasting for our present purposes."  Ex. G at 10, 34 (from Pavatt v. Jones).  Dr. Dershwitz also stated that "there is no measurable difference in onset from thiopental to pentobarbital in a typical patient."  Ex. G at 77.  Dr. Dershwitz opined that a dose of 2.5 grams of pentobarbital, the dose used by Alabama, is a lethal dose on its own.  Exhibit G at 27, 32, 53.

### 2.    Warden Patterson's Affidavit

The affidavit of Anthony Patterson, the Senior Warden of Holman Correctional Facility, establishes that Alabama's lethal injection protocol is carefully and deliberately followed during executions.  Ex. E.  In his affidavit, Warden Patterson describes his knowledge of, and experience with, executions by lethal injection in Alabama.  As Senior Warden of Holman, he is charged with ensuring that execution warrants are properly carried out in compliance with the law and with Alabama's execution protocol, and he is responsible for overseeing the execution team.  Ex. E at 1.  Since becoming Senior Warden of Holman in November of 2009, Warden Patterson presided over nine executions, all of which took place by lethal injection.  Ex. E at 1.  In addition, he served as a member of the execution team in connection with ten other executions that took place at Holman between 2005 and 2009.  Ex. E at 2.  Thus, Warden Patterson has

participated in a total of 19 executions by lethal injection (more than half of the 29

such executions that had taken place in Alabama).  Ex. E at 2.  Warden Patterson

averred: "In each of the nineteen executions in which I have participated,

Alabama's lethal injection protocol was properly administered.  And, each of these

executions took place without mishap."  Ex. E at 2.

Warden Patterson presided over Eddie Powell's execution and stated that

there was "no deviation from the protocol whatsoever."  Ex. E at 4.  He noted that

"[a]t the beginning of the execution, I saw that Powell raised his head for a few

seconds; shortly after he raised his head, he rested it back down on the gurney."

Id.  Warden Patterson stated that the consciousness assessment was conducted in

accordance with the execution protocol:

> After the first drug (pentobarbital) was administered and
> Powell appeared to be unconscious, a consciousness
> assessment was conducted using graded stimulation, in
> accordance with the execution protocol.  I saw a member
> of the execution team, who was stationed in the
> execution chamber, approach Powell.  I heard that team
> member say Powell's name aloud.  I also saw the team
> member reach his hand toward Powell's face,
> presumably to brush Powell's eyelashes.  Finally, I saw
> the team member reach his hand toward Powell's arm,
> presumably to perform the pinch test portion of the
> consciousness assessment.  I did not see or hear Powell
> respond to any of these stimuli.  Following the
> consciousness assessment, the execution continued in
> accordance with the protocol.  Throughout the entire
> execution, I observed nothing that would indicate Powell
> suffered any pain.

Ex. E at 4-5.   Warden Patterson stated that he did not observe anything that indicated Powell suffered any pain.  Ex. E at 5.

### 3.    Warden Culliver's Affidavit

Grantt Culliver, the Senior Warden at Holman Correctional Facility from August of 2002 until November of 2009, also provided an affidavit regarding Alabama's execution process.  See Ex. F.  As Senior Warden, Culliver oversaw and carried out the first execution by lethal injection in Alabama in 2002, as well as the next 19 executions until October 8, 2009, all of which were carried out by lethal injection.  Id.  Warden Culliver personally observed the inmates in all 20 executions.   In each instance, the anesthesia was properly administered to the inmate and there was no indication whatsoever that the inmate experienced any pain.  Id.

### 4.    Anne Hill's Affidavit

Anne Hill, General Counsel for ADOC, submitted an affidavit that is an eyewitness account of Powell's execution.  Ex. I.  Hill viewed the execution in a room directly in front of Powell.  Ex. I at 2.  Hill said that at approximately 6:03 p.m., Powell gave a final statement.  Ex. I at 2.  After Powell gave his statement, the Warden exited the execution chamber and went into the control room.  Id.  At approximately 6:04 p.m., the Warden, through intercom transmission, asked the Commissioner if the execution should proceed.  Id. at 3.  After receiving the

directive to proceed, the Warden began his preparations to carry out the execution. Id.  At the time the Warden was given the directive to proceed, the chaplain was praying with Powell.  Id. at 5.  While the chaplain was praying, Powell closed his eyes briefly.  Id.  Hill described what happened next:

> [Powell] then simply lifted his head with his eyes open and appeared disoriented – this lasted at the most three seconds – and then placed his head back down on the gurney.  He closed his eyes, took a few deep breaths, and appeared to go to sleep.  Within about two minutes of the Warden being given the order to proceed, Powell appeared unconscious.

Id.[8]  Approximately a minute later, "the execution team member stationed in the execution chamber to Powell's left approached Powell and, in keeping with the protocol, conducted a consciousness assessment using graded stimulation – saying Powell's name, stroking his eyelashes, and pinching the back of his left arm."  Id.  Powell gave no response indicating that he was unconscious.  Id.  Hill stated that "[t]he fact that Powell picked-up his head, appeared disoriented, put his head back down, and took a few last breaths is not unique and certainly in no way exhibited any pain or distress."  Id. at 5.

---

[8] An exhibit submitted by Arthur corroborates Hill's affidavit.  See Doc. 12, Ex. N (Birmingham News article).  The reporter stated that Powell closed his eyes after the chaplain began praying but, after a moment, opened his eyes and raised his neck and head off the gurney. Id.  Powell looked "confused and startled" and then looked to one side.  Id.  "After a few seconds his breathing slowed again and he closed his eyes."  Id.  Arthur's experts were not given this article to review.  See Doc. 12, Ex. A, Ex. B (listing items that were reviewed).

### 5.    Christopher Summers's Affidavit

Christopher Summers, the Institutional Chaplain at Holman, submitted an affidavit regarding his observations of Powell's execution.  Ex. J.  As a part of his duties, Chaplain Summers is in the execution chamber to be available to the condemned inmate for prayer.  Ex. J at 1.  Chaplain Summers stated as follows:

> After the Warden read the execution warrant, left the execution chamber, and received orders from the Commissioner to proceed with the execution, I was given the signal from the Captain to proceed with prayer.  I stepped over to the gurney, got on one knee, placed my left hand on Powell's left leg, held his left hand with my right hand, and began to pray.  As I prayed, I bowed my head and closed my eyes.  I generally offer prayer for a minute or two and sometime during that time period, the inmate's hand that I am holding releases, signifying to me that the inmate is unconscious.  Powell was no different than any other inmate to whom I have ministered during an execution.

Id. at 1-2.  After Powell released the Chaplain's hand, he stood up, stepped away from the gurney, and looked at Powell, who appeared to be asleep.  Id. at 2.

### 6.    Matt Schulz's Testimony In DeYoung

The next exhibit presented by the State is the testimony of Matt Schulz from the DeYoung district court proceedings giving his eyewitness account of Eddie Powell's execution.  See Ex. K.  The State offers Schulz's testimony solely because it differs from his affidavit on some facts.

After the Warden read the execution warrant, Schulz began to pray but insisted he was still "paying attention."  Ex. K at 118.  Schulz did not indicate in his affidavit that he prayed during Powell's execution.  Doc. 12, Ex. P.  Powell looked to his left to the room where Schulz was located and then laid his head back as the chaplain was praying.  Id. at 119.  Powell remained relaxed "for a minute," but then "sat up very abruptly" and looked to the left with "a look of confusion on his face."  Id. at 120.  Schulz claimed that Powell sat up for about a minute, then his eyes glazed over and he laid his head back down and closed his eyes.  Id. at 121.  There was no more movement from Powell when he laid his head back down.  Id.  During the consciousness assessment, Schulz saw the "guard" call Powell's name and stroke his eyelash to which Powell did not respond.  His testimony indicated Schulz then looked away.  Id. at 122.  Specifically, Schulz testified, "after that point at some point I was looking again."  Id.  Schulz stated that at some point during the execution Powell's eyes "appear[ed] to be open, not all the way, by any stretch, not even halfway, but perhaps maybe twenty, twenty-five percent just sort of barely open, but again not, not completely closed."  Id. at 121-22.

### 7.   Dr. Heath's Previous Affidavits and Testimony Opining That Pentobarbital Is Preferable To Ultrashort-Acting Drugs Such As Sodium Thiopental

Dr. Mark Heath has a long track record of testifying against states in lethal injection actions brought by convicted capital murderers.   As the following

affidavits and testimony demonstrate, Dr. Heath, contrary to his affidavit in the case at hand, previously extolled the benefits of barbiturates (such as pentobarbital) that lasted longer than the ultrashort-acting sodium thiopental.  For example, Dr. Heath opined in a case in Ohio that sodium thiopental was dangerous to use because it has "a quick onset and short duration."  Ex. L at ¶ 37.  Dr. Heath spoke approvingly of the Ohio veterinary regulations that required the use of pentobarbital because it "vastly reduces the risk of the anesthetic wearing off prematurely."  Id. at ¶ 40.  In another affidavit, Dr. Heath criticized the Virginia Department of Corrections for using the ultrashort-acting barbiturate sodium thiopental.  Ex. M at ¶ 33.  Heath stated that "[a]s the name implies, ultra-short acting barbiturates wear off faster than other classes of barbiturates that exhibit longer lasting effects [such as pentobarbital]."  Id.  Heath stated the Virginia DOC should use different anesthetic drugs that would eliminate the risks, which he claimed to exist, from using an ultrashort-acting barbiturate.  Id.

In 2009, Heath testified before the Senate Judiciary Committee in the Nebraska legislature against a bill that proposed adopted lethal injection as that state's method of execution.  Heath testified that a longer lasting drug such as pentobarbital would be more preferable that the ultrashort-acting sodium thiopental.  Heath testified as follows:

> The most important thing to understand about lethal injection is that it is a humane way of killing so long as it

is done properly.  If you need to put an animal to sleep and if you want to give it a humane death, lethal injection will achieve those goals so long as you know what you're doing and you do it the right way.  How do veterinarians put animals to sleep?  Generally, they use a very large overdose of a drug called pentobarbital, which makes the animal fall asleep peacefully and stops all breathing. Pentobarbital used by itself is a very reliable and very humane way of putting an animal to sleep.  The problem is that the kind of lethal injection that is used for executing humans is very different from what is used for animals.  With humans, a drug called Pentothal [sodium thiopental] is used and that's a very poor choice. Pentothal is a very short-acting anesthetic, so if you don't receive enough you'll wake up before the execution is completed.

See http://nebraskalegislature.gov/FloorDocs/101/PDF/Transcripts/Judiciary/2009-01-29.pdf (last visited Aug. 9, 2011).

Heath testified in Baze v. Rees that longer lasting drugs (such as pentobarbital) were preferable over sodium thiopental:

Q: Do you know if thiopental is used in the euthanasia of animals?

A: Very, very rarely, if ever.

Q: Why is that?

A: Um, there are much better drugs for achieving the goal of euthanasia than thiopental.

Q: Uh, do you know if there are any risks associated with using thiopental to euthanize an animal?

A: Well, one of the issues is that it's a ultra-short-acting drug.  Uh, that's certainly a concern and it makes much

> more sense, uh, and what is done is to use is a much
> longer-acting drug.
>
> Q: Does that concern you just mentioned also exist with
> human beings using thiopental?
>
> A: Yes, it does.

Baze v. Rees, 2007 WL 4790797, (U.S.) Joint Appendix Vol. II at *455-*456.  Of

course, pentobarbital fits within Dr. Heath's description of a "longer-acting drug."

At another point in his testimony, Dr. Heath was critical of a three-drug

execution protocol that used an ultrashort-acting drug like sodium thiopental.  He

testified as follows:

> Q: What is it about those chemicals [used in a 3-drug
> execution protocol] that seemed peculiar to you?
>
> A: Uh, many things.  As anesthesiologists, we tend to
> kind of to group our drugs by duration of action.  And
> they had chosen an ultra-short-acting barbiturate,
> thiopental, or pentathlon as it is often called, very-short-
> acting drug, combine it with a very-long-acting drug,
> pancuronium.  That's generally not how one would want
> to do things.  They've also chosen a drug for stopping the
> heart, potassium, which is an extremely painful way of
> stopping the heart.  There are many non-painful ways of
> stopping the heart that would achieve the same end.

Baze, 2007 WL 4790797, at *426-*427.

### 8.    Miami-Dade Circuit Court's Order Denying Manuel Valle's Motion For A Stay Of Execution

The Miami-Dade Circuit Court denied Manuel Valle's request for a stay of

execution after conducting an evidentiary hearing where evidence concerning the

recent executions of Powell and Blankenship were presented.  In a 21-page order, the court made findings of fact regarding those recent executions and the efficacy of pentobarbital in an execution protocol.  <u>See</u> Ex. N.  The court framed the issue as follows: "The question here is whether pentobarbital is an <u>effective</u> substitute for the sodium thiopental previously used."  Ex. N at 2 (emphasis in original).

The court heard testimony from Matt Schulz, who witnessed the execution of his client, Eddie Powell, in Alabama, and from John Harper and Dr. Jacqueline Martin, who witnessed the execution of Roy Blankenship in Georgia.  Ex. N at 3-12.  The court also heard expert witness testimony from Dr. David Waisel, who testified on behalf of the capital defendant, and Dr. Mark Dershwitz, who testified for the State.

Schulz testified that he did not know when the administration of the drugs began in the Powell execution.  Ex. N at 4.  He stated that the chaplain spoke to Powell for 30-60 seconds and that "Powell lay there approximately one minute then suddenly jerked his head and his upper and lower body appeared as if pressing against the restraints."  Ex. N. at 4.  Schulz said that Powell attempted to sit up for about a minute and then laid his head back down and appeared to be unconscious.  <u>Id.</u>  Schulz also said that this was the first execution he had attended and it was a very stressful event.  <u>Id.</u> at 5.

27

John Harper viewed the execution of Roy Blankenship and as a part of his responsibilities as an employee of the Georgia Department of Corrections has witnessed all 28 executions by lethal injection in that state. Id. at 9. The court's order summarized Harper's testimony as follows:

> Blankenship had an intravenous line into each of his arms. He saw Blankenship look around and look at his left arm about five seconds after the start of the first syringe. However, the pentobarbital was first administered to Blankenship's right arm. He heard Blankenship make a "grunt" sound. Harper knew when the drugs were administered because he was given a signal and he was keeping a time log. About ten seconds passed between the time the syringe was pushed and when Blankenship appeared to be unconscious. There was no flailing or thrashing. After the pentobarbital was administered a consciousness check was performed and Blankenship did not respond.

Ex. N at 10.

Dr. Martin, the medical pathologist who performed Blankenship's autopsy, viewed Blankenship's execution. Id. at 11. Dr. Martin stated that two to three minutes after the warden left the execution chamber, Blankenship looked to his left arm and moved his mouth and then looked at his right arm. Id. at 12. At that point, he put his head on the pillow and "stayed put." Id.

Dr. Mark Dershwitz, who has submitted an affidavit in the instant case, see Ex. D, testified during the Valle evidentiary hearing. Dr. Dershwitz testified that pentobarbital is used in clinical settings "to induce a barbiturate coma or as a

sedative or to treat intractable seizures." Id. at 13.   He stated that the dose of pentobarbital used in an execution would cause the circulatory system and then the respiratory system to shut down.  Id.  The dose would cause "a total flat line on the EEG in brain activity" and the inmate "would have no perception of pain or sensation." Id. at 13-14.  Dr. Dershwitz testified that pentobarbital is not used as an anesthetic "because it lasts longer and causes a longer 'hangover' after medical procedures; doctors prefer their patients awake at the end of surgery." Id. at 14. The court found Dr. Dershwitz's testimony "credible and persuasive." Id. at 15.

The court noted that the "facts and testimony in this case are substantially similar to that in DeYoung v. Owens, 2011 WL 289974 (11th Cir. 2011)." Id. at 15.  It quoted a portion of the Eleventh Circuit's opinion in DeYoung holding that Valle did not present any credible evidence to demonstrate that unconsciousness is not achieved after the complete administration of a lethal dose of pentobarbital. Id. at 17.  The court held as follows:

> The defendant has failed to show that the substitution of pentobarbital as an anesthetic violated the Eighth Amendment's prohibition of cruel and unusual punishment.  Defendant has attempted to use evidence of two earlier executions (Powell and Blankenship) to show that the administration of 5,000 mg of pentobarbital caused needless suffering in and of itself, and that the pentobarbital dose does not adequately render an inmate unconscious, thereby leading to needless suffering.  The evidence presented did not establish substantial risk of serious harm from pentobarbital, or even that inmates who were executed earlier necessarily suffered any harm,

> much less serious harm, from intravenous administration
> of pentobarbital.  Like the Federal District Courts in
> <u>Powell</u>, <u>DeYoung</u>, and <u>Pavatt</u>, this court finds that usage
> of pentobarbital does not create an objectively
> unreasonable risk of suffering.

Ex. N at 20.

## D.   Recent Proceedings in the Alabama Supreme Court

On April 20, 2011, the State filed a motion to set Arthur's execution date in the Alabama Supreme Court.  Arthur opposed the State's motion, arguing that the motion was "premature" because review of Arthur's successive Rule 32 petition until the United States Supreme Court adjudicates Arthur's petition for a writ of certiorari.  On June 22, 2011, the Alabama issued an order that stated the State's motion "is denied as prematurely filed."  Ex. H.  Two justices dissented from the order and two justices recused themselves.  On July 15, 2011, the State filed a motion requesting the Alabama Supreme Court to reconsider its decision to not set an execution date.  The State's motion remained pending as of the date of this filing in this Court.

## E.   Relevant Standards Of Review

The Eleventh Circuit has held: "[i]njunctive relief is an equitable remedy that is not available as a matter of right."  <u>Grayson v. Allen</u>, 491 F.3d 1318, 1322 (11th Cir. 2007).  "Additionally, the equitable principles at issue when inmates facing imminent execution delay in raising their § 1983 method-of-execution

challenges are equally applicable to requests for both stays and injunctive relief."
Id.; see also Rutherford v. McDonough, 438 F.3d 1087, 1092 (11th Cir. 2006)
(commenting that "where petitioner's scheduled execution is imminent, there is no
practical difference between denying a stay on equitable grounds and denying
injunctive relief on equitable grounds in a § 1983 lawsuit"), vacated on other
grounds, Rutherford v. McDonough, 547 U.S. 1204, 126 S.Ct. 2915 (2006).

In analyzing the sufficiency of pleading in the complaint, courts are guided
by a two-prong approach: (1) the court is not bound to accept conclusory
statements of the elements of a cause of action and (2) where there are well-
pleaded factual allegations, this Court should assume their veracity and then
determine whether they plausibly give rise to entitlement to relief.  See Ashcroft v.
Iqbal, 129 S.Ct. 1937, 1949-50 (2009).  "[A] plaintiff's obligation to provide the
grounds of his entitle[ment] to relief requires more than labels and conclusions,
and a formulaic recitation of the elements of a cause of action will not do."  Bell
Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation and punctuation
omitted).  Although a complaint need not contain "detailed factual allegations," to
survive a motion to dismiss, it must contain "enough facts to state a claim to relief
that is plausible on its face."  Id. at 570.  Further, the factual allegations "must be
enough to raise a right to relief above the speculative level."  Id. at 555.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986).

## ARGUMENT

## I.   ALL OF THE CLAIMS RAISED IN ARTHUR'S COMPLAINT ARE BARRED BY THE STATUTE OF LIMITATIONS

Arthur's complaint should be dismissed because it was filed outside Alabama's two-year statute of limitations. In Powell, the Eleventh Circuit, in affirming the dismissal of a virtually identical § 1983 lethal injection action on statute of limitations grounds, held that the state's replacement of sodium thiopental with pentobarbital did not restart the statute of limitations clock. Powell, 643 f.3D AT 1301-05. In DeYoung, the Eleventh Circuit reiterated its holding in Powell, noting that it "rejected an identical claim as to Alabama's recent switch from sodium thiopental to pentobarbital." DeYoung, 2011 WL 2899704 at *3 (quoting Powell, 643 F.3d at 1301-05). In addition, DeYoung held that the evidence concerning the Powell and Blankenship executions did not undermine its holding on statute of limitations grounds. DeYoung, 2011 WL 2899704, at *4. This Court should apply this binding precedent and dismiss Arthur's complaint.

32

"All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought."  Crowe v. Donald, 528 F.3d 1290, 1292 (11th Cir. 2008).  In Alabama, that limitations period is two years.  See, e.g., Jones v. Preuitt & Mauldin, 876 F.2d 1480, 1483 (11th Cir. 1989) ("the two-year limitations period of Ala. Code § 6-2-38(l) applies to section 1983 actions in Alabama"); Hutcherson v. Riley, 06-657, 2006 WL 2989214, at *5 n.7 (S.D. Ala. Oct. 18, 2006) (unpublished opinion) ("The statute of limitations period for § 1983 claims is determined by reference to the applicable state law period for personal injury torts, which in Alabama is two years.").

The Eleventh Circuit has repeatedly applied the statute of limitations in rejecting untimely filed § 1983 action by an Alabama death row inmate.   In McNair v. Allen, 515 F.3d 1168 (11th Cir. 2008), the court examined the question of when a death row inmate's constitutional claim relating to the method of execution accrues for limitations purposes.  McNair refused to adopt the plaintiff's contention that because the alleged tort had yet to occur, his claim did not accrue until the moment of execution.  The court deemed such a time-of-harm accrual principle to have no application "where the ultimate injury is reasonably likely and wholly foreseeable."  McNair, 515 F.3d at 1174.  It went on to explain, "[i]t is clear a capital litigant may file suit and obtain injunctive relief long before he is

executed." Id.   After a detailed analysis of various alternative dates, McNair concluded that the appropriate accrual date for a method-of-execution challenge was the date that Alabama's execution protocol became applicable to the plaintiff because by that time, "the facts which would support a cause of action should have been apparent to any person with a reasonably prudent regard for his rights." Id., at 1177; see also Crowe v. Donald, 528 F.3d 1290, 1293 (11th Cir. 2008) (holding that a method-of-execution challenge accrued "when, after direct review of his convictions had been completed, [the plaintiff] became subject to the method of lethal injection that he challenges"). A similar conclusion was reached in Lovett v. Ray, 327 F.3d 1181 (11th Cir. 2003), where the court deemed a § 1983 complaint, which related to a change in parole procedures that would not affect the plaintiff until several years in the future, to be time barred because the plaintiff "knew, or should have known, all of the facts necessary to pursue a cause of action" more than two years before bringing a § 1983 claim seeking prospective injunctive relief. Id. at 1182-83.

Pursuant to McNair, Lovett, Powell, and DeYoung, Arthur's § 1983 cause of action accrues not at the time of execution, but when the facts which would support a cause of action should have been apparent to a person with a reasonably prudent regard for this rights. As noted above, McNair held that the accrual date was July 31, 2002, after Alabama had changed its method-of-execution to lethal injection

and the inmate knew that he was subject to that form of execution rather than electrocution. McNair, 515 F.3d at 1177. Under the clear principles enunciated in Lovett, McNair, Powell, and DeYoung, the facts which would support Arthur's lethal injection action should have been apparent to any person with a reasonably prudent regard for his rights in 2002, when he knew that he was subject to lethal injection rather than electrocution. Thus, Arthur's § 1983 action accrued for limitations purposes some 9 years ago, rendering it clearly time barred.

As the Eleventh Circuit held in Powell, the fact that Alabama slightly modified its protocol to allow for the use of pentobarbital does not change the accrual date. See Powell, 643 F.3d at 1301-05. Specifically, the Eleventh Circuit held that the replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol:

> Powell claim that the basis of his first claim – that the ADOC's lethal injection protocol violates the Eighth Amendment – has undergone a "significant change" as contemplated by McNair, because of the recent change in the anesthetic used to ensure that there is no pain during the remaining stages of the procedure. However, this very argument - that the ADOC's change from sodium thiopental to pentobarbital, is a substantial or significant change in the lethal injection protocol - was rejected by a panel of this Court in Powell (Williams), where we held that "[t]he replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol." 2011 WL 2077796, at *3 (emphasis added). Indeed, as the Tenth Circuit has recognized, sodium thiopental and pentobarbital are both classified as barbiturates. See

35

> Pavatt v. Jones, 627 F.3d 1336, 1337 (10th Cir.2010).
> They differ in their length of effect; sodium thiopental is
> "ultrashort-acting," while pentobarbital is "intermediate-
> acting"—which simply means its effect lasts longer than
> that of sodium thiopental.  Id. at 1340 & n. 3.

Powell, 643 F.3d at 1303.   The slight modification in Alabama's execution

protocol does not reset the statute of limitations clock.  Id.

The Eleventh Circuit recently rejected the argument that the evidence

presented in DeYoung regarding the executions of Powell and Blankenship

executions restarts the statute of limitations clock.  DeYoung, 2011 WL 2899704 at

*4.   The court stated that "the mere act of proffering additional reasons not

expressly considered previously will not open the door to reconsideration of the

questions by a second panel."  Id. (quoting Smith v. GTE Corp., 236 F.3d 1292,

1302 (11th Cir. 2001)).   Finally, DeYoung held that the evidence concerning the

executions in Powell and Blankenship did not undermine the statute of limitations

holding in Powell because this evidence lacked merit.   DeYoung, 2011 WL

2899704 at *4-*6.   Arthur presents the same witness statements here, thus

DeYoung is binding precedent that his lethal injection action is barred by the

statute of limitations.

Arthur's complaint also attacks, albeit in non-specific terms, the

qualifications and training of ADOC's personnel.  See, e.g., Doc. 12, ¶ 54.  This

particular claim could have been raised at any point after Alabama changed its

method of execution in 2002.  See Trzebackowski v. Cleveland, 319 F.3d 853, 856

(6th Cir. 2003) ("In determining when the cause of action accrues in § 1983 cases,

we look to the event that should have alerted the typical lay person to protect his or

her rights.").

The same is also true of Arthur's procedural due process claim regarding

Alabama's lethal injection statute.  See Doc. 12, ¶¶ 80-87 (citing Ala. Code §§ 15-

18-82 to – 82.1).  This statute has been in place since 2002 and could have been

challenged at any point after its promulgation.  In Powell, the Eleventh Circuit held

that an identical due process claim was barred by the statute of limitations:

> Nor, moreover, did the district court err in dismissing
> Powell's second claim - that his rights under the Eighth
> and Fourteenth Amendments were violated because
> Alabama's private execution protocol was changed
> secretly and without any oversight - on statute of
> limitations grounds.  As the district court held, Powell
> could have challenged the ADOC's "secrecy"
> surrounding the method of execution beginning July 31,
> 2002, as the facts supporting this cause of action "should
> have been apparent to any person with a reasonably
> prudent regard for his rights."  McNair, 515 F.3d at 1177.
> Indeed, as Powell acknowledges in his opening brief,
> "Alabama does not mandate by statute or regulation what
> drugs are to be used in conducting a lethal injection, and
> the ADOC may change the drugs used in the protocol at
> any time for any reason without notice or oversight[,] ...
> [and the drug used] is subject to change at any time."
> Blue Br. at 13 n. 3.  Thus, Powell fails to show how his
> claim about the secrecy surrounding the ADOC's recent
> change in lethal injection protocol was revived by the
> ADOC's 2011 switch in drugs.  And in any event, this
> very claim was also rejected by this Court in Powell

37

(Williams), which, as noted above, constitutes binding
precedent.  See 2011 WL 2077796, at *3. The district
court, therefore, did not err in finding Powell's second
claim for relief barred by the statute of limitations as
well.  Accordingly, we affirm.

Powell, 643 F.3d at 1305.  Under this binding precedent, Arthur's due process

claim, like his Eighth Amendment claim, is barred by the statute of limitations.

Arthur contends his equal protection claim is timely because it is based on

his contention that the ADOC deviated from its execution protocol during the

Powell execution by not performing the third part of the consciousness assessment

check.  Doc. 12, ¶ 77.  Specifically, Arthur contends that the ADOC did not pinch

the inmate's arm as part of the consciousness assessment before the administration

of the second and third drugs in the protocol.  Id.  Arthur's contention is based on

the affidavits of Powell's counsel, Christine Freeman and Matt Schulz, who viewed

Powell's execution.  Id.

In DeYoung, the Eleventh Circuit held that an equal protection claim is

barred by the statute of limitations.  DeYoung, 2011 WL 2899704 at *3.  Arthur

does not mention that precedent or attempt to distinguish it.  Furthermore, it should

be noted that neither Freeman nor Schulz stated that this part of this consciousness

assessment was not performed; rather, their affidavits do not mention it at all.  See

Doc. 12, Ex. O, Ex. P.  Furthermore, Schulz testified in the DeYoung evidentiary

hearing that he was praying throughout the execution, thus, there is a probability

38

that he was distracted and did not see everything that took place during Powell's execution. Ex. K at 118. In addition, Schulz's testimony indicated that he looked away after the "guard" called out Powell's name and stroked Powell's left eyelash. Ex. K at 122. Finally, the State presented affidavits from Anne Hill, ADOC's General Counsel, and from Warden Patterson establishing that all parts of the consciousness assessment, including the arm pinch, were performed during Powell's execution. Ex. I, ¶ 18; Ex. E, ¶ 13. Based on DeYoung and the fact that no deviation from the protocol occurred during the Powell execution, Arthur's equal protection claim is barred by the statute of limitations.

Arthur's state law separation of powers claim is barred by the statute of limitations as well. This claim could have been raised at any point after Alabama changed its method of execution in 2002. See Powell, 643 F.3d at 1305 (holding that Powell's due process claim was barred by the relevant statute of limitations grounds because the claim could have been raised in 2002 when Alabama changed its method of execution to lethal injection).

## II. ARTHUR'S COMPLAINT SHOULD BE DISMISSED BECAUSE HE FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Arthur's amended complaint alleged four causes of action: (1) a Fourteenth Amendment due process violation; (2) an Eighth Amendment cruel and unusual punishment violation; (3) a Fourteenth Amendment equal protection violation; and

(4) a violation of Alabama's doctrine of separation of powers pursuant to Article III, Section 43 of the Alabama Constitution.  See Doc. 12.  Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint is subject to dismissal if it does not "state a claim upon which relief can be granted."   When reviewing the sufficiency of a complaint, the question to be answered is whether the well-pleaded factual allegations give rise to a "plausible" suggestion of unlawful conduct.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 565-66, 127 S.Ct. 1955, 1971 (2007). Conclusory allegations are insufficient to meet the plausibility standard.  Id., 550 U.S. at 555, 127 S.Ct. at 1965; Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1949 (2009).  Unsupported conclusory allegations are entitled to no presumption of truth and should be disregarded when deciding a motion to dismiss.  Iqbal, 129 S.Ct. at 1950.   For the reasons stated below, Arthur's four causes of action should be dismissed because they fail to state a plausible claim for relief.

### A.    Arthur's Eighth Amendment Claim Fails To State A Claim For Which Relief Can Be Granted

The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully."  Id. at 1950.  The facts necessary to meet the plausibility standard will depend on the constitutional provision at issue.  Id. at 1948.  "For a capital prisoner to establish an Eighth Amendment claim for exposure to future harm of severe pain constituting cruel and unusual punishment from an execution method, he is required to show that 'the conditions presenting

the risk must be sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers.'" Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011) (quoting Baze v. Rees, 553 U.S. 35, 50, 128 S.Ct. 1520 (2008)) (citation, emphasis, and punctuation omitted).  Arthur must also overcome the Eleventh Circuit's recent holding that "[t]he replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol, and we conclude that such an amendment does not violate the Eighth Amendment under the cases cited by [the petitioner]." Powell (Williams), 641 F.3d at 1258.  Moreover, if the well-pleaded allegations are consistent with lawful behavior, the complaint must be dismissed.  Twombly, 550 U.S. at 557, 127 S.Ct. at 1966.  As established in this motion to dismiss, Arthur's amended complaint is replete with unsupported conclusory allegations.  When only the well-pleaded facts are considered, it is clear that Arthur's amended complaint fails to meet the plausibility standard.

The United States Supreme Court has upheld the use of lethal injection procedures similar to that used in Alabama.  See Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520 (2008).  In Powell (Williams) and Powell, the Eleventh Circuit specifically addressed the use of pentobarbital as the anesthetizing agent in the lethal injection protocol.  Noting that pentobarbital and sodium thiopental are both fast acting barbiturates that differ only in the length of effect, with pentobarbital

lasting longer, the Eleventh Circuit concluded that the use of pentobarbital does not create a substantial risk of harm.  Powell (Williams), 641 F.3d at 1257, Powell, 641 F.3d at 1258.  These precedents demonstrate that Arthur's challenge to ADOC's execution protocol is barred as a matter of law.  Because the ADOC's protocol is constitutional as a matter of law, Arthur's claims should be dismissed.

The Constitution does not "demand an avoidance of all risk of pain in carrying out executions."  Baze, 553 U.S. 35, 47, 128 S.Ct. 1520, 1529 (2008). Instead, to establish that the risk from a lethal injection procedure is sufficiently high to constitute cruel and unusual punishment in violation of the Eighth Amendment, "the condition presenting the risk must be 'sure or very likely' to cause serious illness and needless suffering, and give rise to 'sufficiently imminent dangers,'" Id., 553 U.S. at 50, 128 S.Ct. at 1531 (quoting Helling v. McKinney, 509 U.S. 25, 33, 34-35, 113 S.Ct. 2475 (1993)).  "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of objectively intolerable risk of harm that qualifies as cruel and unusual."  Baze, 553 U.S. at 50, 128 S.Ct. at 1531.

Thus, Arthur must allege with well-pleaded facts that ADOC's lethal injection protocol poses a risk that is "sure or very likely" to cause needless suffering that gives rise to "sufficient imminent dangers."  Baze, 553 U.S. at 50, 128 S.Ct. at 1531.  Arthur argues in this regard that pentobarbital is not used

clinically as an anesthetic and, therefore, there is no clinical experience to inform its use in the execution setting. He submits expert witness reports from Dr. Lubarsky and Dr. Heath, who frequently testify on behalf of convicted murderers in lethal injection challenges. These reports primarily rely on narrow bits of information concerning the executions of Roy Blankenship and Eddie Powell to make conclusions concerning ADOC's execution protocol. The Eleventh Circuit, in denying a stay of execution in DeYoung, 2011 WL 2899704 at *4-*5, addressed the very evidence underlying Arthur's expert witnesses' opinions. The court noted that there were various versions describing Blankenship's movements but that "[t]he evidence undisputedly shows that Blankenship became still and was unconscious before the second drug was administered." Id. at *5. Moreover, "[e]ven assuming Blankenship's movement was during the administration of the pentobarbital or right after, the evidence in this record does not establish a substantial risk of serious harm from the pentobarbital, or even that Blankenship necessarily suffered any harm, much less serious harm." Id.

In its opinion denying the stay of execution in DeYoung, the Eleventh Circuit did not mention Matt Schulz's testimony regarding Powell's execution. However, even if Schulz's testimony regarding Powell lifting his head for approximately a minute is truthful, the evidence established that Powell was unconscious before the administration of the second and third drugs in the

execution protocol.  No matter how long Powell raised his head, it is clear that his execution did not proceed to the second drug until after he was fully unconscious. As DeYoung reiterated, "[t]he Eighth Amendment does not protect against all harm, only serious harm; and it does not prohibit all risks, only substantial risks." DeYoung, 2011 WL 2899704, at *5.  "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of objectively intolerable risk of harm that qualifies as cruel and unusual."  Baze, 553 U.S. at 50, 128 S.Ct. at 1531.

Arthur has wholly failed to state a plausible claim that pentobarbital, once fully administered and allowed to act, is ineffective as an anesthetic.  The ADOC's use of pentobarbital does not create a substantial risk of serious harm to inmates. In Iqbal, the Supreme Court reiterated that legal conclusions unsupported by well-plead factual allegations are not entitled to the assumption of truth.  Iqbal, 129 S.Ct. at 1950.  To be considered plausible, a claim must be more than merely conceivable.  Twombly, 550 U.S. at 556.  What this means is that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S.Ct. at 1949.  The Supreme Court emphasized in Brewer v. Landrigan, 131 S.Ct. 445 (2010), that an inmate fails to carry his burden if his proof requires speculation.  Under the principles set forth in these cases, Arthur has

failed to sufficiently state a § 1983 claim showing that the modification of the ADOC's execution protocol to allow for the use of pentobarbital is sure or very likely to cause needless suffering.

### B. Arthur's Fourteenth Amendment Due Process Claim Fails To State A Claim For Which Relief Should Be Granted

Arthur's procedural due process claim also fails to state a plausible claim for relief.  Both this Court and the Eleventh Circuit recently rejected virtually identical due process claims raised by Alabama death row inmate Jason Williams.  See Powell (Williams), 2011 WL 1843616, at *9 - *10; Powell (Williams), 641 F.3d at 1257-58.  In rejecting this due process claim, this Court and the Eleventh Circuit explained that there is no authority supporting the proposition that a condemned inmate has a due process right to receive notice and an opportunity to be heard regarding changes to an execution protocol.  Id.  Indeed, the Eleventh Circuit characterized Williams's due process claim as an attempt "to avoid the legal prism typically used for analyzing similar Eighth Amendment claims."  Powell (Williams), 641 F.3d at 1258.  Furthermore, as this Court correctly held in Powell (Williams), a death row inmate is not entitled a copy of Alabama's lethal injection protocol.  Specifically, this Court stated as follows:

> Williams does not cite any authority from any court in Alabama – federal or state – that has required the state of Alabama to disclose its lethal injection protocol as a constitutional or other requirement, and the court is aware of no such authority.  In fact, in the context of examining

> whether a condemned inmate unreasonably delayed in
> filing his § 1983 claim, the Eleventh Circuit has rejected
> the argument that the confidentiality of Alabama's lethal
> injection protocol precluded the inmate from filing his
> challenge to the method of execution any earlier.  <u>See</u>
> <u>Grayson v. Allen</u>, 491 F.3d 1318, 1323 (11th Cir. 2007).

<u>Powell (Williams)</u>, 2011 WL 1843616, at *11 n. 5.

Arthur's citation to <u>Matthews v. Eldrige</u>, 424 U.S. 319 (1976), in no way supports his attempt to place a due process label on his claim that the ADOC has not publicly disclosed the execution protocol.  Contrary to Arthur's suggestion, that case does not "establish[] a categorical rule entitling defendants to a lethal injection protocol that is legislatively enacted and subjected to extensive litigation."  <u>Powell (Williams)</u>, 641 F.3d at 1258.  Arthur's reliance on <u>Oken v. Sizer</u>, 321 F. Supp. 2d 658, 664 (D. Md. 2004) is similarly misplaced.  As the Arizona district court explained in <u>Beaty v. Brewer</u>, No. 11-1037, 2011 WL 2164022, at *7 (D.Ariz. May 25, 2011), "this Court cannot rely on one district court's unsupported assertion that capital plaintiffs have such a due process right, especially in view of the fact that the United States Supreme Court vacated the stay of execution granted by the district court in <u>Oken</u>."  Given the complete lack of authority to support Arthur's procedural due process claim, this claim fails to state a cognizable claim for relief.

Furthermore, Arthur's due process claim is based on the false premise that the defendants' failure to disclose Alabama's lethal injection protocol prohibits

him from ascertaining the method of his execution and raising an Eighth Amendment claim. These allegations are clearly false in light of the detailed information regarding the protocol contained in his complaint. In addition, as the Eleventh Circuit noted, "the State's representations regarding the amended execution protocol were accurate and adequately informed [Jason] Williams of the process that would be used." <u>Powell (Williams)</u>, 641 F.3d at 1258. The representations made by the State in the Williams litigation are available to Arthur and refute his contention that he has been denied access to the execution protocol. Furthermore, this Court's published opinion in <u>Powell (Williams)</u>, 2011 WL 1893616, provides a detailed description of Alabama's lethal injection protocol. Information regarding the chemicals to be injected, including the quantity, method, and order of administration, as well as the relevant procedures, including the consciousness assessment, is thus publicly available. Accordingly, the information Arthur needs to challenge the method of execution under the Eighth Amendment is readily available to him. And, indeed, as noted above, Arthur's complaint describes the lethal injection protocol in terms that show that his lawyers have reviewed this information. Thus, it is clear that Arthur does, in fact, have sufficient knowledge about Alabama's execution protocol to formulate a challenge to that protocol.

Because Arthur's procedural due process claim fails to state a plausible claim for relief, it should be summarily dismissed.

### C.   Arthur's Equal Protection Claim Fails To State A Claim For Which Relief Can Be Granted

Arthur argues that Alabama's method of lethal injection violates his right to equal protection under the Fourteenth Amendment because the "[d]efendants have materially deviated from their written execution protocol, impermissibly burdening Mr. Arthur's right to be free from cruel and unusual punishment."  Doc. 12 at 39, ¶ 114; see also id. at 24 - 25, 38 - 40.  He does not allege that the defendants consistently deviate from Alabama's lethal injection protocol, or even that they did so on more than one occasion.   Rather, Arthur's equal protection claim stems solely from his allegation that during the June 16, 2010 execution of Eddie Powell, the execution team did not perform one of the three elements of the consciousness assessment called for in the protocol.  Doc. 12 at 24 - 25, 39.  Specifically, Arthur alleges that "witnesses did not observe" Powell's arm being pinched during the consciousness assessment following the administration of the first drug.  Doc. 12 at 24, ¶73, 39, ¶ 115.

Even assuming Arthur's factual allegations are true, his Eighth Amendment

argument fails to state a claim for which relief may be granted.[9]  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 39 (1989).  To state an equal protection claim, a plaintiff "must show that the State will treat him disparately from other similarly situated persons."  DeYoung v. Owens, 2011 WL 2899704, at *6 (11th Cir. Jul. 20, 2011).  He must also show that the alleged disparate treatment interferes with a fundamental right, discriminates against a suspect class, or is not rationally related to a legitimate government interest.  Id. Here, Arthur contends that the alleged "[d]eviation[] from the State's lethal injection protocol" during Powell's execution "burden[s] Mr. Arthur's fundamental right to be free from cruel and unusual punishment 'by negating . . . precise procedural safeguards.'"  Doc. 12 at 39, ¶ 117 (quoting Cooey v. Kasich, No. 04-

---

[9] Although Arthur's equal protection argument fails to state a cognizable claim for relief even if one assumes that his factual allegations are true, it is important to note that the evidence Arthur has presented in support of these allegations does not, in fact, establish any deviation from the execution protocol during Eddie Powell's execution.  As discussed in more detail below, in Section V(B) of this motion, Arthur has at most presented conclusory and speculative allegations, which are based solely on inferences made from the affidavits of two of Powell's lawyers.  Neither of these affidavits actually state that Powell's arm was not pinched during the course of his execution.  Indeed, neither affidavit mentions the pinch test at all.  Furthermore, the affidavits of Anne Hill and Anthony Patterson refute Arthur's speculative assertions regarding the alleged deviation from the lethal injection protocol during Powell's execution.  See Exs. E, I. As a result, Arthur's allegations do not raise a material issue of fact that must be resolved prior to the disposition of his claims.

1156, 2011 WL 2681193 (S.D.Ohio Jul. 8, 2011)).  His argument fails to state a claim for which relief may be granted.

First, Arthur fails to cite, and the defendants are unaware of, any legal authority that would support his argument that allegations of a single deviation from Alabama's execution protocol, in a single previous execution, would "impermissibly burden[] Mr. Arthur's right to be free from cruel and unusual punishment," Doc. 12 at 39, ¶ 114.  In raising this argument, Arthur relies mainly on Cooey, 2011 WL 2681193, in which an Ohio district court found, in the course of evaluating an inmate's motion for a stay of execution, that the inmate had established a likelihood of success on the merits of an Eighth Amendment claim. Arthur's reliance on Cooey is misplaced.  Evidence in that case revealed that Ohio officials "routinely deviate[d] from mandated or core provisions set forth in [Ohio's] written protocol," Cooey, 2011 WL 2681193, at *19, and as a matter of policy, treated the protocol merely as "an advisory compilation of guidelines subject to being ignored," id. at *20; see also id. at *27, *28.  The court found that in practice, "Ohio's execution policy now embraces a nearly unlimited capacity for deviation from the core or most critical execution procedures." Id. at *21.  Further, "the deviations are substantive departures from some of the most fundamental tenets of Ohio's execution policy."  Id.  Officials routinely, and deliberately, deviated from the requirements of Ohio's execution protocol in numerous ways,

including: (1) "fail[ing] to document the preparation of the execution drugs, leading to the untenable possibility that the state has failed to use the correct drug dosages[,]" id. at *21; (2) failing to assess an inmate's veins to insure that an IV could be started, which ultimately contributed to a botched execution attempt, id. at *22, *32 - *33; (3) "fail[ing] to adhere to the systematic redundancies designed to minimize . . . the possibility of human error," id. at *23, for example, performing an execution despite the absence of a key execution team member, id.; and (4) "fail[ing] to exercise control over who participates in an execution," id. at *26. The extent and pervasiveness of the deviations caused the district court to disparage, "[i]t is the policy of the State of Ohio that the State follows its written execution protocol, except when it does not."   Id. at *1. The court further determined that Ohio's "only rationale" for its routine, deliberate deviations from its execution protocol "is to simply complete the executions at all or nearly all costs." Id. at *30.  Ultimately, the district court found that the plaintiff established a likelihood of success on the merits of his equal protection claim based on extensive evidence of Ohio officials' pattern and practice of deviating from fundamental provisions of that state's execution protocol.  Cooey, 2011 WL 2681193, at *19 - *33.

In contrast to Cooey, Arthur does not allege a pattern and practice of deviations from Alabama's lethal injection protocol.  Rather, he merely alleges a

single instance in a previous execution where he claims witnesses did not observe officials performing one component of the consciousness assessment.  He does not contend that the alleged deviation was deliberate.  Consequently, even if the Ohio district court's decision in Cooey constituted binding authority on this Court (which of course, it does not), Cooey's holding cannot be stretched to support the equal protection argument Arthur advances in the case at hand.  See Cooey, 2011 WL 2681193, at *19 - *33; cf. DeYoung v. Owens, 11-02324, Doc. 27, at 20 (N.D.Ga Jul. 20, 2011), aff'd DeYoung, 2011 WL 2899704 (noting Cooey's holding that "a state could violate the Equal Protection Clause if it materially and repeatedly deviates from its lethal injection protocols" and finding Cooey inapplicable to the plaintiff's claim).

Not only is there no legal support for Arthur's equal protection claim, but also, the claim is meritless on its face.  Even if one assumes that the factual allegations underlying Arthur's claim are true, failing to pinch Powell's arm during his execution did not cause an Eighth Amendment violation.  Arthur's assertion that "[f]ailure to pinch the inmate's arm prior to paralyzing the inmate with pancuronium bromide and injecting potassium chloride puts the inmate at a substantial risk of serious harm," Doc. 12 at 39, ¶ 115 (citing Baze v. Rees, 553 U.S. 35, 52 (2008)), is categorically false and misrepresents the United States Supreme Court's holding in Baze.  Contrary to Arthur's representations, neither the

"pinch test" nor any other particular consciousness assessment test is constitutionally required.   Indeed, <u>Baze</u> explicitly rejected such an argument. <u>Baze</u>, 553 U.S. at 60.   And, all of the evidence in this case, including that submitted by Arthur, indicates that Powell's consciousness was assessed, and that he did not respond to the stimuli.   As discussed in more detail below, in Section V, it is clear that Powell's execution did not proceed to the second drug until after he was fully unconscious.   The alleged failure to pinch Powell during his execution did not result in a violation of the Eighth Amendment in Powell's case and does not "impermissibly burden[] Mr. Arthur's right to be free from cruel and unusual punishment," Doc. 12 at 39, ¶ 114.

Because Arthur has failed to state a claim for which relief may be granted, this Court should dismiss his Eighth Amendment claim.

**D.    Arthur's Claim That Alabama's Lethal Injection Statute Violates The Separation Of Powers Clause Of The Alabama Constitution Should Be Dismissed For Lack Of Jurisdiction And For Failure To State A Cognizable Claim Under § 1983**

Alabama's capital punishment statute provides that death sentences shall be carried out by lethal injection but does not specify the specific procedures for carrying out the sentence.   Ala. Code. § 15-18-82; <u>id.</u> § 15-18-82.1.   Instead,

Alabama law confides to the Alabama Department of Corrections the duty of

developing and implementing the State's lethal injection protocol.  Id.[10]

---

[10] The Alabama statute mirrors the pattern set by numerous other states: the legislature sets the methods of execution, while the details of the execution protocol are left to executive branch officials, and prison officials are given wide discretion over the processes for carrying out death sentences.  See, e.g., Ala. Code. § 15-18-82(a) (providing that a death sentence "shall be executed . . . by lethal injection unless the convict elects execution by electrocution as provided by law"); id. § 15-18-82.1(a); id. § 15-18-82.1(g) ("The policies and procedures of the Department of Corrections for execution of persons sentenced to death shall be exempt from the Alabama Administrative Procedure Act . . . ."); Ariz. Rev. Stat. Ann. § 13-757(A) ("The penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, under the supervision of the state department of corrections."); id. §41-1005(A)(23) (providing that "[r]ules made by the state department of corrections" are exempted from Arizona's Administrative Procedures Act); Ark. Code Ann. § 5-4-617(a)(1) ("The sentence of death is to be carried out by intravenous lethal injection of one (1) or more chemicals, as determined in kind and amount in the discretion of the Director of the Department of Correction."); id. § 5-4-617(a)(4) ("The director shall determine in his or her discretion any and all policies and procedures to be applied in connection with carrying out the sentence of death . . . ."); id. § 5-4-617(a)(5)(A) ("The policies and procedures for carrying out the sentence of death and any and all matters related to the policies and procedures for the sentence of death including but not limited to the director's determinations under this subsection are not subject to the Arkansas Administrative Procedures Act, §25-15-201 et seq."); Del. Code Ann. tit. 11, §4209(f) ("Punishment of death shall, in all cases, be inflicted by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such person sentenced to death is dead, and such execution procedure shall be determined and supervised by the Commissioner of the Department of Correction."); id. § 4322(d) (providing that all policies and procedures developed by the Department of Correction "shall be confidential, and not subject to disclosure except upon the written authority of the Commissioner"); see also Jackson v. Danberg, 2008 WL 1850585, at *3 - *6 (Del. Super. Ct. Apr. 25, 2008) (unpublished opinion) (holding that under § 4322(d), the Delaware Department of Corrections's "policies and procedures, including those policies and procedures governing lethal injection[,]" are exempted "from compulsory promulgation to the public before official adoption under the APA"); State v. Jackson, No. 11C–06–080, 2011 WL 2750672, at *8 (Del. Super. Ct. Jul. 14, 2011) (unpublished opinion), aff'd 2011 WL 3198796 (Del. Jul. 27, 2011); Fla. Stat. Ann. § 922.105(1) ("A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution.  The sentence shall be executed under the direction of the Secretary of Corrections or the secretary's designee."); id. § 922.105(7) ("The policies and procedures of the Department of Corrections for execution of persons sentenced to death shall be exempt from [Florida's Administrative Procedure Act]."); Ga. Code Ann § 17-10-38(a) ("All persons who have been convicted of a capital offense and have had imposed upon them a sentence of death shall suffer such punishment by lethal injection.  Lethal injection is the continuous intravenous injection of a substance or substances sufficient to cause death into the body of the person sentenced to death until such person is dead."); La. Rev. Stat. Ann. §

15:569(B) ("Every sentence of death executed on or after September 15, 1991, shall be by lethal injection; that is, by the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead."); id. § 15:569(D) (providing that Louisiana's Administrative Procedures Act "shall not apply to the procedures and policies concerning the process for implementing a sentence of death"); Mo. Ann. Stat. § 546.720(1) ("The manner of inflicting the punishment of death shall be by the administration of lethal gas or by means of the administration of lethal injection. . . ."); Ringo v. Lombardi, 706 F.Supp. 2d 952, 955-56 (W.D.Mo. 2010) ("Missouri's lethal injection protocol is not statutory -- it is issued by the Department of Corrections and sets out technical procedures for carrying out lethal injections, and it is exempt from Missouri's typical notice and comment rulemaking requirements."); Middleton v. Missouri Dep't of Corr., 278 S.W.3d 193, 194-98 (Mo. 2009) (holding that the lethal injection protocol adopted by the Missouri Department of Corrections was exempt from the Missouri Administrative Procedures Act); Neb. Rev. Stat. § 83-964 ("A sentence of death shall be enforced by the intravenous injection of a substance or substances in a quantity sufficient to cause death.  The lethal substance or substances shall be administered in compliance with an execution protocol created and maintained by the Department of Correctional Services."); id. 965(2) ("The director [of Correctional Services] shall create, modify, and maintain a written execution protocol describing the process and procedures by which an execution will be carried out consistent with this section.  The director shall (a) select the substance or substances to be employed in an execution by lethal injection, (b) create a documented process for obtaining the necessary substances, (c) designate an execution team composed of one or more executioners and any other personnel deemed necessary to effectively and securely conduct an execution, (d) describe the respective responsibilities of each member of the execution team, (e) describe the training required of each member of the execution team, and (f) perform or authorize any other details deemed necessary and appropriate by the director."); State v. Elis, 799 N.W.2d 267, 289 (Neb. 2011) ("The only substantive direction provided by the Legislature regarding the execution protocol is that the protocol 'shall require that the first or only substance injected be capable of rendering the convicted person unconscious and that a determination sufficient to reasonably verify that the convicted person is unconscious be made before the administration of any additional substances, if any.'") (quoting Neb. Rev. Stat. § 83-965(3)); Nev. Rev. Stat. § 176.335(1) ("The judgment of death must be inflicted by an injection of a lethal drug."); id. § 176.335(2)(b) ("The Director of the Department of Correction shall: . . . . [s]elect the drug or combination of drugs to be used for the execution after consulting with the State Health Officer."); S.C. Code Ann. § 24-3-530(A) ("A person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the person, lethal injection under the direction of the Director of the Department of Corrections."); S.D. Codified Laws § 23A-27A-32 ("The punishment of death shall be inflicted by the intravenous injection of a substance or substances in a lethal quantity. The warden, subject to the approval of the secretary of corrections, shall determine the substances and the quantity of substances used for the punishment of death."); Tenn. Code Ann. § 40-23-114(a) ("For any person who commits an offense for which the person is sentenced to the punishment of death, the method for carrying out this sentence shall be by lethal injection."); id. § 40-23-114(c) ("The department of correction is authorized to promulgate necessary rules and regulations to facilitate the implementation of this section."); Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 311-12 (Tenn. 2005) (holding that Tennessee's lethal injection protocol is not subject to the Uniform Administrative Procedures Act); Tex. Code Crim. Proc. Ann. art. 43.14

In the case at hand, Arthur contends that Alabama's lethal injection statute violates the separation of powers clause of the Alabama Constitution.  Doc. 12, at 29, ¶88, 40 - 41,  ¶¶  118-23.    Specifically,  he  argues  that  the  statute "unconstitutionally delegates to the DOC the unfettered authority to decide the lethal injection protocol, without notice of its legal bounds, and to change the lethal injection protocol at any time."  Id. at 40, ¶ 120.

At the outset, it is important to note that this Court lacks jurisdiction to direct State officials to comply with State law.  U.S. Const. Amend. XI; Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against state officials on the basis of state law, whether prospective

---

("Whenever the sentence of death is pronounced against a convict, the sentence shall be executed . . . by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such convict is dead, such execution procedure to be determined and supervised by the director of the correctional institutions division of the Texas Department of Criminal Justice."); Tex. Gov't Code Ann. § 2001.226 (providing that the Texas Administrative Procedures Act does not apply to rules or internal procedures of the Texas Department of Criminal Justice); Foster v. Texas Dept. of Criminal Justice, No. 03-11-00191, 2011 WL 2297709 (Tex. Ct. App. Jun. 10, 2011) (holding that pursuant to Tex. Gov't Code Ann. § 2001.226, the procedures adopted by the Texas Department of Criminal Justice for carrying out death sentences by lethal injection are exempt from the Texas Administrative Procedures Act); Va. Code Ann. § 53.1-234 ("The Director, or the assistants appointed by him, shall . . . cause the prisoner under sentence of death to be electrocuted or injected with a lethal substance, until he is dead. . . .   Execution by lethal injection shall be permitted in accordance with procedures developed by the Department."); Wash. Rev. Code § 10.95.180(1) ("The punishment of death shall be supervised by the superintendent of the penitentiary and shall be inflicted by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until the defendant is dead, or, at the election of the defendant, by hanging by the neck until the defendant is dead. . . ."); Brown v. Vail, 237 P.3d 263, 269 (Wash. 2010) ("The Department, through the superintendent of the state penitentiary, is charged with the duty to supervise executions by lethal injection under RCW 10.95.180(1), necessarily including the authority to establish the protocol by which lethal injection will be administered.").

or retroactive, does not vindicate the supreme authority of federal law.  On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").  Accordingly, to the extent that Arthur's claim is an attempt to require state officials to comply with state law, this claim should be dismissed for lack of subject matter jurisdiction.

In addition, and in the alternative, this claim should be dismissed because it fails to state a cognizable claim under § 1983, it falls outside this Court's original jurisdiction, and this court should decline to exercise supplemental jurisdiction.  Arthur's separation-of-powers claim falls outside the bounds of a proper § 1983 action, which does not extend to a claim that a state statute violates a state constitution.  In the context of § 1983 actions, "liability is appropriate solely for violations of federally protected rights."  Almand v. DeKalb County, 103 F.3d 1510, 1513 (11th Cir. 1997) (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)).  Section 1983 does not create a substantive right; rather, "it merely provides a remedy for deprivations of federal statutory and constitutional rights."  Almand, 103 F.3d at 1512; accord Doe v. School Bd. of Broward County, 604 F.3d 1248, 1265 (11th Cir. 2010).  Accordingly, to state a claim under § 1983, a plaintiff must allege that the defendant violated a specific federal right.  See, e.g.,

Doe, 604 F.3d at 1265 ("a § 1983 plaintiff must allege a specific federal right violated by the defendant"); Griffin v. Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001) ("In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law.") (emphasis added).   Here, Arthur's separation-of-powers claim does not allege any violation of a federal right.   Instead, this claim alleges that Alabama's lethal injection statute violates the Alabama Constitution.   Arthur has thus failed to state a cognizable claim for relief under § 1983.

Furthermore, this Court lacks original jurisdiction over Arthur's state-law claim, and it should decline to exercise supplemental jurisdiction.   Because this Court has jurisdiction over Arthur's federal claims under § 1983, it has the authority to exercise supplemental jurisdiction over the remaining state-law claims. See 28 U.S.C. § 1367(a) ("[I]n any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that . . . form part of the same case or controversy . . . .").   It should decline to do so in the instant case, for at least three separate reasons.   First, Arthur's separation-of-powers claim raises a novel and complex issue of State law. See 28 U.S.C. § 1367(c)(1).   Second, this claim is not intertwined with Arthur's federal claims.   Finally, because all of Arthur's federal claims are ripe for dismissal, this court should decline to exercise supplemental jurisdiction over his

state law claim.  See 28 U.S.C. § 1367(c)(3); see also Williams v. Hobbs, No. 09-00394, 2010 WL 749563, at *4 (E.D.Ark. Mar. 2, 2010) .  As an Arkansas district court recently explained when declining to exercise supplemental jurisdiction over the plaintiff's claim that Arkansas's capital punishment statute violated the separation of powers clause set forth in the Arkansas constitution:

> A district court may decline to exercise supplemental jurisdiction over a claim under § 1367(a) if the district court has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3).  Out of respect for the principles of federalism and for the courts of the State of Arkansas, the Court will exercise its discretion under 28 U.S.C. § 1367(c) to decline to exercise supplemental jurisdiction with respect to [the plaintiff's] state-law claims.  Cf. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n.7, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."); Condor Corp. v. City of St. Paul, 912 F.2d 215, 220 (8th Cir. 1990) (stating that the district court should have declined pendent jurisdiction after dismissing the federal claims because of "the necessity to provide great deference and comity to state court forums to decide issues involving state law questions").  Here, those concerns for deference and comity to the state courts are even more compelling because the state-law issue that [the plaintiff] raises is whether the MEA violates the separation-of-powers doctrine contained in the Arkansas Constitution.  That issue should be decided by the Arkansas courts, not by the federal courts.

Williams, 2010 WL 749563, at *4.

For all of the foregoing reasons, this Court should dismiss Arthur's claim that Alabama's lethal injection statute violates the separation of powers clause of the Alabama constitution.

## III. PRELIMINARY EQUITABLE RELIEF IS PRECLUDED BY ARTHUR'S INEQUITABLE CONDUCT

When the United States Supreme Court clarified that an action such as this one could be brought pursuant to § 1983, it clearly held that "[f]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course."  Hill v. McDonough, 547 U.S. 573, 584, 126 S.Ct. 2096, 2104 (2006).  Furthermore, the Court recognized that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence" which interest was not diminished by the recognition of an inmate's ability to file an action pursuant to § 1983.  Id.  The Supreme Court further explained that its decision recognizing the ability of death row inmates to bring such claims was not intended to deprive federal courts of the means to protect the interest of the State and the victims of crime in the timely enforcement of a sentence.  Id.  Indeed, the Supreme Court made plain that "[t]he federal courts can and should protect States from dilatory or speculative suits[.]"  Id.

The Eleventh Circuit has long held that "[i]njunctive relief is an equitable remedy that is not available as a matter of right."  Grayson v. Allen, 491 F.3d

1318, 1322 (11th Cir. 2007) (dismissing a lethal injection on laches grounds). "Additionally, the equitable principles at issue when inmates facing imminent execution delay in raising their § 1983 method-of-execution challenges are equally applicable to requests for both stays and injunctive relief." Id.; see also Rutherford v. McDonough,   438 F.3d 1087, 1092 (11th Cir. 2006) ("where petitioner's scheduled execution is imminent, there is no practical difference between denying a stay on equitable grounds and denying injunctive relief on equitable grounds in a § 1983 lawsuit"), vacated on other grounds, Rutherford v. McDonough, 547 U.S. 1204, 126 S.Ct. 2915 (2006).

Since the Supreme Court's decision in Hill, the Eleventh Circuit has on numerous occasions affirmed the dismissal of cases brought by death row inmates who inexcusably delayed in filing their § 1983 actions.  See, e.g., Hallford v. Allen, 576 F.3d 1221, 1222 (11th Cir. 2009) (holding that a lethal injection challenge was properly dismissed because the case could be litigated fully only if a stay of execution was granted or the case was "sped up in an uncommon way"); Williams v. Allen, 496 F.3d 1210 (11th Cir. 2007) (holding that a lethal injection action was properly dismissed because "there was no justification for Williams's failure to bring his lethal injection challenge earlier to allow sufficient time for full adjudication on the merits of his claim"); Grayson, 491 F.3d 1318 (holding that the district court properly dismissed an inmate's § 1983 action because he

61

unnecessarily delayed in seeking equitable relief pursuant to § 1983); <u>Jones v. Allen</u>, 485 F.3d 635 (11th Cir. 2007) (holding that an inmate inexcusably delayed in filing his lethal injection action by waiting until the end of collateral review). No matter what accommodations are made for Arthur to expedite his claim, this case cannot realistically be fully litigated before the setting of Arthur's execution date which could occur very soon.  As previously noted, the Alabama Supreme Court denied the State's execution motion as being prematurely filed, but on July 15, 2011, the State filed a motion to reconsider which could result in the setting of an execution date in the very near future.  At the latest, Arthur's execution date could be set soon after the United States Supreme Court addresses Arthur's petition for certiorari, which was filed on July 14, 2011.

That said, even if this Court can rule on the merits of Arthur's § 1983 action before the setting of Arthur's execution date, the case will not (by a long shot) be over when this Court rules.  One party or the other will have the opportunity to appeal, and it is unimaginable that this Court's order will not be followed by an appeal to the Eleventh Circuit and a petition for writ of certiorari to the United States Supreme Court.

As Judge Thompson recognized in <u>Jones v. Allen</u>, this simply is not the type of case that can be squeezed into a few months:

> Jones maintains that this case can be resolved in this court on the merits within two to three months.  The

court finds such an assertion dubious.  First, if the court were to find in favor of Jones on the merits, fashioning relief (that is, reviewing the State's adoption of a new protocol for lethal injection) would take much more than three months.   Second, regardless of whether Jones prevailed or not, an appeal would be certain and would add months, if not years, to this litigation.  As a result, the State would be looking at one or more years, beyond the 28 years that have already passed, before it could carry out its judgment of execution.

Jones v. Allen, 483 F.Supp.2d 1142, 1152 (M.D. Ala. 2007).  In affirming the denial of Jones's stay request, the Eleventh Circuit expressly "agree[d]" with Judge Thompson's assessment of the temporal practicalities:

> The district court made a factual finding that adjudicating Jones's claim in the trial would take 'much more than three months' and that a subsequent appeal 'would add months, if not years, to this litigation.'  Jones, 2007 WL 1140416.  We agree and thus cannot say that Jones's suit was filed in time to allow full adjudication without the need for a stay of execution.

Jones, 485 F.3d at 639 n.2.

Arthur could have filed this action months ago when it was well known that sodium thiopental was no longer being manufactured and the states were switching to pentobarbital.  See Exs. B, C.  Arthur could certainly have filed this action at least by May 2, 2011, when Jason Williams, the intervener plaintiff in Eddie Powell's lethal injection action, filed a petition raising virtually identical claims in the Alabama Supreme Court.  But Arthur chose to delay his filing until June 8, 2011, when this Court would not have sufficient time to determine the merits of

Arthur's § 1983 action. The precedent cited above requires this Court to deny equitable and injunctive relief if the late-filed petition does not allow for sufficient time to address the merits of the action. Accordingly, because Arthur inexcusably delayed in filing the instant § 1983 complaint, this Court should deny Arthur's request for equitable and injunctive relief.

## IV. ARTHUR'S EIGHTH AMENDMENT CLAIM IS BARRED BY <u>RES JUDICATA</u>

Arthur's Eighth Amendment claim is precluded by the doctrine of <u>res judicata</u>. Therefore, this Court should dismiss that claim challenging ADOC's execution protocol.

For purposes of <u>res judicata</u>, "a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action." <u>Federated Department Stores v. Moite</u>, 452 U.S. 394, 398 (1981); <u>Olmstead v. Amoco Oil Co.</u>, 725 F.2d 627, 631 (11th Cir. 1984). <u>Res judicata</u> "will bar a subsequent action if: (1) the prior decision was rendered by a court of competent jurisdiction; (2) there was a final judgment on the merits; (3) the parties were identical in both suits: and (4) the prior and present causes of action are the same." <u>Urfirer v. Cornfield</u>, 408 F.3d 710, n.1 (11th Cir. 2005) (quoting <u>Davila v. Delta Air Lines, Inc.</u>, 326 F.3d 1183, 1187 (11th Cir. 2003)). The <u>res judicata</u> bar extends to all relevant issues and legal theories arising out of the same set of operative facts, whether or not fully presented in the previous

litigation.  Olmstead, 725 F.2d at 632.  Because Arthur has previously filed two lethal injection actions concerning ADOC's execution protocol, his current Eighth Amendment claim is barred by res judicata.

Arthur's first lethal injection action sought to enjoin the state defendants from executing him by lethal injection.  The District Court in the Southern District of Alabama dismissed Arthur's lawsuit based on the equitable principle that he unnecessarily delayed in filing his action.  Arthur v. Allen, 07-342-WS, 2007 WL 2320069 (S. D. Ala. Aug. 10, 2007).  Arthur appealed and the Eleventh Circuit affirmed the district court's opinion.  Arthur v. Allen, 07-13929, 248 Fed. Appx. 128 (11th Cir. Sept. 17, 2007).  Arthur filed another lethal injection action again seeking a declaratory judgment and injunctive relief enjoining the state defendants from executing him.  The district court dismissed Arthur's action and the Eleventh Circuit affirmed.  Arthur v. Allen, 07-722, 2007 WL 4105113 (S.D. Ala. Nov. 15, 2007), aff'd, Arthur v. Allen, 07-15877, 285 Fed. Appx. 705 (11th Cir. July 29, 2008).

There can be no question that the parties to all three of Arthur's § 1983 lethal injection actions are the same.  Arthur's present Eighth Amendment claim seeks a declaratory judgment adjudicating the method of execution Alabama will use to execute him unconstitutional and injunctive relief enjoining the state defendants from executing him using lethal injection.  ADOC's modification of its execution

65

protocol to allow for the use of pentobarbital, instead of sodium thiopental, as the first drug in the three-drug protocol, has been held by the Eleventh Circuit to not be a significant alteration.  Powell v. Thomas, 643 F.3d 1300, 1304 (11th Cir. 2011).  Thus, Arthur's Eighth Amendment claim raises nothing new and that claim is barred by res judicata.

Because the Eleventh Circuit has twice denied Arthur's request for injunctive relief, his current Eighth Amendment claim for the same relief is barred under the doctrine of res judicata.

## V.    THE STATE IS ENTITLED TO SUMMARY JUDGMENT

To the extent that this Court considers the evidentiary presentation submitted with this motion, the State is entitled to a summary judgment.  Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id., 477 U.S. at 322-23.

## A.   Arthur's Eighth Amendment Claim Should Be Summarily Dismissed

Arthur has failed to present evidence which would show that Alabama's lethal injection protocol is constitutionally infirm; nor has he established that the recent amendment allowing the use of pentobarbital instead of sodium thiopental will cause a substantial risk of serious harm or that it will cause any unnecessary pain.  Further, even if Arthur's complaint raised a cognizable Eighth Amendment claim (which it does not), his claim would necessarily fail as a matter of law.  As discussed in detail below, Arthur cannot plead a claim that survives scrutiny under the United States Supreme Court's decision in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520 (2008) (upholding a lethal injection protocol substantially similar to Alabama's).  Furthermore, the same evidence presented by Arthur concerning the recent executions of Blankenship and Powell was considered and rejected by the Eleventh Circuit.  DeYoung, 2011 WL 2899704, at *4-*6.  Specifically, the court held that "DeYoung has wholly failed to show that pentobarbital, once fully administered and allowed to act, is ineffective as an anesthetic."  Id. at *6.  This Court should follow this binding precedent and grant the defendants' motion for summary judgment.

Alabama, just like every other state that has recently carried out executions by lethal injection, has modified its execution protocol because the anesthetic drug sodium thiopental is no longer available.  The use of pentobarbital, a barbiturate

just like sodium thiopental, ensures that the inmate is sufficiently anesthetized and will not cause an impermissible risk of harm.  See DeYoung, 2011 WL 2899704, at *6 ("As the district court succinctly found, Georgia's 'use of pentobarbital does not create a substantial risk of serious harm to inmates.'").

The standard for evaluating an Eighth Amendment claim in this context is whether the plaintiff inmate demonstrated "a substantial risk of serious harm," alternatively described as "an objectively intolerable risk of serious harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment."   Baze, 553 U.S. at 50 (internal quotation omitted).  The Supreme Court emphasized that the conditions at issue "must be sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers."   Id. (quotations omitted) (emphasis in original). The Court further explained: "simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of objectively intolerable risk of harm that qualifies as cruel and unusual."   Id. (quotation omitted).  The Court, therefore, concluded that a federal court may grant a stay only if a lethal injection protocol "creates a demonstrated risk of severe pain … [and] that the risk is substantial when compared to the known and available alternatives."   Id.

Recently, in Brewer v. Landrigan, 131 S.Ct. 445 (Oct. 26, 2010), the Supreme Court rejected a lethal injection challenge by an Arizona inmate who argued that a drug obtained from a foreign source for use in his execution was unsafe. Id. The district court in that case "granted the restraining order because it was left to speculate as to the risk of harm" in light of the absence of proof establishing that the drug at issue would cause pain and suffering. Id. The Supreme Court vacated the stay, holding that "speculation cannot substitute for evidence that the use of the drug is sure or very likely to cause serious illness and needless suffering." Id. (quoting Baze, 553 U.S. at 50).

In the case at hand, Arthur has not alleged any facts that would establish that Alabama's three-drug lethal injection protocol is constitutionally infirm. The recent modification to the protocol, which permits the use of pentobarbital in place of sodium thiopental, does not affect this conclusion. See Powell (Williams), 641 F.3d at 1258; Powell, 643 F.3d at 1304 (holding that the replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol). As Dr. Dershwitz's affidavit demonstrates, the use of pentobarbital in Alabama's execution protocol fails to pose "a substantial risk of serious harm," or an "objectively intolerable risk of harm." Baze, 553 U.S. at 50. Dr. Dershwitz's affidavit establishes that the dose of pentobarbital is sufficient to render the inmate unconscious quickly and that the three drugs cause

"rapid and painless death."  Ex. D at ¶ 5.  He further explained that where Alabama's amended protocol is properly administered, the inmate would be more than sufficiently anesthetized prior to the administration of the pancuronium bromide and will not be able to feel the effects of the second and third drugs in the protocol.  Ex. D at ¶¶ 11, 14.  Indeed, Dr. Dershwitz opined that the dose of 2,500 milligrams of pentobarbital is lethal by itself in that it will cause a person to stop breathing.  Id. at ¶ 12.  Further, it is worth noting that pentobarbital is the most common drug of choice "for physician-assisted suicide in those jurisdictions where the practice is legal."  Ex. D at ¶ 13.  The expert witness reports presented by Arthur do not dispute these material facts.  See Doc. 12, Ex. A, Ex. B.  Although Arthur's expert witness reports contend that pentobarbital is designed to produce sedation and is not used as an anesthetic drug, they do not dispute the fact that pentobarbital will render the inmate unconscious.   Indeed, Dr. Heath has in previous testimony repeatedly criticized the use of the ultrashort-acting sodium thiopental and opined that longer lasting drugs such as pentobarbital should be used.  Exs. L, M.

In upholding the constitutionality of Kentucky's method of execution in Baze, the Supreme Court noted that "[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard."  Baze, 553 U.S. at 62.  While Alabama has slightly modified

its protocol to allow for the use of pentobarbital when sodium thiopental is unavailable, Alabama's execution protocol remains virtually identical to Kentucky's.  As the Tenth Circuit recognized in <u>Pavatt</u>, sodium thiopental and pentobarbital are similar drugs in that they are both classified as a barbiturate. <u>Pavatt</u>, 627 F.3d at 1337-38.  The second and third drugs in Alabama's and Kentucky's lethal injection protocols are pancuronium bromide and potassium chloride.  Ex D at ¶ 6(g) and 6(h); <u>Baze</u>, 553 U.S. at 44, 128 S.Ct. at 1527. Because Alabama's execution protocol is virtually identical to Kentucky's, Arthur has not established a "substantial risk of serious harm." <u>Baze</u>, 553 U.S. at 49-50, 128 S.Ct. at 1530-31.  Consequently, the State is entitled to a judgment as a matter of law.

Since Alabama changed its method of execution to lethal injection in 2002, two individuals, Grantt Culliver and Anthony Patterson, have served as Senior Warden of the Holman Correctional Facility, where executions are carried out in Alabama.  Patterson has served as the Senior Warden at Holman since November of 2009, and at the time he prepared his affidavit, he had presided over 9 executions.  Ex. E at 1.  Before becoming Senior Warden, Patterson served as a member of the execution team in connection with ten other executions that took place between 2005 and 2009.  Ex. E at 2.  Warden Patterson stated that Alabama's lethal injection protocol was properly administered in all nineteen of the executions

in which he has participated and that all of these executions "took place without mishap." Ex. E at 2. Grantt Culliver, the Senior Warden at Holman Correctional Facility from August of 2002 until November of 2009, presided over twenty executions by lethal injection. See Ex. F. Warden Culliver stated that in all of these executions, the drugs were administered properly and none of the twenty executed inmates appeared to suffer any pain during the execution. Id.

As shown in the affidavits submitted with this motion, Alabama's execution protocol has been properly administered in all twenty-nine of the executions by lethal injection that have taken place in this state, and further, the protocol is not inherently cruel and unusual. Indeed, Arthur does not demonstrate that using pentobarbital will cause a substantial risk of serious harm. Alabama eliminates the risk of unnecessary pain by using 2.5 grams of pentobarbital – which is by itself a lethal dose – to sufficiently anesthetize the inmate. As an additional safeguard, after the pentobarbital is administered, a consciousness assessment is performed to ensure that the inmate is unconscious before the administration of the pancuronium bromide and potassium chloride. Another district court has held that the consciousness assessment is a significant safeguard that is as good as or better for assessing the depth of anesthesia than using electronic monitors that measure brain activity. See Dickens v. Brewer, No. CV-07-1770-PHX, 2009 WL 1904294, at *6

(D. Ariz. 2009).  As demonstrated above, the ADOC purposefully seeks to avoid any unnecessary pain and suffering during an execution.

The Eleventh Circuit has already rejected the same evidence presented by Arthur in its recent DeYoung opinion.  DeYoung, 2011 WL 2899704, at *4-*6. The court noted that the evidence concerning the execution of Roy Blankenship differed in the description of the type of movement and whether it occurred before or after the administration of the pentobarbital.  Id. at *5.  It was undisputed, however, that "the movement occurred only a few times and all briefly during a total time period of three minutes."  Id.  Furthermore, "[t]he evidence undisputedly shows that Blankenship became still and was unconscious before the second drug was administered."  Id.  The court in DeYoung did not mention Schulz's testimony even though Schulz was the only fact witness presented with regard to the Powell execution.

As in DeYoung, the evidence presented in the case at hand differs on some inconsequential facts.  Schulz and Freeman, Powell's counsel, contend that Powell raised his head for approximately a minute and looked confused and disoriented during that time period.  Doc. 12, Ex. O, Ex. P.  Anne Adams, General Counsel for ADOC, and Warden Patterson saw Powell raise his head for a few seconds as the pentobarbital began to be administered.  Ex. I, ¶ 17, Ex. E, ¶ 12.  Chaplain Summers held Powell's hand while praying, and stated that Powell released his

hand after a minute or two which signified to the Chaplain that Powell was unconscious at that point. Ex. J, ¶ 3. One of Arthur's exhibits, an article published in the Birmingham News states that Powell raised his head for a few seconds. Doc. 12, Ex. N. Even if the accounts of Schulz and Freeman are truthful, they do not establish "a substantial risk of serious harm from the pentobarbital, or even that [Powell] suffered any harm, much less serious harm." DeYoung, 2011 WL 2899704 at *5. All of the evidence presented, both by Arthur and by the defendants, demonstrates that Powell was unconscious after the administration of the pentobarbital. See DeYoung, 2011 WL 2899704, at *6 (holding that DeYoung failed to show that pentobarbital was ineffective as an anesthetic because there was no dispute that he was unconscious after the administration of the pentobarbital). There is absolutely no material factual dispute that Powell was unconscious before the administration of the second and third drugs in the execution protocol.

The court in DeYoung held that even if the claims there alleged were not untimely, "they fail as a matter of law." DeYoung, at *3. Arthur's Eighth Amendment claim should be dismissed because "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c).

**B.     Arthur's Fourteenth Amendment Due Process Should Be Summarily Dismissed**

Arthur's procedural due process claim also should be summarily dismissed as a matter of law.  Both this Court and the Eleventh Circuit recently rejected virtually identical due process claims raised by Alabama death row inmate Jason Williams.  See Powell (Williams), 2011 WL 1843616, at *9 - *10; Powell (Williams), 641 F.3d at 1257-58.  In rejecting this due process claim, this Court and the Eleventh Circuit explained that there is no authority supporting the proposition that a condemned inmate has a due process right to receive notice and an opportunity to be heard regarding changes to an execution protocol.  Id.  Indeed, the Eleventh Circuit characterized Williams's due process claim as an attempt "to avoid the legal prism typically used for analyzing similar Eighth Amendment claims."  Powell (Williams), 641 F.3d at 1258.  Furthermore, as this Court correctly held in Powell (Williams), a death row inmate is not entitled a copy of Alabama's lethal injection protocol.  Specifically, this Court stated as follows:

> Williams does not cite any authority from any court in Alabama – federal or state – that has required the state of Alabama to disclose its lethal injection protocol as a constitutional or other requirement, and the court is aware of no such authority.  In fact, in the context of examining whether a condemned inmate unreasonably delayed in filing his § 1983 claim, the Eleventh Circuit has rejected the argument that the confidentiality of Alabama's lethal injection protocol precluded the inmate from filing his challenge to the method of execution any earlier.  See Grayson v. Allen, 491 F.3d 1318, 1323 (11th Cir. 2007).

75

Powell (Williams), 2011 WL 1843616, at *11 n.5.

Furthermore, Arthur's due process claim is based on the false premise that the defendant's failure to disclose Alabama's lethal injection protocol prohibits him from ascertaining the method of his execution and raising an Eighth Amendment claim. These allegations are clearly false in light of the detailed information regarding the protocol contained in his complaint. In addition, as the Eleventh Circuit noted, that "the State's representations regarding the amended execution protocol were accurate and adequately informed [Jason] Williams of the process that would be used." Powell (Williams), 641 F.3d at 1258. The representations made by the State in the Williams litigation are available to Arthur and refute his contention that he has been denied access to the execution protocol. Furthermore, this Court's published opinion in Powell (Williams), 2011 WL 1893616, provides a detailed description of Alabama's lethal injection protocol. Information regarding the chemicals to be injected, including the quantity, method, and order of administration, as well as the relevant procedures, including the consciousness assessment, is thus available to the public. Accordingly, the information Arthur needs to challenge the method of execution under the Eighth Amendment is readily available to him. And, indeed, as noted above, Arthur's complaint describes the lethal injection protocol in terms that show that his lawyers have reviewed it. Thus, it is clear that Arthur does, in fact, have sufficient

knowledge about Alabama's execution protocol to formulate a challenge to that protocol.

Because Arthur's procedural due process claim fails as a matter of law, and because there is no dispute as to any material fact, it should be summarily dismissed.

### C.   Arthur's Equal Protection Claim Should Be Summarily Dismissed

Arthur argues that Alabama's method of lethal injection violates his right to equal protection under the Fourteenth Amendment because the "[d]efendants have materially deviated from their written execution protocol, impermissibly burdening Mr. Arthur's right to be free from cruel and unusual punishment."  Doc. 12 at 39, ¶ 114; see also id. at 24 - 25, 38 - 40.   He does not allege that the defendants consistently deviate from Alabama's lethal injection protocol, or even that they did so on more than one occasion.   Rather, Arthur's equal protection claim stems solely from his allegation that during the June 16, 2010 execution of Eddie Powell, the execution team did not perform one of the three elements of the consciousness assessment called for in the protocol.  Doc. 12 at 24 - 25, 39.  Specifically, Arthur alleges that "witnesses did not observe" Powell's arm being pinched during the consciousness assessment following the administration of the first drug.  Doc. 12 at 24, ¶73, 39, ¶ 115.

Arthur has not established that there is a genuine dispute as to any material fact to support his equal protection claim.  His allegation that Powell's arm was not pinched is speculative at best.  It should be noted that neither Freeman nor Schulz stated that the arm pinch portion of the consciousness assessment was not performed; their affidavits do not mention it at all.  See Doc. 12, Ex. O, Ex. P.  The fact that the affidavits do not mention the pinch test does not, and cannot, establish that the pinch test did not occur.

Moreover, at the DeYoung evidentiary hearing, Schulz testified that he was praying throughout the execution, which suggests that that he was likely distracted and did not see everything that took place during Powell's execution.  Ex. K at 118.  In addition, Schulz's testimony indicated that he looked away after the "guard" called out Powell's name and stroked Powell's left eyelash.  Ex. K at 122.  Even if Schulz was not distracted or looking away at the time of the pinch test, there is no indication that he necessarily would have been able to see the guard pinch Powell's arm.  The protocol calls for the guard to pinch the inside of the inmate's arm.  Unlike Anne Hill, who observed Powell's execution from a window directly in front of Powell, see Ex. I, Schulz and Freeman were in a room off to the side of the execution chamber.  This indicates that they were likely not in a position from which they would be able to see a pinch to the inside of Powell's arm.

In any event, affidavits submitted with the instant motion establish that the pinch test was, in fact, performed.  The affidavits of Anne Hill, ADOC's General Counsel, and Warden Patterson conclusively show that all parts of the consciousness assessment, including the arm pinch, were performed during Powell's execution.  Ex. I, ¶ 18; Ex. E, ¶ 13.  These affidavits directly refute Arthur's conclusory, speculative allegation that Powell's arm was not pinched. Because no deviation from the protocol occurred during the Powell execution and Arthur has not presented any evidence supporting his allegation, Arthur's equal protection should be summarily dismissed.  <u>See</u> Fed. R. Civ. P. 56(c).

Furthermore, as noted above, this claim is meritless on its face and should be dismissed as a matter of law.  Even if one assumes that the factual allegations underlying Arthur's claim are true, failing to pinch Powell's arm during his execution did not cause an Eighth Amendment violation.  Arthur's assertion that "[f]ailure to pinch the inmate's arm prior to paralyzing the inmate with pancuronium bromide and injecting potassium chloride puts the inmate at a substantial risk of serious harm," Doc. 12 at 39, ¶ 115 (citing <u>Baze v. Rees</u>, 553 U.S. 35, 52 (2008)), is categorically false and misrepresents the United States Supreme Court's holding in <u>Baze</u>.  Contrary to Arthur's representations, neither the "pinch test" nor any other particular consciousness assessment test is constitutionally required.  Indeed, <u>Baze</u> explicitly rejected this very argument.

Baze, 553 U.S. at 60.   And, all of the evidence in this case, including that submitted by Arthur, indicates that Powell's consciousness was assessed, and that he did not respond to the stimuli.   As demonstrated in Exs. E, I, J, and K, it is clear that Powell's execution did not proceed to the second drug until after he was fully unconscious.   The alleged failure to pinch Powell during his execution did not result in a violation of the Eighth Amendment in Powell's case and does not "impermissibly burden[] Mr. Arthur's right to be free from cruel and unusual punishment," Doc. 12 at 39, ¶ 114.

This claim should be summarily dismissed because there is no genuine dispute as to any material fact and the state defendants are entitled to a judgment as a matter of law.

## CONCLUSION

Wherefore, for the foregoing reasons, the State respectfully requests this Court dismiss Arthur's § 1983 action.

Respectfully submitted,

Luther Strange
*Alabama Attorney General*


*s/  J. Clayton Crenshaw*
J. Clayton Crenshaw


*s/ Stephanie Reiland*
Stephanie Reiland
*Assistant Attorneys General*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of August, 2011, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to the following:   **Suhana S. Han, Jordan T. Razza, and Meredith A. Calandra.**

*s/  J. Clayton Crenshaw*
J. Clayton Crenshaw
*Assistant Attorney General*

OF COUNSEL:

Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300 Office
(334) 353-3637 Fax
ccrenshaw@ago.state.al.us
sreiland@ago.state.al.us