IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THOMAS D. ARTHUR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 2:11-cv-0438-MEF |
| v. | ) | (WO – Publish) |
| | ) | |
| KIM THOMAS, Commissioner, Alabama | ) | |
| Department of Corrections, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Thomas D. Arthur ("Plaintiff" or "Arthur"), an inmate under sentence of death, brings this lawsuit alleging that Defendants will violate his constitutional rights to equal protection and to be free from cruel and unusual punishment by executing him pursuant to Alabama's current lethal injection protocol.[1]  Plaintiff also alleges a state law claim that Alabama's lethal injection statute, Ala. Code § 15-18-82, unlawfully delegates the legislature's authority to devise Alabama's lethal injection protocol to the Alabama Department of Corrections ("ADOC").[2]

---

[1]  Plaintiff's amended complaint also alleges a constitutional due process claim concerning the purported "secrecy" with which Alabama adopts and revises its execution protocol.  The Court dismissed this claim on statute of limitations grounds when it granted Defendants' prior motion to dismiss all of Plaintiff's claims.  (Doc. #37.)  On appeal, the United States Court of Appeals for the Eleventh Circuit reversed the Court's judgment with respect to Plaintiff's Eighth Amendment and equal protection claims and remanded for further proceedings, *Arthur v. Thomas, et al.*, 674 F.3d 1257, 1262-63 (11th Cir. 2012), but did not disturb the Court's adjudication of Plaintiff's due process claim.

[2]  In its prior order granting Defendants' motion to dismiss, the Court declined to exercise supplemental jurisdiction over Plaintiff's state law claim, pursuant to 28 U.S.C. § 1367(c)(3), due to the dismissal of all of Plaintiff's federal constitutional claims.  (Doc. #37, at 10-11.)

Upon remand from the Court of Appeals, Defendants filed their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment.  (Doc. #53.)  The Court set an evidentiary hearing on the motion and the parties commenced discovery in advance of the hearing.  The Court held the hearing on October 18 and19, 2012.  At the hearing, the parties presented expert and lay witness testimony, offered evidence, and presented argument.  After the hearing, the Court extended the discovery period and afforded the parties the opportunity to provide supplemental briefs regarding the pending motion to dismiss or motion for summary judgment.  The parties have filed all supplemental briefs and the matter is ripe for decision.  Having reviewed the submissions of the parties and the record as a whole, the Court finds that, for the reasons explained below, Defendants' motion is due to be GRANTED IN PART and DENIED IN PART.

## I.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the claims in this action under 28 U.S.C. §§ 1331 and 1343.  To the extent the Court exercises jurisdiction over Plaintiff's state law claim, such is permitted by 28 U.S.C. § 1367(a).  The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

## II.  STANDARD OF REVIEW

In assessing the merits of a Rule 12(b)(6) motion, the court must assume that all the factual allegations set forth in the complaint are true and construe them in a light most favorable to the plaintiff.  *See Baloco ex rel. Tapia v. Drummond Co., Inc.*, 640 F.3d 1338, 1344–45 (11th Cir. 2011).  However, "the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not contain "detailed factual allegations," but must include enough facts "to raise a right to relief above the speculative level on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. In addition to considering the properly pleaded allegations in a complaint, the court may also consider on a motion to dismiss any exhibits attached to the complaint, *see Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005), as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

To the extent Defendants are not entitled to summary dismissal pursuant to Rule 12(b)(6), the court must determine whether they are entitled to summary judgment. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

3

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a district court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A reviewing court is restrained during summary judgment proceedings from making the sort of determinations ordinarily reserved for the finder of fact at a trial. *See Strickland v. Norfolk Southern Ry. Co.*, 692 F.3d 1151, 54 (11th Cir. 2012) (citations and quotations omitted). After the non-moving party has responded to the motion for summary judgment, the district court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## III. FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion.  The submissions of the parties, when viewed in the light most favorable to Arthur, the non-moving party, establish the following material facts:

The Court has previously described background facts relating to Plaintiff's crimes and conviction, his history of collateral challenges to his conviction and sentence, Alabama's adoption of a lethal injection execution protocol in 2002, and the 2011 revision to the protocol that precipitated this litigation.  (Doc. #37, at 3–5.)  The parties do not dispute these facts and, accordingly, the Court adopts and incorporates herein that portion of its prior order.  By way of review, the Court stated in its prior order that

> [I]t was well known that, until April 26, 2011, ADOC conducted lethal injections by administering three drugs sequentially to achieve a loss of consciousness, paralysis, and finally death by cardiac arrest. The drugs administered were sodium thiopental, pancuronium bromide, and potassium chloride. However, due to well chronicled circumstances that made sodium thiopental all but unavailable, ADOC announced publicly on April 26, 2011 that it was changing the first drug in its lethal injection protocol from sodium thiopental to 2,500 mg of pentobarbital.

(Doc. #37, at 5.)  Beyond these core facts relating to the substitution of pentobarbital in Alabama's execution protocol, the parties dispute essentially every material fact relating to pentobarbital's efficacy within the execution protocol.  They also dispute whether the protocol adequately accounts for the chemical differences between sodium thiopental and pentobarbital, which arguably render pentobarbital less effective than thiopental to a degree of constitutional significance.  Despite the parties' lack of common ground on these core issues, the Court finds the following additional facts undisputed for purposes of deciding

Defendants' motion.

## A.    Differences Between Sodium Thiopental and Pentobarbital

Both sodium thiopental and pentobarbital are barbiturates. Their chemical structures are very similar, differing only by a single atom. Sodium thiopental is classified as an "ultra-short acting barbiturate," while pentobarbital is an "intermediate-acting barbiturate." As these classifications indicate, sodium thiopental has an extremely rapid onset of effect and subsequent recovery, while pentobarbital is slower and longer-acting. These differences between the two drugs are reflected in their practical applications. Sodium thiopental is approved for and commonly used as an anaesthetic in clinical settings because the ordinary goal of anaesthesia is to quickly induce anaesthesia and to allow the patient to awaken rapidly following the procedure. Pentobaribital, on the other hand, is not commonly used for general anaesthesia purposes in humans because of its prolonged duration. Rather, in humans, pentobarbital is approved for use as a sedative-hypnotic or as an anticonvulsant. Pentobarbital is also used to induce "barbiturate coma" in humans in order to prevent or to decrease brain damage following trauma or during surgical procedures in which the flow of blood to the brain will be interrupted. Pentobarbital is commonly used in veterinary euthanasia procedures and also by practitioners in jurisdictions that permit assisted suicide.

## B.    Alabama's Execution Protocol

The relevance of the differences between sodium thiopental and pentobarbital to this litigation, and the materiality of the parties' factual disputes about Alabama's use of pentobarbital, cannot be judged without considering the drug's use in Alabama's current

lethal injection protocol.  Although Alabama generally maintains that its execution protocol is confidential, the pertinent contents of the protocol have been revealed by Alabama in prior unsealed documents submitted in this and other similar cases.[3]  In short, during an execution two intravenous catheters are inserted into the inmate.  The Warden first injects 2,500 milligrams of pentobarbital into the line, followed by a flush of saline solution.[4]  At some point thereafter, a corrections officer on the execution team is tasked with assessing the consciousness of the inmate by performing graded stimuli as follows: first the team member says the inmate's name; if the inmate does not respond, the team member then gently strokes the inmate's eyelashes; if the inmate still does not respond, the team member pinches the inmate's arm.  If the inmate responds to any of the foregoing stimuli, the Warden will inject another 2,500 milligrams of pentobarbital and the team member will again perform the consciousness check.  Once the Warden confirms that the inmate is unconscious, he injects the second and third drugs in the protocol, pancuronium bromide, a neuromuscular blocking agent that causes paralysis and cessation of respiration, and potassium chloride, which causes cardiac arrest.  The Warden also flushes the line with a saline solution following the injection of each of the second and third drugs.

## IV.  DISCUSSION

---

[3]  Specifically, the Court draws the following description of Alabama's execution procedures from the Expert Report of Mark Dershwitz, M.D., Ph.D., which Defendants attached to their motion. (Doc. #53, Ex. D, ¶ 6.)  *See also Powell v. Thomas*, 784 F. Supp. 2d 1270, 1277 (M.D. Ala. 2011).

[4]  It is undisputed that the rapid injection of 2,500 mg of pentobarbital as required by Alabama's protocol is itself likely fatal to the inmate because it will cause the inmate's blood pressure to drastically, but gradually, decrease to the point that life-saving measures would be required in a clinical setting.

A.      **Plaintiff's Eighth Amendment Claim**

Plaintiff's first claim is as follows:

> Defendants are acting under color of Alabama law in undertaking to execute Mr. Arthur by lethal injection through (i) the use of an insufficient, improperly designed and improperly administered procedure for inducing and maintaining loss of consciousness and loss of sensation prior to execution, and (ii) the use of chemicals that cause severe pain in the process of causing death, in conjunction with chemicals used specifically and for no other purpose than to mask that severe pain, such that there is a substantial risk that Mr. Arthur will suffer serious harm in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

(Doc. #11, at ¶ 102.)  Defendants argue that this claim is barred by the applicable statute of limitations, fails to state a claim upon which relief can be granted, or, in the alternative, that they are entitled to summary judgment on the claim.  (Doc. #53, at 27–41, 67– 75.)  The Court will consider each contention in turn.

1.      **Summary Dismissal Pursuant to Rule 12(b)(6)**

Defendants first argue that Plaintiff's Eighth Amendment claim should be dismissed pursuant to Rule 12(b)(6) because it is barred by the statute of limitations and because Plaintiff has failed to state a claim upon which relief can be granted.  On the statute of limitations issue, Defendants expend considerable effort challenging the majority opinion in the prior appeal of this case, while championing the dissenting opinion.  (Doc. #53, at 31–35.)  While this Court interpreted the Eleventh Circuit's prior opinions as holding that Plaintiff's Eighth Amendment claim was time-barred, the Eleventh Circuit has made it clear that, *in this case*, the Court must look beyond Circuit precedents and perform a "fact-dependent inquiry" into the allegations of the complaint before granting a motion to dismiss

on statute of limitations grounds.  *See Arthur*, 674 F.3d at 1260–62.  This Court does not review the judgments of the Court of Appeals and no amount of contrasting the perceived merits of the majority and dissenting opinions on appeal permits the Court to reconsider the parties' arguments free of the Eleventh Circuit's clear findings about Plaintiff's statement of his claims.[5]  For this reason, Defendants' renewed argument that Plaintiff's Eighth Amendment claim should be summarily dismissed as time-barred or because he has failed to state a claim need not greatly detain the Court.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may raise a statute of limitations defense when the complaint shows on its face that the limitations period has run.  *Avco v. Precision Air Parts, Inc.*, 676 F.2d 494, 495 (11th Cir. 1982); *see also Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1194 (11th Cir. 2008) ("A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred.").  Arthur must have brought these claims within two

---

[5] Although the Eleventh Circuit on numerous occasions prior to the appeal in this case addressed the issue of whether a "significant change" occurred when various states substituted pentobarbital for sodium thiopental, the majority of those cases were reviewed by the appellate court in the context of appeals from the denial of a motion for stay of execution.  *See Valle v. Singer*, 655 F.3d 1223, 1225 (11th Cir. 2011); *DeYoung v. Owens*, 646 F.3d 1319, 1324 (11th Cir. 2011); and *Powell v. Thomas*, 641 F.3d 1255, 1257 (11th Cir. 2011).  This pattern prevails in the cases the Eleventh Circuit has decided since its decision in *Arthur*. *See Mann v. Palmer*, 713 F.3d 1306, 1310 (11th Cir. 2013); *Pardo v. Palmer*, 500 F. App'x 901, 903–04 (11th Cir. 2012); *Ferguson v. Warden, Florida State Prison*, 493 F. App'x 22, 23–24 (11th Cir. 2012).  The showing required to obtain equitable relief like a stay of execution–that the plaintiff "has a substantial likelihood of success on the merits" of his underlying claims–is much more rigorous than the burden presently carried by Plaintiff, who must show only that he has stated a plausible claim for relief and that there are genuine disputes of material fact regarding whether Alabama's protocol was significantly changed and whether this change results in a "substantial risk of serious harm" to Plaintiff.

years of their accrual date, and his Eighth Amendment claim is barred by the statute of limitations unless Alabama's substitution of pentobarbital constitutes a "significant change" to Alabama's execution protocol. *See Powell v. Thomas*, 643 F.3d 1300, 1304 (11th Cir. 2011). Plaintiff's complaint on its face alleges just such a "significant change": "The change from an ultra-quick acting drug used routinely in millions of cases per year (sodium thiopental) and designed to produce unconsciousness, to a drug that is not a routine anesthetic to produce unconsciousness (but sedation) and is not rapid constitutes a significant change." (Doc. #11, ¶ 59.) The Eleventh Circuit made clear that determining whether the substitution of pentobarbital is a "significant change" requires a "fact-dependent inquiry" involving careful consideration of scientific and medical evidence. *Arthur*, 674 F.3d at 1260. The Court of Appeals required this Court to make "finding[s] about the manner in which Alabama administers its lethal injections," and to evaluate "whether Alabama's representations are accurate," and to provide Plaintiff with the opportunity to present evidence to counter the "State's assertions." *Id.* at 1261. In short, the Court of Appeals mandated significant factual development, "including discovery between the parties," to resolve Plaintiff's argument that Alabama has significantly changed its execution protocol. *Id.* at 1262. This required fact-finding precludes any judgment that the complaint shows on its face that the limitations period has run. As a result, Defendants' renewed motion to dismiss Plaintiff's Eighth Amendment claim pursuant to Rule 12(b)(6) on statute of limitations grounds is due to be DENIED.

Defendants also renew their argument that Plaintiff's Eighth Amendment claim must

be dismissed for failure to state a claim upon which relief can be granted.  (Doc. #53, at 40–41.)  However, the Eleventh Circuit has already determined that Plaintiff's pleadings, if taken as true for purposes of a motion to dismiss, are sufficient to survive a Rule 12(b)(6) motion.  *Arthur*, 674 F.3d at 1261.  Moreover, Defendants' contention that Plaintiff "has wholly failed to state a plausible claim that pentobarbital, once fully administered *and allowed to act*, is ineffective as an anesthetic[,]" ignores the central tenet of Plaintiff's allegations.  Plaintiff alleges that Defendants' protocol, in theory and in practice, does not allow pentobarbital to fully and properly "act" on the condemned inmate because the protocol employs insufficient safeguards to assure that the pentobarbital has achieved its intended effect before the injection of the second and third drugs.  Further, Plaintiff alleges that, to the extent the protocol may include such safeguards, Alabama has failed to adequately and consistently employ those safeguards in practice.  (Doc. #11, ¶¶ 54, 73–74.)  Taking these factual allegations as true, which the Court must do for purposes of Defendants' Rule 12(b)(6) motion, it is apparent that Plaintiff has sufficiently stated a plausible Eighth Amendment claim for which relief can be granted.  As a result, Defendants' motion to dismiss Plaintiff's Eighth Amendment claim for failure to state a claim upon which relief could be granted is due to be DENIED.

### 2.    Summary Judgment Pursuant to Rule 56

The Court must now determine whether Defendants are entitled to summary judgment on their statute of limitations defense or on the merits of Plaintiff's Eighth Amendment claim.  As set forth above, the statute of limitations issue hinges on whether Alabama's

execution protocol underwent a "significant change" when pentobarbital was substituted for sodium thiopental in 2011. *Arthur*, 674 F.3d at 1259-60. Defendants argue that no "significant change" occurred because the Eleventh Circuit has previously, and repeatedly, rejected this argument and because their expert witness, Dr. Dershwitz, "opined that an inmate who is properly administered 2500 mg of pentobarbital during a lethal injection will not experience any pain and suffering associated with the administration of the lethal doses of pancuronium bromide and potassium chloride," and would "reach a state of burst suppression–a deeper state of anesthesia than what is required in a surgical setting–in only two or three minutes." (Doc. #147, at 10–12.) Defendants further assert that one of Plaintiff's experts, Dr. Heath, concurred with this assessment of the effect of the dose of pentobarbital mandated by the protocol and that Plaintiff's other expert, Dr. Lubarsky, could offer only a "qualified and vague opinion regarding whether pentobarbital would take effect before the administration of the second and third drugs." (Doc. #147, at 12–13.)

The Court first observes that, in many instances, Defendants seem to mistake, or at least misstate, Plaintiff's burden in opposing summary judgment. For instance, Defendants repeatedly charge Plaintiff with failing to "establish," "demonstrate," or "prove" facts. (*See* Doc. #147, at 6) ("In the case at hand, Arthur, has not proven any facts that would establish that Alabama's three-drug protocol is constitutionally infirm."); (Doc. #147, at 14) ("Arthur has failed to demonstrate that Alabama's lethal injection protocol is constitutionally infirm, nor has he established that the recent amendment allowing the use of pentobarbital instead of sodium thiopental will cause a substantial risk of serious harm or that it will cause any

12

unnecessary pain."). But at this stage, it is not Plaintiff's burden to "establish" or "prove" facts. Rather, as the non-moving party, Plaintiff must only cite to portions of the record which demonstrate a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A). For the reasons discussed below, Plaintiff has met this burden.

Even if there is no dispute that the dose of pentobarbital required by the protocol would, given certain conditions, result in the unconsciousness and eventual death of the inmate, this would not dispose of Plaintiff's claim.[6] Defendants' contention does not dispose of Plaintiff's claim because it ignores Plaintiff's argument about the inclusion of pentobarbital in Alabama's three-drug protocol. The dispute in this case is about the relative speed with which pentobarbital renders the inmate insensate, given the impending injection of the second and third drugs, and whether Alabama's protocol, in theory and in practice, is sufficient to ensure that inmates are properly anaesthetized before injection of the second and third drugs. Plaintiff contends that pentobarbital is slower-acting than sodium thiopental due to its solubility and greater susceptibility to precipitation. Plaintiff further contends that execution team members are not trained to properly measure anaesthetic depth and do not consistently or correctly apply the rudimentary consciousness check safeguards included in the protocol. Plaintiff thus argues that the substitution of pentobarbital for sodium thiopental in a protocol designed specifically for the latter drug amounts to a "significant change" to the protocol which results in a substantial likelihood that he will not be properly anaesthetized

---

[6] Plaintiff appears even to dispute Defendants' contentions about the effectiveness of a stand-alone dose of pentobarbital consistent with Alabama's protocol. (Doc. #132, at 98:22–103:4) (containing Dr. Lubarsky's opinion that a 4,200 mg dose of pentobarbital administered over a longer amount of time is needed to achieve an acceptable level of anaesthesia).

before the injection of the second and third drugs.

The first drug in the three-drug protocol is, Arthur argues, the linchpin of the protocol. By preventing the inmate from perceiving the effects of the second and third drugs, it may "constitutionalize" a process that could otherwise constitute cruel and unusual punishment. Thus, any change in the protocol that arguably results in a less effective anaesthesia-inducing agent that is not accompanied by a compensatory change to account for the new drug enhances the constitutional significance of the change to the protocol. The Court must undertake the fact-intensive inquiry required by the Court of Appeals in light of Plaintiff's argument that the unique properties of the subject drugs could have material consequences within the confines of Alabama's lethal injection protocol.

At the outset, the Court notes Plaintiff's observation that the current medical and scientific understanding of pentobarbital, as well as practical experience administering the drug, constrains our ability to understand pentobarbital's effectiveness within Alabama's execution protocol. This is because, unlike sodium thiopental, which was the first drug in the three-drug execution protocol approved of by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), there is little scientific evidence on the effects of pentobarbital when injected into healthy and conscious humans in the amount and manner required by Alabama's protocol. Judicial executions are the only known context in which pentobarbital is administered in this fashion. It is for this reason that Plaintiff disputes Dr. Dershwitz's testimony on pentobarbital's effectiveness in the execution context. Plaintiff disputes Dr. Dershwitz's testimony on the basis that barbiturate comas are ordinarily induced in persons

already under anaesthesia and, furthermore, Alabama's protocol requires rapid, massive injections rather than the gradual injection normally administered.   While Dr. Dershwitz disputes the relevance of these distinctions, it only emphasizes that material disputes exist. In short, all experts in this case are opining about subject matter that is without substantial precedent in medical science and that is not easily replicated for purposes of study.

Plaintiff also argues that there are unique and known properties of pentobarbital that render it less effective in an execution protocol that is wholly reliant upon the efficiency of the anaesthesia-inducing agent.  Plaintiff gives the following two examples of fundamental differences between sodium thiopental and pentobarbital that demonstrate a genuine dispute of material fact about whether Alabama's protocol was significantly changed when it adopted the latter drug: (1) according to available scientific literature, pentobarital takes longer than sodium thiopental to affect the brain because it is less lipid soluble than sodium thiopental and, therefore, crosses the blood-brain barrier more slowly; and (2) pentobarbital is more likely than sodium thiopental to precipitate out of solution in the intravenous line or in the bloodstream, becoming unable to affect the brain, which enhances the likelihood that it will not achieve its intended effect as quickly as sodium thiopental.

Plaintiff has offered considerable expert opinion in support of his contentions about pentobarbital and how it differs from sodium thiopental in ways material to Alabama's protocol.  In pertinent part, Dr. Lubarsky, a board certified anaesthesiologist and Emanuel M. Papper Professor and Chair of the Department of Anaesthesiology at the University of Miami Miller School of Medicine, testified that, based upon his review of available scientific

literature, sodium thiopental is about three times as fast as pentobarbital in reaching its intended effect (Doc. #132, at 108:2–22), and that this difference is attributable to sodium thiopental's greater ("60 fold") lipid solubility (Doc. #132, at 114:10–115:1).  (*See also* Doc. #132, Ex. 1, at ¶¶ 11–16) (Expert Declaration of David Lubarsky).  Dr. Heath, a practicing anaesthesiologist and assistant professor of clinical anaesthesiology at Columbia University, discussed these same properties and surveyed medical sources contrasting sodium thiopental's and pentobarbital's speed of action and length of duration as a result of their relative "lipophilicity."  (Doc. #132, Ex. 6, at ¶ 7) (Declaration of Mark J.S. Heath, M.D.)  Dr. Melethil, a practicing attorney and academic who specializes in the field of pharmacokinetics, testified that there is a high probability of pentobarbital precipitating somewhere in either the intravenous line or in the bloodstream (Doc. #133, at 123:7–124:7), and that this precipitation is more likely to occur with pentobarbital than with sodium thiopental due to the latter's higher solubility (Doc. #133, at 142:1–11).  Finally, in response to this Court's questioning of Dr. Melethil at the evidentiary hearing, Plaintiff has submitted the declaration of an additional expert, a pharmaceutical chemist, who opines that as much as half of the pentobarbital injected pursuant to the protocol will precipitate as it is injected into the bloodstream, and that sodium thiopental does not similarly precipitate.  (Doc. #152-1, Ex. 7, at ¶ 8.)

These asserted differences between sodium thiopental and pentobarbital are not merely academic points before the Court in a vacuum.  They must be considered in conjunction with Plaintiff's other evidence about Alabama's implementation and execution

of the consciousness checks included in the protocol.  If Alabama's switch to pentobarbital causes inmates to attain sufficient anaesthesia more gradually than does sodium thiopental, then the effort to assess consciousness takes on enhanced importance in ensuring the constitutionality of Alabama's protocol.  However, Plaintiff adduced evidence that the final and most important component of the graded stimuli, the pinch test, was not applied in several recent Alabama executions.[7]  Plaintiff further adduced evidence that, to the extent the pinch test is performed, those responsible for performing it are not medical professionals trained at measuring anaesthetic depth, have not been trained by medical professionals with such expertise, and are not given specific instructions about how hard to pinch the inmate or how to perceive and distinguish any possible reactions to the stimuli they are administering.  (Doc. #132, at 55:3–4, 58:20–59:14, 61:15–17, 64:13–24) (testimony of Warden Patterson).  Plaintiff submits that this lack of training and instruction can negatively effect the consciousness check.

To that end, Plaintiff has adduced evidence that the various officers tasked with this function over the years do not have a uniform understanding of the amount of force to be applied while pinching in order to assess consciousness, much less gauge anaesthetic depth.[8]

---

[7]  This evidence, consisting of the testimonies of several witnesses to recent executions, will be discussed in greater detail in conjunction with the Court's discussion of Plaintiff's equal protection claim.

[8]  Plaintiff's evidence of the disparate understanding among execution team members about how hard the pinch must be to reliably assess consciousness is contained in deposition transcripts that are sealed.  Thus, the Court will not extensively review their contents.  It is sufficient for present purposes to observe that the various execution team members' testimonies on this topic reflect the sort of wide-ranging understanding of the required amount of force that one might expect to occur when lay persons are asked to perform a task more often performed by trained medical professionals

The amount of force applied with the pinch is relevant to the reliability of the consciousness check.  Plaintiff's experts opine that the stimuli should be applied with great force, with intent to inflict significant pain.  (Doc. #132, at 171:11–14, 174:5–12, 179:20–180:2) (testimony of Dr. Heath).  Defendants' own expert agrees that the pinch must be "hard" and with the intent to cause pain.  (Doc. #132, at 55:4–21) (testimony of Dr. Dershwitz).  But Warden Patterson, who presides over executions in Alabama, testified that he did not believe the pinch should be so hard as to inflict pain on a conscious person, much less someone who is sedated.  (Doc. #132, at 61:25–62:5.)  As opined by Plaintiff's experts, a consciousness check, such as the pinch test, which is insufficiently forceful will not render a reliable result and is, therefore, essentially worthless and could enhance the likelihood that the inmate will suffer extreme pain upon injection of the second and third drugs.

Defendants mostly challenge Plaintiff's assertions about pentobarbital through the opinion and testimony of Dr. Dershwitz.  In pertinent part, Dr. Dershwitz testified that he believes the amount of pentobarbital administered pursuant to Alabama's protocol would cause unconsciousness and likely death (Doc. #133, at 13:5–7), that pentobarbital does "readily pass" the blood brain barrier (Doc. #133, at 15:8–10), that even if pentobarbital takes a longer time to reach its peak effect, it can achieve its intended effect–adequate anaesthesia–rapidly (Doc. #133, at 21:3–15), that Dr. Lubarsky improperly relied upon "archaic" data and methodology in formulating his extrapolations about pentobarbital's effects on humans (Doc. #133, at 22:6–25), that he has never seen or heard of any problem

---

and yet also are not afforded specific, uniform instructions on how to perform the task.

with pentobarbital precipitating in the intravenous line as opined by Dr. Melethil (Doc. #133, at 23:20–24:11), and that pentobarbital is not likely to precipitate in the bloodstream to any significant degree because of high concentrations of protein in blood and the "lipid milieu of the cellular component of blood" (Doc. #133, at 25:2–18).[9]  In addition to contrasting Dr. Dershwitz's opinions and practical experience with Plaintiff's experts, Defendants also argue that, apart from Plaintiff's experts, there is simply a lack of scientific or medical evidence to support Plaintiff's "classroom theory" about precipitation of pentobarbital.  (Doc. #155, at 23.)

Plaintiff has identified a number of facts about pentobarbital and sodium thiopental that, his experts submit, demonstrate that pentobarbital affects the brain more slowly than thiopental and, therefore, renders pentobarbital less effective as the first drug in Alabama's execution protocol, especially considering other evidence about the protocol as actually written and administered.  Defendants contention that the distinguishing traits of the two drugs are inconsequential does not negate that Plaintiff has demonstrated a material dispute of fact regarding whether Alabama's switch from sodium thiopental to pentobarbital constitutes a significant change to its execution protocol.  Indeed, it only illuminates the parties' dispute.  The parties offer conflicting expert opinions on complex subject matter involving the intersecting disciplines of medicine, chemistry, and pharmacology.  All experts

---

[9]  For all his candor about the opinions offered by Plaintiff's experts, however, Dr. Dershwitz repeatedly refused to compare or to contrast the relevant qualities of pentobarbital with sodium thiopental as did Plaintiff's experts (Doc. #133, at 20:20, 31:10–11, 77:15–18), despite that such comparison would seem crucial in analyzing the degree to which Alabama's execution protocol was changed.

are constrained by the fact that the subject matter about which they are opining–the implications of the rapid injection of large amounts of pentobarbital into conscious, ostensibly healthy humans–is unique to judicial executions.  Therefore, it is not the product of years of careful, considered practice by medical professionals and does not lend itself to accessible and reliable medical review in the relatively recent instances in which it has been performed in executions.  Nevertheless, the experts appear to offer their opinions in good faith based upon their own unique backgrounds, education, and experiences.

Even if Defendants present a compelling argument about the perceived deficiencies of Plaintiff's expert opinions and the relative strengths of their own experts' opinions, the Court simply may not determine during summary judgment whether Plaintiff's or Defendants' experts are more credible or persuasive.  Such determinations are ordinarily the province of the fact-finder at trial.  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.") (internal quotations omitted).  Where multiple experts have opined in good faith based upon their considerable experience and knowledge, and within the confines of their expertise, and their opinions are simply conflicting, there is little for a court to do but conclude that a material dispute of fact exists.  *See, e.g., Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) ("This approach of weighing the credibility of the competing expert reports amounts to improper fact-finding.  Indeed, competing expert opinions present the classic battle of the experts and it [is] up to a jury to evaluate what weight and credibility each expert

opinion deserves.") (internal citations and quotations omitted).  A court must refrain from such prohibited fact-finding at the summary judgment stage even in instances where it may serve as the ultimate fact-finder after trial.  Because on the record before the Court the issue of whether Alabama's execution protocol underwent a significant change cannot be decided without weighing the credibility and persuasiveness of the various expert opinions offered by the parties, Defendants' motion for summary judgment on statute of limitations grounds is due to be DENIED.

The Court next examines Defendants' argument that they are entitled to summary judgment on the merits of Plaintiff's Eighth Amendment claim.  The Eleventh Circuit has articulated the standard governing such claims as follows:

> "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  A typical Eighth Amendment[] challenge–alleging that the State will inflict cruel or unusual punishment–requires the defendant to demonstrate that (1) the State is being deliberately indifferent (2) to a condition that poses a substantial risk of serious harm to him.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  As a plurality of the Supreme Court summarized, "to prevail on such a claim there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"  *Baze v. Rees*, 553 U.S. 35, 50 (2008) (plurality opinion) (quoting *Farmer*, 511 U.S. at 842, 846 & 847 n. 9).[]

*Powell v. Thomas*, 641 F.3d 1255, 1257 (11th Cir. 2011) (footnotes omitted).

As with their statute of limitations argument, Defendants contend that they are entitled to summary judgment on the merits of Plaintiff's Eighth Amendment claim because "there is no factual dispute that 2500 mg of pentobarbital will not cause unconsciousness in humans."  (Doc. #147, at 16–17.)  However, as discussed above, the fact that 2500 mg of

pentobarbital will eventually render a person unconscious does not dispose of Plaintiff's claim.  Although the Supreme Court has never held squarely that any particular form of capital punishment violates the Eighth Amendment, *Baze*, 553 U.S. at 48, the speed with which pentobarbital induces anaesthesia could affect whether Alabama's three-drug protocol constitutes cruel and unusual punishment.  This is because an insufficiently anaesthetized inmate would experience "chemical entombment" via the pancuronium bromide as it would both paralyze the inmate and cause him to stop breathing.  Upon injection of potassium chloride the inmate would experience intense burning as the drug interacts with nerves from the point of injection until it reaches, and stops, his heart.  The inmate would experience this pain until death from cardiac arrest or suffocation, and, due to the paralysis caused by the second drug, would be unable to convey that he is experiencing tremendous pain or suffering. The Court finds that, to the extent that Plaintiff has demonstrated a genuine dispute of material fact about the efficacy of pentobarbital within Alabama's protocol, thereby amounting to a significant change in the protocol, he has also established a genuine dispute of material fact about whether Alabama's protocol creates a substantial risk that he will suffer cruel and unusual punishment and that Defendants are acting with deliberate indifference to this risk.  Therefore, Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claim is due to be DENIED.

**B.    Plaintiff's Due Process Claim**

Plaintiff's second cause of action is a due process claim challenging Alabama's "veil of secrecy" regarding the adoption and revision of its procedures for carrying out executions.

(Doc. #11, at ¶¶ 107–110.)  In its order granting Defendants' prior motion to dismiss, the Court determined that this claim is barred by the applicable statute of limitations.  (Doc. #37, at 9–10.)  The Eleventh Circuit did not reverse, or even address, the Court's ruling as to this claim.  Upon remand, Defendants once again moved to dismiss this claim as untimely and for failure to state a claim upon which relief could be granted.  (Doc. #53, at 41–50.)  For the reasons previously articulated by the Court, Plaintiff's due process claim is barred by the statute of limitations and is due to be dismissed pursuant to Rule 12(b)(6).

## C.    Plaintiff's Equal Protection Claim

Plaintiff claims that Alabama's alleged failure to adhere to its execution protocol by conducting the pinch test component of the protocol's enumerated consciousness checks burdens his right to be free from cruel and unusual punishment and, therefore, violates his right to equal protection.  (Doc. #11, at ¶¶ 114–17.)  In its prior order, the Court determined that Plaintiff's allegation that Alabama had failed to perform the pinch test in a prior execution did not state a claim upon which relief could be granted and, accordingly, granted Defendants' motion to dismiss pursuant to Rule 12(b)(6).  (Doc. #37, at 10.)  The Eleventh Circuit reversed, stating "Arthur has alleged enough facts to constitute a plausible Equal Protection claim because he alleges that Alabama has substantially deviated from its execution protocol in a manner that significantly reduces inmate safeguards."  *Arthur*, 674 F.3d at 1263.  Defendants now contend that they are entitled to summary judgment on Plaintiff's claim because it is time-barred, fails to state a claim upon which relief can be granted, and is without merit.  (Doc. #147, at 42–68.)  The Court will examine each of these

contentions.

### 1.    Timeliness

Defendants' contention that Plaintiff's equal protection claim is barred by the statute of limitations is based upon the Eleventh Circuit's holding in *DeYoung* and Defendants' own construction of the claim as an Eighth Amendment "cruel and unusual punishment" claim, rather than the Fourteenth Amendment equal protection claim alleged in the amended complaint.  (Doc. #147,  at 43–44.)  In both respects, Defendants' arguments are without merit.

First, *DeYoung* is inapposite because, in that case, DeYoung's equal protection claim was that Georgia's lethal injection protocol "contains gaps in the execution procedure that [Georgia] fills in on an *ad hoc* basis, leading to disparate treatment for different inmates," and that Georgia "deviates from the written protocol, similarly leading to disparate treatment for different inmates."  646 F.3d at 1323.  The Eleventh Circuit's analysis of the timeliness of DeYoung's claims was predicated on DeYoung's attempt to argue that Georgia's substitution of pentobarbital for sodium thiopental constituted a substantial change which reset the statute of limitations.  *Id.* at 1325.  The Court rejected this argument without specifically discussing the timeliness of DeYoung's claim that Georgia's alleged deviations in application of its protocol violated his right to equal protection.  *Id.*  The Court's discussion of the merits of DeYoung's equal protection claim reveals that his equal protection claim is not, as Defendants assert, "similar" to Arthur's.  In fact, they are fundamentally different. DeYoung challenged Georgia's protocol as "insufficiently specific"

and alleged that this lack of specificity permitted Georgia to deviate on an *ad hoc* basis from its protocol in ways that lead to disparate treatment for inmates. *Id.* at 1328. Importantly, the Court observed that "the 'deviations' DeYoung cites . . . are all ways by which the GDOC provides *more* protection for an inmate and the execution process than the written protocol provides." *Id.* (emphasis in original). Arthur, on the other hand, alleges that Alabama has wholly failed to comply with an express component of its protocol that is intended to safeguard his right to be free from cruel and unusual punishment. Thus, Arthur's equal protection claim, as a challenge to Alabama's failure to abide by the specific terms of its protocol in a manner that reduces inmate safeguards, is wholly different than the Plaintiff's claim in *DeYoung*. Alabama's alleged failure to follow its protocol during the execution of Eddie Powell on June 16, 2011, occurred within two years of the date Arthur filed his amended complaint. As a result, Plaintiff's equal protection claim is not time-barred pursuant to *DeYoung*.

Second, Defendants' attempt to recast Plaintiff's equal protection claim as an Eighth Amendment claim is unavailing. (Doc. #147, at 44). While there is overlap between some of the elements of Plaintiff's Eighth and Fourteenth Amendment claims, the claims are distinct. Because Plaintiff's allegations suffice to state an Equal Protection claim, they will not be recast by this Court, at Defendants' behest, into another, separate Eighth Amendment claim for purposes of applying the statute of limitations.

### 2. Dismissal Pursuant to 12(b)(6)

Defendants also seek dismissal on the basis that "Arthur's equal protection claim fails

to state a plausible claim for relief."  (Doc. #147, at 44.)  This argument is refuted by the Eleventh Circuit's finding that "Arthur has alleged enough facts to constitute a plausible Equal Protection claim because he alleges that Alabama has substantially deviated from its execution protocol in a manner that significantly reduces inmate safeguards."  *Arthur*, 674 F.3d at 1263.  Plaintiff's allegations are therefore sufficient to avoid summary dismissal.

### 3.    Summary Judgment on the Merits

The Eleventh Circuit previously described Plaintiff's burden in pleading and proving his equal protection claim as follows:

> To state an Equal Protection claim, Arthur first has to "show that the State will treat him disparately from other similarly situated persons," *DeYoung*, 646 F.3d at 1327.  Second, "[i]f a law treats individuals differently on the basis of ... [a] suspect classification, or if the law impinges on a fundamental right, it is subject to strict scrutiny." *Leib v. Hillsborough County Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009).  Otherwise, Arthur must "must show that the disparate treatment is not rationally related to a legitimate government interest." *DeYoung*, 646 F.3d at 1327–28.

*Id.* at 1262.  As set forth above, Plaintiff claims that, in allegedly failing to conduct the third and most important measure of the protocol's consciousness check, the pinch test, Alabama's failure to abide by its protocol in a prior execution impinges on his fundamental right to be free from cruel and unusual punishment.  Defendants maintain that they are entitled to summary judgment on this claim because there is no dispute of material fact about whether the pinch test is performed consistently.  There does not appear to be any dispute that failing to conduct the pinch test on Plaintiff as required by the protocol would not be rationally related to a legitimate government interest.  Thus, the Court must assess Plaintiff's evidence that Alabama will treat him disparately from other similarly situated persons.

Plaintiff has presented the testimonies or declarations of numerous witnesses to prior executions, all of whom testified that they did not observe an execution team member pinch the inmate during the execution, and that they likely would have seen one if it had occurred. As Defendants do not materially challenge the qualification or ability of these witnesses to testify about what they observed, the Court need not delve into the specifics of each witness at this time.  Defendants do argue, however, that Plaintiff's witnesses are not to be credited because of various factors, including the witnesses' lack of knowledge of the confidential execution protocol, their positioning and ability to see all parts of the consciousness check as it is performed, and their emotional state or loyalty to the condemned inmate whose execution they were witnessing.  (Doc. #155, 31–33.)  By contrast, Defendants assert they have presented numerous knowledgeable, neutral, and experienced witnesses, including corrections officers who served on execution teams, prison administrators, a DOC attorney, etc., whom all maintain that the pinch test is performed at every execution.  In an attempt to skirt the prohibition on weighing the credibility of witnesses during summary judgment proceedings, Defendants draw the following distinction: "Defendants are not calling upon this Court to make credibility determinations regarding the execution witnesses presented. Rather, the State has differentiated the performance of the pinch test as opposed to the observation of it.  There is no dispute that ADOC performs the pinch test; the only dispute is what Arthur's witnesses observed."  (Doc. #155, at 26–27 (citation omitted) (emphasis in original).  This is a specious distinction that ignores the testimony of at least one of Plaintiff's witnesses that, had a pinch been performed, he would have seen the execution team

member's conforming arm movements.  (Doc. #132, at 259:4–25 (testimony of Matt Schulz).

Elsewhere, Defendants make clear why they believe that this Court should discredit

Plaintiff's witnesses at the summary judgment stage, arguing that Plaintiff

> [H]as not presented a single witness who was either trained in the execution
> protocol at the time that he witnessed an execution, or a witness who was
> present in the execution chamber and could actually see what the captain was
> doing.  Instead, he has presented witnesses who were not only family and
> associates of the inmates being executed, but who were seated in a room that
> gave them a partially obstructed view of the captain–in particular, they could
> not see the back and underside of the inmate's left arm, which is where the
> pinch occurred.

(Doc. #155, at 32–33.)  However relevant and persuasive these points might be, they go to

the credibility and weight of Plaintiff's witnesses' testimonies, not whether Plaintiff has

demonstrated a genuine dispute of material fact about whether Alabama consistently

performs the pinch test.  Considering all of the evidence in the record, Plaintiff has

demonstrated that a genuine dispute of material fact exists regarding whether or not Alabama

has performed all components of the consciousness check expressly included in its execution

protocol during prior executions.  As a result, Defendants are not entitled to summary

judgment on the merits of Plaintiff's equal protection claim.

**D.    Plaintiff's State Law Claim**

Plaintiff's fourth claim is a state law claim alleging that Alabama's lethal injection

statute "unconstitutionally delegates to the DOC the unfettered authority to decide the lethal

injection protocol, without notice of its legal bounds, and to change the lethal injection

protocol at any time."  (Doc. #11, at ¶ 120.)  Plaintiff contends this delegation of legislative

authority violates the Alabama Constitution.  In its prior order, the Court declined to exercise

supplemental jurisdiction over this state law claim pursuant to 28 U.S.C. § 1367(c)(3)

because the Court was dismissing all of Plaintiff's federal claims.  (Doc. #37, 10-11.)

As the Court is not dismissing all of Plaintiff's federal claims at this time, the Court

must now revisit Plaintiff's state law claim.  Section 1367(c)(1) provides that a district court

may decline to exercise supplemental jurisdiction over a pendent state law claim if "the claim

raises a novel or complex issue of State law."  The Court finds that, in requiring this Court

to assess the constitutionality of the Alabama legislature's delegation of its authority to the

DOC, Plaintiff places the Court in the uncomfortable position of interpreting the Alabama

Constitution's allocation of the State government's inherent powers.  Plaintiff is not asking

that the Court merely apply some general principles of a well-developed body of state tort

or contract law, as is typical in a district court's exercise of jurisdiction over supplemental

state law claims.  *See Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743-44 (11th

Cir. 2006) ("Generally, state tort claims are not considered novel or complex.").  The Court

can scarcely conceive of more "novel or complex issues of State law" than the Alabama

legislature's ability to delegate its lawmaking authority and whether it has unconstitutionally

done so with its lethal injection statute.  *See, e.g., Grant v. Seminole County, Fla.,* 817 F.2d

731, 732 (11th Cir. 1987) (affirming dismissal of plaintiff's state law claim that a county

ordinance was preempted by Florida law because exercising jurisdiction over claim "would

have required the district court to decide a novel question of state law that was by no means

clear cut.").  Because resolution of this question is rightfully reserved to Alabama's co-equal

judicial branch of State government, comity demands that this Court refrain from imposing

29

its own judgment on this issue.  As a result, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law separation of powers claim.

## V.  CONCLUSION

For the reasons stated above, it is hereby ORDERED as follows:

1.     Defendants' Motion to Dismiss or, in the alternative, Motion for  Summary Judgment (Doc. #23) as to Plaintiff's Fourteenth Amendment due process claim (Count II) is DENIED AS MOOT;

2.     Defendants' Motion to Dismiss or, in the alternative, Motion for  Summary Judgment (Doc. #23) is DENIED as to Plaintiff's Eighth Amendment "cruel and unusual punishment" and Fourteenth Amendment equal protection claims (Counts I and III); and

3.     Pursuant to 28 U.S.C. § 1367(c)(1), the Court DECLINES to exercise supplemental jurisdiction over Plaintiff's state law claim concerning the separation of powers under the Alabama Constitution (Count IV) and such claim is, accordingly, DISMISSED without prejudice.

DONE this the 30th day of September, 2013.

_____/s Mark E. Fuller_____
UNITED STATES DISTRICT JUDGE