```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                FOR THE MIDDLE DISTRICT OF ALABAMA

 3                          NORTHERN DIVISION

 4

 5   THOMAS D. ARTHUR,

 6        Plaintiff,

 7   Vs.                              CASE NO.: 2:11-cv-438-MEF

 8   KIM TOBIAS THOMAS, et al.,

 9        Defendants.

10

11                  *  *  *  *  *  *  *  *  *  *  *  *  *

12                          STATUS CONFERENCE

13                  *  *  *  *  *  *  *  *  *  *  *  *  *

14        BEFORE THE HONORABLE MARK E. FULLER, UNITED STATES DISTRICT

15   JUDGE, at Montgomery, Alabama, on Tuesday, March 4, 2014,

16   commencing at 9:05 a.m.

17                              APPEARANCES

18   FOR THE PLAINTIFF:        Ms. Suhana S. Han
                               Mr. Peter Steciuk
19                             Ms. Kathleen M. Cochrane
                               SULLIVAN & CROMWELL LLP
20                             Attorneys at Law
                               125 Broad Street
21                             New York, NY  10004

22   FOR THE DEFENDANT:        Mr. James Clayton Crenshaw
                               Mr. Thomas R. Govan, Jr.
23                             Alabama Attorney General's Office
                               501 Washington Avenue
24                             Montgomery, Alabama  36130

25
```

```
 1              Proceedings reported stenographically;

 2              transcript produced by computer

 3              * * * * * * * * * * * *

 4       (The following proceedings were heard before the Honorable

 5        Mark E. Fuller, United States District Judge, at

 6        Montgomery, Alabama, on Tuesday, March 4, 2014, commencing

 7        at 9:05 a.m.:)

 8       (Call to Order of the Court)

 9            THE COURT:  Good morning, counsel.

10            I'm going to ask that we be a little less formal

11   today.  This is a status conference on where we're going to go

12   from here.  What I'd like to do is just have an opportunity to

13   have a conversation with y'all.  I'm going to give you leave to

14   remain seated while we talk.  If there's any arguments, I would

15   ask that you stand and address the Court at the podium, but

16   let's just talk about where we are.

17            Summary judgment has gone out.  The engineer in me

18   wants to -- lines and columns, rows and columns.  I want to

19   figure out where we are as far as our claims to make sure that

20   everybody is on the same page so that we have a starting point.

21            Can everybody agree that what we're down to now is the

22   Eighth Amendment equal -- I'm sorry -- the Eighth Amendment

23   excessive force claim with a change in the protocol and the

24   equal protection claim dealing with the pinch test?

25            You can stay seated.
```

 1            MS. HAN:  Thank you, Your Honor.  We do agree that the

 2    Eighth Amendment and the Fourteenth Amendment claims are at

 3    issue.  However, there has been some recent correspondence

 4    between the parties with respect to the current status of

 5    Alabama's lethal injection protocol.  As we had noted in a

 6    letter to Mr. Crenshaw, we believe that Alabama's current supply

 7    of pentobarbital has expired.  The only U.S. authorized

 8    manufacturer, Lundbeck, stopped selling pentobarbital in July

 9    2011.  We understand that the pentobarbital sold under the brand

10    name Nembutal expires -- has a 24-month shelf life.  So if we

11    say that best-case scenario Alabama purchased pentobarbital in

12    July 2011, more than two years have passed.

13            THE COURT:  Are you getting to a compounding claim now?

14            MS. HAN:  Yes, Your Honor.  And, in fact, during the

15    hearing before the Court in October 2013 -- 2012, before the

16    expiration, we had brought this issue up to the Court's

17    attention, and Mr. Crenshaw represented to the Court that the

18    State, quote, had not gone to compounding.  We've written

19    letters to the State requesting that they confirm whether

20    there's any change in the protocol, because in our view it would

21    be a waste of the Court's resources, the lawyers' resources to

22    go to trial on a protocol that is no longer in effect.  So from

23    Mr. Arthur's perspective, we really believe we're entitled to

24    know whether there have been any changes to the protocol,

25    including whether the State has decided to go to compounding.

1          THE COURT:  So your argument is that compounding would

2    be a change to the protocol.

3          MS. HAN:  Yes, Your Honor.

4          THE COURT:  Doesn't that fly squarely in the face of

5    the Eighth Circuit, the Missouri case, *In re: Lombardi*?  I mean

6    isn't that actually the same thing they took up in that case?

7          MS. HAN:  Well, we respectfully disagree with that,

8    Your Honor.  I think at the very least we are entitled to

9    understand details about compounding.

10          As Your Honor is aware, our experts who opined on

11    precipitation, for example, focused on Nembutal.  We believe

12    that the characteristics of pentobarbital make it particularly

13    susceptible to contamination, and therefore we think that we

14    should get more information in the event that our experts are

15    able to opine that a move to compounding would result in further

16    precipitation.

17          THE COURT:  What evidence do you have about compounding

18    resulting in further precipitation?

19          MS. HAN:  I'm sorry, Your Honor?

20          THE COURT:  What evidence do you have that compounding

21    results in further precipitation of any drug, particularly

22    pentobarbital?

23          MS. HAN:  We are not yet prepared to present any

24    evidence.  I think what we really need to understand, what

25    our experts will need to understand, is the following

1   information:  What are the components of the compounded drug?

2   What are the ratios?  What are the volumes?  And based upon the

3   specific information, we will want to go back to our experts.

4           But frankly, Your Honor, we have no idea.  So at this

5   point, we're merely speculating because the State refuses to

6   tell us whether it will go to compounding.  For all we know,

7   they plan to execute Mr. Arthur with expired pentobarbital,

8   which raises a whole host of other issues.

9           THE COURT:  Okay.  Well, I mean, to follow up on our

10  compounding discussion here, isn't it true that if we all go to

11  the drug stores today to get whatever prescriptions that we take

12  for cholesterol or blood pressure or thyroids or whatever else

13  that we take medication for, isn't it very likely that most of

14  those drugs are produced by compounding companies?

15          MS. HAN:  I don't think --

16          THE COURT:  Just because it's compounded, I'm not -- I

17  don't know that I agree with you that just because the drug is

18  from a compounding source that that necessarily means that it's

19  not pentobarbital.

20          MS. HAN:  Your Honor, it's not Mr. Arthur's position

21  that compounding in and of itself may render a drug dangerous.

22  I agree with Your Honor that in many instances, certain drugs

23  are subject to compounding, especially in situations where a

24  person is allergic to a particular ingredient in a drug.  In

25  that case, it does make sense.

1          But here we're talking about a little bit something

2     different.  Again, I'm not an expert.  We really need to talk

3     more to our experts about this.  But what I understand is there

4     are two components about pentobarbital that render it

5     particularly susceptible to issues through compounding.  I

6     understand, for example, that pentobarbital has something that's

7     called a low therapeutic index, which means that there's a low

8     ratio between the appropriate and the toxic dose, which,

9     basically, my lay understanding, there is a fine line between

10    what the right dosage is and what renders it to be toxic.

11          THE COURT:  But we're not -- the State's not intending

12    to prescribe pentobarbital to anesthetize Mr. Arthur.  In fact,

13    I think everybody's experts has agreed that the dosage that the

14    state administers would likely kill Mr. Arthur without the other

15    two drugs being administered.

16          MS. HAN:  It's not merely the dosage, Your Honor.  It's

17    also the ratio in terms of what the components are.  Because

18    pentobarbital will be administered intravenously, you know, my

19    understanding, again, is through that form of administration

20    there is a risk of rendering pentobarbital -- I think the term

21    is subpotent.  And that is really critical in our case because

22    we presented evidence that pentobarbital would precipitate at

23    least 50 percent, and if there's not enough drug that goes --

24    that circulates through the body within a particularly

25    prescribed period of time, if you add to that the factor of

1  compounding, you know, we would like the opportunity to explore

2  whether that would render the drug in that particular situation

3  even more ineffective.

4         THE COURT:  Well, that's assuming I believe your

5  experts.

6         MS. HAN:  Yes, Your Honor.  That's a fair point.

7         THE COURT:  Okay.  And I also want to remind you that

8  the testimony from all of the experts that I've heard so far is

9  that even 50 percent of the dosage of pentobarbital administered

10  to Mr. Arthur would likely kill him.  And the whole purpose of

11  the first drug in the three-drug protocol is to anesthetize

12  him.  Isn't that true?

13         MS. HAN:  Respectfully, Your Honor, it's not just a

14  matter of the dosage.  It's also the matter of the amount of

15  time under Alabama --

16         THE COURT:  I agree.  I agree.  I agree with you.  But

17  my point to you is assuming your expert's testimony is correct

18  that 50 percent of the dosage that the State would administer to

19  Mr. Arthur would precipitate out and become ineffective in his

20  bloodstream, that it is going to absorb into the fatty layers of

21  his brain slower than sodium thiopental; but even with all of

22  the other testimony that I've heard, the quantity that would

23  have been administered to Mr. Arthur, even if you cut it in half

24  such that half over time would be absorbed into Mr. Arthur's

25  body, all of the experts, from what I recall, agree that that

1  quantity of pentobarbital over a given period of time would

2  likely kill Mr. Arthur.

3          MS. HAN:  I think, Your Honor, Dr. Lubarski's testimony

4  and report opine that it would take a larger dosage and --

5          THE COURT:  Than the 50 percent?

6          MS. HAN:  Yes.  That 50 percent of 2500 would be

7  insufficient.

8          THE COURT:  To kill him?

9          MS. HAN:  Yes.

10          THE COURT:  But not to anesthetize him.  We're not on a

11  one-drug protocol.  I may even agree with you that if we went

12  from a three-drug protocol -- I'm not saying I would.  But if

13  the State said, all right, we're going to go to a single-drug

14  protocol and it's going to be pentobarbital, you may have more

15  of an argument that that would be the change of policy,

16  procedure, protocol.

17          But let me hear from the State.  First of all, if you

18  would, if you are able to answer this question, does the State

19  intend to change the protocol?

20          MR. CRENSHAW:  Yes, sir.  Pentobarbital -- I've been

21  told by DOC that pentobarbital as it's manufactured is no longer

22  available to DOC.

23          I do disagree with one of the points that was made.

24  There is one manufacturer of this drug, and that is a Danish

25  company, I think, called Lundbeck.  They have not stopped

1    selling the drug at all.  I mean it's still available.  But

2    lawyers who represent convicted murderers have lobbied them to

3    not allow prisons to have access to that drug, and that program

4    has been successful.  So --

5         THE COURT:  How can they stop the prisons -- I mean

6    assuming even if you're going to lobby or protest or whatever

7    happens -- maybe I'm just -- I'm confused about how they could

8    stop prisons from having access to it.  A prison is not a

9    pharmacy.  There probably are pharmacies within the prisons, but

10   couldn't the prison get a doctor to write a prescription that

11   you could take to another pharmacy that has access to

12   pentobarbital?  Wouldn't that solve your problem?

13        MR. CRENSHAW:  From what I've heard from news sources,

14   I think what Lundbeck does is they may -- you know, somebody in

15   the pharmacy or whoever distributes it signs some kind of

16   affidavit, you know, that they represent that they're not going

17   to give prisons access to this medication.  And I think that's

18   been successful.

19        But where we go from now, I think once DOC lets us know

20   what they're going to do, you know, we plan to file whatever

21   appropriate motion in this court.

22        And I will say this.  I'm not being flippant about

23   this point I'm about to make.  If pentobarbital really

24   precipitates, half of it, this is a health risk.  And I would

25   encourage their experts to report that to the Food and Drug

1   Administration.  That is just something that I've never read in

2   any of the literature, and that could be a public health risk if

3   half of it is actually precipitated, you know, in the line that

4   is being administered to a human being.

5            That's all I have, Your Honor.

6            THE COURT:  Would I be safe to assume, Mr. Crenshaw,

7   that if the Court were to deny the plaintiff's claims and the

8   State were to move forward with the execution of Mr. Arthur,

9   that at whatever date Mr. Arthur would be executed that it's

10  very likely that he would not be executed using the three-drug

11  protocol that the State has in effect today?

12           MR. CRENSHAW:  I think that's accurate, Your Honor.  I

13  mean I can't predict, you know, that some American company will

14  start making pentobarbital.  I just don't know.  But as of right

15  now, pentobarbital as it's manufactured by Lundbeck is not

16  available to us.  So, yes.  Right now, DOC is going to formulate

17  a new protocol at some point in the future, and it will not be

18  with the use of pentobarbital.

19           THE COURT:  Even through a compounding agency?

20           MR. CRENSHAW:  That I don't know.

21           THE COURT:  I mean am I wrong if I assume that if the

22  drug comes from a compounder that it's not -- I would assume it

23  would still be pentobarbital.  Because pentobarbital is the

24  drug, not the manufacturer.

25           MR. CRENSHAW:  It is pentobarbital.  I think when

1    somebody -- when a pharmacy compounds it, they just have the
2    material itself and they make it and they compound it.  That's
3    the only difference with, you know, it being made by a drug
4    company that manufactures it.
5              THE COURT:  Other than the FDA doesn't supervise
6    compounding companies, I believe.  That's been argued a lot.
7              MR. CRENSHAW:  Yes.  But, Your Honor, I want to make a
8    direct answer to your question.  I don't think that DOC is going
9    to use manufactured pentobarbital that we have been using,
10   that's been manufactured by Lundbeck.
11             THE COURT:  Okay.  Then would you consider a
12   substituted version of the Lundbeck pentobarbital, that being a
13   compounded version of pentobarbital, to be a change of your
14   policy?
15             MR. CRENSHAW:  You mean in the term of it being a
16   significant alteration like we've --
17             THE COURT:  Yes.
18             MR. CRENSHAW:  No, Your Honor.  We would not.
19             THE COURT:  Okay.  So you would still take issue with
20   the fact that even if you substituted compounded pentobarbital
21   for the Lundbeck provided pentobarbital, it's still
22   pentobarbital and it would still be pentobarbital in the
23   three-drug protocol?
24             MR. CRENSHAW:  We would take that position, Your Honor.
25   Yes.  But I'm not saying that's what --

```
1              THE COURT:  I understand.

2              MR. CRENSHAW:  -- the protocol is going to be.

3              THE COURT:  Do you have any idea when the DOC is going

4    to make that decision?

5              MR. CRENSHAW:  I hope soon.  Very soon.

6              THE COURT:  I'm going to still push you.  Soon being?

7              MR. CRENSHAW:  I would hope within the next month, Your

8    Honor.  I mean you have to find the protocol, you have to find

9    the source, you know, and people aren't jumping up and down to

10   do this.  I mean I think you've seen in the news where a

11   compounding pharmacy was actually sued.  So, you know, I will

12   let you know as soon as I know something.

13             THE COURT:  Okay.  Ms. Han?

14             MS. HAN:  Yes, Your Honor.

15             THE COURT:  If the State were to amend its protocol --

16   and I'm assuming that if there's a change in the protocol in

17   which the State says from this point forward, we're not going to

18   use commercially provided pentobarbital from a manufacturer as a

19   traditional manufacturer.  In other words, Lundbeck would not be

20   our source of pentobarbital.  We will use pentobarbital as we

21   can acquire it from a compounding agency.  Let's just assume

22   that's what their protocol says.  Would I be safe to assume that

23   you would then wish to amend your complaint to challenge that

24   compounded pentobarbital?

25             MS. HAN:  Yes, Your Honor.
```

1          I also want to note, Your Honor, in the correspondence

2    back and forth with the State, one of the reasons why the State

3    offered for refusing to give us information with respect to

4    compounding is they said that that information is not relevant

5    to the amended complaint.  So certainly as the State did in its

6    motion papers for summary judgment, I fully expect the State to

7    argue, if we don't amend the complaint, that it -- we're trying

8    to introduce new factual allegations.

9          THE COURT:  Mr. Crenshaw?

10         MR. CRENSHAW:  Your Honor, I don't know if you want to

11   hear argument.  And I need to go back and read *Hill versus*

12   *McDonough*.  But we're getting to a point where whatever we do is

13   going to be challenged.  And that -- if I remember *Hill versus*

14   *McDonough* correctly, it held that method of execution challenges

15   should be raised in a 1983 action.  It also contemplated these

16   actions would be rare.  But if our method of execution is going

17   to be challenged no matter what, that converts this into a

18   challenge against Arthur's sentence, which would convert this

19   into a successive habeas petition, which is another ground for

20   dismissing any kind of an amended complaint.  And we'll

21   certainly be filing that at the appropriate time.

22         THE COURT:  What about her argument, though, as far as

23   the compounds that go into the compounded pentobarbital?  Have

24   you read the case out of Missouri, the Eighth Circuit, *In Re:*

25   *Lombardi*?

```
1            MR. CRENSHAW:  Your Honor, I've been working on some
2     other cases.  I know it's out there, and it's on my list to
3     read.  I have not read it.
4            THE COURT:  Have you read the Eleventh Circuit case,
5     the Chavez versus Florida?
6            MR. CRENSHAW:  It's in a stack to read.
7            THE COURT:  Okay.
8            MR. CRENSHAW:  And I have not read it yet.  I think
9     there may even be another Eleventh Circuit case as well.  But I
10    plan to read those.
11           THE COURT:  There are three are concurrences in the
12    majority's opinion in Chavez.  I think it may be per curiam.
13    I'm not sure.
14           MR. CRENSHAW:  But I'm not sure -- what's the point
15    about compounding that I need to respond to?
16           THE COURT:  Well, all I was saying is I think that this
17    very issue of challenging the compounding drug, the makeup of
18    the drug, was addressed in this Missouri case.  The District
19    Court ruled that the State had to turn over the policies and
20    procedures.  The manufacturer or the compounder of the drugs --
21    correct me if I'm wrong.  I'm sure you've read it, Ms. Han.  And
22    the District Court ruled that they had, and it went up on
23    mandamus to the Eighth Circuit.  The Eighth Circuit reversed and
24    rendered the decision that said there is no requirement that the
25    State provide that information to the plaintiff.
```

```
 1           And they went further to say that based, I believe, on
 2  the Bates case, that the plaintiff has to provide more than an
 3  accusation for an Eighth Amendment claim; has to provide more
 4  than an accusation that the State's protocol is
 5  unconstitutional.  They've got to show -- and I will quote Judge
 6  Carnes' language from his concurrence:  An inmate must not only
 7  plead that a specifically named alternative drug is available,
 8  feasible, or can be readily implemented in the challenged lethal
 9  injection protocol.  He must also prove it.
10           MR. CRENSHAW:  I believe Bates says that as well.
11           THE COURT:  That's not what I was looking for.
12           Had Dr. Lubarski in that case.
13           Here it is.  And it gets back to the very pleading
14  standard.  And this is in a concurrence from Judge Carnes, who
15  wrote the majority -- or wrote the opinion.  It was a panel
16  decision.  He wrote the panel decision, and they had three
17  concurrences.  To establish that in regard to the use of a
18  particular drug, the inmate must prove not only that the drug
19  being used creates a substantial risk of serious harm, but also
20  that there is a known and available alternative drug that is
21  feasible, readily implemented, and will, in fact, significantly
22  reduce the substantial risk of severe pain.
23           And I doubt very seriously that you believe that the
24  law would support that, Ms. Han.  But assuming that this works
25  its way into the majority opinion in the Eleventh Circuit, would
```

you agree that we are back to a pleading standard that you can't meet?

MS. HAN: I would not agree with that, Your Honor, because we haven't yet had that opportunity.

THE COURT: Okay. I think what the circuit, the Eighth Circuit and the Eleventh Circuit, at least through the concurrences of one of the judges on the Eleventh Circuit, has kind of pointed out in frustration is, is that the states are trying to provide the drugs that would make the execution as humanely as possible. And just pointing a finger at the State and saying, that drug will create substantial risk for pain, that drug will create this problem or that problem, without providing an alternative, would be deficient. We aren't there yet, but I just want to say to you that the Eighth Circuit has said that.

MS. HAN: Your Honor, respectfully, in Mr. Arthur's view, it's not just a matter of the State offering up various drugs. The State has deliberately, with respect to compounding -- and I don't know ultimately whether that's where we'll end up, but I want to use it as an example -- the State has deliberately carved out compounding in connection with lethal injection from the practice of pharmacy. So in our view, the State is taking deliberate steps so that compounding is not subject to normal oversight. So in our view, it's not merely the State -- the Department of Corrections identifying

1   particular drugs to use in lethal injection, it's going the

2   extra step to make sure it's not subject to the oversight

3   that -- you know, in other situations.

4           THE COURT:  Do you want to respond to that,

5   Mr. Crenshaw?

6           MR. CRENSHAW:  Well, again, I'll have to look at those

7   cases that you've mentioned.  But it's my understanding that in

8   other states that have used compounded pentobarbital, that the

9   pentobarbital is tested in a lab to make sure, you know, that

10  it's potent and that it does what it's supposed to do.  So I

11  disagree completely that there's no oversight on that.  Because

12  if the drug is tested to determine whether it's going to work or

13  not, then that should answer any question.

14          THE COURT:  All right.  Well, it really changes what

15  we're here to talk about, as I see it.

16          MS. HAN:  Your Honor, one other point for your

17  consideration while we're on the topic of trying to understand

18  whether they need changes the State is trying to implement.

19  When the State filed its filing, filed its answer to the

20  complaint after the Court denied summary judgment, they finally

21  admitted that there's a new warden.  We've asked for the

22  opportunity to depose the warden, especially since Warden Hetzel

23  is now the named defendant, replacing Warden Patterson.  The

24  State has refused.  You know, for purposes of our ability to

25  litigate the case, we think that we are entitled to depose one

1   of the key defendants in the case.

2          We also don't know, again, because we are not provided

3   information, whether the two correctional officers who are

4   tasked with conducting the consciousness assessment, Captain

5   Craft and Officer Howard, will also continue to conduct the

6   consciousness assessment.  So from our perspective, Your Honor,

7   in thinking about where we go forward, we would like to bring to

8   the Court's attention Mr. Arthur's view that to the extent that

9   there are changes in personnel, we believe we would be entitled

10  to depose them as well.

11         THE COURT:  Well, as long as the procedure is spelled

12  out clearly, why would it matter who the personnel is that

13  carries it out?

14         MS. HAN:  I think the evidence showed that the

15  procedure is not spelled out correctly.  And so to the extent

16  that we're all in agreement that even if there is new personnel,

17  but the testimony from all these other witnesses still holds

18  true, then we're fine.  We just don't want to find ourselves in

19  the position down the road where the State is going to say, all

20  that testimony provided by officers -- Officer Howard and

21  Captain Craft are invalid because they're no longer here.

22  That's what we need to protect ourselves against.

23         MR. CRENSHAW:  Can Mr. Govan respond?

24         THE COURT:  Yes.  Mr. Govan?

25         MR. GOVAN:  Judge, just kind of an initial matter, we

1  did not agree to the further depositions for a number of

2  reasons.  Number one, there was an order closing fact discovery

3  a while ago.  Secondly, Judge, as you pointed out, there's been

4  a slew of depositions in these cases from multiple DOC personnel

5  who have been deposed and redeposed, and it's been quite clear

6  what the procedures are and how the consciousness assessment

7  is --

8         THE COURT:  Does the State have a procedure, written or

9  otherwise, on the execution of the consciousness test or the

10 pinch test as I call it?

11        MR. GOVAN:  The assessment is listed in the protocol,

12 Judge, and that protocol was submitted as evidence in the

13 hearing.

14        THE COURT:  Right.  I saw that.  But I'm saying, has

15 there been any change to that?

16        MR. GOVAN:  No, Judge, there's not.

17        THE COURT:  Has there been any training to explain to

18 the persons who are going to carry it out, the warden and the

19 guards who would carry this out, has there been any training

20 that would explain to them how hard you pinch, for instance?

21        MR. GOVAN:  Judge, I think that -- yes, I think that

22 there is -- and this kind of came out during the depositions.

23 There is routine testing -- not testing, but practicing that

24 goes on from time to time.  And they've all -- the deponents

25 also talked about how prior to certain executions, they practice

1  each component of the entire day of the execution, but

2  specifically the consciousness assessment.

3         There is nothing in the written protocol, to answer

4  Your Honor's question, about the degree of force that is given.

5  But I think it was nearly universal -- I was going to say,

6  Judge, there's nothing written in the protocol; but it was

7  universal from the deponents, from wardens, from the actual

8  officers themselves, they give a strong or firm or hard pinch.

9  And even -- I think --

10        THE COURT:  There's no attempt to quantify that, the

11 amount of force used in the pinch.

12        MR. CRENSHAW:  I think it's basically just as hard as

13 you can pinch them.

14        MR. GOVAN:  There's not a scale saying from one to ten

15 or anything, Judge, but it's kind of like a very common sense,

16 everyday --

17        THE COURT:  For the record, that's one of several tests

18 used.  You speak the name; you brush the eyelashes.  There are

19 several attempts made to determine consciousness.

20        MR. GOVAN:  Correct.

21        THE COURT:  I think the pinch is the last thing maybe?

22        MR. GOVAN:  Correct, Judge.

23        THE COURT:  Okay.  So, Ms. Han, why would you need to

24 take the new warden's deposition?

25        MS. HAN:  Your Honor, if we can stipulate that all the

1  testimony already in the record would apply for purposes of

2  going forward and that none of the testimony changes due to

3  personnel change, then we would be -- we wouldn't need to have a

4  deposition.  But we would need that stipulation.

5          THE COURT:  Can the State stipulate to that?

6          MR. CRENSHAW:  Yes.

7          THE COURT:  Okay.  Y'all work on that stipulation when

8  it comes down to the trial.  You know, this is just the equal

9  protection claim about whether or not this test is going to be

10 carried out sufficiently to determine consciousness in

11 Mr. Arthur's case, not -- I mean only the fact that we've got

12 conflicting testimony from what I heard at the earlier hearing

13 back in October 2012 -- whether or not it was carried out in

14 other executions.  And the testimony was conflicted even then.

15 So, you know, the whole issue is whether or not it would be

16 applied to Mr. Arthur properly.

17         MS. HAN:  Your Honor, respectfully, also the

18 consciousness assessment is quite critical to our Eighth

19 Amendment claim.

20         THE COURT:  Absolutely.  That is your Eighth Amendment

21 claim, right?  I'm sorry.  Your equal protection claim.  But it

22 is part of your Eighth Amendment claim.

23         MS. HAN:  Yes, Your Honor.

24         THE COURT:  How is that part of your Eighth Amendment

25 claim?

1          MS. HAN:  Because the testimony provided by the State's

2    expert relied heavily on the fact that there is a consciousness

3    assessment being conducted as a safeguard.

4          THE COURT:  To determine effectiveness of the first

5    drug, pentobarbital.

6          MS. HAN:  Yes, Your Honor.

7          THE COURT:  Okay.  I can agree with you to that extent.

8    But only as it's used as an indicator to determine if the first

9    drug has taken effect before the second and third drugs are

10   administered.  Do you agree with that?

11         MS. HAN:  Yes, Your Honor.

12         THE COURT:  All right.  Well, if the State comes back

13   and 30 days from now they file something with the Court or send

14   you a letter that says, we are going to -- beginning

15   immediately, the State of Alabama will be using pentobarbital as

16   compounded in place of manufactured pentobarbital by whomever it

17   is that would provide it, tell me what the position of the

18   plaintiff would be as to the case as it stands today.

19         MS. HAN:  If the State were to advise us about its

20   decision to use compounding, we would like more information

21   about it.  We would like to understand what the components will

22   be, the ratios, the volume, as well as the opportunity for

23   30(b)6 deposition.

24         THE COURT:  And at best, you would be able to do that

25   by an amended complaint in this case.

 1          MS. HAN:  Our hope would be to be provided that

 2    information and shortly thereafter file an amended complaint.

 3          THE COURT:  Mr. Crenshaw?

 4          MR. CRENSHAW:  Your Honor, our position would be to

 5    file some kind of a -- you know, once there is a change in the

 6    protocol, we would file a motion to dismiss the lawsuit as being

 7    moot.

 8          But I think you're seeing by this 30(b)6 deposition

 9    request, what they want is they want to talk to the people who

10    are compounding the drug.  Because they know if they do that,

11    these people will go away because they don't want the hassle.

12    You know, if they are going to be deposed and if they are

13    subject to being brought in here to court, they will go away.

14    So that is the strategy that the other side is using.

15          Now, in terms of can this drug be tested to determine

16    whether it's going to work or not, that can be done and it can

17    be sent to a lab.  From the cases you're citing, that might not

18    even be required.  But we possibly could do that.

19          But what they want to do is they want to find out who's

20    compounding the drug.  They might even file a lawsuit against

21    them because that's what's being done nationwide.  The folks

22    that represent these convicted murderers want to try to find out

23    who's doing this to hassle them, to bring them into court,

24    because they will go away.  So we would certainly be opposed to

25    any request to depose that individual or individuals who are

1  compounding the drug.

2         THE COURT:  All right.  But as far as moving forward

3  with this case, we're clearly at this point not able to move

4  forward without the expectation that the State's very likely to

5  change or modify the protocol at least as it relates to

6  pentobarbital, even if your modification of the protocol would

7  be a substituted version of pentobarbital through compounding.

8  That would be what you're talking about as changing the

9  protocol; is that right?

10        MR. CRENSHAW:  Yes, sir.  I mean that is a possibility.

11  I'm not saying that's going to be done, but that is a

12  possibility.

13        THE COURT:  Do you see any way we can move forward with

14  getting this case prepared for trial at this point?  I mean I

15  just don't want this to drag on forever.  This case has been

16  here a long time, and I'm ready to get this case moving along.

17        MR. CRENSHAW:  Well, I mean to the extent that you

18  want to have a trial and rehear a lot of what you've already

19  heard, I mean, we're certainly ready to do that.  I mean I think

20  you've heard probably 80 to 90 percent of what will be presented

21  anew.

22        THE COURT:  Well, that was one of the things I was

23  prepared to discuss today, is what new testimony would there be

24  if we had a trial.  I'll certainly give the parties an

25  opportunity to submit the testimony from the previous hearing we

1   had in October 2012 without having to regurgitate all of those

2   same expert testimonies and opinions, unless you are going to

3   abandon your expert or want to change what the expert is going

4   to say.

5           MR. CRENSHAW:  No, Your Honor.

6           THE COURT:  If there's going to be a new argument that

7   compounding somehow changes the landscape, then we would have to

8   talk about whether or not there should be either an amended

9   complaint or a new lawsuit filed.

10          MR. CRENSHAW:  And, Your Honor, I don't know how this

11  present lawsuit can continue, because I think there's going to

12  be something different in terms of the drugs that are used.  And

13  I guess it's up to Your Honor on whether you just -- you

14  probably have enough to render a final decision at this point.

15  But whatever Your Honor wishes in terms of a trial, we

16  certainly --

17          THE COURT:  Well, I can't at this point.  The only

18  thing we're down to, we have conflicting expert opinions.

19  Unless you're willing to submit on the record from the testimony

20  that we had back in October 2011 and let me make a credibility

21  determination, that's the only way we could ever get close to

22  having a final opinion in this case.

23          Ms. Han, what do you say?

24          MS. HAN:  In my view, if the State is planning to -- I

25  mean I think the State has made very clear that the protocol

1   that was the subject of the hearing and the summary judgment

2   will be changed.  I'm not quite sure, based on that information

3   represented today, how we proceed on that basis.  We're

4   certainly going to have a dispute with respect to whether the

5   change -- whatever change that the DOC will announce constitutes

6   a significant change.  And that, I think, is sort of depending

7   on what the DOC decides to do.  But from what I'm hearing right

8   now, it seems to me that we don't have -- it wouldn't make sense

9   to proceed to trial now.

10          THE COURT:  Do you agree with that, Mr. Crenshaw?

11          MR. CRENSHAW:  I do, Your Honor.  I don't think -- I

12   think the protocol that's been challenged is no longer in

13   existence.

14          THE COURT:  If we're thinking outside the box, Ms. Han,

15   assuming the State comes back and says we've got a new protocol

16   that we're going to use based upon the use of pentobarbital

17   through a compounding company, I wouldn't disagree that that

18   would need to be pled either through an amended complaint or a

19   new lawsuit.  That still wouldn't change your equal protection

20   claim based upon the consciousness test or the pinch test as

21   I've called it.  Would you agree with that?

22          MS. HAN:  I do not agree with that, Your Honor.

23          THE COURT:  You do not agree with that.

24          MS. HAN:  No, I do not.

25          THE COURT:  Why don't you agree with that?

1          MS. HAN:  Because I do -- and I'm sort of at an
2    informational disadvantage, so I'm really hypothesizing here.
3    But to the extent that the change involves ratios that really
4    are -- really essentially render pentobarbital ineffective, then
5    it raises the question about whether, you know, there's
6    additional training that needs to be provided to the inmates.
7    It could be a situation where the pinch test is not enough; the
8    consciousness assessment is not enough; the three graded
9    stimuli.  It could be a situation where they may have to add
10   another component to it.  And without any additional training,
11   without adequate information, I don't think at this point I
12   would be willing to say that the compounding has no bearing on
13   our equal protection claim.
14          THE COURT:  Anything else from the State?  I want to
15   take a short recess before we continue.
16          MR. CRENSHAW:  No, sir.
17          THE COURT:  All right.  Y'all think about -- over the
18   next ten minutes or so, y'all think about how we should proceed.
19   I want to hear from both of you based upon what you announced,
20   Mr. Crenshaw.  And specifically, can we proceed on any remaining
21   claims if the Eighth Amendment claim would go out because the
22   procedure has been modified or the pentobarbital has been
23   substituted with a version that comes from a compounder?  So
24   y'all think about what it is that we need to be looking towards
25   as far as discovery, all of the things that go into uniform

1  scheduling order and whether or not we would be prepared to put

2  this case on one of the nonjury cases I have -- July and

3  September?  July and November are my two terms, nonjury terms.

4  But just be prepared to discuss that.  We'll take about a

5  10-minute recess, 15-minute recess.

6       (Recess was taken from 9:47 a.m. until 10:08 a.m., after

7        which proceedings continued, as follows:)

8            THE COURT:  Counsel, as far as where we are here today,

9  I just don't see there's any way that we can go forward based

10 upon what you've represented, Mr. Crenshaw.  So I'm going to

11 pose a question to you based upon what might be the new

12 protocol, if there is such a thing.  If, in fact, the State

13 amends the protocol or changes the protocol to remove

14 pentobarbital in any fashion from the protocol, does this Court

15 have jurisdiction to move forward under any circumstances?

16           Ms. Han?

17           MS. HAN:  Yes, Your Honor.

18           THE COURT:  How?

19           MS. HAN:  We would take the position that we would file

20 an amended complaint.  And under the doctrine of relation back,

21 we think that the case, the original lawsuit, can proceed and we

22 would be allowed the opportunity in the amended complaint to

23 allege new facts.  We would still be asserting an Eighth

24 Amendment and Fourteenth Amendment claim.  The other two --

25 presumably if the first drug got -- gets changed, it would be

1    that the other two would still remain in the protocol.

2             THE COURT:  But your claims in this case have not

3    related to the second and third drugs at all, except that it's

4    administered either prematurely or before the pentobarbital has

5    had a chance to take its full effect.

6             MS. HAN:  Respectfully, Your Honor, the focus really

7    has been on pentobarbital, because that has been the most recent

8    change.  But as late as in our complaint, and as the evidence

9    shows, the interaction between the first drug and the subsequent

10   drugs, respectfully, is quite critical to our Eighth Amendment

11   claim.  So we would take the view that, you know, even if the

12   first drug is changed, that the Court would continue to have

13   jurisdiction and we would request the opportunity to amend the

14   complaint under the relation back doctrine.

15            THE COURT:  Let me hear from the State.  Do you think I

16   would have jurisdiction if pentobarbital was no longer used?

17            MR. CRENSHAW:  Your Honor, that would be the subject of

18   our motion to dismiss as being moot at that point.  The

19   complaint, which is kind of a carbon copy of other complaints

20   that were filed based on pentobarbital, is no longer or will no

21   longer be applicable.  So at the point DOC formulates a new

22   protocol, the State plans to file a motion to dismiss.

23            Now, just to some alternative suggestion here, Your

24   Honor could go ahead and, the State believes, decide the equal

25   protection claim to the extent that it's even a viable claim at

1    all.  You have on the record the people that did the

2    consciousness assessment.  They said they did it every time.

3    The DOC representative is saying that they saw them do it.  The

4    only thing that the other side has is just people in the viewing

5    booth saying they didn't see it happen.  So Your Honor can

6    actually make a final merits determination and take care of that

7    equal protection claim.

8             THE COURT:  If we had a trial, or if we were not going

9    to have a trial but everybody agrees that I can consider all of

10   the evidence from the previous hearing, I can't make a

11   credibility determination at this point; not before we have a

12   trial or an agreement to use the testimony that was presented

13   earlier.

14            MR. CRENSHAW:  I'm not sure I understand Your Honor.

15            THE COURT:  We're just past summary judgment, is where

16   we are, and we have conflicting evidence.  I can't make

17   credibility determinations on that conflicting evidence because

18   I must believe the evidence in the light most favorable to the

19   nonmoving party, and that would be the plaintiff, Mr. Arthur.

20   And if the parties wish to proceed on the Eighth Amendment --

21   I'm sorry -- on the equal protection claim and just say, Judge,

22   we're going to submit the testimony that you've already heard

23   that was presented at the October 2012 hearing, and you can use

24   that in making your final decision as to the equal protection

25   claim, then I could make a credibility determination and render

1  a decision as to that claim.  But otherwise, I don't see how I

2  can.

3          I would ask that you tell me, if I'm wrong, why you

4  think I'm wrong.

5          MR. CRENSHAW:  Well, I think you're right, Your Honor.

6  But what I meant was when the DOC has the new protocol, we'll be

7  filing a motion to dismiss the entire lawsuit.  All claims.  But

8  I was just suggesting, you know, as an alternative, if Your

9  Honor wanted to decide --

10          THE COURT:  Bifurcate the two issues and go forward.

11          MR. CRENSHAW:  But I do agree with Your Honor on that,

12  that there would, I guess, need to be some kind of

13  representation from the parties that you could decide it.

14          THE COURT:  So Ms. Han, you believe if the State --

15  let's just say the State were to abandon the drugs that they're

16  using today, pentobarbital and possibly the other two as well,

17  and they were to look south or look east into Georgia or Florida

18  and they were to decide that they are going to use the drugs

19  that let's just say Florida uses.  I think Florida uses maybe

20  the same third drug, but they use a different anesthetic and a

21  different second drug.

22          MR. CRENSHAW:  That's correct, Your Honor.

23          THE COURT:  Georgia may be a one-drug state?

24          MR. CRENSHAW:  That's correct.  I think they're using

25  compounded pentobarbital, one drug.

1          THE COURT:  Okay.  And if that's the -- if that's the

2    decision that the Department of Corrections chooses, your

3    statement is I can still maintain jurisdiction by allowing you

4    to amend your complaint?

5          MS. HAN:  Yes, Your Honor.  And it will involve to a

6    large extent the same players, the same type of testimony, the

7    same experts.  You know, there may be some modifications,

8    depending upon what the actual --

9          THE COURT:  Well, I mean if pentobarbital is no longer

10   a drug to be used, there's going to be a lot of changes as far

11   as the challenge to whatever other drugs are used.

12         MS. HAN:  I think it would depend upon the degree of

13   the change.  If the intent is to use the third drug and whether

14   it's the first drug -- the first drug is somehow some type of

15   anesthetic -- and for all we know, it could be a different

16   family of pentobarbital.  So, again, even if it's a different

17   drug and it's not pentobarbital, but it's still in that

18   pentobarbital family, then certainly our position is that Your

19   Honor -- this Court would have jurisdiction and we would have --

20   we should get the opportunity to amend.

21         THE COURT:  Okay.  All right.  But if then the State

22   comes back -- this is the second alternative.  If the State

23   comes back and says -- Mr. Crenshaw says, let me clarify what I

24   meant, Judge.  The State's going to change the protocol, but the

25   only change in the protocol is the fact that we're going to

1  substitute a compounded version of pentobarbital in place of our

2  usual supply of pentobarbital.  And as I recall, your policy

3  doesn't specifically identify the manufacturer of

4  pentobarbital.  It just says "pentobarbital."

5          MR. CRENSHAW:  That's correct, Your Honor.

6          THE COURT:  If the State were to come back and say,

7  because of the lack of sources of pentobarbital, we're going to

8  now use pentobarbital from a compounding agency, but that's the

9  only change in what we're going to use, I think under those

10  circumstances that, yes, I would have jurisdiction.  And I would

11  be able to allow you to continue discovery possibly, if that's

12  where we are, to some degree on whether or not there's been any

13  type of modification in the active ingredients or the inert

14  ingredients or whatever it is that goes into a compounded form

15  of pentobarbital and allow you to amend your complaint and

16  maintain jurisdiction.  But otherwise, I just don't know that I

17  would have jurisdiction.  But I'm going to allow certainly there

18  to be a briefing schedule on that if the State were to move for

19  a dismissal if, in fact, the policy was more radically changed

20  than just substituting compounded pentobarbital for the

21  pentobarbital from this source that they've relied on for years

22  before.

23          MS. HAN:  So under that scenario, Your Honor, if I'm

24  hearing you correctly, the motion would be whether we would be

25  allowed to file an amended complaint relating back --

1          THE COURT:  You're going to be able to file your motion

2    regardless, Ms. Han.  I'm just saying I would be skeptical that

3    I would have jurisdiction to do anything if the State were to

4    radically change the protocol and change a drug in place of

5    pentobarbital or go to a totally different drug or just decide

6    it's going to use compounded pentobarbital and go to a single

7    drug protocol.  But I would want to hear from both sides on that

8    before I would rule.  I'm just telling you what I think as I sit

9    here today.

10          Mr. Crenshaw, I hate to put you on the spot, but at

11   some point we've got to move on and we've got to get this

12   whatever change that's going to be made, modification,

13   clarification, new protocol, together.  I don't know what it is,

14   but I feel that it would be very unlikely that the DOC would do

15   anything with its protocol without involving you.

16          MR. CRENSHAW:  And Your Honor, maybe you could set

17   another status conference where I can report on any -- you know,

18   it could be by telephone or whatever --

19          THE COURT:  Sure.

20          MR. CRENSHAW:  -- to report on any developments.

21   Although even, you know, before the setting of that status -- or

22   before the status conference is held, it could be that I've

23   found out by then and filed an appropriate motion by that point.

24          THE COURT:  Sure.  Does the State have access to video

25   conferencing?

```
 1              MR. CRENSHAW:  I can check on that.

 2              THE COURT:  Okay.  Do y'all have access to video

 3      conferencing?

 4              MS. HAN:  Yes, Your Honor.

 5              THE COURT:  As much as I enjoy seeing y'all's smiling

 6      faces, and in Alabama I assure you it will be a whole lot nicer

 7      at the end of March than the beginning of March, we might have

 8      another conference but do it by video if that's appropriate.

 9      Because at that point, all I want to do is find out what it is

10      that's going to be changed with the protocol, if anything.

11              Do you have a problem with that, Ms. Han?  Any

12      objections to doing it that way?

13              MS. HAN:  No, Your Honor.  We've happy to travel here,

14      but whatever is most convenient for the Court.

15              THE COURT:  April, May, October, November.  That's when

16      you need to plan your travels to Alabama.  July, very, very hot.

17              Okay.  Well, what I'll do, then, I'll enter an order.

18      We'll just have another status conference.  Mr. Crenshaw, to the

19      best that you can, persuade the powers to be that we need to get

20      moving on this case.  This is turning into a three-year-old

21      case, and we're not even close to getting a trial setting just

22      yet.  So let's try to get this case moving along.

23              MR. CRENSHAW:  Yes, Your Honor.

24              THE COURT:  All right.  Anything else from the

25      plaintiffs before we adjourn?
```

```
1          MS. HAN:  No, Your Honor.

2          THE COURT:  Anybody else?  Anything on behalf of the

3  State?

4          MR. CRENSHAW:  No, sir.

5          THE COURT:  All right.  We'll see y'all probably by

6  conference call, but I'll get an order out.  We'll be adjourned

7  until a hearing date later in the month.

8       (Proceedings concluded at 10:20 a.m.)

9                    * * * * * * * * * * * *

10                   COURT REPORTER'S CERTIFICATE

11         I certify that the foregoing is a correct transcript

12  from the record of the proceedings in the above-entitled matter.

13         This 5th day of June, 2014.

14

15                         /s/ Patricia G. Starkie
                           Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```