IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

-------------------------------------------------------- x
THOMAS D. ARTHUR,                                 :
                                                  :
                        Plaintiff,                :
              v.                                   :
                                                  :
JEFFERSON S. DUNN,                                :
COMMISSIONER, ALABAMA                             :
DEPARTMENT OF CORRECTIONS,                        :
in his official capacity,                         :
                                                  :        No. 2:11-cv-00438
WALTER MYERS, WARDEN,                             :
HOLMAN CORRECTIONAL FACILITY,                     :
in his official capacity, and                     :
                                                  :
OTHER UNKNOWN EMPLOYEES AND                       :
AGENTS, ALABAMA DEPARTMENT                        :
OF CORRECTIONS,                                   :
in their official capacities,                     :
                                                  :
                        Defendants.               :
                                                  :
                                                  :
-------------------------------------------------------- x

## MOTION TO EXCLUDE TESTIMONY OF DR. ROSWELL LEE EVANS

## <u>TABLE OF CONTENTS</u>

**Page**

**PRELIMINARY STATEMENT** ...............................................................................1

**ARGUMENT** .......................................................................................................2

**I.    DR. EVANS IS NOT QUALIFIED AS AN EXPERT TO OPINE ON THE
       SUBJECTS FOR WHICH DEFENDANTS OFFER HIM.** ...........................................3

   A.    Dr. Evans Lacks Relevant Training and Experience Relating to
         Anesthesiology and Cardiology. .................................................................3

   B.    Critical Errors and Inconsistencies in Dr. Evans' Testimony Highlight His
         Lack of Qualifications as an Expert in This Case. .........................................6

         1.    Dr. Evans Concedes That He Provided Erroneous Testimony in
               Prior Cases Involving Midazolam. ............................................ 6

         2.    Dr. Evans' Testimony Has Been Rejected as Inconsistent and
               Unreliable. ...................................................................... 8

         3.    Dr. Evans Has Provided Inconsistent and Unreliable Testimony in
               This Case. ........................................................................ 9

**II.   DR. EVANS' METHODOLOGY IS UNRELIABLE AND WILL NOT
       ASSIST THIS COURT.** .......................................................................11

   A.    Dr. Evans Offers Unreliable Opinions Based on the Erroneous Citation of
         Literature Regarding the Anesthetic Effects of Midazolam. ................................11

   B.    Dr. Evans Offers Unreliable Opinions Concerning Midazolam's
         "Toxicity." ............................................................................16

**CONCLUSION** ...................................................................................19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allison* v. *McGhan Med. Corp.*,
  184 F.3d 1300 (11th Cir. 1999) ...................................................................3

*Chavez* v. *Palmer*,
  No. 14-cv-110, 2014 WL 521067 (M.D. Fla. Feb. 10, 2014)................................7

*City of Tuscaloosa* v. *Harcros Chems., Inc.*,
  158 F.3d 548 (11th Cir. 1998) ...................................................................6

*E.C. ex rel. Crocker* v. *Child Dev. Sch., Inc.*,
  No. 10-cv-759, 2011 ...................................................................3

*Daubert* v. *Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...................................................................2, 3, 17

*Devito* v. *Smithkline Beecham Corp.*,
  No. 02-cv-745, 2004 WL 3691343 (N.D.N.Y. Nov. 29, 2004)................................5

*EEOC* v. *Freeman*,
  778 F.3d 463 (4th Cir. 2015) ...................................................................10

*Faulkner* v. *Arista Records LLC*,
  46 F. Supp. 3d 365 (S.D.N.Y. 2014)...................................................................13

*Hendrix ex rel. G.P.* v. *Evenflo Co.*,
  609 F.3d 1183 (11th Cir. 2010) ...................................................................2-3

*Gen Elec. Co.* v. *Joiner*,
  522 U.S. 136 (1997)...................................................................17

*Glossip* v. *Gross*,
  135 S. Ct. 2726 (2015)...................................................................8, 11

*Kumho Tire Co.* v. *Carmichael*,
  526 U.S. 137 (1999)...................................................................2, 3

*KW Plastics* v. *U.S. Can Co.*,
  131 F. Supp. 2d 1289 (M.D. Ala. 2001) ...................................................................18

*McClain* v. *Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ...................................................................6, 17-18

*McCorvey* v. *Baxter Healthcare Corp.*,
    298 F.3d 1253 (11th Cir. 2002) ............................................................3

*Newton* v. *Roche Labs., Inc.*,
    243 F. Supp. 2d 672 (W.D. Tex. 2002).............................................5, 6

*Pardo* v. *Palmer*,
    No. 12-cv-1328, 2012 WL 6106331 (M.D. Fla. Dec. 10, 2012) ...........7, 9

*Seamon* v. *Remington Arms Co.*,
    51 F. Supp. 3d 1198, 1202 (M.D. Ala. 2014) .......................................3

*Smith* v. *State*,
    No. BDV-2008-303, 2015 WL 5827252 (Mont. Dist. Ct. Oct. 6, 2015)..................9

*United States* v. *Brown*,
    415 F.3d 1257 (11th Cir. 2005) ............................................................6

*United States* v. *Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ............................................................2

*United States* v. *Paul*,
    175 F.3d 906 (11th Cir. 1999) ..............................................................5

*United States* v. *Wooden*,
    693 F.3d 440 (4th Cir. 2012) ...............................................................13

**Other Authorities**

A. Alberts, et al., *Letters to the Editor*,
    16 S. AFR. J. ANAESTHESIA & ANALGESIA 9 (2010) .....................................15

Peter L. Bailey, et al., *Frequent Hypoxemia and Apnea After Sedation with Midazolam and Fentanyl*,
    73 ANESTHESIOLOGY 826 (1990) ......................................................17, 18

Blanca Coll-Vinent, et al., *Sedation for Cardioversion in the Emergency Department:  Analysis of Effectiveness in Four Protocols*,
    42 ANNALS EMERGENCY MED. 767 (2003) ......................................... 14-15

G. Consales, et al., *Bispectral Index compared to Ramsay score for sedation monitoring in intensive care units*,
    72 MINERVA ANESTESIOLOGICA 329 (2006)....................................... 15-16

T.K. Daneshmend & R.F.A. Logan, *Midazolam Antagonism*,
    THE LANCET 388 (Aug. 13, 1988).........................................................17

Peter S. Glass, et al., *Bispectral Analysis Measures Sedation and Memory Effects of Propofol, Midazolam, Isoflurane, and Alfentanil in Healthy Volunteers*, 86 ANESTHESIOLOGY 836 (1997) .......................................................................13, 14

Richard I. Hall, et al., *The Anesthetic Efficacy of Midazolam in the Enflurane-anesthetized Dog*, 68 ANESTHESIOLOGY 862 (1988) ....................................................................11, 12

Jerry E. Fleischer, et al., *Cerebral Effects of High-dose Midazolam and Subsequent Reversal with Ro 15-1788 in Dogs*, 68 ANESTHESIOLOGY 234 (1988) ................................................................... 12-13

Mine Parlak, et al., *Age Effect on Efficacy and Side Effects of Two Sedation and Analgesia Protocols on Patients Going through Cardioversion:  A Randomized Clinical Trial*, 13 ACAD. EMERGENCY MED. 493 (2006) ...............................................................14

Wakako Miyake, et al., *Electroencephalographic response following midazolam-induced general anesthesia:  relationship to plasma and effect-site midazolam concentrations*, 24 J. ANESTHESIA 386 (2010) ......................................................................12

**Rules and Statutes**

Federal Rule of Evidence 702 ...................................................................2, 13

## PRELIMINARY STATEMENT

Roswell Lee Evans, a pharmacist and college administrator, purports to opine on (i) the degree to which midazolam is capable of inducing and maintaining anesthesia, (ii) the reliability of various methods of measuring anesthetic depth, (iii) the likelihood that the 500 milligram dose of midazolam called for in the Alabama Department of Corrections ("ADOC") protocol will cause Mr. Arthur to suffer a painful heart attack, and (iv) the degree to which midazolam will precipitate out of solution.  None of these opinions is sufficiently reliable to be admitted.  As Dr. Evans freely admits, he (i) has *no* clinical experience administering midazolam to patients, (ii) has *never* assessed a patient's level of sedation, (iii) has not published an article concerning the effects of any drug in decades, and (iv) has only a one-year graduate degree in pharmacy.  As a longtime administrator with no clinically relevant experience and minimal relevant academic credentials, Dr. Evans bases his opinions in this case solely on a limited number of articles and anecdotal case reports cited in his November report.  But these sources do not support, and in many instances affirmatively contradict, Dr. Evans' conclusions.  Dr. Evans' reliability is further undermined by his concession that testimony he gave in a number of cases involving Florida's method of execution incorporating midazolam—including several cases in which Dr. Evans was the state's only expert and the court expressly relied on his testimony in denying plaintiffs' claims—was inaccurate.  Dr. Evans now concedes that those opinions "were pretty much off-the-cuff" and "essentially [his] best guess at what [he] remember[ed] about the drug at that point."  (Dec. 8, 2015 Evans Dep. Tr. ("Evans Dep. Tr.") at 159:7-19.)

In light of Dr. Evans' lack of qualifications and significant and repeated errors and inconsistencies, this Court should exclude his testimony as unreliable.

**ARGUMENT**

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  The Supreme Court has made clear that this rule imposes on district courts a "gatekeeping role" to prevent the introduction of purported expert testimony that is insufficiently reliable.  *See Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993).  The objective of this "gatekeeping requirement" is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 152 (1999).  Only if "the expert's opinion will have a reliable basis in the knowledge and experience of his discipline" is relaxation of the requirement that a witness speak from firsthand knowledge warranted.  *Daubert*, 509 U.S. at 592.

Expert evidence may be admitted only if the following requirements of a "rigorous three-part inquiry" are satisfied:   "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *United States* v. *Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa* v. *Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).  "The proponent of the expert testimony bears the

burden of showing, by a preponderance of the evidence, that the testimony satisfies each [of these] prong[s]." *Hendrix ex rel. G.P.* v. *Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

Whether an expert is qualified to testify "is case specific and therefore lies within this court's discretion." *E.C. ex rel. Crocker* v. *Child Dev. Sch., Inc.*, No. 10-cv-759, 2011 WL 4501560, at *10 (M.D. Ala. Sept. 29, 2011) (Watkins, J.).   In order to be able to testify competently, a witness must be qualified by one or more of the following:  "knowledge, skill, experience, training, or education." *Id.*  With regard to the reliability of a proffered expert's testimony, "the trial judge must assess 'whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Seamon* v. *Remington Arms Co.*, 51 F. Supp. 3d 1198, 1202 (M.D. Ala. 2014) (Watkins, J.) (alteration in original) (quoting *Daubert*, 509 U.S. at 592-93). The test of reliability is a "flexible" one—courts may consider one or more of the factors set forth in *Daubert*, but are not limited to these factors.  *Kumho Tire*, 526 U.S. at 141-42; *see also Allison* v. *McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) ("Some other factors which this and other courts have considered in the *Daubert* analysis are reliance on anecdotal evidence (as in case reports), temporal proximity, and improper extrapolation . . . .").  "Rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology." *McCorvey* v. *Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

## I.   DR. EVANS IS NOT QUALIFIED AS AN EXPERT TO OPINE ON THE SUBJECTS FOR WHICH DEFENDANTS OFFER HIM.

### A.   Dr. Evans Lacks Relevant Training and Experience Relating to Anesthesiology and Cardiology.

Dr. Evans is not an anesthesiologist (as he put it during his deposition, "[f]ar from it"); has never administered an anesthetic drug to a patient; has received no training in

anesthesiology; and has not published a single article or conducted any research related to anesthesiology. (Evans Dep. Tr. at 10:4-17.)[1] Yet in his written reports and oral testimony in this case he purports to testify about numerous subjects relating to anesthesiology. Dr. Evans also purports to opine that midazolam will not cause Mr. Arthur to suffer a painful heart attack (*see* Nov. 24, 2015 Evans Decl. ¶¶ 44-47),[2] despite concededly having no experience whatsoever in the field of cardiology. (Evans Dep. Tr. at 269:2-11.) Because Dr. Evans lacks the necessary clinical experience or academic training to render expert opinions about anesthesiology and cardiology, his opinions on these issues should be excluded.[3]

Dr. Evans has neither prescribed nor used midazolam in clinical practice. (*Id.* at 265:8-22, 267:2-268:5.) His only experience with midazolam outside of a selective literature review for purposes of testimony appears to be that he has received midazolam himself. (*Id.* at 155:24-156:9 ("I can tell you, from personal experience, you can't count to 10 with a low -- even a low dose of midazolam before you're out like a light.").)[4]

Dr. Evans does not have an educational or research background to make up for his indisputable lack of experience practicing anesthesia or administering midazolam. In addition to

---

[1]  Relevant excerpts of the transcript of Dr. Evans' deposition in this case are attached hereto as Exhibit A.

[2]  Dr. Evans' November 24, 2015 declaration is attached hereto as Exhibit B.

[3]  In comparison to Dr. Evans, the experts offered by Mr. Arthur have relevant expertise in the subject matters at issue. Mr. Arthur is offering the testimony of Dr. Alan D. Kaye, an M.D. and Ph.D. in pharmacology, who is the head of anesthesiology at Louisiana State University, has written multiple books and articles on anesthesiology, and who has administered midazolam thousands of times. Similarly, on the issue of whether the ADOC protocol would cause a painful heart attack, Mr. Arthur is offering the testimony of Dr. J. Russell Strader, Jr., a board-certified cardiologist with over a decade of relevant clinical experience.

[4]  When asked at his deposition how he could remember that he could not count to ten after receiving a dose of midazolam, Dr. Evans admitted that he could not. (*See* Evans Dep. Tr. at 156:15-20 ("Q. . . .  If midazolam is supposed to cause you not to recollect, how could you recollect whether or not you were able to count to 10?  A.  Well, I guess that's a good point.").)

his bachelor's degree, Dr. Evans holds only a one-year Pharm.D. from the University of Tennessee at Memphis, which he obtained in 1973.  (Evans CV at 1 (attached hereto as Exhibit C).)[5]  *Cf. Newton* v. *Roche Labs., Inc.*, 243 F. Supp. 2d 672, 677 (W.D. Tex. 2002) (excluding testimony about drug's effects where putative expert's "only claim to the title of 'doctor' [was] based upon the completion of a one-year 'Pharm.D.' program in 1971.").  When Dr. Evans obtained his degree in the early 1970s, a Pharm.D. degree was "'an entry-level degree' that pharmacists [needed to] have to even practice pharmacy."  *Id.* at 677 n.2; *see also Devito* v. *Smithkline Beecham Corp.*, No. 02-cv-745, 2004 WL 3691343, at *7 (N.D.N.Y. Nov. 29, 2004) (noting that Pharm.D. was "*not* a pharmacologist" and thus could not "opine to a 'reasonable pharmacological certainty'" regarding a drug's effects).  Dr. Evans has not earned an M.D., a Ph.D., or any other degree in pharmacology.

Dr. Evans concedes that his opinions about anesthesiology and cardiology in this case are based exclusively on a review of selected articles and other references as well as his "knowledge of pharmacology."  (Evans Dep. Tr. at 10:14-23, 20:17-25; 48:14-21, 57:5-8.)  But the Eleventh Circuit has emphasized that an expert's review of literature in areas outside of his competence does "not make him any more qualified to testify as an expert . . . than a lay person who read the same articles."  *United States* v. *Paul*, 175 F.3d 906, 912 (11th Cir. 1999). Selective review of relevant literature is indicative of "the sort of 'litigation-driven expertise' which courts have eschewed."  *Devito*, 2004 WL 3691343, at *7.  Like the so-called "expert" in *Newton*, Dr. Evans' "opinion in this case is based solely on an incomplete review of existing literature (mainly limited to anecdotal case reports)."  *Newton*, 243 F. Supp. 2d at 678.

---

[5]    Although at his deposition Dr. Evans indicated that the Pharm.D. program for which he is Dean at Auburn University is "a seven-year program," he admitted that the program from which he obtained his degree took only one year to complete.  (Evans Dep. Tr. at 261:4-14.)

Dr. Evans has "no relevant expertise regarding [midazolam, anesthesiology, or cardiology] outside of that which he has gleaned from a scant literature review for the purposes of consulting and testifying in this case." *Id.*; *see also United States* v. *Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (upholding exclusion of expert testimony where the proffered expert's "academic work and professional experience" related to subject unrelated to the issues presented in the litigation); *McClain* v. *Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242, 1244 (11th Cir. 2005) (excluding putative expert who based his opinions on "the broad principles of pharmacology").

In light of Dr. Evans' limited educational and experiential credentials relating to the topics that are relevant in this case, his opinions about midazolam's anesthetic and hemodynamic effects, the means of assessing anesthetic depth, and midazolam's tendency to precipitate "are outside of his competence and must be excluded." *City of Tuscaloosa*, 158 F.3d at 565.

**B.    Critical Errors and Inconsistencies in Dr. Evans' Testimony Highlight His Lack of Qualifications as an Expert in This Case.**

**1.    Dr. Evans Concedes That He Provided Erroneous Testimony in Prior Cases Involving Midazolam.**

Dr. Evans previously testified in a number of cases involving Florida's method of execution.[6]  Florida, like Alabama, conducts executions using a three-drug protocol with a 500 mg dose of midazolam as the first drug.  In several of the Florida cases, Dr. Evans was the state's only expert witness, and his sworn testimony led directly to the courts' rejection of the

---

[6]    At his deposition, Dr. Evans testified that he gave testimony in six method-of-execution cases in Florida:  (1) *Chavez* v. *Palmer*, No. 14-cv-110 (M.D. Fla. 2014); (2) *State* v. *Howell*, No. 1992-CF-22  (Fla. Cir. Ct.  2014);  (3) *State*  v.  *Henry*,  No. 8718628CF10A  (Fla. Cir. Ct. 2014); (4) *Davis* v. *State*, No. SC14-1178 (Fla. Cir. Ct. 2014); (5) *State* v. *Knight*, No. 04-1980-CF-341-A  (Fla. Cir. Ct. 2013);  and  (6) *Pardo*  v.  *Palmer*, No. 12-cv-1328 (M.D. Fla. 2012). (Evans Dep. Tr. at 261:21-262:25.)

inmate's claims.   *See, e.g.*, *Chavez* v. *Palmer*, No. 14-cv-110, 2014 WL 521067, at *18 (M.D. Fla. Feb. 10, 2014) ("[C]rediting Dr. Evans' testimony" in determining that the petitioner failed to show "a substantial likelihood of success on the merits of his claim with respect to the use of midazolam as the first drug in [Florida's] three-drug protocol."); *Pardo* v. *Palmer*, No. 12-cv-1328, 2012 WL 6106331, at *4 n.7 (M.D. Fla. Dec. 10, 2012) (referencing Dr. Evans' testimony in "conclud[ing] that Pardo is unlikely to prevail" on his method-of-execution challenge).   Dr. Evans now concedes that he testified in those Florida cases based on his "best guess":

> Well, those -- the Florida cases were pretty much off-the-cuff, cold kind of cases.  In other words, there was almost no prep time.  And I was asked and -- not -- I did not -- I was not asked to write a report.   So this is my -- essentially my best guess at what I remember about the drug at that point.  And I think that's pretty much the case throughout the couple of Florida cases that -- that I did.

(Evans Dep. Tr. at 159:10-19.)

Dr. Evans readily admits to substantive errors in his Florida testimony, and indeed seeks to use his lack of preparation in those cases to excuse inconsistencies in his testimony that have developed over time as his "know[ledge of] the issues"—from repeatedly testifying as a paid expert—has evolved.  (*Id.* at 162:7-13.)  For example, in *State* v. *Howell*, Dr. Evans testified that midazolam would exhibit its peak effects "within ten minutes."  Evid. Hr'g Tr. at 145:16-20, *State* v. *Howell*, No. 1992-CF-22 (Fla. Cir. Ct. Feb. 11, 2014).[7]  In his February 14, 2015 report in this case, Dr. Evans declared under penalty of perjury that midazolam's effects "increase during at least the initial 20 minutes" following its administration.  (Feb. 14, 2015 Evans Decl.

---

[7]   Relevant excerpts of the transcript of Dr. Evans' testimony in *Howell* are attached hereto as Exhibit D.

¶ 10.)[8]  But at his deposition ten months later, he changed his testimony to now claim that midazolam's peak effects will occur in "[a]s little as [one] minute." (Evans Dep. Tr. at 144:11-13.)[9]  Dr. Evans tries to explain his changed opinions based on approaching this case "with a little bit more rigor" and "beg[inning] to learn what questions were important." (*Id.* at 160:7-17.) But an expert who is "beg[inning] to learn" about the details of a subject matter as he repeatedly provides sworn testimony, each time presenting himself as a qualified expert, is not a reliable expert.

### 2.  Dr. Evans' Testimony Has Been Rejected as Inconsistent and Unreliable.

Even before Dr. Evans admitted that his opinions in the Florida cases were his "best guesses" and inaccurate, separate inconsistencies recently led a court in Montana to reject his testimony in another method-of-execution action.  In *Smith* v. *State*, Dr. Evans submitted a declaration opining that pentobarbital's onset of action takes less than a minute:  "it could be 20 seconds to 40 seconds."  Evans Dep. Tr. at 92:5-22, *Smith* v. *State*, No. BDV-2008-303 (Mont.

---

[8]  Dr. Evans' February 14, 2015 declaration is attached hereto as Exhibit E.

[9]  Dr. Evans' opinions, which he now says were erroneous, not only were accepted by courts in Florida, but also led directly to Alabama's adoption of its current three-drug protocol incorporating  midazolam. ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████  Further, the Supreme Court in *Glossip* expressly took note of the Florida cases in which Dr. Evans testified in upholding Oklahoma's method of execution incorporating midazolam.  *See Glossip* v. *Gross*, 135 S. Ct. 2726, 2739-40 (2015) ("The District Court did not commit clear error when it found that midazolam is highly likely to render a person unable to feel pain during an execution . . . .  [N]umerous courts [in Florida] have concluded that the use of midazolam as the first drug in a three-drug protocol is likely to render an inmate insensate to pain that might result from administration of the paralytic agent and potassium chloride.").

Dist. Ct. Apr. 24, 2015).[10]   The court rejected Dr. Evans' testimony, noting "that in the *Pardo* v. *Palmer* case, in testimony given not three years ago, Dr. Evans testified that pentobarbital's onset of action is three to four minutes as opposed to the less than one minute referred to in his testimony in this case."[11]   *Smith* v. *State*, No. BDV-2008-303, 2015 WL 5827252, at *4 (Mont. Dist. Ct. Oct. 6, 2015).[12]

### 3.   Dr. Evans Has Provided Inconsistent and Unreliable Testimony in This Case.

Dr. Evans has continued his pattern of changing his testimony to fit his evolving understanding of "what questions [are] important" to his clients.   *First*, just as in *Smith*, Dr. Evans has offered inconsistent opinions regarding the timing of midazolam's anesthetic effects.   Here, Dr. Evans has stated that within "2 to 2.5 minutes," an individual receiving 500 mg of midazolam "would enter into a very deep coma[.]"   (Evans Dep. Tr. at 167:19-168:6.) In *Davis* v. *State*, Dr. Evans testified under oath that "it would definitely be five to 10 minutes until [the inmate] reached that level of unconsciousness."   Evid. Hr'g Tr. at 114:15-22, *Davis* v. *State*, No. SC14-1178 (Fla. Cir. Ct. June 30, 2014).[13]

---

[10]   Relevant excerpts of the transcript of Dr. Evans' deposition in *Smith* are attached hereto as Exhibit G.

[11]   The court in *Pardo* explicitly relied upon Dr. Evans' testimony in rejecting the petitioner's claim.   *See Pardo* v. *Palmer*, 2012 WL 6106331, at *4 n.7.   Manuel Pardo was executed on December 11, 2012.

[12]   In the *Smith* case, Dr. Evans also testified incorrectly about serving as an expert in a separate case involving Ohio's method of execution, later attempting to revise his testimony through an errata sheet.   (*Compare* Evans Dep. Tr. at 25:3-19, *Smith* v. *State*, No. BDV-2008-303 (Mont. Dist. Ct. Apr. 24, 2015) (testifying that he submitted a report and gave testimony at a hearing before a judge in Ohio regarding "the use of hydromorphone as an agent"), *with id.* at 108 (attempting to remove any references in the deposition transcript to his involvement in Ohio, citing a "mistake in [his] memory").)

[13]   Relevant excerpts of the transcript of Dr. Evans' testimony in *Davis* are attached hereto as Exhibit H.

*Second*, although Dr. Evans testified at his December 2015 deposition that midazolam's peak effects manifest in "[a]s little as a minute" (Evans Dep. Tr. at 144:11-13), he opined in his February 2015 report that the maximum effects of midazolam "are seen in 20-60 minutes." (Feb. 14, 2015 Evans Decl. ¶ 9.)  In a feeble attempt to explain this discrepancy, Dr. Evans claimed that he was opining in his February report "about intramuscular administration, not IV administration"—even though "intramuscular" appears nowhere in his report. (Evans Dep. Tr. at 150:10-12.)  Dr. Evans' *post hoc* rationalization for his prior testimony defies reason, given that then, as now, the ADOC protocol involved midazolam's administration via intravenous injection.

*Third*, during his December 2015 deposition, Dr. Evans relied on a Material Safety Data Sheet ("MSDS") prepared by Bedford Laboratories for the proposition that a 500 mg dose of midazolam "is a massive overdose" that "will lead to toxicity, resulting in [central nervous system] depression and respiratory and cardiac arrest." (Evans Dep. Tr. at 86:24-87:5; Feb. 14, 2015 Evans Decl. ¶¶ 12-13.)[14]  But Dr. Evans previously acknowledged in sworn testimony that this citation was inaccurate, as the MSDS reports a lowest toxic dose in humans of 71 mg/kg—1,000 times greater than the 0.071 mg/kg figure Dr. Evans purports to derive from the MSDS.  *See* Prelim. Inj. Hr'g Tr. at 659:3-5, *Warner* v. *Gross*, No. 14-665 (W.D. Okla. Dec. 17-19, 2014) ("Yes, [my report] is wrong. . . .  It should be 71 milligrams [per kilogram].").[15]  *Cf. EEOC* v. *Freeman*, 778 F.3d 463, 467 (4th Cir. 2015) (upholding district court's exclusion of testimony where the expert failed to correct "errors in his analysis in

---

[14]     A copy of the Bedford Laboratories MSDS is attached hereto as Exhibit I.

[15]     Relevant excerpts of the transcript of Dr. Evans' testimony in *Warner* are attached hereto as Exhibit J.

subsequently-filed supplemental reports," and "introduce[d] fresh errors into his new analysis").[16]

*Finally*, Dr. Evans' February 2015 report in this case advances the completely unsubstantiated view that midazolam's "ceiling effect" occurs solely at the level of the spinal column (rather than at the level of the brain).[17]  (*See* Feb. 14, 2015 Evans Decl. ¶ 11.)  Dr. Evans now concedes that his opinion about this issue "was pretty much an incomplete statement." (Evans Dep. Tr. at 230:3-15.)

## II.   DR. EVANS' METHODOLOGY IS UNRELIABLE AND WILL NOT ASSIST THIS COURT.

### A.   Dr. Evans Offers Unreliable Opinions Based on the Erroneous Citation of Literature Regarding the Anesthetic Effects of Midazolam.

Because Dr. Evans lacks any clinically relevant experience and has only minimal academic credentials relevant to the issues in this case, his opinions are based entirely on a limited review of scientific literature.  But his interpretation of the sources cited in his report is unsupportable, and indeed a number of the sources on which he purports to rely affirmatively contradict his conclusions.

For example, in his February 14 report, Dr. Evans agreed that a study by Richard Hall and others "supports that there is a ceiling effect" with respect to midazolam's anesthetic properties.  (Feb. 14, 2015 Evans Decl. ¶ 11 (citing Richard I. Hall, et al., *The Anesthetic*

---

[16]     Dr. Evans testified at his deposition in this case that he did not include the MSDS citation in his November 2015 report because "it was in the earlier report"—not because it was erroneous.  (Evans Dep. Tr. at 87:20-88:3.)

[17]     In *Glossip* (then *Warner*), Dr. Evans testified that "[t]he 'ceiling effect' that's been referred to is an effect specifically on the spinal cord . . . .  What we're talking about here is at the reticular activating system, the part of the brain that controls respiration, so we're basically shutting down respiration centers.  There is no ceiling effect at that level."  Prelim. Inj. Hr'g Tr. at 636:13-23, *Warner* v. *Gross*, No. 14-665 (W.D. Okla. Dec. 17-19, 2014).

*Efficacy of Midazolam in the Enflurane-anesthetized Dog*, 68 ANESTHESIOLOGY 862 (1988) (attached hereto as Exhibit K)).)  Apparently realizing that this concession is inconsistent with defendants' position, Dr. Evans now reverses course, claiming that this study does not support the existence of a ceiling effect that cannot be overcome by much larger doses of midazolam. (Nov. 24, 2015 Evans Decl. ¶¶ 38-39.)  But the authors of this article concluded that the results of their study supported the existence of a ceiling effect, and attributed this effect specifically to midazolam's mechanism of action:

> [A] plasma concentration of 9763 ng/ml failed to produce a significantly greater reduction of enflurane MAC beyond that produced by a plasma midazolam concentration of 1464 ng/ml (73 vs. 60%), *suggesting that there may be a ceiling effect to the anesthetic efficacy of midazolam.  A ceiling effect to the anesthetic efficacy of midazolam is not surprising, since midazolam acts at specific receptors in the central nervous system.*  It is likely that the number of benzodiazepine receptors is limited, and that they will become saturated at a sufficiently high concentration of midazolam.  *Beyond this concentration, no greater pharmacological effect would be expected to occur, no matter how much drug is administered.*

Hall, et al., 68 ANESTHESIOLOGY at 864-65 (emphasis added and footnote omitted).

Dr. Evans likewise does not address in his November 2015 report other peer-reviewed articles cited by Dr. Kaye that further substantiate midazolam's maximum pharmacological effect.  *See, e.g.*, Wakako Miyake, et al., *Electroencephalographic response following midazolam-induced general anesthesia:  relationship to plasma and effect-site midazolam concentrations*, 24 J. ANESTHESIA 386, 392 (2010) ("Saturation at the benzodiazepine receptor site would account for the small differences in EEG between patients receiving midazolam 0.2 and 0.3 mg kg$^{-1}$, respectively, and the absence of burst suppression.") (attached hereto as Exhibit L); Jerry E. Fleischer, et al., *Cerebral Effects of High-dose Midazolam and Subsequent Reversal with Ro 15-1788 in Dogs*, 68 ANESTHESIOLOGY 234, 240 (1988) ("From the

stable plateau of . . . EEG activity reached after a total dose of approximately 10 mg • kg$^{-1}$ of midazolam [in dogs] and the increasing serum midazolam concentration, it is apparent that additional midazolam administered did not have any demonstrable effect. . . .   Saturation of benzodiazepine binding sites appears to be the most likely explanation for the plateau phenomena observed.") (attached hereto as Exhibit M).   Dr. Evans' failure to address contradictory evidence in his report "highlights the unreliability of [his] methodology." *Faulkner* v. *Arista Records LLC*, 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014); *see also United States* v. *Wooden*, 693 F.3d 440, 455 (4th Cir. 2012) (reversing district court opinion that relied on testimony of expert who "largely ignored all contradictory evidence" and provided analysis that "was internally inconsistent").

Dr. Evans also purports to opine about the Bispectral Index ("BIS") and the Ramsay Sedation Scale ("RSS").  Dr. Evans' qualifications and ability to evaluate the use of these two scales once again fall well short of the reliability mandated by Federal Rule of Evidence 702.

With respect to the BIS, Dr. Evans opines that "[t]he use of the bispectral index (BIS) to determine depth of anesthesia is not reliable when using midazolam."  (Nov. 24, 2015 Evans Decl. ¶ 30.)  Despite never having used or researched the BIS himself (Evans Dep. Tr. at 16:9-14), Dr. Evans purports to base his opinion on, among other things, an article by Dr. Peter Glass and others that "seems to support the conclusion that relying on BIS to monitor midazolam's efficacy might be questionable."  (Nov. 24, 2015 Evans Decl. at ¶ 35 (citing Peter S. Glass, et al., *Bispectral Analysis Measures Sedation and Memory Effects of Propofol, Midazolam, Isoflurane, and Alfentanil in Healthy Volunteers*, 86 ANESTHESIOLOGY 836 (1997) (attached hereto as Exhibit N)).)  But, as is evident from the plain text of the Glass article, the

-13-

authors reach *the opposite conclusion* about whether the BIS can be used to measure the effects of midazolam:

> In summary, this study showed that the BIS correlated well with the effects of propofol, midazolam, and isoflurane on level of consciousness and recall . . . . ***Therefore we believe that the BIS may be used effectively to measure the absence of consciousness after midazolam, propofol, or isoflurane.***

Glass, et al., 86 ANESTHESIOLOGY at 845 (emphasis added).    At his deposition, Dr. Evans conceded that his characterization of the Glass article in his report was "an error." (Evans Dep. Tr. at 188:21-24 ("Now, I will tell you that is an error. . . .   You can take out Glass.  Okay?").) Dr. Evans' "error," however, highlights a more fundamental problem with his testimony:  he is simply not qualified to testify as an expert in anesthesiology, and he cannot make up for that lack of qualification by parroting (incorrectly) the work of others.

With regard to the RSS, Dr. Evans testifies that this scale "seems to be effective in determining if a patient cannot respond to painful stimuli."  (Nov. 24, 2015 Evans Decl. ¶ 23.) Although the reliability of different metrics for assessing anesthetic depth is an important and contested issue in this case, Dr. Evans does not provide a source for this statement.[18]   At most, Dr. Evans cites to two articles in which the RSS was performed, and the patients did not respond. (*Id.* ¶¶ 26-27.)[19]  But these articles do not address at all whether the RSS—which involves only

---

[18]    This is just one of many examples of statements in Dr. Evans' report that are not supported by any citations.  (*See also, e.g.*, Nov. 24, 2015 Evans Decl. ¶ 44 ("Although midazolam does cause a reduction in blood pressure, speed of heart rate [sic] that is not dramatic and the body compensates rapidly.  This reaction is the same with patient [sic] with pre-existing heart disease.").)

[19]    The two articles cited by Dr. Evans are Mine Parlak, et al., *Age Effect on Efficacy and Side Effects of Two Sedation and Analgesia Protocols on Patients Going through Cardioversion: A Randomized Clinical Trial*, 13 ACAD. EMERGENCY MED. 493 (2006) (attached hereto as Exhibit O), and Blanca Coll-Vinent, et al., *Sedation for Cardioversion in the Emergency*

-14-

the administration of a "light glabellar tap" (a painless tap on the forehead)[20] or "verbal stimulus"—can be used to determine whether a patient will respond to *painful stimuli*, let alone stimuli as painful as those caused by administration of the second and third drugs in the ADOC protocol.  (*See* Nov. 24, 2015 Evans Decl. ¶ 26 n.20 ("The Ramsay Sedation Scale ranges from 1 (anxious, agitated, restless) to 6 (no response to glabellar tap or loud auditory stimulus).").)  Dr. Evans' failure to provide a source for his opinion regarding the utility of the RSS is particularly crucial here because, as Dr. Evans stated during his deposition, "I am not an expert in the assessment of [anesthetic] depth [based on] physically examining the patient."  (Evans Dep. Tr. at 200:11-13.)

Had Dr. Evans performed even a cursory review of publicly available sources related to the RSS, he would have realized quickly that it is not used, or intended for use, to assess whether a patient is in a state of general anesthesia such that he or she will be unarousable from and insensate to painful stimuli.  *See, e.g.*, A. Alberts, et al., *Letters to the Editor*, 16 S. AFR. J. ANAESTHESIA & ANALGESIA 9, 10 (2010) ("The [RSS] was specifically designed not to be a painful test and not to startle the patient.") (attached hereto as Exhibit Q); *see also id.* at 11 ("[T]he Ramsay scale mainly involves a passive approach to the patient, designed to cause minimal disturbance to sleep.").  Sources cited in Dr. Kaye's report make clear that the RSS cannot be used to assess whether an inmate has reached the deep level of anesthesia required to withstand the excruciatingly painful effects of the second and third drugs of the ADOC protocol, as opposed to only "light" to "moderate" sedation.  *See* G. Consales, et al., *Bispectral Index compared to Ramsay score for sedation monitoring in intensive care units*, 72 MINERVA

---

*Department: Analysis of Effectiveness in Four Protocols*, 42 ANNALS EMERGENCY MED. 767 (2003) (attached hereto as Exhibit P).

[20]      (*See* Evans Dep. Tr. at 106:7-10.)

ANESTESIOLOGICA 329, 332 (2006) (attached hereto as Exhibit R).   In short, Dr. Evans'
testimony regarding sedation scales is, once again, no more than "off-the-cuff" guesswork
lacking reliability and should be excluded.

> **B.      Dr. Evans Offers Unreliable Opinions Concerning Midazolam's "Toxicity."**

Relying on anecdotal case reports, Dr. Evans opines that a 500 mg dose of
midazolam will "render [an inmate] unconscious and insensate during the remainder of the
procedure" because such a dose will be "toxic."  (Nov. 24, 2015 Evans Decl. ¶ 19; *see also id.* at
¶ 18 ("[W]hen midazolam is administered rapidly in this quantity, it will lead to toxicity,
resulting in unconsciousness and depression of respiration and cardiac arrest.").)  A 500 mg dose
would be "toxic," Dr. Evans reasons, because "[o]ver eighty deaths from the use of midazolam
(and in some cases, midazolam plus an opioid) had occurred as of 2009," some of these deaths
involved midazolam doses ranging from 0.04 to 0.07 mg/kg (2.8-4.9 mg for a 70 kg adult), and
the 500 mg dose called for under the ADOC protocol is, compared to these doses, a "massive
overdose."  (*Id.* at ¶¶ 17-18.)

Dr. Evans' logic—because some relatively small midazolam doses have proven
fatal, a "massive overdose" of midazolam will result in insensitivity to pain then death—is
untenable.  Dr. Evans provides no biomechanical explanation for how a "massive overdose" of
midazolam will result in a painless death, nor does he even discuss whether any of the deaths
associated with lower doses of midazolam resulted in pain.  Dr. Evans' reasoning could be
applied to any substance that has been known to cause death in higher doses—water, for
example.  (*See* Dec. 14, 2015 Harper Dep. Tr. at 206:10-15 ("There's a concentration of any

drug that can cause death.  There's a concentration of water consumed that can cause death.").)[21]
Yet no one would claim that a "massive overdose" of water would result in unconsciousness and
insensitivity to the effects of the second and third drugs in the ADOC protocol.[22]

Further, the sources on which Dr. Evans relies for information about midazolam
overdoses make clear that many, or even most, of the fatalities associated with midazolam also
involved other drugs.  *See* Peter L. Bailey, et al., *Frequent Hypoxemia and Apnea After Sedation
with Midazolam and Fentanyl*, 73 ANESTHESIOLOGY 826, 829 (1990) (attached hereto as Exhibit
U).[23]  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to
admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A
court may conclude that there is simply too great an analytical gap between the data and the
opinion proffered."  *Gen Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997); *see also McClain*,
401 F.3d at 1240 (upholding exclusion of expert testimony where putative expert did not

---

[21]     Relevant excerpts of the transcript of Dr. Harper's deposition are attached hereto as
Exhibit S.

[22]     The eighty deaths that Dr. Evans says have occurred from administration of midazolam
(and in some cases other drugs) represent a vanishingly small fraction of the number of times
that midazolam has been administered over this period.  (Nov. 16, 2015 Kaye Decl. ¶ 7
(reflecting that Dr. Kaye himself has administered midazolam "many thousands of times over
decades of medical practice") (attached hereto as Exhibit T).)  Moreover, Dr. Evans concedes
that he did not review each of the case reports for these deaths to determine whether a drug
besides midazolam was involved.  (Evans Dep. Tr. at 58:10-14.)

[23]     The other two sources cited in his report each cover only a handful of deaths associated
with midazolam, and do not specify whether other drugs were involved or whether the deaths
were painful.  *See* Benzodiazepines, POISINDEX® Managements, at 9 ("Four deaths due to
'cardiac complications' (2) and cardiorespiratory arrest (2) have been reported to the US Food
and Drug Administration (FDA) after the therapeutic use of midazolam (Versed(R)) (Anon,
1986).  No further details were available.") (excerpts of which are attached hereto as Exhibit V);
T.K. Daneshmend & R.F.A. Logan, *Midazolam Antagonism*, THE LANCET 388, 389 (Aug. 13,
1988) (detailing three midazolam-related deaths during emergency endoscopies) (attached hereto
as Exhibit W).

"support his opinions with sufficient data or reliable principles" and "drew speculative conclusions about [a drug's] toxicity from questionable principles of pharmacology").[24]

Finally, Dr. Evans' reasoning is inconsistent with other opinions that he has offered in this case, including that doses much larger than 2.8 to 4.9 mg are used (and approved by the FDA for use) to induce anesthesia.  (*Cf.* Nov. 24, 2015 Evans Decl. ¶ 13 ("The initial dose required for induction . . . is 0.3-0.35mg/kg (21-24 mg for a 70 kg person) administered over 20-30 seconds.").)  *See KW Plastics* v. *U.S. Can Co.*, 131 F. Supp. 2d 1289, 1293 (M.D. Ala. 2001) ("[E]xpert testimony should be excluded if it contains internal inconsistencies.").  As Dr. Kaye explained in his February 16 declaration, the dose Dr. Evans says can be used to induce anesthesia is "roughly ten times that he simultaneously suggests is fatal."  (Feb. 16, 2015 Kaye Decl. ¶ 22.)[25]

---

[24]    The data set forth in the Bailey article is unreliable, as it is drawn from the FDA's Adverse Event Reporting System ("FAERS"), a source whose reliability the Eleventh Circuit has specifically questioned.  *See McClain*, 401 F.3d at 1250 ("Uncontrolled anecdotal information [from FAERS] offers one of the least reliable sources to justify opinions about both general and individual causation.").

[25]    Dr. Kaye's February 16, 2015 declaration is attached hereto as Exhibit X.

## CONCLUSION

The Court should exclude the testimony of Dr. Evans as unreliable.

Dated:  December 30, 2015

Respectfully submitted,

/s/ Suhana S. Han

Suhana S. Han (admitted *pro hac vice*)
   NY Bar Registration # 3016482
   hans@sullcrom.com
Adam R. Brebner (admitted *pro hac vice*)
   brebnera@sullcrom.com
Meredith A. Sherman (admitted *pro hac vice*)
   shermanm@sullcrom.com
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Fax:  (212) 558-3588

*Counsel for Plaintiff Thomas D. Arthur*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:   J. Clayton Crenshaw, Esq., Thomas R. Govan, Jr., Esq., Henry Mitchell Johnson, Esq., and Lauren Ashley Simpson, Esq.

/s/ Suhana S. Han

Suhana S. Han (admitted *pro hac vice*)
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Fax:  (212) 558-3588
E-mail:  hans@sullcrom.com