**<u>Exhibit A</u>**

1               LEE EVANS

2      IN THE UNITED STATES DISTRICT COURT

3       FOR THE MIDDLE DISTRICT OF ALABAMA

4

5   THOMAS D. ARTHUR,     )

6         Plaintiff,    )CIVIL ACTION NO:

7   VS.                   )2:11-CV-00438

8   JEFFERSON S. DUNN,   )

9   ET AL.,              )VIDEOTAPED

10                        )DEPOSITION OF:

11         Defendants.  )LEE EVANS

12

13

14         THE VIDEOTAPED DEPOSITION OF LEE

15   EVANS, may be taken before Nancy Holland,

16   Commissioner and Notary Public, State at

17   Large, at Auburn University, Harrison School

18   of Pharmacy, 2316 Walker Building, Auburn,

19   Alabama, on the 8th day of December, 2015,

20   commencing at approximately 9:07 a.m.

21

22

23

24   Reported By: Nancy Holland

25   Job No. 100625

                          LEE EVANS

2            IT IS FURTHER STIPULATED AND AGREED

3    that the signature to and reading of the

4    deposition by the witness is waived, the

5    deposition to have the same force and effect

6    as if full compliance had been had with all

7    laws and rules of Court relating to the

8    taking of depositions.

9

10            IT IS FURTHER STIPULATED AND

11   AGREED that it shall not be necessary for

12   any objections to be made by counsel to any

13   questions, except as to form or leading

14   questions, and that counsel for the parties

15   may make objections and assign grounds at

16   the time of the trial, or at the time said

17   deposition is offered in evidence, or prior

18   thereto.

19                        * * *

20

21

22

23

24

25

1              LEE EVANS

2           A P P E A R A N C E S

3

4    FOR THE PLAINTIFF:

5           SUHANA HAN

6           JUSTIN ROLLER

7           Attorneys at Law

8           Sullivan & Cromwell

9           125 Broad Street

10          New York, New York  10004

11

12

13

14

15   FOR THE DEFENDANTS:

16          THOMAS GOVAN, JR.

17          Attorney at Law

18          State of Alabama

19          Office of the Attorney General

20          501 Washington Avenue

21          Montgomery, Alabama  36130

22

23

24   ALSO PRESENT:

25          Paige Byrd, Videographer

```
1                    LEE EVANS
2               EXAMINATION INDEX
3
   LEE EVANS
4      BY MS. HAN                        8
       BY MR. GOVAN                    274
5
6
                 EXHIBIT INDEX
7
8
   Exhibit 10   Final expert declaration  17
9
   Exhibit 11   Glass study               20
10
   Exhibit 12   Chavez hearing transcript 38
11
   Exhibit 13  Warner hearing transcript  39
12
   Exhibit 14  Bailey article            49
13
   Exhibit 15  Amrein article            77
14
   Exhibit 16  Expert declaration        85
15
   Exhibit 17  Parlak article            94
16
   Exhibit 18  Persson article           113
17
   Exhibit 19   Coll-Vinent article      115
18
   Exhibit 20  Davis hearing transcript  153
19
   Exhibit 21  Howell hearing transcript 158
20
   Exhibit 22  Miyake article            178
21
   Exhibit 23  Ibrahim article           188
22
   Exhibit 24  Buhrer article            206
23
   Exhibit 25  Greenblatt article        217
24
   Exhibit 26  Kuizenga study            234
25
```

1                    LEE EVANS

    Exhibit 27  Sarri article              241

2

    Exhibit 28  Legal case participation  261

3

    Exhibit 29 Motion hearing transcript  262

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               LEE EVANS

2     adequate muscle relaxation in order for

3     interventions to be conducted.

4     Q.        You're not an anesthesiologist --

5     A.        I am not.

6     Q         -- are you?

7     A.        Far from it.

8     Q         And you've never administered an

9     anesthetic?

10    A.        No, I haven't.

11    Q.        And you've received no training

12    in anesthesiology?

13    A.        That's correct.

14    Q.        You've written no articles or

15    conducted any research relating to

16    anesthesiology?

17    A.        None.

18    Q.        So what is your understanding

19    based on?

20    A.        Most of my understanding is based

21    on my knowledge of pharmacology and --

22    clinical pharmacology and review of

23    literature.

24    Q.        Would you agree that there are

25    different levels of anesthesia?

                        LEE EVANS

1
2    A.        Well, the BIS is a mathematical
3    measure of the level of anesthesia.  It has
4    become fairly common to use the BIS to
5    determine if a person is at a state where
6    they not -- where they would -- where they
7    would not respond to painful -- painful
8    procedures or painful stimuli.
9    Q.        Have you -- have you ever used
10   BIS in your practice?
11   A.        No, no.
12   Q.        Have you ever taught any courses
13   or done any research regarding BIS?
14   A.        No.
15   Q.        In your November 2015 report, you
16   opine that BIS can't be relied upon to
17   monitor midazolam's efficacy.
18   A.        Right.
19   Q.        That's paragraph 35, which I will
20   introduce as an exhibit.
21   A.        Right.
22             MS. HAN:  We'll mark this as -- I
23   apologize.  I'm not sure what exhibit
24   numbers we've been using at the other
25   depositions.  Do you know?

1                    LEE EVANS

2    Q.        Are you familiar with that

3    article?

4              MR. GOVAN:  What --

5    A.        Yes, I am.

6              MR. GOVAN:  What page are you

7    referring to?

8              MS. HAN:  Paragraph 35.

9              MR. GOVAN:  Okay.

10             MS. HAN:  So I'm marking as

11   Plaintiff's Exhibit 11 a study by Glass, et

12   al.

13             (Plaintiff's Exhibit 11 marked.)

14   Q         (By Ms. Han)  So, Dr. Evans, in

15   your report, you state, in paragraph 35 --

16   A         Uh-huh.

17   Q         -- "Glass' work seems to support

18   the conclusion that relying on BIS to

19   monitor midazolam's efficacy might be

20   questionable."

21             Do you see that?

22   A.        Yes.

23   Q.        And that conclusion was based

24   upon your review of this Glass study?

25   A.        Yes.

1                    LEE EVANS

2    effects, fatalities, increases.

3              So unlike -- unlike, like,

4    Valium, you could take a pretty large dose

5    of Valium and survive.  You would cause

6    respiratory depression, but this drug has

7    that impact much quicker.

8    Q.        I think you testified earlier

9    that you've never administered midazolam,

10   correct?

11   A.        I have never administered

12   midazolam.  I have been the recipient of

13   midazolam.

14   Q.        And is your conclusion about

15   midazolam having a higher acute toxicity

16   than longer-acting benzodiazepines, is that

17   based upon your review of scientific

18   literature?

19   A.        Yes.

20   Q.        Anything else?

21   A.        No.

22   Q.        And in your report, you cite to

23   P.L. Bailey --

24   A.        Right.

25   Q.        -- for that proposition.

1                    LEE EVANS

2    those incidences.  So it -- it probably

3    comes from a lot of different resources.

4    But that's -- and it's updated.

5    Q.        Are these anecdotal case reports?

6    A.        One would have to say yes,

7    because you don't plan these things.  These

8    are not studies.  These are case reports.

9    Q.        And would you agree that

10   anecdotal case reports are less reliable

11   than case studies in terms of their

12   scientific value?

13   A.        Well, these -- these would be

14   case studies.  Okay?  But they're still --

15   case studies are anecdotal.  They may be

16   published in the literature -- in

17   peer-reviewed literature, but it's still

18   anecdotal.

19            When you have a case you're

20   reporting, it's not -- it's not a -- it's

21   really not a scientific study of any sort.

22   You may get all the data about the case;

23   what happened with the procedure, was -- all

24   of that information, but you -- it is not a

25   controlled trial.

1                    LEE EVANS

2            You don't --

3    Q.      For --

4    A.      Excuse me.

5    Q.      I'm sorry.

6    A.        You don't get any toxicology data

7    in humans, especially those that engage in

8    fatalities, that's controlled.  It's all

9    anecdotal.

10   Q.      Did you go through each one of

11   the anecdotal case reports relating to

12   midazolam's deaths to determine whether

13   midazolam was the only drug administered?

14   A.      No.  In most cases, though, it

15   was clear that it was either midazolam by

16   itself or in combination with a narcotic.

17   Q.      So how many case reports did you

18   review?

19   A.      I don't -- I didn't -- I honestly

20   did not pull all of those case reports.  I

21   think of the 80-some-odd cases, something

22   tells me it was -- there were about 60 of

23   those that were midazolam alone.  I could

24   have that backwards, but that's from memory.

25                THE VIDEOGRAPHER:  You've got

1               LEE EVANS

2    A.       Okay.  All right.  Fine.

3             All right.  Now, tell me where I

4    am again.

5    Q.       On paragraph 12.

6    A.       12.

7    Q.       The last sentence.

8    A.       All right.  Yes.

9    Q.       Do you see that -- the last

10   sentence beginning with "The lowest dose"?

11   A.       No.

12            MR. GOVAN:  Which one are you --

13   I think this is the --

14   A.       Let's see.  Now, this one --

15            MR. GOVAN:  That's --

16   A.       -- is February 15.

17            MR. GOVAN:  Yeah.

18   A.       You're talking --

19   Q.       Yes, February 2015.  Yes.

20   A.       And in 12 --

21   Q.       Paragraph 12 of your February

22   report.

23   A.       Okay.  Got it.  All right.

24   Q.       Okay.  So is it your testimony

25   that, based upon the Material Safety Data

                    LEE EVANS

1    Sheet, the lowest dose resulting in human

2

3    deaths is approximately 5 milligrams for a

4    70-kilogram person?

5    A.        Yes.

6    Q.        And you testified earlier that

7    you've never administered midazolam,

8    Dr. Evans?

9    A.        I have never administered

10   midazolam.

11   Q.        In your -- let -- let me direct

12   you to your November report.

13   A.        Okay.

14   Q.        Oh, I'm sorry.  I had one more

15   question --

16   A.        Uh-huh.

17   Q.        -- about the question -- the

18   Material Safety Data Sheet.

19   A.        Yes.

20   Q.        That statement is not included in

21   your November report.  Is there a reason

22   why?

23   A.        It didn't -- I mean, I think the

24   major reason was that it was in the earlier

25   report.  It's probably a replication of the

1                    LEE EVANS

2    data that's already available in terms of

3    lowest dose.  So I didn't include it.

4    Q.        So in your November report --

5    A.        Yes.

6    Q.        -- paragraph 11.

7    A.        Yes.

8    Q.        So you state that "Midazolam is a

9    short-acting benzodiazepine used as a

10   preanesthetic agent for routine medical

11   procedures."

12   A.        Okay.  Hang on just a minute.

13   Q.        Oh, sorry.

14   A.        I don't have -- is this the

15   November one?

16             MR. GOVAN:  That's -- yeah.

17   A.        Here we go.  Thank you.

18             All right.  Give me the paragraph

19   again.

20   Q.        Paragraph 11.

21   A.        Right.  I've got it now.  Yes.

22   Q.        So in paragraph 11 of your

23   November report, you state that "Midazolam

24   is a short-acting benzodiazepine used as a

25   preanesthetic agent for routine medical

1                    LEE EVANS

2     to stimuli.

3                    So that should have been -- 6

4     should have been no response.

5                    MR. GOVAN:  That's what it says.

6                    THE WITNESS:  Uh-huh.

7     Q.        And what is a glabellar tap?

8     A.        Right here.

9     Q.        So let -- let the record reflect

10    Dr. Evans tapping his forehead.

11    A.        Yeah.  I would prefer something

12    even more painful.  But that's -- it's done

13    differently by different anesthesiologists.

14    That's my gleaning from what I've read.

15    So --

16    Q.        Okay.  Just a few more

17    articles -- questions about this Parlak

18    article.

19    A.        Uh-huh.  Do you -- do you want

20    this put in evidence or --

21    Q.        Yes, I'll take it back.  Thank

22    you.

23                    So going back to your report and

24    the description of the conclusion of the

25    Parlak study, you state that the patients in

1                   LEE EVANS

2    with the 2 to 5 minutes?

3    A.        Because I think we're talking

4    about the peak effect of -- of the drug.

5    Q.        And what is the peak effect?

6    A.        Peak effect is when you're going

7    to get the maximum therapeutic effect of the

8    drug with midazolam.

9    Q.        And what is the peak effect

10   for -- let me rephrase that.

11             How long does it take for

12   midazolam to reach its peak effect?

13   A.        As little as a minute.  Maybe

14   sooner.  Because it is a -- you know, it's

15   introduced intravenously.  It goes right to

16   the brain.  It's about a 20-second cycle

17   before it gets there.  So any time after 20

18   seconds, you should begin to get a peak

19   effect, and it rises -- the plasma

20   concentration of the blood rises very

21   rapidly at that point.

22   Q.        And is this peak effect that you

23   just referred to, is that based upon a bolus

24   administration of midazolam?

25   A.        Yes.

1                    LEE EVANS

2    A.        Yes.   "Based on the

3    pharmacokinetic information, however, the

4    maximum effects of midazolam are not seen

5    for 20 to 60 minutes after its

6    administration."

7    Q.        So what are you referring to

8    there with the --

9    A.        We're --

10   Q.        -- "20 to 60 minutes"?

11   A.        We're talking about intramuscular

12   administration, not IV administration.

13   Q.        So your testimony is that when

14   midazolam is administered by IV, the maximum

15   effect is reached 2 --

16   A.        2 --

17   Q.        -- to 2.5 minutes?

18   A.        Right.

19   Q.        But when midazolam is

20   administered by intramuscular method, it

21   takes 20 to 60 minutes to --

22   A.        Right.

23   Q.        -- render an individual

24   unconscious?

25             MR. GOVAN:   Object to the form of

1                    LEE EVANS

2    Q.        In the Davis case, you said

3    essentially 10 seconds, a few seconds.

4    A.        Yeah.

5              MR. GOVAN:  Object to form.

6    That's -- you're misstating his -- the

7    witness' testimony.  He never said it would

8    take 2.5 to -- I believe he was talking

9    about peak -- peak effect and inducing a

10   state of anesthesia.

11   Q.        Well, let me clarify, Dr. Evans.

12             Did you not testify earlier that

13   a bolus dose of midazolam would take 2 to

14   2.5 minutes to induce unconsciousness and

15   keep an individual unconscious?

16   A.        No.  The maximum effect is

17   probably to 2, 2 1/2 minutes.  I think this

18   is simply an analogy.  10 -- counting back

19   from 10 -- you would be unconscious by the

20   time you -- you counted back from 10.  You

21   might be at a lower level of

22   unconsciousness.  You might even be at a

23   sleep level by the time you had counted to

24   10.  But I can tell you, from personal

25   experience, you can't count to 10 with a

```
1                    LEE EVANS
2   low -- even a low dose of midazolam before
3   you're out like a light.
4   Q.         And that's because you said
5   earlier you received --
6   A.         I received it, yes.
7   Q.         -- midazolam?
8   A.         Several times, as a matter of
9   fact.
10  Q.         But how can you recall that you
11  weren't able to count to 10?
12  A.         I -- if I did, I was unconscious
13  and still saying it.  Because I never made
14  it to 10.
15  Q.         But my question is:  If midazolam
16  is supposed to cause you not to recollect,
17  how could you recollect whether or not you
18  were able to count to 10?
19  A.         Well, I guess that's a good
20  point.  However, you -- before you ever went
21  to sleep, you realize you're losing it.
22  So --
23  Q.         Just so that we're clear, the 2
24  to 2.5 minutes you referred to earlier, that
25  is, in your view, the amount of time it
```

1                    LEE EVANS

2    would take midazolam to reach its maximum or

3    peak effect?

4    A.        Yes.

5    Q.        Okay.  And by maximum or peak

6    effect, again, we're talking about the Level

7    5 or 6 in the Ramsay scale?

8    A.        Yes.

9    Q.        And then the 10 seconds

10   referenced in this testimony in the Davis

11   case, that refers to the amount of time it

12   would take to induce unconsciousness?

13   A.        Well, I don't know that we timed

14   it.  I said count to 10.

15   Q.        Okay.

16   A.        I'm not sure that you could say

17   that's 10 seconds, but it's a safe guess.

18   Q.        So -- but -- but that's to induce

19   unconsciousness, correct?

20   A.        Yes.  Well, at least induce

21   sedation.

22   Q.        So I'd like to direct your

23   attention to testimony you have provided in

24   the Howell case.

25   A.        Yes.

1                     LEE EVANS

2    Q.        And this is a transcript from the

3    hearing in the Howell case being marked as

4    Plaintiff's Exhibit 21.

5              (Plaintiff's Exhibit 21 marked.)

6    Q.        So I'd like to direct your

7    attention to page 145, please.

8    A.        Okay.

9    Q.        So, Dr. Evans, the -- the

10   questioning on page 145, that relates to 500

11   milligrams of midazolam; is that right?

12   A.        Yes.

13   Q.        And I'd like to direct your

14   attention to line beginning 16.

15             You were asked the question:

16   "How long would it take to render" -- "how

17   long would it take for midazolam to take

18   effect?"

19             Can you read your response,

20   please, beginning with line 18?

21   A.        "It begins to have an effect

22   almost immediately.  Peak effects from the

23   drug within 10 minutes.  In rendering

24   someone comatose, probably much quicker

25   than that."

1                    LEE EVANS

2    Q.        So here you testified that the

3    peak effects from the drug occur within 10

4    minutes.

5    A.        Yes.  I believe this is one of

6    the first of those cases.

7    Q.        So I'm not sure I understand the

8    relevance of this being one of the first

9    cases.

10   A.        Well, those -- the Florida cases

11   were pretty much off-the-cuff, cold kind of

12   cases.  In other words, there was almost no

13   prep time.  And I was asked and -- not -- I

14   did not -- I was not asked to write a

15   report.  So this is my -- essentially my

16   best guess at what I remember about the drug

17   at that point.  And I think that's pretty

18   much the case throughout the couple of

19   Florida cases that -- that I did.

20   Q.        So is it fair to say that your

21   earlier testimony in the Florida cases did

22   not necessarily reflect the views that you

23   hold today?

24   A.        That's true.

25             MR. GOVAN:  Object to form.

                        LEE EVANS

1

2  Q.        An example of that would be

3  the -- the 10 minutes here?

4  A.        Yes.

5  Q.        But you agree with me that the

6  reference to the 10 minutes here refer to

7  intravenous administration of midazolam?

8  A.        Yes.

9  Q.        And can you explain what changed

10 in the year or so since the Howell case with

11 respect to your views on the peak effects?

12 A.        Well, it -- what's changed is

13 I've had to do a lot more work.  So we --

14 we -- we know the -- we knew -- we began to

15 learn what questions were important in the

16 case -- these cases and began to address it

17 with a little bit more rigor.

18 Q.        And then, again, what is the

19 basis -- so let me step back.

20            So you just testified that you

21 have been approaching these issues with more

22 rigor.

23 A.        Uh-huh.

24 Q.        And that higher level of rigor

25 includes what?

                         LEE EVANS
1
2    A.        Well, it's more literature
3    review.  Refreshing -- refreshing neurons.
4    Remote memory.
5    Q.        So more literature review.
6    Anything else?
7    A.        No.  That's pretty much it.  Some
8    discussion with colleagues.
9              Let's see.
10   Q.        So the Howell case, the -- the
11   testimony was provided on February 11, 2014.
12   So, Dr. Evans, you provided testimony prior
13   to that date in other Florida cases?
14   A.        Uh-huh.  And each one of those
15   cases seemed to be a different issue that
16   the plaintiffs raised.  So they weren't all
17   the same issue -- issues.
18   Q.        But you agreed that as time went
19   on, you, I think you testified earlier,
20   exercised more rigor in formulating your
21   opinions?
22   A.        Yes.
23   Q.        And so some of the earlier
24   testimony in the Florida cases, would it be
25   fair to say that, again, you were asked to

```
 1                     LEE EVANS
 2   provide an opinion, and you provided those
 3   opinions without necessarily undertaking a
 4   rigorous literature review?
 5             MR. GOVAN:  Object to that
 6   question.  Object to the form.
 7   A.        Well, I wouldn't say -- I would
 8   say that the amount of rigor that -- that we
 9   have undertaken in the most recent cases has
10   been much greater than what we undertook
11   with the Florida cases.  We frankly didn't
12   know the issues that we were getting into
13   with -- with the Florida cases.
14   Q.        Going back to your November
15   report, paragraph 13.
16   A.        Let me see if I've got the right
17   report here.
18             Yes.  Is that one that starts
19   "Midazolam is a widely" -- "is widely
20   distributed in the body"?
21   Q.        Yes.
22   A.        Okay.
23   Q.        But I'd like to direct you to the
24   next page.
25   A.        Okay.
```

1                   LEE EVANS

2   Q.        The sentence beginning with "The

3   initial dose."

4   A.        Yes.

5   Q.        So you write in your report, "The

6   initial dose required for induction time

7   needed to create unconsciousness is .3 to

8   .35 milligram per kilogram" --

9   A.        Right.

10  Q.        -- "administered over 20 to 30

11  seconds."

12  A.        Right.

13  Q.        So I'm trying to understand what

14  you're claiming in this sentence.

15            Are you opining on dosage or the

16  amount of time to reach peak effect?

17            MR. GOVAN:  Object to the form.

18  A.        That one sentence talks about the

19  dose and the time that's required.

20  Q.        The dose and time to induce

21  unconsciousness?

22  A.        Yes.

23  Q.        But you're not opining that such

24  dose and time period would result in the

25  state of unconsciousness to remain over a

                    LEE EVANS

1

2    particular period?

3              MR. GOVAN:  Object to the form.

4              What do you mean by "remain over

5    a particular period"?

6    Q.        Let me reframe it.

7              So you're not testifying in that

8    paragraph, Dr. Evans, that that .3 to .35

9    milligram dose would sustain an individual

10   in a state of unconsciousness?

11             MR. GOVAN:  Object to the --

12   A.        Not --

13             MR. GOVAN:  -- form.

14             How -- how long are you talking

15   about?

16             MS. HAN:  Thomas, that's not a

17   form objection, as I'm sure you're aware.

18   Q.        (By Ms. Han)  So, Dr. Evans, what

19   I'm trying to get at is you're only

20   testifying here -- you're only opining here

21   about the induction of anesthesia --

22   A.        That's right.

23   Q.        -- not the --

24   A.        You're not talking about a

25   long-term duration here from that, no.

1                  LEE EVANS

2    You're inducing it.  You're not maintaining

3    it.

4    Q.        Thank you.

5              And again, the basis for your

6    statement relating to the .3 to 3 -- to .35

7    milligram dose --

8    A.        Uh-huh.

9    Q.        -- the basis for that opinion is

10   the LexiComp?

11   A.        Yes.

12   Q.        Anything else?

13   A.        No.

14   Q.        Again, going back to the Davis

15   case -- that's the Florida case from 2014.

16   A.        Uh-huh.  The Davis case.

17   Q.        So I'd like to direct your

18   attention to page 94.

19   A.        Okay.

20             MS. HAN:  Maybe we should change

21   the tape now.

22             THE VIDEOGRAPHER:  The time is

23   2:32 p.m.  This concludes tape number three

24   of the deposition of Dr. Evans.  We're off

25   the record.

Page 166

1            LEE EVANS

2            (Deposition was in recess.)

3            THE VIDEOGRAPHER:   The time is

4    2:37 p.m.   This is the beginning of tape

5    number four.   We're back on the record.

6    Q.        (By Ms. Han) Dr. Evans, before

7    the break, I directed you to a hearing

8    transcript from the Davis case in Florida.

9    A.        Uh-huh.

10   Q.        And on page 94, you were asked

11   the following question:

12            "Would a dosage of 500 milligrams

13   render an individual insensate to pain?"

14   A.        Yes.

15   Q.        And you were asked how quickly.

16   And can you -- let me clean up the record.

17            So the question:   "And that would

18   be how quickly?   Within a space of, say, 10

19   seconds or longer?"

20   A.        Uh-huh.

21   Q.        And --

22            MR. GOVAN:   You're reading a

23   different question to a different -- for the

24   completeness of the record, he needs to read

25   what his answer was and then go on to the

1                    LEE EVANS

2  next question.

3                    MS. HAN:  Sure.

4  Q.        "Would" -- "Question:  Would a

5  dosage of 500 milligrams render an

6  individual insensate to pain?"

7                    You answered:  "Very quickly the

8  person is in a very deep coma.  He would not

9  respond to pain."

10                   "Question:  And that would be how

11 quickly?  Within a space of, say, 10 seconds

12 or longer?"

13                   And, Dr. Evans, what was your

14 response?

15 A.        "Longer than that, but in the

16 space of a few minutes, we have achieved a

17 very deep level of unconsciousness heading

18 to a very deep coma."

19 Q.        And so it's your testimony that

20 within a few minutes of the administration

21 of 500 milligrams of midazolam, an

22 individual would enter into a very deep

23 coma?

24 A.        Yes.

25 Q.        And would the space of a few

1                    LEE EVANS

2    minutes be more or less than the 2 to 2.5

3    minutes you testified about earlier with

4    respect to the peak effect?

5    A.        I think that would be in that

6    neighborhood, yes.

7    Q.        Are you testifying that the

8    amount of time it would take for an

9    individual to reach -- I'm sorry.

10              Are you testifying the amount of

11   time it would take for midazolam to reach

12   its peak effect is the same amount of time

13   it would take for midazolam to place someone

14   into a very deep coma?

15              MR. GOVAN:  Object to form.

16              And what dose are you talking

17   about?

18              MS. HAN:  500 milligrams.

19   A.        Could you restate that for me

20   just a minute?

21   Q.        Sure.  I asked you earlier when

22   you referred to in the space -- quote, in

23   the space of a few minutes -- with respect

24   to how long it would take for 500 milligrams

25   of midazolam to render an individual

```
 1                    LEE EVANS
 2    A.         Uh-huh.
 3    Q.         It's the Ibrahim article.
 4               So this is an article by Ibrahim
 5    marked as Plaintiff's Exhibit 23.
 6               (Plaintiff's Exhibit 23 marked.)
 7    A.         Thank you.  Okay.
 8    Q.         So, Dr. Evans, I will direct you
 9    to page -- I'm sorry.  Paragraph 35 of your
10    report.
11    A.         Yes.
12    Q.         So at the bottom of that
13    paragraph --
14    A.         Right.
15    Q.         -- you state, "Miyake and
16    Ibrahim's work further supports Glass'
17    conclusion that BIS can't be relied upon to
18    monitor midazolam's efficacy."
19               Do you see that?
20    A.         Yes.
21               Now, I will tell you that is an
22    error.
23    Q.         Okay.
24    A.         You can take out Glass.  Okay?
25    Q.         Okay.  So you agree that Glass'
```

1                    LEE EVANS

2    consciousness assessment was not conducted

3    appropriately?

4              MR. GOVAN:  Object to the form.

5              What do you mean by "not done

6    appropriately"?

7              MS. HAN:  Well, I'm actually

8    supposed to be answering -- asking the

9    questions, Thomas.  But if -- if Dr. Evans

10   has a question, I'm happy to clarify.

11   A.        You know, I -- I am not an expert

12   in the assessment of the depth physically

13   examining the patient.  So I -- I can't -- I

14   don't know that I can answer that question,

15   you know, but it is a process that was being

16   used long before we got a BIS.

17   Q.        But I just want to go back to

18   Ibrahim -- the Ibrahim article --

19   A.        Uh-huh.

20   Q.        -- where his conclusion with

21   respect to BIS, you would agree, relates to

22   its ability to measure second-to-second

23   changes, correct?

24   A.        Well, I mean, if you -- if you

25   look at -- what he says is measuring depth

                    LEE EVANS

1   want to go over it.  I'm sorry.

2   Q.      You testified previously that

3   midazolam ceiling effect occurs at the

4   spinal cord level.

5           Do you recall that testimony?

6   A.      I do.  That's the --

7   Q.      Warner.

8   A.      -- Warner case, right.

9   Q.      Yes.

10  A.      And it can because there are GABA

11  receptors in the spinal column, but the

12  primary effect that we're after is not

13  there.  It's centrally.  So that was pretty

14  much an incomplete statement.

15          As a matter of fact, that's

16  probably -- the notion of being able to get

17  some anesthetic effects lower in the spinal

18  column is part of the reason the drug might

19  work, but it's minor.  For our purposes, the

20  effect that we're after from this drug are

21  centrally mediated.

22  Q.      And by "centrally mediated,"

23  you're talking about the brain?

24  A.      The brain.

1                    LEE EVANS

2    A.        Yes, after I finished my

3    Bachelor's degree in pharmacy.

4    Q.        So that Pharm.D. program was a

5    one-year program?

6    A.        Yes.  It was a one-year --

7    actually, you know, today that program is --

8    that same degree is essentially -- here at

9    least, it's a seven-year program.

10   Q.        But at the time you obtained it,

11   it was a one-year --

12   A.        Right.

13   Q.        -- program?

14   A.        Right.  That's true.

15   Q.        Okay.  So I'm going to provide

16   you a copy of the case lists you included.

17   A.        Uh-huh.

18             MS. HAN:  So this is Plaintiff's

19   Exhibit 28.

20             (Plaintiff's Exhibit 28 marked.)

21   Q.        So, Dr. Evans, is this an

22   up-to-date list of all the cases in which

23   you've testified or given an opinion as an

24   expert witness related to lethal injection?

25   A.        Yes.

1                      LEE EVANS

2    Q.        For the Ronald Allen Smith

3    case -- do you see that third one down?

4    A.        Yes.

5    Q.        Was the Commissioner of Alabama

6    the defendant in that case?

7    A.        No, he was not.

8    Q.        So that's a typo?

9    A.        Yeah.

10   Q.        Dr. Evans, is Pardo v. Palmer

11   missing from this list?  This is a Florida

12   case from 2012.

13   A.        It may well be.  Do you have the

14   transcript on that?

15             THE WITNESS:  This is the update

16   list I gave you.

17   Q.        Sure.

18             (Plaintiff's Exhibit 29 marked.)

19   Q.        This is Plaintiff's Exhibit 29 --

20   A.        Okay.

21   Q.        -- the hearing transcript for

22   Pardo.

23   A.        The hearing transcript.  Okay.

24             That should have been included.

25   Yeah.

1                          LEE EVANS

2     Q.         Is there any other testimony that

3     you can think of that should be included?

4     A.         No.

5     Q.         Did you ever testify in Ohio with

6     respect to its lethal injection?

7     A.         No.

8     Q.         Did you ever provide testimony or

9     a report in connection with Ohio's lethal

10    injection?

11    A.         I -- what did I do?  I did

12    something for them, but I never testified

13    nor did I give a deposition.

14    Q.         What --

15    A.         This one is not listed here.

16    Q.         What did you do for Ohio?

17    A.         To be honest with you, I can't

18    remember exactly what the question was.

19    Q.         And it was in connection with its

20    lethal injection?

21    A.         I'm sure it was, yeah.

22    Q.         In a Montana case --

23    A.         Uh-huh.

24    Q.         -- you testified in --

25    A.         Right.

LEE EVANS

1

2  Q.        -- Smith, do you recall being

3  asked questions about whether you did any

4  work in connection with Ohio's lethal

5  injection?

6  A.        Uh-huh.  I did.  I was asked.

7  Q.        And -- and do you recall

8  subsequently submitting an errata --

9  A.        Yes.

10  Q.        -- in that case?

11  A.        Yes, I did.

12  Q.        Can you describe the

13  circumstances of that testimony in that

14  errata?

15  A.        Only that I had never testified

16  in -- in Ohio or had done a deposition of

17  any sort.

18  Q.        But your recollection is you

19  provided --

20  A.        Provided some sort of --

21  Q.        -- some other service?

22  A.        Some sort of consultation work

23  with them.  I'm not sure what it was now.

24  Q.        Are you a licensed pharmacist in

25  Alabama?

1                    LEE EVANS

2    A.        No.  Georgia.

3              THE REPORTER:  I'm sorry.  What

4    was --

5              THE WITNESS:  Georgia.

6    Q.        Just Georgia?

7    A.        Just Georgia.

8    Q.        And do you prescribe

9    pharmaceutical drugs?

10   A.        Not currently, no.  Not directly.

11   Indirectly, yes, but not directly.

12   Q.        And when was the last time you

13   prescribed pharmaceutical drugs?

14   A.        Probably in '94.

15   Q.        Had you ever prescribed

16   midazolam?

17   A.        No.

18   Q.        Approximately what percentage of

19   your time do you currently devote to

20   clinical practice?

21   A.        Probably 10 to 15 percent of my

22   time.

23   Q.        And the rest of the time is

24   spent --

25   A.        Administration and teaching.  A

1                    LEE EVANS

2    little bit of teaching, not much.

3    Q.        And I think you became the Dean

4    of the pharmacy school in 1994?

5    A.        Yes.

6    Q.        And would it be fair to say that

7    since you assumed that role as Dean in 1994,

8    your lectures, workshops, professional

9    presentations have focused on topics related

10   to the administrative roles of your

11   Deanship?

12   A.        Yes, or education typically.

13   Q.        And would it also be fair to say

14   that you have not published any papers

15   regarding the pharmacological effects of

16   drugs since approximately 1996?

17   A.        That's probably true, yeah.

18   Q.        And have you ever published any

19   papers relating to midazolam?

20   A.        No, no.  Just its kissing cousin,

21   alprazolam.

22   Q.        And you mentioned earlier about,

23   I think, 10 to 15 percent is focused on

24   clinical practice?

25   A.        Right.

1                  LEE EVANS

2   Q.        And -- and what does that

3   practice entail?

4   A.        We -- we maintain a clinic here,

5   and I belong to a team that sees -- our

6   total population is less than 500 patients

7   in the community.  So we see them, evaluate

8   them, do interventions in terms of the drug

9   therapy.  So teaching scenario as well.

10  Q.        Any involvement with

11  benzodiazepine in that capacity?

12  A.        Occasionally we'll see patients

13  that either need it or don't need it.

14  Q.        But that's --

15  A.        And we'll do something about it.

16  Q.        But that's midazolam's kissing

17  cousin?

18  A.        Well, yeah, alprazolam.  We

19  wouldn't deal with any patient who is

20  routinely taking midazolam.  We hope.

21  Q.        So what, if any, experience have

22  you had with respect to midazolam?

23  A.        Well, obviously, discussing

24  benzodiazepines, it's included in that

25  discussion in lectures.  In -- clinically,

1                    LEE EVANS

2    none.  None really.  I mean, if I saw it

3    used, it was on a service that I was

4    participating in, but nothing that I had

5    control over or --

6    Q.        With respect to pentobarbital --

7    A.        Uh-huh.

8    Q.        -- is it your view that a

9    500-milligram dose of pentobarbital could

10   cause death?

11   A.        Yes.

12   Q.        Do you also believe that a

13   500-milligram dose of thiopental could cause

14   death as well?

15   A.        Yes.

16             MR. GOVAN:  Object to the form of

17   that question.

18   Q.        And I think you testified earlier

19   you don't have experience inducing or

20   maintaining anesthesia?

21   A.        No.

22   Q.        And I think you also testified

23   earlier that you don't have experience

24   performing consciousness assessments?

25   A.        I don't.

                           LEE EVANS

1

2    Q.       You testified in your report,

3    Dr. Evans, about midazolam's hemodynamic

4    effect.

5    A.       Uh-huh.

6    Q.       And you're not a cardiologist?

7    A.       No.

8    Q.       So on what basis is that opinion?

9    A.       Based on review of literature.

10   Q.       Anything else?

11   A.       Huh-uh.

12   Q.       I want to direct you to a

13   statement you made in paragraph 44 of your

14   report.

15   A.       44.

16   Q.       I'm sorry.  45.

17   A.       45.  Yeah.

18            MR. GOVAN:  Suhana, about two

19   more minutes and then I'm going to ask

20   questions and then we're going to have to

21   cut it off.

22            MS. HAN:  Well, let me check

23   first what the official time is, Thomas.

24   A.       Okay.

25            MR. GOVAN:  I'm just saying.