**Exhibit A**

Contains Confidential Portions
Bound Separately

Page 1

1          DANIEL BUFFINGTON

2     IN THE UNITED STATES DISTRICT COURT

3      FOR THE MIDDLE DISTRICT OF ALABAMA

4

5   THOMAS D. ARTHUR,      )

6        Plaintiff,      )CIVIL ACTION NO:

7   VS.                    )2:11-CV-00438

8   JEFFERSON S. DUNN,     )

9   ET AL.,               )DEPOSITION OF:

10                        )DANIEL BUFFINGTON

11       Defendants.      )

12

13   CONTAINS CONFIDENTIAL PORTIONS - BOUND SEPARATELY

14         THE DEPOSITION OF DANIEL

15   BUFFINGTON, may be taken before Nancy S.

16   Holland, Commissioner and Notary Public,

17   State at Large, at the office of the

18   Attorney General, 501 Washington Avenue,

19   Montgomery, Alabama, on the 11th day of

20   December, 2015, commencing at approximately

21   9:20 a.m.

22

23

24   Job No. 100908

25

Contains Confidential Portions
Bound Separately

Page 6

DANIEL BUFFINGTON

1
2 testimony today?
3    A.    No, sir.
4    Q.    And you're refusing to be
5 videotaped today, correct?
6    A.    I was not properly noticed for a
7 videotape.  That's correct.
8    Q.    And you're refusing to be
9 videotaped, correct?
10   A.    Yes.  I chose not to.
11   Q.    And is there a reason that you
12 chose not to be videotaped?
13   A.    If I don't know the end purpose
14 for that, then I prefer not to be taped.
15   Q.    Have you been deposed before in a
16 Federal case?
17   A.    Yes, I have.
18   Q.    You've been videotaped before?
19   A.    Yes.
20   Q.    Do you understand that
21 videotaping depositions is quite common?
22   A.    Yes.  If noticed properly, yes.
23   Q.    You understand that this
24 deposition is proceeding by agreement,
25 right?

Page 7

DANIEL BUFFINGTON

1
2    A.    Yes, sir.
3    Q.    And I take it that you like to go
4 by Dr. Buffington.  Is that correct?
5    A.    Either is fine.
6    Q.    Either Mr. Buffington or
7 Dr. Buffington is fine?
8    A.    Sure.
9    Q.    And you don't hold a Ph.D., do
10 you, Mr. Buffington?
11   A.    No, sir.  It's a doctorate --
12 clinical doctorate degree.
13   Q.    It's a Doctor of Pharmacy,
14 correct?
15   A.    Just like a doctor of medicine
16 who's not a Ph.D.
17   Q.    It's an M.D., correct?
18   A.    That's correct.  This would be a
19 Pharm.D.
20   Q.    Right.
21         You're not a medical doctor,
22 right?
23   A.    That is correct.
24   Q.    And you're qualified and licensed
25 to practice as a pharmacist, right?

Page 8

DANIEL BUFFINGTON

1
2    A.    That's correct, in the states of
3 Georgia and Florida.
4    Q.    You're not an anesthesiologist,
5 correct?
6    A.    That is correct.
7    Q.    You're not a cardiologist?
8    A.    That is correct.
9    Q.    You're not a surgeon?
10   A.    That is correct.
11   Q.    You have never prescribed or
12 administered midazolam.
13   A.    That is correct.
14   Q.    You have never prescribed or
15 administered any barbiturate.
16   A.    That is correct.
17   Q.    Or any benzodiazepine.
18   A.    That is correct.
19   Q.    And prior to your work on this
20 case, what research had you done on
21 midazolam?
22   A.    Well, midazolam was developed
23 around the time that I was in graduate
24 school and residency and fellowship, so it
25 was part of my professional training.

Page 9

DANIEL BUFFINGTON

1
2         It was also a routine area of
3 practice in terms of consultative support
4 for clinical pharmacology consultations,
5 both with individual practitioners on a
6 patient specific basis as well as hospital
7 and healthcare facility on an institutional
8 basis.
9         So the research is concurrent
10 with clinical practice and familiarity with
11 the information surrounding its -- the
12 research data, its regulatory approval
13 process and its clinical application in
14 ongoing research.
15   Q.    All right.  So you said that
16 midazolam was developed around the time that
17 you were in graduate school.  When was that?
18   A.    I graduated in '87, and I think
19 that it was approved in '88.  It was
20 initially developed I want to say in the
21 late '70s.  And I was in graduate school '83
22 through '87.
23   Q.    And at that time, did you play
24 any part in the approval process for
25 midazolam?

Contains Confidential Portions
Bound Separately

Page 10

DANIEL BUFFINGTON

1
2   A.      No.
3   Q.      And when you were in graduate
4   school, what courses specifically did you
5   take relating to anesthetics --
6   A.      Yes.
7   Q.      -- or anxiolytics or amnestics,
8   anything like that?
9   A.      Right.  So in the Pharm.D.
10  program, each year hosts different levels of
11  intensity of pharmacotherapy, and the
12  courses are individualized into sections
13  that cover different therapeutic categories.
14  So benzodiazepines, anxiolytics, sedatives
15  are involved in numerous courses in the
16  training.
17  Q.      And I think that you also said
18  that -- Let me just ask you.  Is there any
19  specific course that comes to mind?
20  A.      Well, pharmacotherapy, but
21  it's -- that's the course title, but it's
22  taught and administered on different
23  curricula across different years.  So there
24  are different levels, introductory and more
25  advanced levels of pharmacotherapy as the

Page 11

DANIEL BUFFINGTON

1
2   course curricula.
3   Q.      So how many courses did you take
4   roughly?
5   A.      Oh, four years' worth.  So --
6   Q.      In pharmacotherapy?
7   A.      Probably three full years.
8   Q.      And did that cover an entire
9   range of prescription and nonprescription
10  drugs?
11  A.      As well as practice settings and
12  applications, yes.
13  Q.      That wasn't specific to
14  anesthetics or anxiolytics?
15  A.      Sections of those courses
16  absolutely would be.
17  Q.      And I think that you mentioned
18  clinical consultations.  Is that one thing
19  that you do as a pharmacist?
20  A.      Yes.  I have a specialty practice
21  in Tampa called Clinical Pharmacology
22  Services.  I've had that since approximately
23  1991 or '92.
24          That is a medical specialty
25  practice where patients are referred for

Page 12

DANIEL BUFFINGTON

1
2   clinical consultation, typically to look at
3   potential adverse side effects from
4   medications or to perform medication therapy
5   management.
6           Patients are referred by primary
7   care, specialty practitioners, healthcare
8   facilities and insurers, patients who have
9   been identified to be on multiple or high
10  risk or chronic medications to help identify
11  and resolve drug therapy-related problems.
12  Q.      And Clinical Pharmacology
13  Services is your business?  You're the 100
14  percent owner?
15  A.      That's correct.  It's a private
16  practice.
17  Q.      And how many employees does it
18  have?
19  A.      Right now, about eight.  Maximum,
20  20s.
21  Q.      And how long has it had around
22  eight?
23  A.      For about two years.
24  Q.      And how many of those employees
25  are pharmacists?

Page 13

DANIEL BUFFINGTON

1
2   A.      Three.
3   Q.      Including yourself?
4   A.      That's correct.
5   Q.      Who else?
6   A.      Dr. Sean Casella, Dr. Jace
7   Joseph.
8   Q.      They're both D Pharm,
9   pharmacists?
10  A.      Yes.  Well, D Pharm is actually a
11  different degree.  So it's Pharm.D.
12  Q.      Pharm.D.  Sorry.
13          They're not doctors of
14  pharmacology.  They don't have doctorates in
15  pharmacology, correct?
16  A.      Correct.  They're clinicians.
17  Q.      And you don't have a doctorate in
18  pharmacology, correct?
19  A.      That's correct.  A doctor of
20  pharmacology would not be a clinician.
21  Q.      So that's three employees.  So
22  who are the other five?
23  A.      Support staff.
24  Q.      And when is the last time that
25  you personally, Dr. Buffington, did a

Contains Confidential Portions
Bound Separately

Page 14

DANIEL BUFFINGTON

1    clinical consult relating to midazolam?
2    A.      Probably about three weeks.
3    Q.      Three weeks ago?
4    A.      About three or four.
5    Q.      Was that with respect to an
6    individual patient?
7    A.      Yes.
8    Q.      And was that for the use of
9    midazolam as an anesthetic?
10    A.      That one was with regards to
11    status epilepticus.
12    Q.      Have you authored any papers
13    relating to midazolam?
14    A.      None that I can recall that are
15    specific to it, no.
16    Q.      And you haven't authored any
17    books relating to midazolam?
18    A.      Specific to it, no.
19    Q.      And you haven't taught any
20    courses on midazolam?
21    A.      Yes.
22    Q.      What courses have you taught on
23    midazolam?
24    A.      Pharmacotherapy as well,

Page 15

DANIEL BUFFINGTON

1    medication safety, substance abuse.
2    Q.      When was the last time that you
3    taught a pharmacotherapy course pertaining
4    to midazolam?
5    A.      Last year.  And substance abuse
6    would have been this semester.
7    Q.      Where was that?
8    A.      University of South Florida, the
9    College of Pharmacy.
10    Q.      Was that actually lecturing at
11    the college?
12    A.      Yes.  The campus is about three
13    traffic lights from my office, and I've been
14    faculty with the university since the early
15    '90s, the College of Medicine.  And we just
16    instituted a new College of Pharmacy that's
17    just graduated its first class.
18    Q.      Are you on the faculty of the
19    College of Pharmacy?
20    A.      Medicine and Pharmacy.
21    Q.      Are you a paid member of the
22    faculty?
23    A.      Yes.
24    Q.      For both?

Page 16

DANIEL BUFFINGTON

1    A.      For pharmacy.  For medicine, I
2    have a clinical appointment and exchange
3    relationship with taking students on
4    clinical rotations.
5    Q.      And is that a courtesy
6    appointment?
7    A.      Yes.
8    Q.      And when you say that you take
9    students on clinical rotations, that's as
10    part of the Pharm.D. degree?
11    A.      Both.  And nurse practitioner as
12    well.
13          So we typically have four to six
14    students, graduate students a month with our
15    practice on clinical rotations participating
16    in medical consults, clinical research trial
17    activities, forensic toxicology
18    consultations, healthcare consults,
19    healthcare institution consults.
20    Q.      And how long have you had a paid
21    position with the College of Pharmacy?
22    A.      Well, with the College of
23    Medicine, it was for many years.  Then I
24    converted that to a courtesy appointment

Page 17

DANIEL BUFFINGTON

1    because of the practice structure.  And the
2    College of Pharmacy is probably three.
3    Again, it's a new college.
4    Q.      And what is your official
5    position with the College of Pharmacy?
6    A.      Associate professor.
7    Q.      Can you tell me the mechanism by
8    which midazolam operates on the body?
9    A.      Sure.  It is a benzodiazepine,
10    and the class of benzodiazepines actually
11    work on the postsynaptic membrane, neuronal
12    membrane at GABA receptors, GABA
13    aminobutyric acid, gamma-aminobutyric acid.
14    And they work to decrease the excitatory
15    effects of GABA.  So they mute or stun the
16    post receptor with regards to its response
17    to circulating GABA.  Mostly through
18    modifying chloride channel rate -- passage
19    rates.
20    Q.      How does midazolam interact with
21    the cardiovascular system?
22    A.      Indirectly, in the sense that it
23    has the potential to alter cardiorespiratory
24    status.

Contains Confidential Portions
Bound Separately

Page 18

DANIEL BUFFINGTON

1
2    In other words, if you think of
3    chicken/egg, egg/chicken, you can have a
4    respiratory depression, which is where the
5    majority of the adverse side effect profile
6    is for midazolam.
7        And with an ischemic event,
8    meaning a decreased respiratory status, you
9    can then trigger a cardiovascular event as
10   well.  And there are different types.  It
11   could be an arrhythmia.  It could be an
12   ischemic event.
13       The other ways that -- you can
14   also alter blood pressure, and by modifying
15   blood pressure ranges, typically mean
16   arterial pressure, you can actually result
17   in changes in cardiac heart tissue perfusion
18   and create changes in blood perfusion to
19   cardiac tissue as well.
20   Q.      And how does midazolam affect
21   mean arterial pressure?
22   A.      It can lower it.  It can increase
23   heart rate in a compensatory fashion and
24   decrease mean arterial pressure.
25   Q.      And you referred to, I believe,

Page 19

DANIEL BUFFINGTON

1
2    an ischemia.  Is that right?
3    A.      That's one type, yes.
4    Q.      And is that a kind of heart
5    attack?
6    A.      It is.  It's damage to a
7    cardiovascular tissue that may or may not
8    result in a heart attack.
9    Q.      And could it also result in a
10   myocardial infarction?
11   A.      Yes.  That would be an extreme.
12   Q.      Would you agree that as an
13   anesthetic drug, midazolam is primarily used
14   in practice as a premedicant or a juven drug
15   because of its anxiolytic, sedative and
16   amnestic properties?
17   A.      Yes.  And characteristics well
18   beyond that.
19   Q.      What is CMRO2?
20   A.      CMRO2?
21   Q.      Are you familiar with CMRO2?
22   A.      I'd have to look up the
23   definition.
24   Q.      In the context of sedatives?
25   A.      Correct.

Page 20

DANIEL BUFFINGTON

1
2    Q.      What about CBF?
3    A.      I'd have to look that up.
4    Q.      Are you familiar with the
5    cerebral metabolic rate for oxygen?
6    A.      Yes.
7    Q.      Is that referred to as CMRO2?
8    A.      I don't refer to it as that.
9    Q.      Cerebral blood flow, is that
10   referred to as CBF?
11   A.      That's correct.
12   Q.      You don't refer to it as that?
13   A.      Correct.
14   Q.      And does midazolam have an effect
15   on CMRO2 or cerebral metabolic rate for
16   oxygen?
17   A.      Yes, it can.
18   Q.      What effect?
19   A.      It can decrease it.
20   Q.      And what about CBF?
21   A.      The same in a direct result.
22   Q.      Would you agree that in contrast
23   to barbiturates -- barbiturates and
24   propofol, midazolam is unable to produce a
25   burst suppressive isoelectric pattern on an

Page 21

DANIEL BUFFINGTON

1
2    EEG?
3    A.      No.  I would not opine that.
4    Q.      And would you not agree with
5    that?
6    A.      No.
7    Q.      And would you agree that there is
8    a ceiling effect with respect to the
9    decrease in cerebral metabolic rate for
10   oxygen produced by increasing doses of
11   midazolam?
12   A.      No.
13   Q.      You would disagree with that?
14   A.      I would disagree.
15   Q.      And what is the basis for that?
16   A.      I have not seen any clinical data
17   in humans that would document that.
18   Q.      You would agree that midazolam
19   produces decreases in systemic vascular
20   resistance and blood pressure when large
21   doses are administered for induction of
22   anesthesia?
23   A.      Yes.  And progressively larger.
24   It is associated with the dose-response
25   curve.  However, to clarify, not one that

Contains Confidential Portions
Bound Separately

---

Page 34

DANIEL BUFFINGTON

1
2    A.    I don't recall.  I would have to
3    go back and look at office correspondence.
4    Q.    Approximately?
5    A.    I literally would have to go back
6    and look.  I don't know.
7    Q.    More than a couple of months ago?
8    A.    I think I don't know is I don't
9    know.  I would assume months, but I know --
10   I don't think that it's over a year.
11   Q.    So can you narrow the range at
12   all beyond not over a year?
13   A.    No.  Like I said, I assume that
14   it's been more than a couple of months, so
15   I've given you that.  I don't know whether
16   it's been three, six, seven.  I don't know.
17   Q.    Do you think that it's less than
18   seven?
19   A.    I don't know.
20   Q.    Okay.  Approximately how much
21   time have you spent -- or how much time did
22   you spend preparing your report roughly?
23   How many hours?
24   A.    On this case?  Probably well in
25   excess of four days, four workdays.

---

Page 35

DANIEL BUFFINGTON

1
2    Q.    What's your typical workday?
3    A.    An eight-hour day.
4    Q.    So about 32 hours preparing your
5    report?
6    A.    That's a guesstimate.
7    Q.    Did anyone else at your office
8    assist you in preparing this report?
9    A.    Not in the preparation of the
10   report.  I have -- like in your practice,
11   have someone who helps receive documents,
12   log them in, make sure that I've got access
13   to them.
14   Q.    And have you submitted any bills
15   in this case?
16   A.    I don't know if we have submitted
17   the first invoice.
18   Q.    And what are you billing at?
19   A.    Four hundred an hour, flat rate.
20   Q.    And are you billing for any of
21   the time of your support staff or
22   associates?
23   A.    No, sir.
24   Q.    Do those bills come from Clinical
25   Pharmacology Associates?

---

Page 36

DANIEL BUFFINGTON

1
2    A.    They would.
3    Q.    And who wrote your report?
4    A.    Me.
5    Q.    Did anyone else assist you in the
6    writing of your report?
7    A.    No, sir.
8    Q.    Did counsel write portions of
9    your report?
10   A.    No.
11          MR. CRENSHAW:  I'd be in trouble
12   if I did.
13          THE WITNESS:  You'd be in trouble
14   with me.
15   Q.    (By Mr. Brebner) Did you
16   undertake any empirical study or
17   investigation to write your report?
18   A.    No, sir.
19   Q.    What research or investigation
20   did you undertake to write your report?
21   A.    None.
22   Q.    And prior to preparing your
23   report, did you review Dr. Strader's
24   reports?
25   A.    Yes.  That was one of the tasks

---

Page 37

DANIEL BUFFINGTON

1
2    that was requested by the Attorney General's
3    office was to review Dr. Kaye and Strader's
4    declarations or reports and evaluate them
5    for clinical relevance.
6    Q.    Look at Paragraph 1 of your
7    report.
8    A.    Yes.
9    Q.    Paragraph 1 refers to the
10   declarations of Russell Strader, the Second
11   Amended Complaint and the Alabama Execution
12   Procedures.  That is the records in the
13   Arthur case that you reviewed pertaining to
14   this case?
15   A.    Yes.  I'm not stating that those
16   are in entirety.
17   Q.    Okay.  And what else did you
18   review?
19   A.    Well, the literature that we've
20   referred to.
21   Q.    And I'm sorry.  Let me just make
22   it clear.  I'm not referring to the
23   references and literature that we've already
24   talked about.  I'm talking specifically
25   about documents specifically pertaining to

Contains Confidential Portions
Bound Separately

Page 94

DANIEL BUFFINGTON

1
2 submitted to the Court with your report.
3 A.      Yes.
4 Q.      And this is dated -- if you
5 look --
6 A.      7/6/2015.
7 Q.      Yeah, 7/6/2015.
8         Has it been updated since then?
9 A.      There's items to add, but it
10 hasn't been manually updated yet.
11 Q.      And what items do you have to
12 add?
13 A.      Honors, awards, presentations.
14 Q.      Any changes in your education or
15 employment?
16 A.      No.  Does it list U.S.
17 Government?
18        No change.
19 Q.      Any changes in any of your
20 faculty appointments?
21 A.      No.
22 Q.      Your testimony is that your CV is
23 complete and accurate and not misleading?
24 A.      Through 7/6/15, yes.
25 Q.      And what specifically do you have

Page 95

DANIEL BUFFINGTON

1
2 to add to your CV?
3 A.      The RJ -- Let's see if it's been
4 added as an award.
5         There's an award from the
6 University -- or the Florida Pharmacist
7 Association that was added late summer for
8 professional practice achievement.  There is
9 an award that was about three weeks ago, the
10 United States Department of Health and Human
11 Services' highest annual award.  It's the
12 distinguished service award and the team
13 that I'm on at Medicare and the healthcare
14 reform team was just awarded that a few
15 weeks ago in D.C.
16 Q.      Anything else that you can think
17 of in terms of awards?
18 A.      No.  Just those two.
19 Q.      And you've done some additional
20 presentations?
21 A.      Yes.
22 Q.      And other than the Florida
23 testimony that we talked about earlier, any
24 additional presentations relating to
25 anesthetics?

Page 96

DANIEL BUFFINGTON

1
2 A.      I don't think so.
3 Q.      Any additional presentations
4 related to cardiology?
5 A.      This was July.  No.  I don't
6 think in the last six months.
7 Q.      Anything else since July 6, 2015
8 that we haven't already talked about that
9 you think would be germane to your testimony
10 here?
11 A.      No.  I don't think so.
12 Q.      And just looking at your CV, in
13 terms of your education, you have a Doctor
14 of Pharmacy from Mercer University, correct?
15 A.      That is correct.
16 Q.      And that's a four-year
17 professional degree that is a prerequisite
18 for the profession of pharmacists?
19 A.      Correct, just like an M.D. is to
20 medicine.
21 Q.      Or J.D. Is to lawyer?
22 A.      Correct.
23 Q.      And that is the degree that you
24 currently -- the degree that one currently
25 needs to be accredited to become a

Page 97

DANIEL BUFFINGTON

1
2 pharmacist, correct?
3 A.      That is correct.
4 Q.      And when did the D.Pharm become a
5 requirement to be a pharmacist?
6 A.      Well, the degree has been in
7 existence since, I think, the 1960s.  And
8 all the national schools and the ACPE, the
9 national accrediting board, somewhere --
10 maybe '80, '81 convened that by the year
11 2001 all schools would be converted to all
12 doctorate level.  And Mercer where I went
13 converted immediately, in like eighty --
14 converted the program in '81 or '82, and I
15 graduated in '87.  So I think that by 2001
16 or 2002 nationally all curriculum programs
17 had converted.
18 Q.      Is that a requirement for
19 activation and licensure?
20 A.      Yes.
21 Q.      And so accredited or licensed
22 pharmacists in the last 20 years or so are
23 going to have Doctor of Pharmacy degrees?
24 A.      Since 2001.  You may have had
25 someone completing a Bachelor's program at

Contains Confidential Portions
Bound Separately

Page 130

DANIEL BUFFINGTON

1
2  College of Pharmacy website?
3  A.    Yes, I have.
4  Q.    And Kevin Sneed who's on the top
5  of the first page under Leadership here,
6  he's the Dean of the College of Pharmacy you
7  mentioned?
8  A.    Is that a question?
9  Q.    Yes, it is.
10 A.    Yes.  I didn't hear a question,
11 but yes.
12 Q.    And if you look under Leadership
13 for the College of Pharmacy on the first two
14 pages, you're not listed there, right?
15 A.    I don't see -- I know that I'm
16 not on the website, so I can answer your
17 question.
18 Q.    Pardon me.  You know that you're
19 not on the website?
20 A.    That is correct.
21 Q.    You're not listed on the website
22 under the faculty either, correct?
23 A.    That is correct.
24 Q.    And the same would apply for the
25 faculty of the University of Florida,

Page 131

DANIEL BUFFINGTON

1
2  correct?
3  A.    I wouldn't be expected to be on
4  any of those.
5  Q.    And you would not expect to be on
6  the faculty list of Mercer University,
7  correct?
8  A.    That is correct.  That would go
9  for all the rest.
10 Q.    You would not expect to be on the
11 faculty list for Lake Erie College of
12 Osteopathic Medicine, correct?
13 A.    All as stated.
14 Q.    You would not expect to be on the
15 list of affiliate faculty for Idaho State
16 University, correct?
17 A.    I'm not familiar with their
18 website.
19 Q.    If you'd turn to Tab 8, please.
20 If you could turn to the second page of Tab
21 8, please.
22        This is a printout of a listing
23 of affiliate faculty from --
24 A.    I don't see my name.
25 Q.    It's not there, correct?

Page 132

DANIEL BUFFINGTON

1
2  A.    Nor would I expect to be on it.
3  Q.    You can set Exhibit 4 aside.
4        Do you view yourself as an expert
5  in coronary atherosclerosis?
6  A.    No.
7  Q.    Are you an expert in
8  cardiovascular hemodynamics?
9  A.    No.
10 Q.    As a licensed pharmacist in
11 Florida, you are not licensed to diagnose or
12 treat cardiovascular disease, correct?
13 A.    That's incorrect.
14 Q.    You believe that as a licensed
15 pharmacist in Florida, you're permitted to
16 diagnose and treat cardiovascular disease?
17 A.    That is correct.
18 Q.    Are you permitted as a licensed
19 pharmacist to write prescriptions?
20 A.    Yes.
21 Q.    For what medication?
22 A.    Multiple medications.
23 Q.    What classes of medication?
24 A.    It depends on where you're at and
25 what practice setting.  It could include all

Page 133

DANIEL BUFFINGTON

1
2  classes.
3  Q.    In Florida?
4  A.    It could include all classes.
5  Q.    Are you entitled to write
6  prescriptions for Class IV medication?
7  A.    Yes.
8  Q.    Have you ever written a
9  prescription for midazolam?
10 A.    Yes.
11 Q.    To whom?
12 A.    A patient.
13 Q.    I'm going to mark as Exhibit 5 a
14 printout of -- from Florida Statutes
15 Annotated.
16 (Plaintiff's Exhibit Number 5 was marked)
17 Q.    This is a printout of a part of
18 Chapter 465 from Florida Title 32,
19 Regulations of Professions and Occupations,
20 and in particular, relating to pharmacy.
21        Are you familiar with Florida's
22 statute pertaining to the regulation of
23 pharmacy?
24 A.    Very much so.
25 Q.    Pardon me?

Contains Confidential Portions
Bound Separately

Page 134

DANIEL BUFFINGTON

1
2  A.      Very much so.
3  Q.      And if you would look at Section
4  13 of the Definitions section which is
5  465.003.  That's a definition of the
6  practice of profession of pharmacy.  Do you
7  see that?
8  A.      I do.
9  Q.      And the practice of the
10 profession of pharmacy includes compounding,
11 dispensing and consulting concerning
12 contents, therapeutic values and uses of any
13 medicinal drug, correct?  It goes on from
14 there as well.
15 A.      That is correct.  It extensively
16 goes on from there.
17 Q.      And if you go on to the next
18 page, do you see at the end of -- Sorry.
19 Approximately five lines down, there's the
20 sentence beginning with "However"?
21 A.      Yes.
22 Q.      And "However, nothing in this
23 subsection may be interpreted to permit an
24 alteration of a prescriber's directions, the
25 diagnosis or treatment of any disease, the

Page 135

DANIEL BUFFINGTON

1
2  initiation of any drug therapy, the practice
3  of medicine or the practice of osteopathic
4  medicine, unless otherwise permitted by
5  law."
6         Do you see that?
7  A.      Absolutely.
8  Q.      So unless otherwise permitted by
9  law, you're not allowed to do any of those
10 things as a licensed pharmacist, correct?
11 A.      Correct.  You're not allowed to
12 alter the directions or diagnosis of a
13 patient and their disease.
14 Q.      And as part of your practice as a
15 pharmacist, what other authorization of law
16 allows you to diagnose or treat
17 cardiovascular disease?
18 A.      Sure.  The point that goes on to
19 describe other pharmaceutical services and
20 the collaborative drug therapy management
21 protocol process in Florida.
22 Q.      That's what you're permitted to
23 do, correct?
24 A.      What is what I'm permitted do?
25 Q.      What you just testified to.

Page 136

DANIEL BUFFINGTON

1
2  A.      Correct.
3  Q.      Other than that, you are not
4  permitted as a pharmacist in Florida to
5  practice medicine or diagnose or treat any
6  disease, correct?
7  A.      That includes those.  You haven't
8  read the whole chapter.
9  Q.      I'm sorry.  Let me just see if I
10 can get it clear for the record.
11        In what circumstances are you as
12 a pharmacist licensed in Florida permitted
13 to diagnose or treat a disease?
14 A.      It says unless otherwise -- where
15 is the sentence here?
16        "Unless otherwise permitted by
17 law."  Elsewhere in the Florida law is
18 something referred to as collaborative drug
19 therapy management and those are practice
20 parameters for pharmacists to diagnose,
21 treat and manage drug therapy, which
22 includes prescription, the initiation, the
23 modification and the termination.
24 Q.      And is that the extent of your
25 authorization to diagnose or treat any

Page 137

DANIEL BUFFINGTON

1
2  disease?
3  A.      That is.
4  Q.      Is there anywhere else?
5  A.      That is the platform.
6         MR. BREBNER:  We will take a
7  break shortly for lunch.  I'll go on for a
8  bit more if that's okay with you.
9         MR. CRENSHAW:  A very brief lunch
10 break.
11        THE WITNESS:  We haven't even got
12 to content.
13 Q.      (By Mr. Brebner) Sir, do you want
14 go off the record?
15 A.      No.  I just said we haven't
16 gotten to content.
17 Q.      You think that my questioning
18 hasn't gotten to content yet?  Is that what
19 you're concerned with?
20 A.      Of the case, right.
21 Q.      You've never performed either
22 invasive or noninvasive cardiac procedures,
23 correct?
24 A.      No.
25 Q.      And do you agree that in

Contains Confidential Portions
Bound Separately

Page 138

DANIEL BUFFINGTON

1
2  individuals with clinically significant
3  coronary disease a rapid drop in blood
4  pressure can lead to a heart attack?
5  A.    Not the way that it's stated.  A
6  significant rapid drop, but not just a
7  rapid.  It's dependent upon the degree or
8  magnitude of drop, not just that it changed.
9  Q.    Would you agree that with
10 patients with known obstructive coronary
11 disease, only a slight drop in MAP may
12 induce myocardial ischemia or infarction?
13 A.    I'm not aware of anything that
14 would describe the hypothetical that you
15 just stated.
16 Q.    All right.  Let me see if I'm
17 stating it precisely enough.
18      Do you know one way or the other
19 whether in clinical medicine patients with
20 known obstructive coronary disease often
21 require only slight drops in MAP to induce
22 myocardial ischemia or infarction?
23      MR. CRENSHAW:  Objection to the
24 form.  The question is unclear.  It doesn't
25 define all of the terms such as "slight

Page 139

DANIEL BUFFINGTON

1
2  drop."
3      MR. BREBNER:  Your objection is
4  to the form, Mr. Crenshaw.  You don't need
5  to go on to testify for the witness.
6      MR. CRENSHAW:  Please don't -- I
7  am not testifying, and I'm offended that you
8  accuse me of that.
9      You haven't defined what "slight"
10 means.  It's an unclear question.
11 Q.    (By Mr. Brebner) In clinical
12 medicine --
13      MR. BREBNER:  Why don't you read
14 back the question.
15      (Requested portion of record read)
16 A.    They may require less, but I'm
17 not aware of anything in the literature that
18 says slight drops.
19 Q.    You've never practiced as an
20 anesthesiologist, correct?
21 A.    No, but I provide consultative
22 support to anesthesiologists routinely.
23 Q.    You've never administered
24 anesthesia to any patient, correct?
25 A.    I would say that would be

Page 140

DANIEL BUFFINGTON

1
2  incorrect.
3  Q.    Let me see if I can rephrase the
4  question.
5      You've never administered general
6  anesthesia to any patient, correct?
7  A.    That is correct.
8  Q.    You may have dispensed or given
9  sedatives, correct?
10 A.    And directly administered
11 topical, moderate definition of regional and
12 intrathecal.
13 Q.    Have you ever administered
14 midazolam intravenously?
15 A.    I don't recall an occasion that I
16 have, no.
17      MR. GOVAN:  How much longer are
18 you going to go before you want to take a
19 break?
20      MR. BREBNER:  For lunch?
21      MR. GOVAN:  Yeah.
22      MR. BREBNER:  If you guys want to
23 break, we can break now.
24      MR. GOVAN:  Well, that's fine.
25      (Deposition was in recess)

Page 141

DANIEL BUFFINGTON

1
2  Q.    (By Mr. Brebner) Did you have any
3  discussions with counsel about your
4  testimony during lunch?
5  A.    I think that the only thing was
6  trying to discern what we said on the way
7  out the door.  Nothing substantive.  It was
8  the pace of where we're at of content, and
9  that's all that I can remember that came up
10 during lunch.
11 Q.    In your review in preparation of
12 your report, did you review the case of
13 Henry v. State?
14 A.    No.
15 Q.    And you're not offering any
16 opinions on that, correct?
17 A.    I don't know it.  In which state?
18 Q.    Henry v. State.  No Henry case
19 that you reviewed as part of your report,
20 correct?
21 A.    Correct.  But you said "v.
22 State."
23 Q.    That's the title of the case.
24 A.    So there's not a state?
25 Q.    No.  The title of the case is

Contains Confidential Portions
Bound Separately

Page 142

DANIEL BUFFINGTON

1  
2  Henry v. State?
3  A.      I thought the state of.
4  Q.      Okay.
5          MR. CRENSHAW:  It's actually a
6  Florida case if that's what you're asking.
7          THE WITNESS:  It was.  Okay.
8  Q.      (By Mr. Brebner)  Henry v. State
9  of Florida.  Still no review of that?
10 A.      No, sir.
11 Q.      And we discussed earlier that you
12 reviewed Dr. Strader's report.  You put his
13 in your report, right, that you reviewed his
14 report?
15 A.      That's correct.
16 Q.      And you recall that in part of
17 Dr. Strader's report, Dr. Strader discusses
18 his review and analysis of Thomas Arthur's
19 medical records, correct?
20 A.      Yes.
21 Q.      You in your report did not
22 present a review and analysis of
23 Mr. Arthur's medical records, correct?
24 A.      Correct.
25 Q.      And you did not review

Page 143

DANIEL BUFFINGTON

1  
2  Mr. Arthur's medical records, correct?
3  A.      Correct.  They were not provided.
4  Q.      And you did not look at any of
5  the electrocardiogram records of Mr. Arthur,
6  correct?
7  A.      That is correct.
8  Q.      Did you give any consideration to
9  Mr. Arthur's age and medical history in
10 coming to your opinions in this matter?
11 A.      No.  I didn't review Mr. Arthur's
12 medical history.
13 Q.      Nothing in your report or
14 opinions relates specifically to Mr. Arthur,
15 correct?
16 A.      That is correct.
17 Q.      Do you know how old Mr. Arthur
18 is?
19 A.      I did from the review.  I don't
20 recall it today.
21 Q.      You have no basis to disagree
22 with Dr. Strader's opinion that the
23 available records show that Mr. Arthur has a
24 70 percent or greater risk of having
25 clinically significant coronary artery

Page 144

DANIEL BUFFINGTON

1  
2  disease.
3  A.      As a baseline medical condition,
4  no.
5  Q.      In your list of references, you
6  refer to a Miller's Anesthesia.
7  A.      Uh-huh.
8  Q.      And that's a -- I'm sorry.  I
9  apologize.  I know that you've testified
10 many times before, but your responses need
11 to be oral for the record.  So let me ask it
12 again.
13 A.      I haven't answered.
14 Q.      I thought you answered that you
15 reviewed Miller's Anesthesia.
16 A.      No.  I was going to the reference
17 list to confirm that.
18 Q.      Okay.
19 A.      Yes, I did.
20 Q.      That's a lengthy treatise,
21 correct?
22 A.      Yeah.  It's a reference.
23 Q.      It's not an article.  It's a --
24 A.      A reference.
25 Q.      Right.  It's a well-known

Page 145

DANIEL BUFFINGTON

1  
2  anesthesiology reference?
3  A.      Uh-huh.
4  Q.      Yes?
5  A.      Yes.
6  Q.      You reviewed portions of it,
7  correct?
8  A.      Correct.
9  Q.      In your report, you don't
10 actually provide specific cites for the
11 material that you reviewed.  Do you recall
12 what pages in Miller's Anesthesia you
13 reviewed?
14 A.      I could pull that for you.
15 Q.      You'll provide that?
16 A.      Yes.
17 Q.      Can you provide that for all of
18 your references and opinion cites?
19 A.      Which ones do not?  That's the
20 only one that I see.
21 Q.      I think all of them -- Yeah.
22 There was you reference the articles, but
23 you don't actually footnote or say what
24 specifically you're referring to in the
25 articles.

Contains Confidential Portions
Bound Separately

Page 146

DANIEL BUFFINGTON

1
2  A.      Yes.  I will do that.
3  (Plaintiff's Exhibit Number 6 was marked)
4  Q.      I've marked as the next exhibit,
5  Exhibit 6, excerpts from Miller's
6  Anesthesiology Eighth Edition.
7        Exhibit 6 includes Pages 841 to
8  843 of Miller's treatise.  Look at these
9  pages.
10       MR. CRENSHAW:  You said 841?
11       MR. BREBNER:  Yeah, 841 to 843.
12  They're double-sided.
13       THE WITNESS:  Begins just a point
14  of reference, but it starts on this page.
15       MR. CRENSHAW:  Thank you.
16  Q.      (By Mr. Brebner) I included the
17  cover in the copyright page as well.
18  A.      I appreciate that.
19  Q.      Yeah.  Looking at Page 842, you
20  see that it says Section Induction and
21  Maintenance of Anesthesia?
22  A.      Yes.
23  Q.      Do you recall if you looked at
24  this in preparation of your report?
25  A.      I would have to go back to the

Page 147

DANIEL BUFFINGTON

1
2  photocopies of each of the sections that I
3  wrote down.  I didn't bring them with me
4  today.
5  Q.      If you would go down to the
6  fourth paragraph under Induction and
7  Maintenance of Anesthesia, starting with
8  Benzodiazepine.  It's the second-to-last
9  paragraph on Page 842.
10  A.      842.
11  Q.      842.
12  A.      Yes.
13  Q.      The first clause there says,
14  "Benzodiazepines lack analgesic properties
15  and must be used with other anesthetic drugs
16  to provide sufficient analgesia."  Do you
17  see that?
18  A.      Yes.
19  Q.      Do you agree with that?
20  A.      When taken in context.
21  Q.      What do you mean?
22  A.      When used in proper context.  So
23  if you're looking at a benzodiazepine for
24  analgesia as a single agent, no one would
25  expect you to opine that the benzodiazepine

Page 148

DANIEL BUFFINGTON

1
2  is providing any type of analgesia.
3  Q.      For use as a general anesthetic,
4  midazolam has to be used with other
5  anesthetic drugs, correct?
6  A.      When used in dosage ranges for
7  induction and maintenance, then you're not
8  simply saying that analgesia is derived as
9  pharmacologic property or pharmacodynamic
10  effect from the medication alone.
11  Progressive degrees of sedation, whether
12  you're looking at minimal, moderate, deep or
13  general anesthesia, you don't necessitate
14  being in general anesthesia to have
15  analgesia from the sedation process.  So
16  when you look at a benzodiazepine, more
17  specifically if you look at midazolam there
18  is analgesia being displayed, being
19  performed even if you're not using the
20  medication as an analgesic agent from its
21  own pharmacologic property.
22  Q.      Is it fair to say that
23  pharmacologically midazolam does not block
24  pain receptors?  Is that correct?
25  A.      When used in standard therapeutic

Page 149

DANIEL BUFFINGTON

1
2  doses, I completely agree.  It's not its
3  therapeutic effect, but that's irrelevant to
4  this case.
5  Q.      If used in a 500-milligram -- Let
6  me ask you this.  Do you discuss the
7  analgesic effects of midazolam in your
8  report, if any?
9  A.      I don't know.  It's throughout
10  the literature.  Whether I raise it as a
11  particular point -- I think that I did
12  address some discussion of analgesia, but
13  it's not -- I'm not advocating or opining
14  that midazolam is an analgesic.  There is
15  analgesia for progressive sedation and by
16  the levels that you would attain, you have
17  analgesia as a process from the degrees of
18  sedation that are induced by the excessive
19  dose.
20  Q.      Do you have Exhibit 1 in front of
21  you, your report?
22  A.      Yes.
23  Q.      Do you offer an opinion anywhere
24  in your report that the dosage of midazolam
25  called for in the Alabama protocol would

Contains Confidential Portions
Bound Separately

Page 150

DANIEL BUFFINGTON

1
2    have analgesic effects and if so, can you
3    point that to me?
4    A.      It's clearly with progressive
5    depth of sedation, so it's not midazolam.
6    It's the sedation.
7    Q.      All right.  Can you point me to
8    where in your report you offer an opinion
9    that midazolam has -- in the Alabama
10   protocol has an analgesic effect?
11   A.      Well, any time that I speak to
12   enhanced effects, when I speak to
13   anesthesia, any of those references are on
14   target.  At the bottom of Page 8, "When
15   midazolam is utilized as an anesthetic
16   induction agent."  Now we're talking about
17   levels of sedation sufficient to reach
18   anesthesia.  Those -- This is a basic
19   principle of anesthesia and sedation, not
20   opining that midazolam individually is an
21   analgesic agent.
22   Q.      And you're not offering the
23   opinion that the dosage of midazolam called
24   for in the ADOC lethal injection protocol
25   acts as an analgesic.

Page 151

DANIEL BUFFINGTON

1
2    A.      Yes.  It's well in excess of
3    standard dosing.  It's ten to 250 times
4    greater than clinical use and application
5    than standard applications.  And with a dose
6    response-related effect and with midazolam
7    showing that it can clinically reach levels
8    of sedation in anesthesia sufficient to be
9    insensate to pain, then the answer would be
10   yes.
11   Q.      Is there, in your understanding,
12   a difference between reaching a level of
13   sedation where you're not conscious of pain
14   and analgesia as a medical matter?  Do you
15   understand whether there's a distinction
16   between those concepts?
17   A.      Very well.
18   Q.      And what is the distinction
19   between those concepts?
20   A.      The distinction as I was
21   addressing before is that there is minimal,
22   which is where the level of effect is an
23   anxiolytic effect.  There's moderate
24   sedation.  So anesthesia is sedation.
25   Anesthesia is the extreme of sedation.

Page 152

DANIEL BUFFINGTON

1
2          So you have minimal.  You have
3    moderate.  With the phases of moderate
4    sedation, so prefull anesthesia, prefull
5    general anesthesia, there is analgesia
6    already.
7          By deep sedation, the next phase,
8    there is even more profound analgesia.  And
9    by anesthesia -- and probably the most
10   common marker for that is a BIS score where
11   for lack of a better surrogate end marker,
12   you can look at EEG, electroencephalogram
13   readings and begin to score the patient's
14   BIS score based on an index, and as they
15   reach low levels of BIS scores, that is the
16   general definition.
17         So general anesthesia is in the
18   range of BIS scores of 40 to 60 by
19   definition from the manufacturer even in
20   associations of who guides that
21   interpretation.  That's routinely done by
22   anesthesiologists in different practice
23   settings.
24         So what we're talking about here
25   is that progressive decline in BIS values

Page 153

DANIEL BUFFINGTON

1
2    getting to a 40 to 60, there is analgesia
3    along the way and it's considered complete
4    or conduction anesthesia, meaning that you
5    have lost the ability to process and
6    interpret pain by the time that you've
7    reached general anesthesia.
8    Q.      I think that I understand what
9    you're saying, but just to clarify, you say
10   when you reach general anesthesia, in your
11   opinion, you've lost the ability to process
12   pain, correct?
13   A.      You are insensate to pain.  Even
14   if pain occurred, you're not processing it.
15   Q.      And that is a different pain
16   blocking mechanism than the pain blocking
17   mechanism of an opiate, for example,
18   correct?
19   A.      Correct.  However, that degree of
20   analgesia, not mirror receptor blockage, but
21   analgesia, meaning the reduced --
22   progressive decline in the ability to
23   process pain, is what's occurring from
24   moderate sedation to deep sedation to
25   general anesthesia.

Contains Confidential Portions
Bound Separately

Page 154

DANIEL BUFFINGTON

1
2    Q.      And do you have an understanding
3    of what is BIS?  What does that mean?
4    A.      Bispectral index.  And it's a
5    progressive -- You can achieve it with
6    commercial devices, Nichon with a "C-H."  I
7    don't think there's a "K" in the middle, the
8    manufacturer that produces the device, and
9    it's a progressive continuous EEG reading,
10   and that's compared as an index score.  And
11   again, with progressive declines, it's an
12   indicator.
13           So during the course of
14   preparation, the onset or outset of
15   sedation, it's an indication of depth of
16   sedation.
17   Q.      And do hospitals doing surgery in
18   a clinical setting use BIS monitors to
19   measure the depth of anesthesia?
20   A.      Most, but I don't think all.
21   It's hasn't always been standard of care to
22   do that, and you'd have to ask an
23   anesthesiologist if it has become standard
24   of care and whether or not it is routinely
25   available.

Page 155

DANIEL BUFFINGTON

1
2    Q.      That would be something that an
3    anesthesiologist would be able to testify to
4    that you don't know.
5    A.      I wouldn't opine on it because I
6    haven't surveyed in any of the clients,
7    healthcare facility clients that I'm working
8    with if they have the device on premises.
9    Q.      And do you know what BIS level
10   anesthesiologists target for in the most
11   serious types of surgery like open heart
12   surgery, for example?
13   A.      Sure, 40 to 60 just like the
14   industry standard.  You're getting the
15   patient to that.  One could say where do you
16   want to target?  If you're saying a
17   pinpoint, then you may say -- that's going
18   to be an individual preference of individual
19   anesthesiologists as to if they feel that
20   there's a difference, if they feel that the
21   lower the value buys them time.  So time
22   will be a relevance factor if it's relevant
23   to the discussion.
24           In this particular case, the
25   three medications are given sequentially

Page 156

DANIEL BUFFINGTON

1
2    back-to-back, so the time becomes less of a
3    variable as a decisionmaking tool.
4    Q.      And you don't discuss BIS values
5    in your report, correct?
6    A.      I don't recall if I put it in
7    here or not.  It's part of the basic
8    background.  I think that I was speaking to
9    the concepts, not every minutia point.
10   Q.      Do you have any citation in your
11   report for a 40 to 60 BIS value being the
12   standard practice for anesthesia?
13   A.      From a teaching perspective, it's
14   the manufacturer's website.
15   Q.      What I'm asking really is do you
16   have any citation in your report for 40 to
17   60 BIS value?
18   A.      No, because I wasn't trying to
19   put in every mechanical step or process.
20   But it's readily available on the
21   manufacturer's website.
22   Q.      Did you look at that at some
23   point?
24   A.      I have seen it.  I just looked at
25   it the other day for the presentation for

Page 157

DANIEL BUFFINGTON

1
2    the Florida Board of Medicine.
3    Q.      But you didn't look that up in
4    preparing your report, correct?
5    A.      I'm familiar with it.  I didn't
6    need to go look at it.
7    Q.      Well, you don't refer to it in
8    your report, do you?
9    A.      In speaking to the general
10   concepts, probably on every point I could
11   have written another chapter if you're
12   asking for every minutia and every
13   reference.
14   Q.      Could you go back to Exhibit 6,
15   Miller's Anesthesia?
16   A.      Yes.
17   Q.      Looking at Figure 30-10 on the
18   top of Page -- Looking at Figure 30-10 on
19   Page 842 of Miller's Anesthesia, can you
20   explain what that diagram shows with respect
21   to midazolam?
22   A.      No, sir.
23   Q.      Do you have an understanding of
24   the time course of plasma levels of
25   midazolam?

Contains Confidential Portions
Bound Separately

Page 162

DANIEL BUFFINGTON

1
2  for the clinical indications for midazolam
3  as a pharmacist?
4  A.    All the other literature
5  surrounding clinical practice applications
6  for it.
7  Q.    And specifically, is there any
8  other literature or practice applications
9  that you're referring to with respect to
10 your testimony?
11 A.    No, but I think what -- If I
12 understand the previous question structure
13 is are you looking for if you don't see an
14 FDA-approved indication, where one would
15 look for off-label use indications?  Is that
16 correct?
17 Q.    My question actually was a little
18 different.  My question to you was whether
19 in opining on the indications of midazolam
20 in your report and the testimony that you
21 will be offering to the Court, do you have
22 sources for the indications for midazolam
23 other than the package insert and the
24 references cited in your report?
25 A.    Oh.  Well, I could do that.  I

Page 163

DANIEL BUFFINGTON

1
2  didn't prepare that as a table, but yes, I
3  could prepare for trial the FDA -- the
4  standard FDA-approved indications as well as
5  to illustrate the off-label use indications
6  as well.
7  Q.    That's not what I'm asking you to
8  do.
9        I'm not asking you to do that.
10 Anything you wanted to do for your report at
11 trial you needed to put in your report, but
12 what I'm asking you to tell me is if the
13 references cited in your report are the
14 sources of your opinions for any indications
15 for midazolam other than the label.
16 A.    No.
17 Q.    So what other sources are there
18 for the indications of midazolam?
19 A.    Two or three professional
20 references and databases that help to track
21 for practitioners since it is not required
22 to only use a product based on its
23 FDA-approved indications.  Over the last
24 three or four years, there's been some
25 professional trade associations and national

Page 164

DANIEL BUFFINGTON

1
2  drug information databases who have begun to
3  build tables to help identify and categorize
4  what are common off-label indication uses.
5  Q.    And you have not cited or
6  referred to those in your report, correct?
7  A.    No.  They're not relevant to my
8  report.
9  Q.    And they're not relevant to your
10 testimony, correct?
11 A.    Well, if asked, it would help to
12 explain that, but there's not an off-label
13 indication per se from a clinical or an
14 FDA perspective addressed in the case.
15 Q.    I'm going to mark as the next
16 exhibit, Exhibit 7, a package insert label
17 for Versed.
18  (Plaintiff's Exhibit Number 7 was marked)
19        MR. GOVAN:  Do you have an extra
20 copy by any chance?  Thanks.
21 Q.    You identified an FDA-approved
22 package insert for midazolam (Versed) as a
23 reference, Reference 16 in your report,
24 correct?
25 A.    It might have been Baxter's

Page 165

DANIEL BUFFINGTON

1
2  version.  We frequently list the common
3  brand names after a drug from an academic
4  perspective.  But if it was Baxter's product
5  which is I think what I have in terms of the
6  package insert that I brought with me.
7  Q.    Reference 16 refers to Versed,
8  right?
9  A.    Correct.
10 Q.    And did you look at the Versed
11 label in preparing your opinions in your
12 report?
13 A.    I'm assuming that it would have
14 been here and using the term "Versed" would
15 have been an academic effort to explain the
16 product.
17 Q.    You understand or do you know
18 whether or not Versed is a discontinued
19 product?
20 A.    No.
21 Q.    You don't know?
22 A.    No.
23 Q.    You brought a different package
24 insert with you.  Can I see that?
25 A.    That is correct.  They're likely

Contains Confidential Portions
Bound Separately

Page 170

DANIEL BUFFINGTON
1
2  Q.     Sorry.  I apologize.  I was
3  referring to the third indication.
4  A.     I'm with you.
5  Q.     The third indication for
6  midazolam is intravenously for induction of
7  general anesthesia before administration of
8  other anesthetic agents, correct?
9  A.     That's correct.
10 Q.     On the package label for
11 midazolam, it's not indicated for general
12 anesthesia without the administration of
13 other anesthetic agents, correct?
14 A.     No, if that was your intent, but
15 that's not the intent of the ADOC protocol.
16 Q.     Just so we're clear, it's not
17 indicated for general anesthesia without the
18 administration of other anesthetic agents,
19 correct?
20 A.     Because in a clinical practice
21 setting, if your intent is to use anesthesia
22 for a procedure with a sustained duration
23 and effect, the short pharmacokinetic and
24 pharmacodynamic effects of midazolam
25 would -- the patient and the patient's

Page 171

DANIEL BUFFINGTON
1
2  safety which is not a factor in the ADOC
3  protocol.  It's actually being used in doses
4  grossly, many times into a potentially
5  lethal range in and of itself.  In the
6  protocol, you would not be restricted to
7  this.
8         The question then would be are
9  excessive high doses of midazolam capable of
10 achieving anesthetic ranges?  And the answer
11 to that from all the other data that we know
12 is yes.  So --
13 Q.     I understand that you have some
14 things that you want to say and I know that
15 you've written a report which has, I think,
16 the things that you want to say and I'm just
17 trying to ask you my questions.  And my
18 specific question really is just that in the
19 package label for midazolam, it is not
20 indicated for general anesthesia before
21 administration of other anesthetic agents,
22 correct?
23        MR. CRENSHAW:  Object to the
24 form.  Asked and answered.
25 A.     That is correct because the

Page 172

DANIEL BUFFINGTON
1
2  adverse side effect profile for an
3  FDA-approved indication would not be
4  optimal.  This is not relevant to its
5  application in the ADOC protocol.
6  Q.     In going down underneath the
7  indications, there are warnings.  And do you
8  see -- I think that it's the second warning
9  paragraph.  Do you see that it says,
10 "Serious cardiorespiratory events have
11 occurred after administration of Versed"?
12 A.     Absolutely.
13 Q.     And you would agree that from
14 your research that's correct?
15 A.     Absolutely.  That's its number
16 one incident adverse side effect potential.
17 Q.     And going back to your report,
18 Paragraph 4 of your report --
19 A.     Yes.
20 Q.     -- you refer in the first
21 sentence to the indications and uses of
22 midazolam and then you say, "See Table 1,"
23 correct?
24 A.     That is correct.
25 Q.     And in Table 1 which is on the

Page 173

DANIEL BUFFINGTON
1
2  next page, Page 4, you cited references 1, 2
3  and 3, correct?
4  A.     Yes, all three and 4.
5  Q.     And do you have any other
6  references that provide a basis for your
7  testimony on the indications and routine use
8  of midazolam?
9  A.     No.  I don't think that they're
10 necessary.
11 Q.     And in the next sentence you say,
12 "Midazolam can be used as an anesthetic
13 agent in combination with other medications
14 (See Table 2)", right?
15 A.     Absolutely.
16 Q.     And none of these combinations
17 are related to the -- in Table 2 are related
18 to the Alabama lethal injection protocol,
19 correct?
20 A.     Correct.  No.  These are just an
21 academic illustration of the progressive and
22 diverse use of midazolam which, I think, was
23 the intent of Paragraph 4.
24 Q.     And in Table 2, you cite
25 references 10 to 15 from your report, right?

Contains Confidential Portions
Bound Separately

Page 174

DANIEL BUFFINGTON

1
2  A.      That is correct.
3  Q.      And if you look at your list of
4  references 10 to 15, the first one, 10, is
5  comparison of dexmed -- Can you pronounce
6  that, the title of reference 10?
7  A.      Dexmedetomidine.
8  Q.      That's comparison of
9  dexmedetomidine with midazolam versus
10 midazolam alone for procedural sedation
11 during endoscopic submucosal dissection of
12 gastric tumor?
13 A.      That is correct.
14 Q.      What is procedural sedation?
15 A.      Procedural sedation would be the
16 degree of sedation required for a given
17 procedure.  So in that particular case, the
18 procedure is the dissection of the gastric
19 tumor.
20 Q.      Is procedural sedation used as a
21 term to refer to a form of conscious
22 sedation?
23 A.      Yes, which also carries with it
24 analgesia which is an early, not general
25 anesthesia, but an early form.  There are

Page 175

DANIEL BUFFINGTON

1
2  many forms of anesthesia.  "General
3  anesthesia" is not the only synonymous term.
4  Q.      And other than being illustrative
5  of the different uses of midazolam in
6  combination -- various combination regimens
7  in Table 2, how else did articles -- your
8  references 10 to 15 inform your opinions?
9  A.      I think that they were
10 illustrative or demonstrative of the fact
11 that some of the applications with midazolam
12 include combining the pharmacokinetic and
13 pharmacodynamic effects with other
14 medications.
15 Q.      And do you recall whether any of
16 the references in 10 to 15 discuss general
17 anesthesia?
18 A.      By specific statement, no.  I'd
19 have to pull them to try to answer that
20 question.
21 Q.      I'm going to mark as the next
22 exhibit reference 10, Comparison of
23 dexmedetomidine with midazolam from the
24 Journal of Digestive Diseases, Exhibit 9.
25 (Plaintiff's Exhibit Number 9 was marked)

Page 176

DANIEL BUFFINGTON

1
2  Q.      Exhibit 9 is your reference 10,
3  correct?
4  A.      Yes, sir.
5  Q.      And this refers to use of
6  midazolam for procedural sedation which is a
7  form of conscious sedation, correct?
8  A.      That's correct.
9  Q.      And if you look at the objective
10 here in the second sentence, it says,
11 "However, sedation with midazolam often does
12 not reach satisfactory sedation levels
13 during a procedure and the drug may suppress
14 respiration and blood pressure."  Do you see
15 that?
16 A.      Absolutely correct.
17 Q.      And that's consistent with your
18 understanding of the operation of midazolam
19 in this article?
20 A.      Correct.
21 Q.      You can set that aside.  Going
22 back to your report, Page 3 --
23 A.      Yes.
24 Q.      -- you write in the third
25 sentence, "Furthermore, midazolam can be

Page 177

DANIEL BUFFINGTON

1
2  used as a stand-alone anesthetic agent in
3  circumcision of children less than one year
4  of age, upper GI endoscopy, pediatric dental
5  procedures, cataract surgery and
6  colonoscopy," correct?
7  A.      That is correct.
8  Q.      And that's your references 5
9  through 9 that you cite there?
10 A.      Correct.
11 Q.      And each of the references 5
12 through 9 discusses the use of midazolam for
13 conscious sedation, correct?
14 A.      Correct.
15 Q.      And looking at all of your
16 references 5 through 15 -- Sorry.  Strike
17 that.
18      In looking at your references 5
19 through 15 that we've been discussing, how
20 did you come up with this list of
21 references?  How did you come up with these
22 references?  What research did you do?
23 A.      Looking specifically through my
24 articles on which conditions had procedures
25 that had been evaluated for the use of

Contains Confidential Portions
Bound Separately

Page 186

DANIEL BUFFINGTON

1
2  Q.      Are you offering an opinion on
3  whether or not midazolam has a maximal or
4  ceiling anesthetic effect?
5  A.      Yes.
6  Q.      And where is that disclosed in
7  your report?
8  A.      In the background knowledge of
9  the product.  There is no documented ceiling
10  effect in humans in the literature period
11  surrounding the product.
12  Q.      I'm not asking about the
13  background knowledge of the product or
14  documented literature.
15      I'm asking you where in your
16  report are you offering an opinion on
17  whether or not midazolam has a maximal or
18  ceiling effect?  Can you point that to me in
19  your report?
20  A.      I will look, but I wasn't aware
21  that I had to write a treatice of every
22  factual point.  I see it as partially
23  embodied in the answer of 7, "There is no
24  scientific or medical evidence to support
25  the theory or concerns that midazolam at low

Page 187

DANIEL BUFFINGTON

1
2  or high doses" -- there it would be in high
3  doses -- "would result in significant
4  hypotensive event (i.e., profound decreases
5  in systolic blood pressure and diastolic
6  blood pressure from baseline) prior to the
7  onset of sedation or is capable of inducing
8  a worsening ischemic cardiac damage, acute
9  cardiac events, excruciating pain and/or
10  suffering."
11  Q.      And that's part of your opinion
12  offered in response to Dr. Strader's
13  opinions, correct?
14  A.      Yes.
15  Q.      And you understand that Dr. Kaye
16  in this case has offered an opinion
17  concerning the ceiling or maximal effect of
18  midazolam, correct?
19  A.      That's correct.  And as I stated
20  in the beginning, I do feel that there are
21  some overlaps.  That's one of the areas of
22  overlaps between their two declarations.
23  Q.      Nowhere in your report do you
24  address Dr. Kaye's opinions specifically,
25  correct?

Page 188

DANIEL BUFFINGTON

1
2  A.      We just did.  In the written
3  report, no, but I wasn't aware that I needed
4  to do a point/counterpoint or a treatise in
5  entirety of everything that I know about
6  midazolam.
7  Q.      You understood in preparing your
8  report that you needed to set forth a
9  complete statement of the opinions that you
10  would express at trial and the reasons and
11  basis for them, correct?
12  A.      Correct.
13  Q.      And you did that, correct?
14  A.      Yes.  And there are many
15  descriptives or illustrations to describe my
16  points that will be used as part of
17  explaining my opinions.
18  Q.      You in your report in the
19  references cited did not seek to address the
20  substance of Dr. Kaye's report or the
21  references cited in Dr. Kaye's report, did
22  you?
23  A.      With granularity, no, because I
24  felt that they were --
25  Q.      In your report, you don't provide

Page 189

DANIEL BUFFINGTON

1
2  any review or comment on the Miyake
3  reference, correct?
4  A.      Correct.
5      MR. CRENSHAW:  I'm sorry.  On
6  what?
7      THE WITNESS:  Miyake.
8      MR. BREBNER:  One of the
9  references cited by Dr. Kaye.
10      MR. CRENSHAW:  Thank you.
11  Q.      (By Mr. Brebner) Is the operation
12  of midazolam stereospecific?
13  A.      It can be.
14  Q.      What do you mean?
15  A.      I think that it changes at
16  different pH levels.
17  Q.      So at the pH level of the human
18  body in the bloodstream, is midazolam
19  stereospecific?
20  A.      That's my understanding once it's
21  in the body.
22  Q.      Is it saturable?
23  A.      Is what saturable?
24  Q.      Midazolam.
25  A.      I need more of a hypothetical.

Contains Confidential Portions
Bound Separately

Page 202

DANIEL BUFFINGTON

1
2  Q.      And this refers to the moment of
3  the electrical discharge.  This article is
4  related to a cardioversion, correct?
5  A.      Correct.
6  Q.      What is cardioversion?
7  A.      Cardioversion is a technique
8  where you can use an external electrical
9  impulse to try to reset cardiac rhythm
10 patterns.
11 Q.      And does cardioversion involve
12 the application of an electrical shock to
13 the heart to reset the rhythm patterns?
14 A.      Correct.
15 Q.      And is it a quick procedure?
16 A.      Yes.
17 Q.      About how long does the actual
18 application of the electrical shock take?
19 A.      It depends on the settings based
20 on the practitioner.
21 Q.      Do you have a sense of a range?
22 A.      Very quickly.
23 Q.      Is it a matter of less than a
24 second?
25 A.      It depends.  I'm not going to

Page 203

DANIEL BUFFINGTON

1
2  opine on that because I didn't read what the
3  settings were in the study.
4  Q.      In looking at the top of 769, you
5  see that the induction time was measured as
6  the time elapsed from the injection of the
7  drug until loss of lid reflex?
8  A.      Yes.
9  Q.      What is loss of lid reflex?
10 A.      The capacity for the patient to
11 respond in terms of eye movement.
12 Q.      And do you know what the loss of
13 lid reflex would correspond to in the BIS
14 scale?
15 A.      No.  I would have to go back and
16 see what threshold window or range.  But
17 again, that's through an external stimulant,
18 so it's going to be midpoint on the range.
19 Q.      And the lid reflex is not the
20 application of a noxious or painful stimuli?
21 A.      No.
22 Q.      And looking at Page 771 --
23 A.      Yes.
24 Q.      -- the second-to-last paragraph
25 refers to the main limitation of the study

Page 204

DANIEL BUFFINGTON

1
2  being the small sample size.
3          Do you see that?
4  A.      Correct.  That's true in any
5  study.
6  Q.      Well, some studies have larger
7  sample sizes, correct?
8  A.      No.  I'm saying the small sample
9  size can be a bias concern.  And what's
10 stated in that paragraph is true.
11 Q.      There was a small sample size in
12 this study, correct?
13 A.      Which can introduce bias.
14 Q.      And the conclusion of this study
15 was that propofol demonstrated superior
16 sedation characteristics compared with
17 etomidate, midazolam and
18 midazolam/flumazenil for the ED
19 cardioversion of hemodynamically stable
20 patients.
21          Do you see that?
22 A.      Sure.  That's one point.
23 Q.      Do you in your report offer an
24 analysis or an extrapolation of the data in
25 the Coll-Vinent study to the Alabama

Page 205

DANIEL BUFFINGTON

1
2  protocol?
3  A.      No.
4  Q.      I'm going to mark the White
5  study, which is Paragraph 17 -- I'm sorry,
6  reference 17 in your report as Exhibit 12.
7  (Plaintiff's Exhibit Number 12 was marked)
8  Q.      Can you confirm that Exhibit 12
9  corresponds to Reference 17 of your report?
10 A.      It does.
11 Q.      And can you explain the rapid
12 sequence induction technique mentioned in
13 the White article?
14 A.      No.
15 Q.      Do you know how the rapid
16 sequence induction technique in the White
17 article compares to the administration of
18 midazolam in the ADOC protocol?
19 A.      No, because as stated previously,
20 I wasn't privy to the previous testimony to
21 clarify exactly how the administration is
22 done in the ADOC.
23 Q.      And you're also not able as you
24 sit here today to explain the rapid sequence
25 induction technique used in White, correct?

Contains Confidential Portions
Bound Separately

Page 206

DANIEL BUFFINGTON

A.      I would have to go back and
review for that.  In the White article, I
was looking specifically at were they able
to demonstrate any significant changes in
mean arterial pressure?  And even in this
article, while they show changes, they
don't, the authors themselves, identify that
it's not significant with regard to
cardiovascular risk factors.
Q.      The White study is from 1982,
correct?
A.      Correct.
Q.      And is it your understanding that
rapid sequence induction is an advanced
airway management medical procedure?
A.      It can be.
Q.      Do you know if that's what's
referred to in the White article?
A.      Well, that's how they're using
it.  It can be used for different
procedures.
        They address that in the intro of
the article, but I'm not sure that that's
the only inclusion criteria or what was

Page 207

DANIEL BUFFINGTON

monitored.  It does look like they studied a
limited number of patients who were
receiving it for that purpose.
Q.      Other than that rapid sequence
induction technique, can you point me to
what the White article says about rapid
infusion?
A.      Well, given the rapid
administration, midazolam had the slowest
onset at 15 to 60 seconds.  That actually --
While they're saying that it's slow in
comparison to the other agents, it's
actually pretty rapid.
        And the longest duration of
action -- It showed that with the rapid
based on the size of the dose related to
induction showed no significant risk factors
for a significant in a clinically relevant
drop in mean arterial pressure.
Q.      And that was at clinical dose
that you described.
A.      Absolutely.
Q.      And did you in your report seek
to extrapolate from the White article what

Page 208

DANIEL BUFFINGTON

drop in mean arterial pressure would occur
with the dosage in the ADOC protocol?
A.      Well, there's no way.  When
you're using an extremely high or overdose
that you would expect a dose-related
response, and in an environment where it's
not tested, you would expect a higher effect
than what you would expect at the low or
advanced ranges, advanced meaning for
induction.  So you would expect a response
greater than what was achieved even at this
level.
Q.      A greater drop in mean arterial
pressure?
A.      There's no evidence of that.
Q.      I thought you just said that you
would expect a greater drop because of the
higher dosage.
A.      Greater effect.  You could have a
drop, but even at that, there would be no
reason to believe that it would be -- Even
in perioperative procedures where you have
cardiovascular events, they frequently have
no pain symptomatology attached to that.

Page 209

DANIEL BUFFINGTON

So even if there's a change in
mean arterial pressure, we don't see a
documented greater induction of hypotensive
events in the time frames to be relevant to
the discussion in the ADOC protocol.
Q.      And I'm trying to focus
specifically on the physiological effect of
the drop in mean arterial pressure --
A.      Sure.
Q.      -- at this point.  Based on the
articles that you reviewed, can you opine on
what the drop in mean arterial pressure
would be with the dosage of midazolam in the
ADOC protocol?
A.      No, you couldn't.  It would be
impossible for anyone to opine that.
Q.      You're not offering an opinion on
it, correct?
A.      Because you can't.
Q.      And you haven't sought to
extrapolate from the White article or the
other articles that you referenced in your
report a -- Let me finish my question.
        You haven't sought to extrapolate

Contains Confidential Portions
Bound Separately

Page 210

DANIEL BUFFINGTON

1
2  from the White article or the other articles
3  that you referenced in your report what the
4  drop in mean arterial pressure was
5  through the application of the dosage of
6  midazolam in the ADOC protocol?
7  A.     That's correct.  Nor would you be
8  able to prioritize the concern greater than
9  the cardiorespiratory arrest that would
10  occur and opine that it would be a
11  myocardial infarction that would result.
12  Q.     Looking at Page 280 of the White
13  article, under Results, the White article
14  refers to the onset -- looking at the third
15  sentence.  "Onset of anesthesia was rapid,
16  less than 30 seconds in most patients.
17  However, it required more time, 30 to 60
18  seconds in about one-fourth of the cases
19  when midazolam alone was used."
20  A.     Absolutely.
21  Q.     And do you know what is being
22  referred to as onset in this article?
23  A.     It's onset of the reduction in
24  patient response.  That's the only way that
25  you could measure or opine on sedation.

Page 211

DANIEL BUFFINGTON

1
2  Q.     And onset is the beginning of the
3  reduction in patient response, correct?
4  A.     The beginning of that phase.
5  It's not like a light switch.  It's not like
6  all of a sudden they're talking to you and
7  then they fall.  It's a progressive decline
8  or a continuum just like we've described
9  numerous times today.  So that's saying that
10  that's the onset of anesthesia.
11  Q.     At what level?
12  A.     Well, anesthesia is defined as 40
13  to 60 on BIS scores.
14  Q.     And this article is from 1982,
15  right?
16  A.     Correct, which did predate this,
17  so as I stated before, it would be based on
18  the investigator's assessment of the
19  individual.
20  Q.     And do you know looking at the
21  White article what they used as the
22  reference point for the onset of anesthesia?
23  A.     No.
24  Q.     And do you see the next sentence
25  of the Results section?  It says, "Although

Page 212

DANIEL BUFFINGTON

1
2  induction was smooth in all cases, one
3  patient in the midazolam group displayed
4  signs of inadequate anesthesia and paralysis
5  during laryngoscopy, contributing to a
6  difficult intubation."
7  Do you see that?
8  A.     That is correct.
9  Q.     And do you know why one patient
10  in the midazolam group displayed signs of
11  inadequate anesthesia?
12  A.     No.  With any medication, you can
13  have what we refer to as paradoxical
14  reactions, and that can happen with
15  midazolam as well.
16  Q.     Do you know how the incidence of
17  paradoxical reactions with benzodiazepines
18  compares to the incidence of paradoxical
19  reactions with barbiturates?
20  A.     No.  I would have to go back and
21  compare that based on national data sets.
22  Q.     In your understanding, in the
23  White study were patients preadministered
24  glycopyrrolate and d-tubocurarine
25  intravenously before induction?

Page 213

DANIEL BUFFINGTON

1
2  A.     Say that again.
3  Q.     In the White study, patients were
4  administered adjunctive agents in connection
5  with induction, correct?  If you look at the
6  bottom of 279 and the top of 280, do you see
7  that?
8  A.     Yes.
9  Q.     And what is glycopyrrolate?
10  A.     It can be used for different
11  reasons, but it can be used to help control
12  nausea.  And the curare would be a
13  paralytic.
14  Q.     What is succinylcholine?
15  A.     Succinylcholine.  It can also
16  impact the paralytic effect.
17  Q.     Can you turn to Page 282?
18  A.     I'm there.
19  Q.     In the first full paragraph of
20  that page in the second sentence, it says,
21  "On at least two occasions, the
22  nurse-observer noted slight agitation during
23  the recovery period in patients who had
24  received midazolam for induction."
25  Do you see that?

Contains Confidential Portions
Bound Separately

Page 214

DANIEL BUFFINGTON
1
2    A.      I do.
3    Q.      And do you know why that
4    occurred?
5    A.      No, nor that it's relevant.
6    Q.      You can set the White article
7    aside.
8           You haven't done any studies of
9    time to onset of midazolam at dosages beyond
10   clinical dosages, correct?
11   A.      That's correct.  I've not done
12   research on that.
13   Q.      You haven't done any studies
14   about the degree of sedation at dosages of
15   midazolam beyond clinical dosages, correct?
16   A.      Correct.
17   Q.      And in your report, you have not
18   presented an extrapolation of existing data
19   with respect to time to onset of midazolam,
20   correct?
21   A.      Correct.
22   Q.      And you have not in your report
23   presented an extrapolation of existing data
24   with respect to degree of sedation of
25   midazolam, correct?

Page 215

DANIEL BUFFINGTON
1
2    A.      Well, I mean, those topics are in
3    here with regards to the dosing and the
4    discussion of the effects.  Did I make them
5    into a table?  No.  Did I make them into a
6    block paragraph?  No.
7    Q.      But did you present an
8    extrapolation of any of the data in any of
9    the articles that you referenced?
10   A.      No.
11   Q.      And you didn't do any study of
12   the hemodynamic effects of midazolam at
13   dosages beyond those associated with
14   standard clinical therapy, correct?
15   A.      Correct.
16   Q.      Because you have not reviewed the
17   testimony and any factual information in the
18   record beyond the ADOC protocol with respect
19   to the administration of midazolam in the
20   ADOC protocol, you are unable to draw
21   inferences about the -- Strike that.  The
22   question was getting too elaborate.
23          Assume that midazolam in the
24   ADOC protocol is injected at a slow rate.
25   Okay?  Assume that.  Can you assume that?

Page 216

DANIEL BUFFINGTON
1
2    I'm asking you to make that assumption.
3    A.      I understand, but you would have
4    to define what "slow" means to the
5    hypothetical.
6    Q.      All right.  At a slow intravenous
7    drip rate.
8    A.      At a KVO?
9    Q.      KVO, right.
10   A.      Okay.
11   Q.      If midazolam is administered at a
12   KVO rate, you haven't performed any
13   calculation or analysis of the length of
14   time that it would take to introduce -- to
15   induce anesthesia in your report, correct?
16          MR. CRENSHAW:  Object to the
17   form.
18   A.      No, but I can do that in front of
19   you right now.  And that would be -- a KVO
20   rate in and of itself would be insufficient.
21   Q.      A KVO rate would be insufficient
22   to induce anesthesia?
23   A.      Given the hypothetical that you
24   just described.  If you're administering the
25   protocol medications, not the IV,

Page 217

DANIEL BUFFINGTON
1
2    medications at a KVO rate, that's exceeding
3    the slope.  But I don't read the protocol to
4    read that way.
5    Q.      Your report doesn't disclose any
6    calculation of the time to onset of
7    anesthesia as used in the ADOC protocol,
8    does it?
9    A.      Well, I would draw your attention
10   to Page -- maybe -- I guess we can include
11   4, for sure 5.  By the time that we're
12   discussing these here, the rate, the dosage
13   of a 500-milligram dose to a small to large
14   human is well in excess of .3 milligrams per
15   kilogram.  If pushed with an IV push, which
16   it's my understanding that these medications
17   are push, followed by a flush, followed by a
18   push, followed by a flush to ensure that
19   those clear the catheter lines, then the
20   induction as evidenced by the discussion
21   that I've put in these paragraphs --
22   Q.      Can you actually point me to
23   specifically what you're reading or what
24   you're referring to?
25   A.      Sure.  Let's go to 5.

Contains Confidential Portions
Bound Separately

Page 218

DANIEL BUFFINGTON

1
2    Five, bottom paragraph says, "A
3  rapid rate of infusion administration of
4  midazolam also influences induction time of
5  anesthesia."  And as an example from a
6  publication out of 17, when .3 milligrams
7  per kilogram -- so this is actually upper
8  end of induction -- clinically, what's done
9  clinically -- was rapidly infused, which
10 would be an IV push, it results in an
11 induction of anesthesia within 30 to 60
12 seconds.
13    So if I'm now to --
14 Q.    I want you to point me to where
15 in your report you say what the onset time
16 would be in the ADOC protocol.  I'm not
17 asking you to give me other testimony that's
18 not disclosed in your report.  I want to
19 know where in your report you talk about the
20 onset time in the ADOC protocol.  So if you
21 could just find that for me and identify
22 that and then I'll ask you some questions
23 about it.
24 A.    Well, you can question whether
25 I'm interpreting the protocol correctly, but

Page 219

DANIEL BUFFINGTON

1
2  that it is my interpretation is that a dose
3  greater than .3 milligrams per kilogram,
4  which the ADOC protocol would be, given IV
5  push, so now we're exceeding the standard
6  anesthesia induction, and that results in
7  the induction in 30 to 60 seconds.  That
8  would be my answer.
9    Again, I didn't add a sentence in
10 the manner that you wanted to elaborate, I
11 apologize, but that would support the
12 statement that the ADOC protocol would be in
13 excess of doses for induction and would be
14 expected to be greater than doses of
15 induction and anesthesia and the rate of
16 onset is dose-related.
17    So you may even be able to say
18 that this supports the theory that it may
19 even be shorter than 30 to 60 seconds.
20 Q.    You didn't present anything in
21 your report that is a calculation based on
22 the dosage of 500 milligrams of the time to
23 onset.  Did you do that anywhere in your
24 report?
25 A.    I just did it now.  I would

Page 220

DANIEL BUFFINGTON

1
2  assume that I will be presenting my report
3  as an element of foundation of testimony.
4  So if you're -- I think what you're actually
5  saying is did I write it out?
6  Q.    Did you write that in your
7  report?
8  A.    No, but it's illustrative of the
9  information that I'll be presenting that's
10 embodied in my report.
11 Q.    In your report, you did not write
12 anywhere what the time to onset would be for
13 the ADOC protocol, correct?  You did not
14 write that in your report, correct?
15 A.    I think that it's inherent in the
16 tables and in the content we just discussed,
17 including Table 3.
18 Q.    What is hypotension?
19 A.    Hypotension is a reduction in
20 blood pressure below normal blood pressure
21 rates.  And blood pressure has two values,
22 systolic and diastolic, and so either
23 reduced below normal could be defined as a
24 type of hypotension.  So you could have low
25 systolic or low diastolic or both.

Page 221

DANIEL BUFFINGTON

1
2  Q.    And one of the hemodynamic
3  effects of midazolam at clinical dosages is
4  hypotension, correct?
5  A.    That is correct.  But as we've
6  seen in the information presented, very
7  little data to support that that would be
8  significant enough changes to render any
9  type of a clinical dilemma.  And before you
10 would see hemodynamic hypotensive effects,
11 you would most likely be experiencing
12 respiratory -- cardiorespiratory effects.
13 Q.    And in terms of cardiorespiratory
14 effects that one might experience, I think
15 you suggested earlier that in some instances
16 a cardiorespiratory event will not be
17 painful, correct?
18 A.    Correct.  As a matter of fact,
19 the vast majority of times -- I think that
20 it's upwards of 94, 95 percent of times --
21 it's something that's identified after the
22 fact, not something that's observed by
23 someone having any discomfort.
24 Q.    In terms of a myocardial
25 ischemia --

Contains Confidential Portions
Bound Separately

Page 226

DANIEL BUFFINGTON

1
2  dosage in the Samuelson article.
3      A.      That would be 14.  So if you do
4  the standard induction range, it's 7 to 21.
5  So they used a midpoint on the induction
6  range.
7      Q.      And have you sought to
8  extrapolate from the data in the Samuelson
9  article to the effects on mean arterial
10  pressure of a dosage of 500 milligrams of
11  midazolam?
12     A.      Well, you can't translate in the
13  sense of a cross calculation because of
14  nonlinear status at higher levels.  However,
15  what you could say is since there is no
16  ceiling dose demonstrated that it would be a
17  higher effect than what's demonstrated at
18  doses of induction.  And these are
19  significantly greater, and you would expect
20  the cardiorespiratory effects to be the
21  issue prior to a cardiac or an ischemic
22  event.
23     Q.      And do you have an opinion on the
24  likelihood of a cardiorespiratory effect
25  or -- On Page 808 of the Samuelson study,

Page 227

DANIEL BUFFINGTON

1
2  the sort of -- about four sentences into the
3  first full paragraph on Page 808, it says,
4  "Although not investigated in humans, there
5  are data that show that midazolam like most
6  anesthetic drugs has a cardiovascular" --
7      A.      You said Page 808?
8      Q.      Yes, 808.  I'm looking at the top
9  on the left and I think four sentences in,
10  the paragraph that begins "This study."
11     A.      Right.  What does the line begin
12  with?  I see it.  I'm with you now.  I was
13  counting lines, not sentences.
14     Q.      So going back on Page 808,
15  there's a sentence, "Although not
16  investigated in humans, there are data that
17  show that midazolam like most anesthetic
18  drugs has cardiovascular depressant
19  effects."
20         Do you see that?
21     A.      Yes, and I agree.
22     Q.      And what are cardiovascular
23  depressant effects?
24     A.      As we discussed, what would
25  impact cardiovascular activity would be

Page 228

DANIEL BUFFINGTON

1
2  changes in blood pressure, reductions,
3  changes in heart rate, elevations.  These
4  are documented.
5      Q.      And midazolam has dose-related
6  negative inotropic properties?
7      A.      Correct.
8      Q.      And what is an inotropic
9  property?
10     A.      Inotropic would be the -- exactly
11  what we were just saying, the rate and
12  control of rhythm.  So clearly, no one is
13  going to disagree that the established
14  literature speaks to potential
15  cardiovascular events.  You can't cherry
16  pick them and place them first in the
17  incidence of what you might see.
18         The cardiopulmonary effects are
19  what you would expect to see and in a dose
20  escalation, there's just simply no way to
21  opine that that's what would happen with any
22  degree of certainty.  As a matter of fact,
23  the literature even in large doses
24  clinically shows that the presumption that
25  you would have a clinically relevant drop in

Page 229

DANIEL BUFFINGTON

1
2  mean arterial has not been demonstrated.
3      Q.      And looking at the end of that
4  paragraph on Page 808 of the Samuelson
5  report, it says, "however, patients with an
6  impaired reflex" --
7      A.      I'm sorry.  Point me to the
8  citation again.
9      Q.      Again, it's the paragraph on Page
10  808 that begins "This study."  I'm now
11  looking at the last sentence of that
12  paragraph.
13     A.      I'm with you.
14     Q.      It says, "However, patients with
15  an impaired reflex adrenergic system or
16  myocardial function could manifest the
17  negative inotropic effects of midazolam."
18     A.      Absolutely.  That's saying that
19  there could be a small subset of patients
20  who had some particular hormonal-driven
21  cardiac anomaly who may not have -- who may
22  have a worsened heart rate control.  So
23  that's an extreme subset of patient
24  population, and I would agree.
25     Q.      And there are -- Patients with

Contains Confidential Portions
Bound Separately

Page 254

DANIEL BUFFINGTON

1
2  publication that I remember.  It was a large
3  pivotal trial for a product called Prialt,
4  P-R-I-A-L-T, and it's an intrathecal pain
5  medication.  It's a common clinical
6  consultation component as well.  And in the
7  CMS Medication Safety Initiatives, it's one
8  of the top priorities is pain.
9      Q.      And none of those are
10  benzodiazepines, correct?
11     A.      In terms of research?  No.
12     Q.      No, the ones that you just --
13     A.      Well, many of them will have
14  midazolam as a component, as a co-agent or
15  other things in them.  The actual agents,
16  no.
17     Q.      And you understand that the
18  administration of narcotics is not part of
19  the ADOC protocol, correct?
20     A.      I do.
21     Q.      And narcotics are opioids.  They
22  act as analgesics, correct?
23     A.      They also act as anxiolytics and
24  other therapeutic end points as well, but
25  yes, their predominant role is as

Page 255

DANIEL BUFFINGTON

1
2  analgesics.
3      Q.      Hydromorphone, one of the drugs
4  that you mentioned, is one of those,
5  correct?
6      A.      Yes.
7      Q.      And that is commonly used in
8  anesthetic protocols in the clinical
9  setting, correct?
10     A.      Because of its potency, yes.
11  Speaking of that, as you stated in that
12  frame of reference, we've done a lot with
13  fentanyl-based preparations in protocols as
14  well.
15     Q.      Fentanyl is commonly used in
16  anesthetic protocols, correct?
17     A.      It is as well.
18     Q.      And that's an analgesic, correct?
19     A.      And an opiate, yes.
20     Q.      And for the induction of
21  anesthesia for surgery in a clinical
22  setting, would you agree that the most
23  common induction agent used by surgeons
24  today is propofol?
25     A.      Well, it depends on the type of

Page 256

DANIEL BUFFINGTON

1
2  procedure, so the irony there is if I --
3      Q.      Just to be -- I don't know if you
4  heard my whole question.  I was talking
5  about major surgery.
6      A.      That's what I was going to
7  clarify.  So the answer to that would be
8  yes.
9      Q.      How does the use of midazolam as
10  part of a sole or combination regimen for
11  conscious sedation pertain to the use of
12  midazolam in the ADOC protocol?
13     A.      Well, it speaks to the capacity
14  of midazolam to induce significant and
15  progressive levels of sedation.  By the time
16  that the ADOC protocol becomes the focal
17  point in the discussion, it's a closer
18  discussion surrounding its induction
19  properties as opposed to its conscious
20  sedation properties.
21         The only other continuous stream
22  through that would be its amnestic
23  properties.  So whether you're using it even
24  in low doses, the anterograde amnesia that
25  is characteristic and a desirable effect of

Page 257

DANIEL BUFFINGTON

1
2  midazolam is you would have that continued
3  effect and exaggerated at higher doses as
4  well.
5      Q.      And how is an amnestic effect
6  relevant to an execution protocol?
7      A.      Say that one more time.
8      Q.      How is an amnestic effect, being
9  amnesia, the lack of recall?
10     A.      Yes.  Well, it goes beyond lack
11  of recall.  It's lack of perception, so
12  during an amnestic effect, what is happening
13  to you is not something that is cognitive to
14  you.  So the amnestic effect by design in
15  say a conscious sedation procedure, a deep
16  sedation procedure or the role that it would
17  play and add as a component of a combination
18  anesthesia procedure is that that which is
19  happening to the individual will not be
20  recalled.  In a retrograde -- I'm sorry,
21  anterograde amnesia, you're losing the
22  ability to discern and lay down the
23  formation of memory.
24         So if an individual is having an
25  event during an anterograde amnesia period,

Contains Confidential Portions
Bound Separately

## Page 258

DANIEL BUFFINGTON

2 then they're still not laying down or
3 perceiving the event.  And that's one of the
4 beauties of that product.  One of the most
5 important benefits of it is that even if you
6 have a sense that the person is reacting or
7 responding to some degree of stimulus, that
8 if it's perceived to be a reactive motion,
9 it would not be perceived or discerned by
10 the clinician as a purposeful response.  And
11 that's all through the anesthesia guidelines
12 and materials is that when an individual is
13 having an amnestic or a deep sedation
14 effect, you would not say -- so for example,
15 if an inmate looks like they moved or if an
16 inmate looks like they had a facial grimace.
17       Now, the one thing that's clear
18 is that you can have a respiratory response
19 that is compensatory to a drop in
20 oxygenation.  We refer to that as a gasp
21 reflex, and that is a physiologic response.
22 But even if a gasp reflex is occurring
23 during an amnestic phase, the individual
24 doesn't know it.
25       Q.       And where in your references does

## Page 259

DANIEL BUFFINGTON

2 it refer to an anterograde amnesia from
3 midazolam?
4       A.       You asked me a question.
5       Q.       I'm asking you where in your
6 references is that?
7       A.       It's just part of the
8 foundational information.  If you could -- I
9 hate to ask you to read it back.  I thought
10 that I was responding.
11       Q.       I'm asking for a reference.
12       A.       Oh.  I don't think specifically
13 here.  I was answering a question.
14       Q.       And you don't discuss in your
15 report the amnestic effects of midazolam,
16 correct?
17       A.       No, but I'd be glad to respond to
18 it.  The issue that I was responding to was
19 Strader's information predominantly, but
20 that's a pertinent response to the question
21 that you just asked.
22       Q.       Nowhere in your report do you
23 mention anterograde amnesia, do you?
24       A.       I don't think so.
25       Q.       All right.

## Page 260

DANIEL BUFFINGTON

2       A.       It would be part of a
3 foundational explanation of the product.
4       MR. BREBNER:  I think that's all
5 we have.
6       MR. CRENSHAW:  Okay.  No
7 questions.
8       (Deposition concluded at 4:23 p.m.)
9
10
11
12
13
14
15 I,          , do hereby certify under
16 penalty of perjury that I have read the foregoing
17 transcript of my deposition taken on          ;
18 that I have made such corrections as appear noted
19 herein in ink, initialed by me; that my testimony as
20 contained herein, as corrected, is true and correct.
21
22
23       Signature: _____
24
25       Dated: _____

## Page 261

1 NAME OF CASE:
2 DATE OF DEPOSITION:
3 NAME OF WITNESS:
4 Reason Codes:
5       1. To clarify the record.
6       2. To conform to the facts.
7       3. To correct transcription errors.
8 Page _____ Line _____ Reason _____
9 From _____ to _____
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22
23
24       _____
25       Signature of Deponent