# EXHIBIT A



1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                       NORTHERN DIVISION
 4

 5   CAREY DALE GRAYSON,     CIVIL ACTION NUMBER
     DEMETRIUS FRAZIER,
 6   DAVID LEE ROBERTS,       2:12-CV-316-WKW
     ROBIN DION MYERS,        2:13-CV-781-WKW
 7   GREGORY HUNT,            2:14-CV-1028-WKW
                              2:14-CV-1029-WKW
 8           Plaintiffs,      2:14-CV-1030-WKW
     VS.
 9                            DEPOSITION OF:
     JEFFERSON S. DUNN,
10   et al.,                  DANIEL BUFFINGTON
11           Defendants.
12

13              S T I P U L A T I O N S
14        IT IS STIPULATED AND AGREED, by and
15   between the parties through their respective
16   counsel, that the deposition of:
17                    DANIEL BUFFINGTON
18   may be taken before Nancy S. Holland,
19   Commissioner and Notary Public, State at
20   Large, at the offices of Northern District
21   of Alabama Federal Defender, 505 North 20th
22   Street, Suite 1425, Birmingham, Alabama, on
23   the 17th day of March, 2016, commencing at
24   approximately 2:30 p.m.
25
```

1   IT IS FURTHER STIPULATED AND AGREED
2   that the signature to and reading of the
3   deposition by the witness is not waived, the
4   deposition to have the same force and effect
5   as if full compliance had been had with all
6   laws and rules of Court relating to the
7   taking of depositions.
8
9   IT IS FURTHER STIPULATED AND AGREED
10  that it shall not be necessary for any
11  objections to be made by counsel to any
12  questions, except as to form or leading
13  questions, and that counsel for the parties
14  may make objections and assign grounds at
15  the time of the trial, or at the time said
16  deposition is offered in evidence, or prior
17  thereto.
18                    * * *
19
20
21
22
23
24
25

1  greatly diminished.
2  Q.     Okay. Now, according to your CV
3  which is like enough to kill a tree, you
4  were a speaker at the National Student
5  Pharmacist Compounding competition in 2013.
6  I'm sure that you remember it well.
7  A.     I do.
8  Q.     All right. You've done a lot of
9  speaking and a lot of training. Do you have
10 any training and experience in compounding
11 drugs?
12 A.     Yes. Every pharmacist does.
13 Q.     So everybody who goes to pharmacy
14 school and gets a Pharm.D. learns how to
15 compound.
16 A.     Absolutely.
17 Q.     Okay. They just may not use it
18 later in their practice, but they do learn
19 how to.
20 A.     Or they may use it a lot.
21 Q.     And have you ever compounded
22 drugs outside of your education in terms --
23 Have you ever compounded drugs
24 professionally like when you were not in
25 school learning about it?

1   A.      Absolutely.
2   Q.      And when was the last time that
3   you compounded any drugs?
4   A.      Probably two years.
5   Q.      And have you ever compounded
6   pentobarbital?
7   A.      If compound as IV preparations as
8   we're discussing here is reconstitution
9   placed in the bag, yes, many times.
10  Q.      That's where you get the powder
11  and you do the correct -- you use the
12  sterile alcohol and all that?
13  A.      Not alcohol.  You have to use the
14  correct dilutatory solution for whatever is
15  called for for that particular product and
16  it's either a dry powder or a lyophilized
17  powder.
18  Q.      A what?  I'm sorry.
19  A.      Lyophilized.  It's a method of
20  taking the substance into like a crystal or
21  a raw form.
22  Q.      Got you.  Kind of like sugar
23  versus maybe powdered sugar?
24  A.      That's a fair statement.
25  Q.      And so you have compounded

```
1    pentobarbital in that sense.
2    A.        Absolutely.
3    Q.        You've never made the underlying
4    pentobarbital that gets --
5    A.        Oh, from like extracted or -- No,
6    sir, I have not.
7    Q.        Okay.  Would you be able to do
8    that?
9    A.        Sure.  It's not a difficult
10   recipe.
11   Q.        Okay.
12   A.        I've just never been asked to.
13   Q.        Sure.  No one has ever asked you
14   to do it?
15   A.        Not that.
16   Q.        The Attorney General's office
17   didn't ask you to do it?
18   A.        No, they have not.
19   Q.        The Alabama Department of
20   Corrections didn't ask you to do it?
21   A.        No, they have not.
22   Q.        And has the State of Alabama or
23   the Department of Corrections or the
24   Attorney General's office or anyone who
25   works for the State of Alabama asked you to
```

```
 1  assist in locating a compounding pharmacist
 2  or other source of pentobarbital?
 3  A.       No, they have not.
 4  Q.       And would you be willing to
 5  compound pentobarbital for the State of
 6  Alabama?
 7  A.       I can identify numerous other
 8  individuals who would be probably more
 9  readily capable based on equipment and site
10  and instrumentation to do that, but I know
11  that there are multiple facilities that can
12  do that.
13  Q.       Would they do it for the Alabama
14  Department of Corrections?
15  A.       We'd just have to ask.
16  Q.       Okay.  Is it something -- There's
17  a lot of controversy around -- The whole
18  reason that we're here is because there's
19  been a crackdown on certain drugs by the
20  manufacturers.
21  A.       Well, I wouldn't call it a
22  crackdown.  I would say limited market
23  availability.
24  Q.       Right.  They won't sell it to
25  Departments of Corrections for executions.
```

1  A.     That's correct.
2  Q.     Are all pharmacists sort of
3  locked in in that regard and wouldn't sell
4  it for purposes of an execution?
5  A.     No.  I'm sure just like
6  physicians where somebody may exercise a
7  conscious clause that do find that within
8  pharmacy as well.  As a matter of fact, it's
9  been an open area of discussion across the
10 country.
11 Q.     And you're involved with the
12 American Pharmacists Association?
13 A.     I am on the Board of Trustees.
14 Q.     All right.  You're in your second
15 term.
16 A.     That is correct.
17 Q.     Re-elected.
18 A.     How did you find that out?
19 Because that just happened last week.
20 Q.     I Googled you.  And you had a
21 campaign website or blog or whatever.
22 A.     Very impressive.
23 Q.     I Google everybody.  That's what
24 I do.  So you know a lot of pharmacists from
25 going to conventions and being on the Board

1 and teaching future pharmacists?
2 A. That's correct.
3 Q. And you don't think that it would
4 be difficult for you to direct the Alabama
5 Department of Corrections to a compounding
6 pharmacist who would be willing to compound
7 pentobarbital for them?
8     MR. GOVAN: Object to form.
9 A. I think that's a resolvable
10 question.
11 Q. You think it's a what?
12 A. A resolvable question. Level of
13 difficulty, how many calls it would take,
14 where that particular practice may reside.
15 I know that they're there.
16 Q. All right. And would it be
17 legal -- You're licensed in Florida and
18 Georgia.
19 A. That is correct.
20 Q. All right. It's not illegal to
21 compound a drug in Florida and send it to
22 someone in Georgia with a prescription, is
23 it?
24 A. That's correct.
25 Q. So the fact that you are licensed

1  in Florida and Georgia and not in Alabama
2  would not preclude you from compounding
3  pentobarbital for the Department of
4  Corrections.
5  A.        Correct.
6  Q.        All right. And is there any
7  reason why you wouldn't if they asked you
8  to?
9  A.        As I stated before, I think that
10 I -- based on availability of equipment in
11 my particular practice setting, we're not
12 stocked well with either the raw supplies or
13 the equipment to do that, and there are many
14 colleagues across the country who have very
15 elaborate systems for doing that. And I
16 would say whether it's Alabama or Florida or
17 any other state, that the highest degree of
18 quality of finished product and accuracy,
19 that should be a baseline to it.
20 Q.        How much do you think it would
21 cost to obtain enough compounded
22 pentobarbital to be administered for
23 purposes of lethal injection?
24           MR. GOVAN: Object to the form.
25 A.        That's a pricing question based

1  on raw supplies and the service cost. I do
2  not know.
3  Q.        Is there a potential -- Is there
4  a sliding scale in other words on the cost?
5  And let me -- I'll ask it this way.
6        The standard -- Somebody comes in
7  and wants pentobarbital, a doctor, for a
8  procedure and you would charge them whatever
9  the hospital rate is or whatever the
10 insurance rate is, but say a Department of
11 Corrections came in and this is something
12 that you may not be as comfortable with, not
13 you personally, but a pharmacist, would you
14 adjust the charge up to reflect the fact
15 that it may cause you some hesitation or
16 concern in filling it?
17 A.        I don't think that has anything
18 to do with pricing.
19 Q.        All right. So it's not a price
20 issue.
21 A.        I don't think so.
22 Q.        It's a resolvable problem or a
23 resolvable issue?
24 A.        I personally would think.
25 Q.        Okay. Have you at any of the

1  conferences that you go to or any of
2  these -- You said that it's being discussed,
3  the use of pharmaceuticals for lethal
4  injection.
5  A.        Absolutely.
6  Q.        Okay.  Have you ever had a
7  discussion with colleagues at one of these
8  meetings about pentobarbital for lethal
9  injection?
10 A.        Yes.
11 Q.        All right.  And when you talked
12 to people, did any of them say I would do
13 it?
14 A.        Yes.
15 Q.        And you know these people
16 personally.
17 A.        Yes.
18 Q.        And would you be willing to
19 provide their names to the Alabama Attorney
20 General?
21 A.        I would check with them first,
22 but what you're asking is would -- and I
23 haven't been asked to do this at this
24 juncture -- would it be possible to identify
25 appropriately-trained and well-staffed

1  facilities to perform that function, and the
2  answer would be yes.
3  Q.      And assuming that they gave you
4  permission, you would share their
5  information with Mr. Govan or someone from
6  the Alabama Attorney General's office?
7  A.      Or whoever was asking me to do
8  that, yes.
9  Q.      If Ms. Hill, the general counsel
10 for ADOC, asked you, you would assist her if
11 you could?
12 A.      Yes.
13 Q.      I swear I think that we're almost
14 done. Did you review Dr. -- I know that you
15 reviewed Dr. Tackett's report.
16 A.      Yes.
17 Q.      Randall Tackett, University of
18 Georgia.
19 A.      Yes.
20 Q.      All right. He had written -- and
21 I don't know if you have a copy of it
22 or not.
23 A.      I do.
24 Q.      Perfect. He referenced -- He
25 talks about -- I guess the heading is